BADIAK & WILL, LLP
Attorneys for Defendant
CROSS SOUND FERRY SERVICES, INC.
106 Third Street
Mineola, New York 11501
Telephone: (516) 877-2225
Fax: (516) 877-2230
Our ref. 08-A-001-AW/LS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------X

HEATHER GIBSON and JONATHAN
GIBSON,

                Plaintiffs,                INDEX NO. 08-CV 0474

    - against -

CROSS SOUND FERRY SERVICES, INC.,

                Defendant.

------------------------------------------------------------X

## MEMORANDUM OF LAW BY DEFENDANT CROSS SOUND FERRY SERVICES, INC. IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE PLAINTIFFS' EXPERTS AND CERTAIN EVIDENCE.

BY:   **ALFRED J. WILL**                   **BADIAK & WILL, LLP**
       **LISA A. SCOGNAMILLO**         **Attorneys for Defendant**
           **Of Counsel**                    **CROSS SOUND FERRY**
                                          **SERVICES, INC.**
                                          **106 Third Street**
                                          **Mineola, New York 11501**

## TABLE OF CONTENTS

<b>PAGE</b>

Table of Cases Cited...................................................................................... iv, v

Table of Rules Cited...................................................................................... v

Other Authorities Cited................................................................................ v

Preliminary Statement................................................................................... 1

Facts............................................................................................................... 2

A. Background Facts....................................................................................... 2

B. The SEA JET I Vessel................................................................................ 3

C. The Alleged Incident.................................................................................. 5

D. Plaintiffs' Experts...................................................................................... 6
   1. William E. Clifford................................................................................. 6
   2. Hugh M. Stephens.................................................................................. 9

E. MRI Films.................................................................................................. 12

ARGUMENT.................................................................................................. 13

POINT I

PLAINTIFFS' PROPOSED EXPERTS AND THEIR
OPINIONS MUST BE EXCLUDED............................................................. 13

A.) Neither Clifford nor Stephens Qualifies as an Expert............................. 14
1.) William E. Clifford.................................................................................. 15
2.) Hugh M. Stephens................................................................................... 16
3.) Applicable Law........................................................................................ 17

B.) Plaintiffs' Experts' Opinions are Unreliable under the *Daubert*
Analysis............................................................................................................ 18
C.) Plaintiffs' Experts' Opinions are Inadmissible *Ipse Dixit*...................... 21

POINT II

PLAINTIFFS' EXPERTS' OPINIONS WILL NOT ASSIST
THE TRIER OF FACT.............................................................................. 22

POINT III

THE VESSEL'S WARNINGS WERE ADEQUATE.................................. 23

POINT IV

HEATHER'S MRI FILMS FROM DECEMBER, 2010 MUST
BE EXCLUDED....................................................................................... 24

Conclusion................................................................................................. 24

# TABLE OF AUTHORITIES

**Page**

## Cases

Baker v. Urban Outfitters, Inc., 254 F.Supp. 2d 346, (S.D.N.Y. 2003)....    14

Barban v. Rheem Textile Sys., Inc., No. 01-CV-8475, 2005 WL
387660, (E.D.N.Y. Feb. 11, 2005), *aff'd*, 147 Fed. Appx. 222,
2005 U.S. App. LEXIS 23220 (2nd Cir. 2005)........................................    17

Brooks v. Outboard Marine Corp., 234 F.3d, 89 (2nd Cir. 2000)..............    20

Clarke v. LR Systems, 219 F.Supp. 2d 323, (E.D.N.Y. 2002)..................    21, 23

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.
Ct. 2786, 125 L.Ed. 469 (1993)..................................................................    18, 19, 21

Dorothy J. v. City of New York, No. 09 Civ. 3512 (E.D.N.Y.
Sept. 11, 2010)..........................................................................................    18

Fernandez v. Central Mine Equipment Co., 670 F. Supp. 2d 178
(E.D.N.Y. 2009).........................................................................................    13, 14, 17-18, 21

Fox v. Cheminova, Inc., 387 F.Supp. 2d 160 (E.D.N.Y. 2005)................    18

General Elec. Co. v. Joiner, 522 U.S. 136, 118 S. Ct. 512,
139 L.Ed. 508 (1997)................................................................................    21

Hendrix v. Evenflo Co., Inc. No. 09-10079, (11th Cir. 2010)...................    14, 22

Keller v. Feasterville Health Care Center, 557 F.Supp. 2d 671
(E.D.Pa. 2008)...........................................................................................    14

Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S. Ct.
1167, 143 L.Ed.238 (1999)........................................................................    18, 19

Liriano v. Hobart Corp., 92 N.Y.2d 232, 677 N.Y.S.2d 764,
700 N.E.2d 303 (1998)..............................................................................    23

Major League Baseball Properties, Inc., v. Salvino, Inc., 542 F.3d
290 (2nd Cir. 2008)...................................................................................... 18

Mannix v. Chrysler Corp., No. 97-CV-1994, 2001 WL 477291,
(E.D.N.Y. Mar. 4, 2001)............................................................................ 17

Nimely v. City of New York, 414 F.3d 381 (2nd Cir. 2005)...................... 21, 22

Nisanov v. Black & Decker (U.S.), Inc., No. 05 Civ. 5911,
2008 WL 906708 (E.D.N.Y. Apr. 3, 2008)............................................... 14, 18

Patsy's Italian Restaurant, Inc. v. Banas, 531 F.Supp. 3d 483
(E.D.N.Y. 2008)........................................................................................ 14, 22

Rider v. Sandoz Pharms. Corp., 295 F.3d 1194, (11th Cir. 2002)............. 21-22

Rosen v. Ciba-Geigy Corp., 78 F.3d 316 (7th Cir. 1996)......................... 22

Rypkema v. Time Manufacturing Co., 263 F.Supp. 2d 687
(S.D.N.Y. 2003)........................................................................................ 18, 23

Trumps v. Toastmaster, Inc., 969 F.Supp. 247,
(S.D.N.Y. 1997)........................................................................................ 17

United States v. Duncan, 42 F.3d 97 (2nd Cir. 1994)................................ 22

Wurtzel v. Starbucks Coffee Co., 257 F.Supp. 2d 520
(E.D.N.Y. 2003)........................................................................................ 19

**Statutes**

Federal Rules of Evidence rule 102............................................................ 14, 18

Federal Rules of Evidence 102(a).............................................................. 13, 14

Federal Rules of Evidence 703................................................................... 13

Federal Rules of Civil Procedure 37(b)(2)(A)(ii)...................................... 24

**Other Authorities**

Black's Law Dictionary, 5th Edition 1979................................................. 21

Judge Wexler's Individual Rules ¶ 4(A)(vi)............................................... 24

## PRELIMINARY STATEMENT

Plaintiff Heather Gibson commenced this action for personal injuries allegedly sustained on November 16, 2007, while a passenger on board the SEA JET I, a ferry owned by defendant, CROSS SOUND FERRY SERVICES, INC. ("CROSS SOUND"). Plaintiff Jonathan Gibson is Heather Gibson's current husband and his claim is derivative for loss of consortium.

CROSS SOUND has denied any and all liability, maintaining it exercised reasonable care under the circumstances and at all material times.

Both of the plaintiffs' experts testified during their respective depositions that they were completely unfamiliar with the operation, navigation, propulsion, mechanics, and engineering system of the SEA JET I.[1]  Further, neither of the experts' opinions have been tested, nor are they based upon sufficient data or supported by facts in the record.

Because neither of the plaintiffs' proposed experts qualifies as an expert under the Federal Rules of Evidence, and further, because their purported opinions are unreliable under the Federal Rules of Evidence because they constitute mere *ipse dixit*, their testimony must be precluded.

Further, because certain MRI films for plaintiff Heather Gibson have never been produced, as required by Judge Wexler's individual rules,  they should be precluded at the trial of this action.

This memorandum of law is respectfully submitted in support of Cross Sound's motion to exclude the plaintiffs' experts' testimony and the subject MRI films.

---

[1]Richard Twomey, another of the plaintiffs' experts, died during these proceedings and was replaced with Captain Hugh M. Stephens.

## FACTS

### A. Background Facts

Plaintiff Heather Gibson ("Heather") allegedly sustained personal injuries on November 16,

2007, while a passenger aboard the SEA JET I, a ferry owned, operated and maintained by CROSS

SOUND. (Verified Complaint ¶¶ 1, 3).[2]  The SEA JET I is a passenger ferry vessel operating

between the terminals at Orient Point and New London, CT. (Thomas Tr. 16:5-11).[3]

Heather was aboard the SEA JET I for the purpose of bringing her two (2) young sons to visit

their father in Connecticut. (Heather Tr. 30:11-16). Heather was a regular traveler aboard the SEA

JET I and this particular route between Orient Point and New London. (Heather Tr. 32:14-16).

Heather made this round-trip every other week-end for more than two (2) years. (Heather Tr. 32:10-

16 and 31:17-22). Heather's routine was to bring the children to their father on Friday night and

return without her children the same night. (Heather Tr.31:23-32:3). Heather would then return to

pick the children up on Sunday, returning with them the same day. (Heather Tr. 32:4-7).

---

[2] The Verified Complaint is annexed as Exhibit 1 to the Attorney's Affidavit in Support of Defendant's Motion in Limine to Exclude Plaintiffs' Experts sworn to by Alfred J. Will on March 14, 2011 ("Will Aff.").

[3] "Thomas Tr.__:__" refers to the page and line numbers of the deposition transcript of David Thomas, Captain of the SEA JET I, dated November 18, 2008. The Thomas Tr. is annexed to the Will Aff. as Exhibit 6.

"Heather Tr.__:__" refers to the page and line numbers of the deposition transcript of Plaintiff Heather Gibson dated May 20, 2008. The Heather Tr. is annexed to the Will Aff. as Exhibit 2.

"Clifford Tr.__:__" refers to the page and line numbers of the deposition transcript of Captain William E. Clifford, plaintiffs' expert, dated April 23, 2010. The Clifford Tr. is annexed to the Will Aff. as Exhibit 4.

"Stephens Tr.__:__" refers to the page and line numbers of the deposition transcript of Captain Hugh M. Stephens, plaintiffs' expert, dated October 8, 2010. The Stephens Tr. is annexed to the Will Aff. as Exhibit 5.

The Orient Point Ferry Terminal is an open harbor completely exposed to the elements and is unprotected and unsheltered from wave, wind and current action. (Scott Aff. ¶ 7).[4] The water level at the Orient Point Ferry Terminal is shallow. (Scott Aff. ¶ 8).

In contrast, the New London terminal is a protected harbor which is sheltered from wind, wave and current, and its water level is significantly deeper than that of Orient Point. (Scott Aff. ¶¶ 9, 10).

## B. The SEA JET I Vessel

It is undisputed that the SEA JET I is a 'catamaran' design which is considered to be an 'unconventional' vessel in the maritime industry. (Scott Aff. ¶ 12; Stephens Tr. 73:20-24 and 96:3-8). It is also undisputed that the vessel is propelled by a KaMeWa water jet propeller system. (Scott Aff. ¶ 14; Stephens Tr. 73:20-24 and 74:15-17; Clifford Report [Will Exh. 7] at p. 1, second paragraph).

The SEA JET I was, at all material times, in complete compliance with U.S. Coast Guard regulations and ASTM standards. (Scott Aff.¶ 11). Under the Coast Guard Rules and Regulations, a vessel identified as a "fast ferry" has a very specific meaning. (Scott Aff. ¶ 13). The SEA JET I is not classified as a "fast ferry" by the Coast Guard. (Scott Aff. ¶ 13).

The subject vessel has an electronic control module which controls the vessel's engines. (Scott Aff. ¶ 15). Limiting factors are programmed into the electronic control module which only allows the SEA JET I to build up speed slowly and gradually. (Scott Aff. ¶ 16). Because of these

---

[4]"Scott Aff. ¶ __ " refers to the numbered paragraphs of defendant's expert Roy Scott sworn to on January 19, 2011. The Scott Aff. is annexed to the Will Aff. as Exhibit 3.

specific and limiting pre-programmed factors, the SEA JET I is incapable of any sudden acceleration. (Scott Aff. ¶ 16).

The SEA JET I also has a computer-operated ride control system, the purpose of which is to stabilize the vessel and keep its ride smooth. (Thomas Tr. 38:13-18 and 39:5-9; Scott Aff. ¶ 18).

If an object becomes lodged in one of the vessel's water jets or impellers, an operation known as "back-flushing" is employed to clear the obstruction. (Scott Aff. ¶¶ 24, 25, 27; Thomas Tr. 25:3-8). "Back-flushing" involves reversing the direction of the impeller to change the direction of the water flow through a tunnel. (Scott Aff. ¶ 27). It is necessary to conduct the back-flushing operation in deeper waters to avoid the vessel taking in unwanted debris from the ocean's bottom which could endanger the vessel and its passengers. (Scott Aff. ¶¶ 8, 10, 25). Because the water level at the Orient Point Terminal is quite shallow, the SEA JET I cannot perform back-flushing operations there. (Scott Aff. ¶ 8). The ferry terminal at New London, Connecticut is better suited for performing back-flushing operations because the water level there is deeper than that of Orient Point. (Scott Aff. ¶¶ 10, 25).

During the back-flushing operation, there is no movement of the vessel. (Scott Aff. ¶¶ 19, 27). Once the back-flushing operation is complete, the vessel resumes normal speed slowly and gradually. (Scott Aff. ¶ 28). Because of the limiting factors which are programmed into the electronic control module, there can be no sudden acceleration, veering, lurching or moving from side to side of the vessel. (Scott Aff. ¶¶ 15, 16).

When there is an obstruction in one of the jets or impellers, it is also sometimes necessary to open an access point to the jet or impeller. (Scott Aff. ¶¶ 19, 20) This access point is known as an "inspection port." (Scott Aff. ¶ 20). Opening an inspection port in an unprotected and

4

unsheltered harbor such as Orient Point poses a danger to the passengers, the crew and the vessel due to the continuous flow of water into the vessel lying in shallow water where the vessel is exposed to the elements and currents. (Scott Aff. ¶ 22). For the safety of the passengers and the vessel, CROSS SOUND opens the SEA JET I's inspection ports at the New London terminal rather than at Orient Point, because New London is a protected harbor sheltered from the wind and currents. (Scott Aff. ¶ 22).

## C. The Alleged Incident

On the date of the alleged incident, the waters were calm during the subject voyage. (Heather Tr. 46:15-18). Shortly after departing Orient Point, there was an automated announcement cautioning passengers of forecasted sea conditions on the vessel stating "Because sea conditions may be rough, please remain seated unless it is necessary to move about." (Thomas Tr. 37:12-20 and 39:23-25; Will Aff. ¶ 43 and Will Exh. 9).[5] Soon after, the SEA JET I experienced a vibration which indicated that there was an obstruction in one of the jets. (Thomas Tr. 22:23-24 and 42:13-25). To clear the obstruction, the vessel performed a routine "back-flushing" operation for at least ten (10) minutes to dislodge the obstruction. (Thomas Tr. 25:3-8).

Prior to the back-flushing operation, there was an automated "Backflush Announcement" stating that there was something caught in the jet and that the vessel would be going at a slow speed while attempting to clear the obstruction. (Heather Tr. 39:13-14 and 20-23; Thomas Tr. 40:21-41:2). This announcement was as follows:

> Ladies and Gentlemen, the vibration you felt was caused by an obstruction in one of our water jets. In order to remove the obstruction we will be maneuvering at slow speeds for the next couple of minutes."

---

[5] "Will Exh. ___" refers to the numbered exhibits annexed to the Will Aff.

5

> Once again, the vibration you felt was caused by an obstruction in one of
> our water jets. In order to remove the obstruction we will be maneuvering
> at slow speeds for the next couple of minutes. We will be back up to speed
> again shortly.
>
> We apologize for any inconvenience, and thank you for your cooperation.

(Thomas Tr. 40:21-41; Heather Tr. 39:13-14; Will Aff. ¶ 44 and Will Exh. 10).

In addition to the automated "Backflush Announcement," Captain David Thomas, the

captain of the SEA JET I, made at least two (2) live, unscripted announcements about back-flushing.

(Thomas Tr. 30:8-12; Heather Tr. 40:2-3).

During the back-flushing operation, the SEA JET I was not moving. (Thomas Tr. 43-22-25;

Heather Tr. 40:6-7). After the back-flushing operation, the SEA JET I continued its voyage to New

London, Connecticut. (Thomas Tr. 44:23-45:2)

At some point during or immediately after the back-flushing operation, Heather claims that

the vessel accelerated and "engaged and took off." (Heather Tr. 40:9-11). Heather claims that when

this happened, the vessel came up out of the water on its right side, causing two (2) of her children

to fall to the floor. (Heather Tr. 40:10-15). According to Heather, she then stood up and leaned out

of the booth she was sitting in to help one of her children up when the boat came back down hard

on the water, causing her to 'jam' her spine into the seat, resulting in her alleged injury. (Heather

Tr. 40:17-41:8).                 **D. Plaintiff's Experts**

### 1. William E. Clifford

Captain William E. Clifford ("Clifford") holds a Bachelor of Science Degree in Marine

Transportation, (Clifford Tr. 4:19-20), and a certificate in standards for training and watch keeping.

(Clifford Tr. 5:3-6).

6

Clifford does not know any details about the SEA JET I, such as its tonnage, length, breadth, or horsepower. (Clifford Tr. 12:14-13:4). Nor does Clifford have any knowledge about the mechanics of the SEA JET I. He does not know the manufacturer of the vessel's engine, or even the type of engine the vessel has, nor does he know anything about the vessel's engineering or transmission systems, or the type of gearbox that the vessel has. (Clifford Tr. 13:5-14; 19:5-6; 21:2-4; and 24:10-12).

Although Clifford identified the SEA JET I as a 'fast ferry,' (Clifford Tr. 13:15-17 and Will Exh. 7), he did not know the meaning of this phrase under the Coast Guard regulations. (Clifford Tr. 15:4-8). Significantly, the SEA JET I is *not* designated as a 'fast ferry' by the Coast Guard. (Scott Aff. ¶ 13). Thus, any conclusions or assumptions Clifford makes about the SEA JET I based upon its status as a 'fast ferry' must be excluded.

Clifford is also completely unfamiliar with the operation and navigation of the SEA JET I. Clifford never piloted, operated or captained the vessel. (Clifford Tr. 17:12-20). In fact, Clifford has never even been on board the SEA JET I! (Clifford Tr. 17:9-11).

Perhaps most important and determinative is Clifford's complete lack of knowledge about what type of propulsion system the SEA JET I has, (Clifford Tr. 19:2-6) or how the vessel's back-flushing operation works or the steps involved in back-flushing. (Clifford Tr. 24:13-16; 26:10-12). Nor did Clifford know anything about the vessel's electronic control module with limiting factors programmed in to prevent sudden acceleration. During his deposition, Clifford testified as follows:

> Q. Okay. What type of propulsion does the Sea Jet have?
>
> A. Once again, I'm sure it has an engine. I don't know what type engine it is.
>
> Q. I mean, have you ever operated a vessel with a KA-ME-WA water jet system?

7

A. No. I've used Ka-Me-Wa controls, a lot of our boats have them. They are air controls. They make a lot of things in the industry but I've never used a jet propulsion boat, no.

(Clifford Tr. 19:2-14).

\*        \*        \*        \*        \*

Q. Does it operate with propellers or impellers?

A. I know nothing about the engineering system on that boat other than the fact that it pushes ahead.

(Clifford Tr. 20:3-7).

\*        \*        \*        \*        \*

Q. Do you know how the backflushing operation works?

A. I will refer to my former answer and, no, I don't.

(Clifford Tr. 24:13-16).

\*        \*        \*        \*        \*

Q. Are you familiar with the steps to backflush?

A. No.

(Clifford Tr. 26:10-12).

\*        \*        \*        \*        \*

Q. Do you know whether or not there is any type of electronic module in the propulsion system which would prevent the vessel from accelerating suddenly?

A. I have no idea.

(Clifford Tr. 32:23-33:3).

8

Surprisingly, without any knowledge of the back-flushing operation, the vessel's propulsion system or its electronic control module with limiting factors programmed in, Clifford concludes, without any support, that there was "sudden and unnecessary acceleration of the Sea Jet" which caused Heather to fall into her seat. (Will Aff. ¶ 41 and Will Exh. 7). Yet, Clifford admits that there is no testimony in the record which talks about "sudden acceleration.":

> Q. Well, is there anywhere where he [Captain Thomas] talks about a sudden acceleration?
>
> A. Of course not.

(Clifford Tr. 34:22-24).[6]

As discussed more fully below, Clifford's opinion is nothing more than mere *ispse dixit* , which is insufficient to constitute an expert opinion and this testimony must be excluded from the evidence.

## 2. Hugh M. Stephens

Captain Hugh M. Stephens ("Stephens"), plaintiffs' second expert, joined the Merchant Marine in 1943, (Stephens Tr. 6:21-24), and obtained a limited ocean master first class pilot license for New York Harbor upper bay in 1951. (Stephens Tr. 7:14-22). However, Stephens never sailed on his license except as a captain on a supply boat between 2001 and 2004. (Stephens Tr. pages 7-37 and 46:25-47:12). None of these supply boats were water jet propelled vessels, (Stephens Tr. 47:19-21), nor were any of these supply boats catamarans. (Stephens Tr. 47:22-24).

---

[6]Clifford also referred to pages 40 and 41 of Heather's deposition transcript to support his conclusion of a "sudden acceleration," (Clifford Tr. 27:2-11), but an examination of this testimony reveals otherwise. Heather testified that the vessel "accelerated" and "engaged and took off." (Heather Tr. 40:9-11). She never testified to any "sudden acceleration."

9

After leaving the Navy, Stephens came ashore in 1951. (Stephens Tr. 8:23-25). From 1951 through 1968, Stephens worked as a bills of lading clerk and in shipping company management, not sailing on his license. (Stephens Tr. pages 9 through 20).

In 1968, Stephens formed a shore side company called Ships' Operational Safety, Inc. ("SOS"), which consisted of a business publishing materials for the marine industry, such as safety posters and bulletins, and vessel inspections and training on the use of equipment. (Stephens Tr. 20:18-20 and 21:1-22:2). In 2003, Stephens decommissioned SOS. (Stephens Tr. 38:8-9).

Stephens has been a certified safety professional (CSP) for at least thirty-five (35) years. (Stephens Tr. 22:8-23:13). With regard to vessel activity, the certification process for becoming a CSP focuses primarily on hazardous materials and fire safety. (Stephens Tr. 26:3-9). In receiving his certification as a CSP, Stephens did not receive any training in connection with water jet propulsion vessels, boat handling, marine vessel handling, navigation, or dealing with unusual sea conditions. (Stephens Tr. 24:15-26:2).

Stephens possesses a standard of training and watch-keeping ("STCW") certificate. (Stephens Tr. 49:11-16). The five (5) major areas of training that an STCW certification involve are firefighting, life boat handling, bridge team operation, radar and social responsibility. (Stephens Tr. 49:8-13).

Stephens is not, and has never been a Coast Guard Marine Engineer, a mechanical engineer, or a civil engineer. (Stephens Tr. 28:18-29:5). Although Stephens holds a professional engineer's license from California, (Stephens Tr. 27:2-5), he only qualified for this license on the basis of reciprocity after obtaining his CSP. (Stephens Tr. 27:14-16). Stephens never took any courses in

10

connection with qualifying as professional engineer in California, nor did he ever take any tests to become so qualified. (Stephens Tr. 27:11-13 and 17-19).

Stephens currently teaches ships' handling, radio communications, nautical science and advanced firefighting at SUNY Maritime. (Stephens Tr. 53:12-16). He does not teach any courses covering water jet propelled vessels, (Stephens Tr.55: 15-17), and none of the certifications Stephens holds involved training in operating water jet propulsion vessels. (Stephens Tr. 24:15-19).

Stephens considers himself an expert on fire safety and hazardous materials. (Stephens Tr. 26:10-13). Admittedly, Stephens does not consider himself an expert on water jet propulsion vessels. (Stephens Tr. 26:14-16). In fact, Stephens has absolutely no experience with water jet propulsion vessels other than owing a small 12 foot jet boat. (Stephens Tr. 27:24-28:5). During his deposition, Stephens testified as follows:

> Q. Okay. Would you consider yourself somewhat of an expert on fire safety and hazardous materials?
>
> A. Yes. I teach it.
>
> Q. Would you consider yourself an expert on water jet propulsion vessels?
>
> A. No.

(Stephens Tr. 26:10-16).

\*          \*          \*          \*          \*

> Q. Other than jet ski cases, have you been involved in any capacity with a water jet propulsion vessel?
>
> A. Yes. I owned a small one.
>
> Q. What type of vessel was that?

11

A. 12 foot jet boat.

(Stephens Tr. 27:24-28:5).

Like Clifford, Stephens is completely unfamiliar with the SEA JET I, and, also like Clifford, he has never even been on board that vessel! (Stephens Tr. 75:2-7). Further, Stephens has never operated a vessel similar to the SEA JET I with the KaMeWa water jet propulsion system. (Stephens Tr. 76:3-6). Significantly, Stephens admittedly does not consider himself to be an expert on the KaMeWa water jet propulsion system either, (Stephens Tr. 80:18-21, and he has no experience clearing water jet impellers on a vessel such as the SEA JET I. (Stephens Tr. 111:17-20).

Like Clifford, Stephens conclusions are also *ipse dixit*, without any support in the record, and must, therefore, be excluded. For example, Stephens concludes that the vessel attempted to "veer sharply." (Will Aff. ¶ 42 and Will Exh. 8 at p. 1, last paragraph). Stephens later admitted during his deposition that this conclusion was "a good educated assumption,"(Stephens Tr. 88:16), and based upon his own "interpretation" of the events. (Stephens Tr. 86:5-6).

As another example, Stephens' conclusion about the vessel's ride control system is expressly based upon his experience with *conventional* vessels. (Will Aff. ¶ 42 and Will Exh. 8 p. 2, last paragraph). Yet, Stephens admits that the SEA JET I is a catamaran which he also admits is an *unconventional vessel.* (Stephens Tr. 95:13-14 and 96:6-8). As such, his conclusion in this regard is irrelevant.

As discussed more fully below, because Stephens' conclusions are unfounded and irrelevant, and further, because he lacks the necessary foundation, he does not qualify as an expert and his testimony must be excluded.

12

## E. MRI Films

By letter dated January 4, 2011, Heather's counsel advised that she had an MRI of her cervical spine on December 1, 2010, and an MRI of her lumbar spine on December 21, 2010, both at a Zwanger-Persiri facility. (Will Aff. ¶ 45 and Will Exh. 11).

By letter dated January 6, 2011, defense counsel requested either copies of the new MRIs or, at the very least, authorizations for same. (Will Aff. ¶ 45 and Will Exh. 11). Having not received a response from the plaintiff's counsel, defense counsel sent a follow-up letter on January 28, 2011. (Will Aff. ¶ 45 and Will Exh. 11). To date, neither the MRI films, nor authorizations to obtain them have been provided. As such, Heather should be precluded from introducing the MRI films at trial.

### ARGUMENT

### POINT I.

### PLAINTIFFS' PROPOSED EXPERTS AND THEIR OPINIONS MUST BE EXCLUDED.

It is the Court's function to determine, preliminarily, whether an individual is qualified to be a witness. Fed. R. Evid. 102(a). Rule 703 of the Federal Rules of Evidence details how a purported expert qualifies as such:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Thus, the Court's initial inquiry is two-fold. It must first determine that the witness qualifies as an expert based upon one or more of the listed criteria (knowledge, skill, etc.). *Fernandez v.*

13

*Central Mine Equipment Co.,* 670 F. Supp.2d 178, 182 (E.D.N.Y. 2009) (Boyle, U.S.M.J.) (citing *Baker v. Urban Outfitters, Inc.,* 254 F. Supp. 2d 346, 352 (S.D.N.Y. 2003)). The Court must then address the admissibility of the expert's pro-offered opinion by determining whether it is reliable and relevant, also based upon the listed criteria (sufficient data, testing, etc.). *Fernandez,* 670 F. Supp.2d at 182.

The party offering an expert has the burden of establishing, by a preponderance of the evidence, the qualifications of the witness in compliance with Rule 702 of the Federal Rules of Evidence. *Keller v. Feasterville Health Care Center,* 557 F. Supp. 2d 671, 674-75 (E.D. Pa. 2008). *Accord Hendrix v. Evenflo Co., Inc.,* No. 09-10079, at 19 (11th Cir. 2010).

"It is well-settled that the determination of whether to admit expert testimony is within the sound discretion of the trial court." *Patsy's Italian Restaurant, Inc. v. Banas,* 531 F. Supp.3d 483, 484 (E.D.N.Y. 2008). *Accord Nisanov v. Black & Decker (U.S.), Inc.,* No. 05 Civ. 5911, 2008 WL 906708 (E.D.N.Y. Apr. 3, 2008).

As discussed more fully below, neither Clifford nor Stephens qualifies as an expert. Further, neither of their pro-offered opinions have sufficient indicia of reliability warranting their admissibility.

## A) Neither Clifford nor Stephens Qualifies as an Expert.

It is undisputed that the SEA JET I is a water jet propelled vessel. (Clifford Report [Will Exh. 7] at p. 1, second paragraph; Stephens Tr. 73:20-24; Scott Aff. ¶ 14). It is also undisputed that the subject vessel is a 'catamaran,' and therefore, considered an 'unconventional' vessel. (Scott Aff. ¶ 12 and Stephens Tr. 73:20-25 and 96:3-8). It has both a computer-operated ride control system and an electronic control module with limiting factors programmed into it which ensures a smooth ride

14

and prevents the vessel from accelerating suddenly. (Thomas Tr. 38:13-18; 39:5-9; Scott Aff. ¶¶ 15, 16, 18).

Heather claims to have been injured either during or immediately after the back-flushing operation was performed to clear an obstruction from one of the jets when she was caused to fall back into her seat 'jamming her spine." (Heather Tr. 40:17-41:8). Specifically, Heather testified that the vessel accelerated and "engaged and took off." (Heather Tr.40:10-15).

It is undisputed that neither Clifford nor Stephens has ever been on board the SEA JET I. (Clifford Tr. 17:9-11; Stephens Tr. 75:2-7). Based upon the undisputed facts and Heather's version of the alleged incident, in order to qualify as experts in this case, both Clifford and Stephens would have to possess, at minimum, knowledge, skill and experience in all the following areas: 1) operation of water jet propelled vessels, specifically those with a KA-ME-WA system; 2) operation of a computer-operated ride control system identical, or at least similar to, the SEA JET I; 3) operation of an electronic control module; 4) back-flushing operations of a water jet propelled vessel such as the SEA JET I; 5) overall operation of a catamaran; and 6) overall operation of an unconventional vessel. The record establishes beyond doubt that neither Stephens nor Clifford has any knowledge, or even a familiarity in *any* of these areas, let alone all of them.

### 1. William E. Clifford

As already noted, Clifford never even boarded the SEA JET I. (Clifford Tr. 17:9-11). He has no knowledge of the SEA JET I's details such as tonnage, length, breadth and horsepower. (Clifford Tr. 12:14-13:4). Significantly, he knows nothing about the SEA JET I's propulsion system, its back-flushing operation, and its computer-operated ride control system with limiting factors programmed in which is designed to prevent sudden acceleration. (Clifford Tr. 19:2-6; 24:13-16;

15

26:10-12; Clifford Tr. 32:23-33:3). Nor does Clifford have any knowledge about the vessel's engine (either its manufacturer or its type), its engineering and transmissions systems, or its gearbox. (Clifford Tr. 13:5-14; 19:5-6; 21:2-4; and 24:10-12). Additionally, Clifford has never operated a vessel with a KA-ME-WA water jet system and is unfamiliar with how it works. (Clifford Tr. 19:15-20:7).

## 2. Hugh M. Stephens

Although Stephens obtained his master's license in 1951, he has no commercial experience sailing on his license. (Stephens Tr. 7:14-22; 7:19-37:12; and 47:7-12) Significantly, he has no experience operating a water jet propelled vessel similar to the SEA JET I. (Stephens Tr. 76:3-6). In fact, he has no experience with any water jet propelled vessel other than his own personal 12 foot vessel. (Stephens Tr. 27:24-28:5). Additionally, Stephens has no experience clearing water jet impellers on a vessel such as the SEA JET I, (Stephens Tr. 111:17-20), and he does not consider himself an expert on the operation of a KA-ME-WA water jet propulsion system. (Stephens Tr. 80:18-21).

Stephens holds certifications in CSP and STCW, but neither of these involved training in connection with jet propelled vessels, boat handling, marine vessel handling, navigation or dealing with unusual sea conditions. (Stephens Tr. 24:15-26:2). Stephens obtained his California professional engineer's license only after obtaining his CSP, on the basis of reciprocity. (Stephens Tr. 27:14-16). None of the courses that Stephens teaches involve instruction on the operation of water jet propelled vessels. (Stephens Tr. 55:15-17).

16

Stephens does not consider himself to be an expert on water jet propulsion vessels. (Stephens Tr. 26:14-16). He admits that his area of expertise is limited to dealing with fire safety and hazardous materials. (Stephens Tr. 26:10-13).

### 3. Applicable Law

Although a proposed expert may possess technical or scientific knowledge, he or she must possess *specialized* knowledge in the specific areas pertinent to the case before the Court, otherwise preclusion is warranted and summary judgment appropriate. *See, e.g., Fernandez,* 670 F. Supp. 2d 178 (precluding expert testimony and granting summary judgment where licensed professional and mechanical engineer did not qualify as expert in water well drilling). *Accord Barban v. Rheem Textile Sys., Inc.,* No. 01-CV-8475, 2005 WL 387660, at 4 (E.D.N.Y. Feb. 11, 2005), *aff'd,* 147 Fed. Appx. 222, 2005 U.S. App. LEXIS 23220 (2nd Cir. 2005) (precluding expert who lacked relevant experience and qualifications, reasoning that his opinion would be speculative and granting summary judgment); *Mannix v. Chrysler Corp.,* No. 97-CV-1944, 2001 WL 477291, at 1 (E.D.N.Y. Mar., 2001) (precluding proposed expert testimony as "imaginatively speculative" and granting summary judgment); *Trumps v. Toastmaster, Inc.,* 969 F. Supp. 247, 251-52 (S.D.N.Y. 1997) (holding that prooffered expert, a mechanical engineer, was not qualified to express opinion on electrical engineering, which was subject at issue).

The *Fernandez* case is directly on point. There, an expert was precluded due to lack of qualifications where, although he was a licensed mechanical engineer, he conceded he had "'very little'" experience with the equipment at issue and he was previously disqualified as an expert. *Fernandez,* 670 F. Supp. 2d at 183-84. The *Fernandez* court reasoned:

'The important point [in rendering an expert qualified to testify]

17

> is that the mechanism at issue has sufficient similarities to those
> which the expert has experience so that the expert's experience is relevant.'
> Plaintiff has offered nothing from which the Court may conclude that
> Anderson's prior experience is relevant to the issues involved herein.
> Accordingly, any opinion that Anderson would offer would be based
> on nothing more than improper speculation.

*Fernandez,* 670 F. Supp. 2d at 184-85 (quoting *Nisanov v. Black & Decker (U.S.) Inc.,* No. 05 Civ.

5911, 2008 WL 906708 (E.D.N.Y. Apr. 3, 2008) at 5).

As discussed at length above, both Clifford and Stephens have admitted during deposition

testimony that they are completely unfamiliar with the SEA JET I. In addition, Clifford's testimony

has previously been rejected as not supported by the evidence, which is the same situation here.

*Dorothy J. v. City of New York,* No 09 Civ. 3512 (E.D.N.Y. Sept. 11, 2010) at 27. As such, under

controlling law, they should both be precluded from testifying due to their lack of qualifications.

## B) Plaintiffs' Experts' Opinions are Unreliable under the *Daubert* Analysis.

In determining the reliability of an expert's opinion, the Court performs a 'gatekeeping'

function by applying the factors enunciated by the Supreme Court in *Daubert v. Merrell Dow*

*Pharmaceuticals,* Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed. 469 (1993) and its progeny, such

as *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S. Ct. 1167, 143 L.Ed. 238 (1999) . *See,*

*e.g., Major League Baseball Properties, Inc., v. Salvino, Inc.,* 542 F.3d 290 (2nd Cir. 2008) (affirming

summary judgment where expert's opinion was conclusory, based upon speculation or conjecture

and without factual basis), *Fox v. Cheminova, Inc.,* 387 F. Supp. 2d 160 (E.D.N.Y. 2005) (staying

motion to exclude experts pending *Daubert* hearings because court had no knowledge of who would

be called as witnesses at trial); *Rypkema v. Time Manufacturing Co.,* 263 F. Supp. 2d 687 (S.D.N.Y.

2003) (precluding plaintiff's expert's conclusion under Rule 702 of the Federal Rules of Evidence

18

as unsupported by scientific knowledge, testing or methodology, and granting summary judgment dismissing complaint).

The court's 'gatekeeping' function involves a two-pronged inquiry requiring determination of (1) whether the reasoning or methodology underlying the testimony is scientifically valid; and (2) whether the reasoning can be properly applied to the facts in issue. *Daubert,* 509 U.S. at 592-93.

The first prong of the *Daubert* test is a reliability inquiry involving four (4) factors: (1) whether a theory or technique can be (or has been) tested; (2) whether it has been subjected to peer review and publication; (3) whether in respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the techniques's operation; and (4) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." *Kumho,* 526 U.S. at 149-50 (citing *Daubert,* 526 U.S. at 592-93).

The second prong of the *Daubert* analysis, the relevance or fit of the expert's testimony, requires the court to determine whether the expert's opinions "fit the facts of the case at hand." *Wurtzel v. Starbucks Coffee Co.,* 257 F. Supp.2d 520, 525 (E.D.N.Y. 2003).

In the case at bar, the first prong of the *Daubert* inquiry is clearly not satisfied. There is no evidence in the record that either Clifford or Stephens' opinions have been tested, were subjected to peer review and publication, or generally accepted in the maritime community. Thus, since neither opinion has been proven to be 'scientifically valid' as required by *Daubert*, they should be precluded.

Nor is the second prong of the *Daubert* analysis satisfied. Neither experts' opinions fit the facts of this case. Clifford made certain 'assumptions' about was happening at the time of the alleged incident to form his conclusions. (Clifford Tr. 32:8-10 and 17-19). Clifford also admittedly

19

'surmised' that the cause of Heather's alleged injury was acceleration based upon a process of elimination. (Clifford Tr. 40:8-11). Further, Clifford concluded there was "a sudden and unnecessary acceleration of the SEA JET" based upon the testimony of Heather Gibson (Clifford Tr. Pp 26-27), but there was never any such testimony. (Heather testified that the vessel "engaged and took off." (Heather Tr. 40:9-11)). Additionally, Clifford basis his 'Analysis' on the incorrect assumption that the SEA JET I is a 'fast ferry.' (Will Aff. ¶ 41 and Will Exh. 7 at p. 2, last paragraph). The vessel is *not* designated a 'fast ferry by the U.S. Coast Guard. (Scott Aff. ¶ 13).

Significantly, Clifford is completely unfamiliar with the vessel, and knows nothing about its engineering, ride control system, electronic control module which prevents sudden acceleration, or its back flushing operation, which are all pertinent factors in the alleged incident. As such, because Clifford's opinion does not fit the facts of this case, it should be precluded.

Stephens likewise lacks knowledge about the details and operation of the SEA JET I. Most important, though, is the admitted fact that Stephens' opinions are expressly based upon his experience with *conventional* vessels, and his classification of the SEA JET I as a 'fast ferry.' (Will Aff. ¶ 42; and Will Exh. 8). It is undisputed that the SEA JET I is an *unconventional* vessel, (Stephens Tr. 73:20-24 and 96:3-8), and the vessel is *not* designated a "fast ferry" by the U.S. Coast Guard. (Scott Aff. ¶ 13). Therefore, since Stephens' testimony based upon 'conventional' vessels and 'fast ferries' is irrelevant, it does not fit the facts of this case and should be precluded.

The case of *Brooks v. Outboard Marine Corp.,* 234 F.3d 89 (2nd Cir. 2000), which affirmed the District Court's decision to preclude expert testimony and grant summary judgment for lack of evidence supporting the plaintiff's claim, is instructive. In affirming, the Second Circuit noted the shortcomings of the expert's testimony which included never inspecting the subject vessel; never

20

speaking directly with those involved in the accident; being unfamiliar with the details of the subject

vessel; and never reconstructing the accident or testing his theory. Since the same shortcomings are

present here with respect to both Stephens and Clifford's testimony, they should be precluded and

summary judgement granted. *Accord Fernandez,* 670 F. Supp.2d 178, 185-86 (finding expert

unreliable where, *inter alia,* he never inspected the subject mechanism, lacked details about

mechanism and how it operated, reviewed limited materials, and did not consult manufacturer of

subject mechanism about use and operation).

## C) Plaintiffs' Experts' Opinions are Inadmissible *Ipse Dixit.*

*Ipse dixit* is defined by Black's Law Dictionary as "a bare assertion resting on the authority

of an individual." Black's Law Dictionary, 5[th] Edition 1979.

It is well-settled that

> nothing in either *Daubert* or the Federal Rules of Evidence requires a
> district court to admit opinion evidence that is connected to existing data
> only by the *ipse dixit* of the expert. A court may conclude that there is
> simply too great an analytical gap between the data and the opinion
> prooffered.

*General Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S. Ct. 512, 519, 139 L.Ed. 508 (1997). *Accord*

*Nimely v. City of New York,* 414 F.3d 381 (2nd Cir. 2005) (ordering new trial where *ipse dixit* of

expert should have been excluded); *Hendrix,* 09-10079 at 20 (affirming District Court's exclusion

of expert testimony as *ipse dixit* and granting partial summary judgment); *Clarke v. LR Systems,* 219

F. Supp.2d 323, 333-34 (E.D.N.Y. 2002) (acknowledging that *ipse dixit* is inadmissible).

The reason for excluding *ipse dixit* is eloquently stated as follows: "'The courtroom is not

the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it.'"

21

*Rider v. Sandoz Pharms. Corp.,* 295 F.3d 1194, 1202 (11th Cir. 2002) (quoting *Rosen v. Ciba-Geigy Corp.,* 78 F.3d 316, 319 (7th Cir. 1996)).

Because the opinions of Clifford and Stephens are conclusory, speculative and unsupported, as discussed above, they constitute inadmissible *ipse dixit* under controlling law and must be excluded.

## POINT II.

### PLAINTIFFS' EXPERTS' OPINIONS
### WILL NOT ASSIST THE TRIER OF FACT.

Even after determining that a witness is qualified and that the opinion is reliable, the court is required to make a third inquiry: whether the expert's testimony will assist the trier of fact. *Nimely,* 414 F.3d at 397. *Accord Hendrix,* No. 09-10079 at 17; *Patsy's,* 531 F. Supp. 3d at 484.

Here, the facts are not complex and neither of the plaintiffs' proposed experts' testimony will assist the jury in understanding the evidence or determining the relevant facts. Under these circumstances, since the jury is not assisted, preclusion is warranted. *Patsy's,* 531 F. Supp. 3d at 485.

Further, where the proposed expert testimony will usurp the jury's role, it does not 'assist' the jury, but, rather, "'attempts to substitute the expert's judgment for the jury's.'" *Nimely,* 414 F.3d at 397 (quoting *United States v. Duncan,* 42 F.3d 97, 101 (2nd Cir. 1994)). As such, the plaintiffs' experts' testimony must be excluded on this ground as well.

22

## POINT III.

### THE VESSEL'S WARNINGS WERE ADEQUATE.

Plaintiffs suggest that the SEA JET I's warnings were inadequate, but offer no support other than the *ipse dixit* of their purported experts. (Will Aff. ¶¶ 41, 42 and Will Exhs. 7, 8). As discussed above, such testimony is inadmissible.

In addition, there were four (4) safety announcements during the subject voyage, all of which were clear and sufficiently alerted passengers what to expect during the voyage, including during the back flushing operation. (Scott Aff. ¶¶ 28-30; Will Aff. ¶¶ 6, 43, 44; and Will Exhs. 3, 9, 10).

Finally, the court may dismiss a failure to warn claim as a matter of law if "the injured party was fully aware of the hazard through general knowledge, observation or common sense . . . ." *Clarke,* 219 F. Supp. 2d at 329 (quoting *Liriano v. Hobart Corp.,* 92 N.Y.2d 232, 241, 677 N.Y.S.2d 764, 769, 700 N.E.2d 303 (1998)). *Accord Rypkema*, 263 F. Supp.2d at 694.

It is undisputed that Heather was a regular passenger aboard the SEA JET I, having made the round trip between the Orient Point and New London terminals every other week-end for more than two (2) years. (Heather Tr. 31:17-32:7). As such, since she was fully aware of the conditions and circumstances she might encounter during the voyage, there was no duty to warn. In any event, the four (4) safety announcements made during the subject voyage were sufficient. (Scott Aff. ¶¶ 30, 31; Will Aff. ¶¶ 43, 44; Will Exhs. 9, 10).

23

## POINT IV.

### HEATHER'S MRI FILMS FROM DECEMBER, 2010
### MUST BE EXCLUDED.

On January 4, 2011, Heather's counsel advised that she had two new MRIs, one on December 1, 2010 of her cervical spine and another on December 21, 2010 of her lumbar spine, both taken at Zwanger-Persiri. (Will Aff. ¶ 45 and Will Exh. 11). Defense counsel, on two (2) separate occasions, duly requested either copies of the subject MRI films or authorizations to obtain same. (Will Aff. ¶ 45 and Will Exh 11). To date, defense counsel never received either copies of the MRI films or authorizations to obtain them. (Will Aff. ¶ 45). As such, the subject MRI films must be excluded from the trial of this action. Fed. R. Civ. P. 37(b)(2)(A)(ii) and Judge Wexler's Individual Rules at ¶ 4(A)(vi) (stating that only exhibits listed in the pre-trial order and that *have been exchanged* may be offered at trial)(emphasis added).

### CONCLUSION

For all the foregoing reasons, CROSS SOUND FERRY SERVICES, INC.'s motion to exclude the plaintiffs' experts should be GRANTED in its entirety, and it is respectfully requested that this Honorable Court grant such other, further or different relief as it deems just and proper.

Dated: Mineola, New York
March 14, 2011

BADIAK & WILL, LLP
Attorney for Defendant
CROSS SOUND FERRY SERVICES, INC.

By:_____
ALFRED J. WILL (AW-2485)
106 Third Street
Mineola, New York 11501
Telephone: (516) 877-2225
Fax: (516) 877-2230
E-mail:awill@badiakwill.com
Our ref.: 08-A-001-AW/LS

ALFRED J. WILL
LISA A. SCOGNAMILLO
Of Counsel

CV 08 0474 (Wexler, L.)

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK )
)SS.:
COUNTY OF NASSAU )

I, **Luz M. Webb,** being duly sworn, deposes and says:

I am not a party to the within action, am over 18 years of age and reside c/o Badiak & Will, LLP, 106 3rd Street, Mineola, New York 11501-4404. On March 14, 2011 I served the within MEMORANDUM OF LAW BY DEFENDANT CROSS SOUND FERRY SERVICES, INC. IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE PLAINTIFF'S EXPERTS AND CERTAIN EXHIBITS on:

John H. Mulvehill, Esq.
Attorney for Plaintiff
220 Cambon Avenue
Saint James, New York 11780
(631) 862-8889

Attn: George R. Gridelli, Esq.
Cellino & Barnes
Attorneys At Law
Attorneys for Plaintiffs
445 Broad Hollow Road, Suite 205
Melville, New York 11747

by depositing a true copy thereof enclosed in a post-paid wrapper in an official depository under the exclusive care and custody of the U.S. Postal Service within New York State.

_____
LUZ M. WEBB

Sworn to before me this
_14_ Day of March, 2011

_____
NOTARY PUBLIC

LISA A. SCOGNAMILLO
Notary Public, State of New York
No. 3011493
Qualified in Nassau County
Commission Expires Apr 19, 20__