UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X
                          :
HEATHER GIBSON and
JONATHAN GIBSON,                 08-CV-474
                          :
            Plaintiffs,
                                 US Courthouse
      -against-           :      Central Islip, NY

CROSS SOUND FERRY SERVICES,      May 21, 2012
                                 9:40 a.m.

            Defendant. :
- - - - - - - - - - - - - X

      TRANSCRIPT OF TRIAL
      BEFORE THE HONORABLE LEONARD D. WEXLER
      UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff:    CELLINO & BARNES
                      600 Old Country Road, Suite 500
                      Garden City, New York 11530-2045
                      BY:  GEORGE R. GRIDELLI, ESQ.

For the Defendant:    BADIAK & WILL LLP
                      106 Third Street
                      Mineola, New York 11501-4404
                      BY:  ALFRED J. WILL, ESQ.
                           LISA ANN SCOGNAMILLO, ESQ.

Court Reporter:       Dominick M. Tursi, CM, CSR
                      Ellen Combs, CSR
                      US District Courthouse
                      1180 Federal Plaza
                      Central Islip, New York 11722
                      (631) 712-6108 Fax:  712-6124
                      DomTursi@email.com

Proceedings recorded by mechanical stenography.
Transcript produced by computer.

1　　　　　(The following ensued in the presence of the

2　jury at 9:40 a.m.)

3　　　　　THE COURT:　Next witness.

4　　　　　MR. GRIDELLI:　With the court's permission, I

5　call Captain William Clifford.

6

7　**WILLIAM EDWARD CLIFFORD**

8　　　　　called by the plaintiff, having been first duly

9　　　　　sworn/affirmed, was examined and testified as

10　　　　　follows:

11

12　DIRECT EXAMINATION

13　BY MR. GRIDELLI:

14　Q.　Good morning, Captain Clifford.

15　　　　　Can you tell the jury and the court your

16　educational background, please.

17　A.　Yes.　I attended the United States Merchant Marine

18　Academy at King's Point, which is the federal Maritime

19　Academy.　I graduated there in 1973.

20　　　　　THE COURT:　Get a little closer to the mic so we

21　can hear you.

22　BY MR. GRIDELLI:

23　Q.　Or bring the mic closer to you if that is easier.

24　A.　I graduated in 1973 with a bachelor's degree in

25　marine transportation.　Since that time -- and I had a

1  license as a Third Mate Unlimited from the United States

2  Coast Guard.  I also have a commission in the United

3  States Naval Reserves as an Ensign.

4          Since that time I have attended a number of

5  different industry training schools, including simulations

6  for, bridge simulations, ship handling.  The school in

7  Grenoble for ship handling.  There is one in Baltimore.

8  There is one here at LaGuardia Airport for marine safety

9  and a number of others including radar and bridge

10 management.

11 Q.    Have you piloted any ships since 1979?

12 A.    Yes.  I am a pilot of vessels in New York Harbor.  I

13 am the docking pilot.  We use the tug boats to maneuvers

14 the vessels in and out of the dock.

15         I maneuver just about any kind of vessel that

16 calls in New York:  tankers, container ships, passenger

17 ships, in and out of the harbor.

18 Q.    Have you ever taught anything concerning seamanship

19 or maritime issues?

20 A.    Yes.

21         I have taught at the United States Merchant

22 Marine Academy.  I have taught seamanship and vessel

23 handling both to cadets at the academy, to the US Navy,

24 and to NOAA, which is the National Oceanic and Atmospheric

25 Administration, their officer school and their vessel

1  handling.

2       I have also taught the Navy at the Naval War

3  College, which was contracted out to the vessel simulator

4  at LaGuardia Airport marine safety, which was a division

5  of flight safety, which you may be familiar with as the

6  people who train airplane pilots.  They have a marine

7  division to train nautical personnel.

8  Q.   How man years of marine experience or maritime

9  experience do you have as you sit here today, sir?

10 A.   Well, including my years at the academy, which are

11 four, I think 39 or 40 years, something like that.

12 Q.   Have you ever owned or operated any type of vessels

13 that passengers would use?

14 A.   Yes.

15      I operated and owned two passenger boats.  The

16 first was called Dolly Madison, the second was the

17 Mystique, and they are engaged in the dinner boat trade in

18 New York.

19 Q.   What was the size of those vessels?

20 A.   The first vessel was 65 feet and it carried 150

21 passengers.  The second vessel was approximately 100 feet

22 long and the capacity for that was 250 passengers.

23      And I owned it, I operated it, and occasionally

24 I was the captain on board.

25 Q.   And how long did you do that where you were involved

1    with the dinner cruises with passengers?

2    A.    A little over ten years.

3    Q.    Do you recall what period of time that was?

4    A.    Somewhere 1985 to 1995.

5    Q.    Did you ever do any type of advisory work for the

6    Port Authority?

7    A.    Yes.  Not only for the New York Port Authority, on a

8    variety of issues.

9            I also helped open the Port of Sail in New

10   Jersey.  I was their marine consultant in the reopening of

11   that Port.  It is on the Delaware Bay.  After it was

12   closed for some 200 years, we helped reopen it.  It is

13   still operating today.

14   Q.    Have you served as a member of the Us Naval Institute

15   Board of Navigation?

16   A.    Yes.  That Board of Navigation that you are asking

17   about was involved in the reissuing of Dutton's

18   Navigation, which is a text on navigation.  And it is in

19   use in a variety of locations including the Merchant

20   Marine Academy and Annapolis.

21   Q.    Have you ever held an office in any pilots

22   association?

23   A.    Yes.  Actually in several.  I was the president of

24   Turacamo Pilots in New York from 1989 until 1998.  And I

25   was also the president of Reynolds Pilots for a couple of

1  years in the '80s.  I now serve with my current pilots

2  association as the head of the financial board.

3  Q.    What is the biggest vessel -- withdrawn.

4        What does a pilot do?

5  A.    A pilot is an advisor to the master of a vessel.  And

6  a pilot -- typically, when a ship calls to the Port of New

7  York we have a two-pilot system that a sea pilot boards

8  the ship out off Sandy Hook and Ambrose Light and that

9  would be the Sandy Hook pilot, and then as the vessel

10  enters the harbor inside of the narrows, the dock pilot,

11  which is me or one of my partners, comes aboard and takes

12  the con of the ship from the sea pilot and directs the

13  movement and the navigation of the ship in towards the

14  dock, in my case using tug boats to assist the ship in and

15  out of its berth.  And the reverse is true when the ship

16  is sailing.  We board the ship, take it off the berth with

17  tug boats, and then move the ship out.

18  Q.    What is the biggest vessel you have piloted?

19  A.    Probably the easiest one to recognize for anybody

20  would be the Queen Mary.

21  Q.    What is the smallest vessel you ever piloted?

22  A.    Probably my rowboat.

23  Q.    Do you have any licenses or certifications?

24  A.    Yes.  I'm licensed by the US Coast Guard as a master

25  and as an unlimited pilot.

235

1    I have certifications in radar, bridge

2  management, and STCW, which is the standards of training

3  certification and watch keeping.

4  Q.   What is a first-class pilot?

5  A.   First-class pilot, once again, is a license from the

6  Coast Guard which allows you to pilot vessels in a certain

7  area.

8    Pilotage is restricted to the area that is

9  denoted on your license.  Mine is denoted for New York

10  Harbor, Hudson River and the Port of Sail, which I

11  mentioned previously.

12  Q.   Are you a member of any professional or civic

13  organizations concerning the maritime issues?

14  A.   Yes.  I'm on the -- well, until recently I was on the

15  board of directors for the Maritime Association, Port of

16  New York, a member of the Harbor Operations Committee, The

17  Marine Society of New York.  A couple of different yacht

18  clubs, things like that.

19  Q.   Are you familiar with the company known as Rocks

20  Reefs and Shoals?

21  A.   That, in fact, is my company.  I started it about 20

22  some-odd years ago.  And it is how I accept checks, it is

23  a corporation and how I accept payment, not only as a

24  pilot but as an expert witness.

25    I also provide a referral service to attorneys

1   who are looking for expert witnesses, and I can refer

2   other experts outside of my area of expertise to those

3   attorneys.

4   Q.   Have you ever testified as an expert witness in

5   maritime and/or marine issues?

6   A.   Yes.

7   Q.   Have you ever testified as an expert in federal

8   court?

9   A.   Yes.

10  Q.   Over how many years have you testified as an expert

11  witness?

12  A.   I would say it has to be in excess of 25 years.

13  Q.   Have you testified for plaintiffs in the past?

14  A.   Yes.

15  Q.   And have you testified for defendants in the past?

16  A.   Yes.

17         MR. GRIDELLI:  Your Honor, I'm prepared to go

18  forward with the factual basis at this point in time.

19         MR. WILL:  Your Honor, at this time I request a

20  voir dire.

21         THE COURT:  Yes, you can have your voir dire.

22         Voir dire means questioning the expert

23  concerning expertise; not the case itself.

24         Go ahead.

25

237

1  VOIR DIRE EXAMINATION

2  BY MR. WILL:

3  Q.  Good morning, jury, your Honor, Mr. Clifford.

4        You testified a minute ago that you own two

5  pleasure or passenger dinner boats.  Is that correct?

6  A.  That's correct.

7  Q.  Neither of those are catamarans, were they?

8  A.  No, sir.

9        THE COURT:  Neither were what?

10       MR. WILL:  Catamarans.

11       THE COURT:  Okay.

12  BY MR. WILL:

13  Q.  Now, you are not an engineer, are you?

14  A.  No, sir.

15  Q.  And you have never piloted the Sea Jet, have you?

16  A.  No, sir.

17  Q.  You have never operated the Sea Jet?

18  A.  No, sir.

19  Q.  You have never navigated the Sea Jet?

20  A.  I have never been on board the Sea Jet.

21  Q.  You have never been on the Sea Jet.  Correct?

22  A.  That's correct.

23  Q.  And you have never inspected the Sea Jet, have you?

24  A.  No, sir.

25  Q.  In fact I believe you testified that the closest you

1    ever got was on a passing ferry.

2    A.    The very dock next to it.  Yes.

3    Q.    Okay.  Let me ask some questions about your knowledge

4    of the Sea Jet when you rendered your opinion in 2009.

5          You didn't know the type of propulsion the

6    vessel had.  Correct?

7    A.    Other than the fact that it was not propelled by

8    propellers, yes.

9    Q.    And you have never operated a water jet propulsion

10   system, have you?

11   A.    No, sir.

12   Q.    And you are not familiar with the Kamewa Water Jet

13   system, are you?

14   A.    No.

15   Q.    And in fact you told me that you don't know anything

16   about the engineering system of the vessel.

17   A.    That is correct.

18   Q.    You don't even know what the type of engine it has.

19   A.    No, sir.

20   Q.    You don't know about the transmission of the vessel?

21   A.    I do not know anything about the engineering on the

22   vessel, no.

23   Q.    Do you know anything about the gear box of the

24   vessel?

25   A.    It is included in the engineering.  No, sir.

1  Q.   You don't even know if it has a clutch.  Right?

2  A.   That's correct.

3  Q.   You don't know the horsepower?

4  A.   Other than looking at the vessel's specs, no.

5  Q.   And I think you told me you didn't know whether it

6  was operated by propellers or impellers.  Correct?

7  A.   I knew it wasn't operated by propellers.

8  Q.   And you knew nothing about the controls to move the

9  vessel forward.  That is what you had told me?

10  A.   No.  I was unfamiliar with the controls.  Yes.

11  Q.   And so you have no hands-on knowledge of the Sea Jet.

12  Correct?

13  A.   No, I have never been a board the Sea Jet.

14  Q.   And you have no personal knowledge of the Sea Jet?

15  A.   Once again, I have never been onboard the Sea Jet.

16  Q.   And I believe you told me you have no experience with

17  a vessel like the Sea Jet.

18  A.   That's correct.

19  Q.   And you never operated a vessel like this from stop

20  to acceleration.

21  A.   No, sir.

22  Q.   So you can't testify that the vessel is mechanically

23  capable of sudden acceleration, can you?

24        MR. GRIDELLI:  Objection.  Your Honor, it is

25  clearly outside the voir dire.

1       MR. WILL:  Sorry.

2   BY MR. WILL:

3   Q.   You have no technical knowledge about the vessel's

4   engineering or propulsion system, do you?

5   A.   That's correct.

6       MR. GRIDELLI:  Objection.  Asked and answered

7   three times.

8   BY MR. WILL:

9   Q.   But do you have any scientific basis that the vessel

10  suddenly accelerated as claimed in this case?

11  A.   The only basis --

12  Q.   The scientific basis.

13  A.   The only basis I have --

14  Q.   Mr. Clifford, scientific basis.

15  A.   I'm explaining that, counselor.

16       The only basis I have is the testimony I read.

17  Q.   Excuse me?

18  A.   The only basis I have for my opinion is the testimony

19  I read.

20       THE COURT:  What testimony did you read that led

21  you to that opinion?

22       THE WITNESS:  Ms. Gibson's testimony, your

23  Honor.

24       THE COURT:  The plaintiff's testimony?

25       THE WITNESS:  Yes, sir.

1  BY MR. WILL:

2  Q.   Now, you did look at the vessel's manual.  Correct?

3  A.   Yes, sir.

4       MR. GRIDELLI:  Your Honor, objection.  May we

5  have a sidebar?

6       THE COURT:  Sure.

7       (Discussion at sidebar ensued as follows.)

8       MR. GRIDELLI:  My objection is, I think he has

9  gone way past voir dire.  Plus I think it would be helpful

10 for the court to know what the opinions are that he is

11 going to render.  One has to do with the announcements

12 made on the vessel so it doesn't matter if it is a

13 rowboat, a sailboat, or a Sea Jet.  It is what

14 announcements should be made to the passengers.

15       THE COURT:  Is he going to talk about the jet

16 going up?

17       MR. GRIDELLI:  He is going to talk about, based

18 on the evidence in this case, that there was a tilt and

19 what caused it.  And what caused it is based on the

20 testimony:  Calm seas, weather --

21       MR. WILL:  Is he speculating?

22       MR. GRIDELLI:  Not speculation.  The injury --

23       THE COURT:  Wait a while.  Calm down.

24       MR. GRIDELLI:  Okay.

25       THE COURT:  You are hyper.

1    MR. WILL:  Your Honor, his opinion is all *ipse*

2 *dixit*.  He is testifying he knows nothing about the

3 vessel.  He does not know the --

4    THE COURT:  I have heard enough.  Step back and

5 I will make my ruling.

6    (There was a pause in the proceedings.)

7    THE COURT:  My ruling is, I'm not going to allow

8 him to testify as to the jet propulsion and what happened.

9 He can testify concerning announcements that were made and

10 what his opinions were about that but not --

11    MR. GRIDELLI:  May --

12    THE COURT:  That is my ruling.

13    MR. GRIDELLI:  May I just be heard, your Honor?

14    THE COURT:  Yes.

15    MR. GRIDELLI:  Obviously, a key part of the case

16 is going to be testifying as to what is important for

17 piloting a ship; any ship.  If the jury believes that the

18 boat listed and they can't explain why it listed, then it

19 has to be pilot error.  It has to be piloting control.

20 There could be nothing else.

21    The defendants say --

22    THE COURT:  All right.  That is enough.  I heard

23 you.  Denied.  I'm --

24    MR. GRIDELLI:  This is important to my case,

25 your Honor.

243

1          THE COURT:  That is not my job.  My job is to

2    make rulings.

3          (Discussion at sidebar was concluded.)

4          THE COURT:  My ruling is, I will allow him to

5    testify as to things other than jet propulsion.  Since it

6    was based upon the testimony, he has no knowledge of that.

7    He has knowledge of what a pilot should do and things of

8    that sort, but he has no knowledge as to jet propulsion.

9          You may continue.

10         You heard my ruling.  You have to stick with it.

11         MR. GRIDELLI:  I will do my best, your Honor.

12         THE COURT:  You will hear from me if you don't.

13         MR. GRIDELLI:  I'm sure I will.

14

15   DIRECT EXAMINATION (Continued)

16   BY MR. GRIDELLI:

17   Q.   As an expert you have set fees that you charge?

18   A.   I do.

19   Q.   What do you charge for research and consultation?

20   A.   My research fees are $175 an hour.  For an

21   appearance, such as today in court, I charge $1,750.

22   Q.   Are the fees the same whether you are testifying on

23   behalf of a plaintiff or a defendant?

24   A.   Yes, sir.

25   Q.   Have you ever consulted on a case on one side and

1  reviewed the client's deposition?

2  A.   I have, yes.

3  Q.   Did there come a time that you were retained by

4  Heather Gibson's former attorneys to review what occurred

5  in this case and render your opinion?

6  A.   Yes, Mr. Mulvehill contacted me a couple of years ago

7  actually on it.

8  Q.   What did you review in order to come to some of the

9  conclusions that you are rendering in this case?

10 A.   I reviewed documents in the case.  I can refer to my

11 report.

12          What I was sent was the deposition of Miss

13 Gibson, the deposition of Captain Thomas, the Exhibits 1

14 through 5, the manual for the Sea Jet, an operations

15 manual for the company, copies of the US Coast Guard

16 documentation for the vessel.  And I looked up the weather

17 report on my own.

18 Q.   What type of vessel is the Sea Jet?

19 A.   The Sea Jet is a passenger-carrying ferry.  I

20 described it in my report as a fast ferry because it is

21 faster than a normal ferry.

22 Q.   Is that a term of art you use in your industry, *fast*

23 *ferry*?

24 A.   Yes.  There was some question as to whether or not it

25 was specific as to the Coast Guard designation of a fast

1    ferry, which I wasn't aware that the Coast Guard had a

2    specific term for fast ferry.

3              But that is a general term used in the industry.

4    It is certainly faster than the other ferries that the

5    company used.

6    Q.   After reviewing the deposition testimony of Heather

7    Gibson and Captain Thomas, the captain on that trip that

8    night, did you come to any opinions concerning the Sea Jet

9    passage which left at 6 pm on November 16, 2007?

10   A.   I did.

11   Q.   Let's talk about the opinions concerning any

12   announcements that were made.

13             There was a departure announcement, was there

14   not?

15   A.   Yes, there was.

16             MR. GRIDELLI:  Your Honor, can we dim the

17   lights.  Thank you.

18             With the court's permission, I would like to

19   read it.  It says:

20             *Safety Announcement Moderate Departing Orient*

21   *Point.*

22             THE COURT:  Is this in evidence?

23             MR. GRIDELLI:  Sorry?

24             THE COURT:  Is this in evidence?

25             MR. GRIDELLI:  Yes.  It is one of the documents,

1    Exhibit 3 in plaintiff's submission.

2            THE COURT:  Is it in evidence?

3            MR. GRIDELLI:  Yes, your Honor.  And it's one of

4    the documents he reviewed.

5            THE COURT:  Okay.  Fine.  Continue.

6    BY MR. GRIDELLI:

7    Q.    *Ladies and gentlemen.  Welcome aboard the Sea Jet*

8    *operated by Cross Sound Ferry.  Sea conditions are*

9    *moderate.  The trip to New London will take about 40*

10   *minutes.*

11           *Federal regulations require us to inform you as*

12   *to the location of life jackets.  Life jackets are located*

13   *beneath the labeled bench seats in the upper and lower*

14   *passenger cabins.  Life jacket instructions, safety*

15   *equipment locations, and evacuation routes are posted*

16   *throughout the vessel.  Please take a few moments to*

17   *familiarize yourself with these instructions.*

18           *In the event of an emergency, the crew will give*

19   *you further instructions.  This vessel is equipped with a*

20   *computer-operated ride control system for your traveling*

21   *comfort.  However, the vessel may still experience*

22   *unexpected movement so we ask that you use caution when*

23   *moving about the cabin.  Because sea conditions may be*

24   *rough, please remain seated unless it is necessary to move*

25   *about.*

1          *Passengers are asked to keep carry-on luggage*

2     *with them at all times during the trip.  We also encourage*

3     *you to report any suspicious activities to the nearest*

4     *crew member.*

5          *Thank you for sailing with Cross Sound Ferry*

6     *aboard the Sea Jet.  Enjoy the trip.*

7          Did I read that accurately, sir?

8     A.   Yes, sir.

9     Q.   Were the conditions where the backflushing and the

10    accident happened rough that night?

11    A.   No.

12         This moderate seas announcement will cover the

13    trip from the Orient Point by ferry over to New London.

14    The area in which the incident happened was actually

15    inside of Orient Point where the water was calm.

16    Q.   What is the name of that body of water where the

17    incident happened?

18    A.   Well, it is just inside Orient Point and normally is

19    referred to as Shelter Island Sound.

20    Q.   Have you had any experience in being on the waters in

21    that location, Shelter Island Sound?

22    A.   Yes, I have.

23         I have been on a number of pleasure boats in

24    that area, certainly.  And this ferry, I take this ferry

25    on a regular basis.  Not the Sea Jet but the other vessels

1  in this Cross Sound Ferry, I take them on a regular basis.

2  Q.   What were the weather conditions like that night a

3  little after 6 o'clock on November 2007, the day of the

4  incident, November 16?

5  A.   Well, the weather, according to the logbook and was

6  confirmed by me looking at the Noel weather reports, winds

7  were out of the northwest I think somewhere around 20

8  knots and sea conditions I believe in Long Island Sound

9  were 3 to 4 feet.

10  Q.   What about the Shelter Island Bay?

11  A.   Immediately inside the point of Orient Point as it

12  extended out the north fork of Long Island, the wind, if

13  it is blowing in Long Island Sound from the northwest,

14  blows across Orient Point and then the water on the other

15  side is usually flat and calm.

16  Q.   In reviewing Captain Thomas' deposition, did you

17  determine what his opinion of the water was?  Was it

18  rough, calm, moderate?

19  A.   Of course, yes.  All witnesses described the area as

20  having calm waters.

21  Q.   Now, there was an incident -- withdrawn.

22       Did there come a time that something became

23  clogged in one of the propellers of the Sea Jet?

24  A.   Yes.  After leaving the dock a vibration was noted --

25       MR. WILL:  Objection.

249

1    Sidebar, your Honor?

2    THE COURT:  Okay.

3    (Discussion at sidebar ensued as follows.)

4    THE COURT:  Where is he getting this information

5    from?

6    MR. GRIDELLI:  First of all, the plaintiff has

7    testified to this.  Plus, he's reading Captain Thomas'

8    deposition that said there was a clog they tried to

9    backflush three times.  I mean, that is not in dispute in

10   this case.

11   MR. WILL:  But he knows nothing about it.

12   THE COURT:  All right.  I will let him.  Just

13   limit it to that, but he can't give an opinion.

14   MR. GRIDELLI:  But see, there is a backflushing

15   announcement that comes out.  I want to discuss that.

16   THE COURT:  I'm going to allow it, but he can't

17   give his opinions as to what caused it.  He's reading

18   from --

19   MR. GRIDELLI:  But it is Captain Thomas.

20   THE COURT:  Did you understand what I said?

21   MR. GRIDELLI:  I did, your Honor, but I don't

22   understand.

23   THE COURT:  Why are you arguing with me if you

24   understand what I said?

25   MR. GRIDELLI:  Because I don't understand the

250

1   reason for your ruling.

2          THE COURT:  I told you before.

3          (Discussion at sidebar was concluded.)

4   BY MR. GRIDELLI:

5   Q.   In order to render you opinions to testify today, did

6   you have occasion to read Captain Thomas, the employee of

7   Cross Island Ferry, concerning the occurrence that night?

8   A.   Yes, I did.

9   Q.   Based on that sworn testimony of Captain Thomas, did

10  you come to learn whether there was any problem with any

11  of the engines that night traveling to New London,

12  Connecticut?

13  A.   Yes.

14          Captain Thomas states that he experienced a

15  vibration in his port engine and he stopped the vessel in

16  order to correct that problem.

17  Q.   Did he use the term or are you familiar with the term

18  *backflushing*?

19  A.   I saw the term in his deposition, yes.

20  Q.   And was there any announcement made during the

21  backflushing process?

22  A.   Yes.  Captain Thomas said he made an announcement a

23  couple of times during this process.

24  Q.   And that was an automated announcement.  Correct?

25  A.   Yes, I believe so.

1    MR. GRIDELLI:  This is Plaintiff's Exhibit 4,

2  your Honor.

3    THE COURT:  Is it in evidence?

4    MR. GRIDELLI:  It is in evidence.

5    THE COURT:  Okay.

6  BY MR. GRIDELLI:

7  Q.   I'm going to read it again if I can.

8    *Backflush Announcement.*

9    *Ladies and gentlemen, the vibration that you*

10  *felt was caused by an obstruction in one of the boat water*

11  *jets, and while we remove the obstruction, we will be*

12  *moving at slow speeds for the next couple of minutes.*

13    *Once again, the vibration that you felt was*

14  *caused by an obstruction in one or more jets.  In order to*

15  *remove the obstruction, we will be maneuvering at slow*

16  *speeds for the next couple of minutes.  We will be back up*

17  *to speed again shortly.*

18    *We apologize for any inconvenience and thank you*

19  *for your cooperation.*

20    Did I read that accurately?

21  A.   Yes, sir.

22  Q.   First of all, based on the deposition testimony, was

23  the boat maneuvering at slower speeds during the

24  backflushing operation?

25  A.   I believe, according to the testimony, the vessel was

252

1  stopped.

2  Q.   Now, there is testimony in this case by Heather

3  Gibson that after the third attempt to backflush, the

4  engines were revving, they seemed to be --

5          MR. WILL:  Objection.

6          Sidebar?

7          THE COURT:  I will let him continue.  I haven't

8  heard the question.

9  BY MR. GRIDELLI:

10 Q.   There is testimony in this case by Heather Gibson

11 that after the third attempt to move this backflushing

12 operation and three of these announcements, she believed

13 that the engines were revving and they seemed to engage

14 quickly and something happened to the boat.  Right?

15         Are you familiar with the testimony?

16 A.   Yes, sir.

17 Q.   And is there anything in this backflush announcement

18 that would inform any passenger that there might be either

19 a sudden acceleration or a tilting of the boat?

20         MR. WILL:  Objection.

21         THE COURT:  Sustained.

22 BY MR. GRIDELLI:

23 Q.   Do you have an opinion based upon a reasonable degree

24 of maritime experience and training whether this

25 announcement would be sufficient to notify passengers that

1  there might be a condition that would cause a problem?

2           MR. WILL:  Objection.

3           THE COURT:  Sustained.

4           MR. GRIDELLI:  May we have a sidebar, your

5  Honor?

6           THE COURT:  No.

7  BY MR. GRIDELLI:

8  Q.   Did this announcement tell anyone to remain seated?

9  A.   Can I see the announcement again?

10 Q.   Sure.

11          THE COURT:  Counselor, the jury can read just as

12 well as you and I.  They don't need an expert to tell them

13 what is in that article.

14 BY MR. GRIDELLI:

15 Q.   And there was a third announcement, when they were

16 arriving in New London.  Is that correct?

17 A.   That is correct.

18          MR. GRIDELLI:  Would the court prefer I not read

19 it, your Honor?

20          THE COURT:  No, you can read it, but we don't

21 need an expert to explain what ordinary language is.

22          He is an expert in a particular field, not in

23 English, and even if he was in English I wouldn't permit

24 it because the jury can read and see.

25          MR. GRIDELLI:  *Arrival Announcement in New*

254

1   *London.*

2          *Ladies and gentlemen, Welcome to New London.*

3          *We will be arriving at the dock in a few*

4   *minutes.  Please remain seated.  Keep all aisles clear*

5   *until the vessel is secured to the dock.  Please look*

6   *around your seats and be sure you have all your carry-on*

7   *items.*

8          *Once again, thank you for sailing with Cross*

9   *Island Ferry aboard the Sea Jet.*

10          Did I read that accurately?

11  A.    Yes.

12  Q.    Did the backflush announcement that we showed you

13  before, tell the passengers that the engines could engage

14  quickly and accelerate the boat?

15          MR. WILL:  Objection.

16          THE COURT:  Sustained.

17  BY MR. GRIDELLI:

18  Q.    Did the backflush announcement tell the passengers

19  that there could be sudden and unusual movement of the

20  vessel when starting up?

21          MR. WILL:  Objection.

22          THE COURT:  Sustained.

23  BY MR. GRIDELLI:

24  Q.    Do you have an opinion based upon a reasonable

25  degree --

255

1          THE COURT:  Sustained.

2          MR. GRIDELLI:  May I at least put the question

3    on the record, your Honor?

4          THE COURT:  Sure.  Go ahead.

5          MR. GRIDELLI:  I appreciate it.  Thank you.

6    BY MR. GRIDELLI:

7    Q.   Do you have an opinion based upon a reasonable degree

8    of maritime training and experience whether the backflush

9    announcements were sufficient under the circumstance?

10         MR. WILL:  Objection.

11         THE COURT:  Sustained.

12   BY MR. GRIDELLI:

13   Q.   Would it be a departure from prudent seamanship --

14         THE COURT:  Counsel, that is the end of that

15   line of questioning.  Move on.

16   BY MR. GRIDELLI:

17   Q.   In your review of this case, Captain Clifford, in

18   your opinion could the condition of the water in that

19   Shelter Island have caused the boat to lift or tilt?

20         MR. WILL:  Objection.

21         THE COURT:  Sustained.

22   BY MR. GRIDELLI:

23   Q.   Could the weather that night cause the boat to lift

24   or tilt?

25         MR. WILL:  Objection.

1    THE COURT:  I will let him answer that with a

2  yes or a no.

3  BY MR. GRIDELLI:

4  Q.   Could the weather that night have caused the boat to

5  lift or tilt?

6  A.   In my opinion, in this area no.

7  Q.   Was there any recording of any, in any of the logs in

8  this case that there was a, let's say, a whale or anything

9  that may have caused the boat to lift or tilt?

10    MR. WILL:  Objection.

11    THE COURT:  A whale?  Sustained.

12  BY MR. GRIDELLI:

13  Q.   Is there anything that you reviewed, Captain

14  Clifford, that would give you an opinion as to what caused

15  the boat to lift or tilt?

16    MR. WILL:  Objection.

17    THE COURT:  Sustained.

18  BY MR. GRIDELLI:

19  Q.   Now, you have been operating passenger vessels for 20

20  to 30 years?

21    THE COURT:  Sustained.

22  BY MR. GRIDELLI:

23  Q.   Do you have an opinion, Captain Clifford, whether it

24  was the piloting of this vessel that caused the vessel to

25  tilt?

1    MR. WILL:  Objection.

2    THE COURT:  Sustained.

3  BY MR. GRIDELLI:

4  Q.   Now, the announcements that you believe should have

5  been made, would it depend on the type of vessel that the

6  vessel is?

7    MR. WILL:  Objection.

8  BY MR. GRIDELLI:

9  Q.   Or would it be for any vessel?

10    THE COURT:  I will allow that.  Go ahead.

11  A.   Some announcements might be vessel specific.  For

12  example, when they talk about backflushing here, it is

13  vessel specific.  But most safety announcements are

14  general announcements.

15  BY MR. GRIDELLI:

16  Q.   Do you have an opinion based upon your experience

17  whether the announcements that were made in this case were

18  sufficient concerning what occurred that evening?

19    MR. WILL:  Objection, your Honor.

20    THE COURT:  Sustained.

21    MR. GRIDELLI:  Your Honor, can we have a

22  sidebar?

23    THE COURT:  No.

24    MR. GRIDELLI:  I misunderstood your ruling.

25    THE COURT:  Move on.

1  BY MR. GRIDELLI:

2  Q.   Would your knowledge about the amount of horsepower

3  on this vessel play a part in any opinion that you would

4  render?

5            MR. WILL:  Objection.

6            THE COURT:  Sustained.

7            Counsel, you are getting frustrated.  So am I.

8  You are showing it.  I'm showing it.

9            MR. GRIDELLI:  I understand it, your Honor,

10  because based on your ruling I'm not sure where I'm going

11  wrong, so I'm trying to learn.  I'm asking for the court's

12  indulgence.

13            THE COURT:  I told you my ruling.  He is not an

14  expert in jet propulsion and therefore he can't testify

15  about it.  He has no experience whatsoever, based upon his

16  own testimony, on jet propulsion.

17            He relied upon the plaintiff's testimony as to

18  what caused the accident.  He cannot do that.

19            MR. GRIDELLI:  He relied on the plaintiff's

20  testimony as to what occurred; not what caused the

21  accident, but what factually occurred.

22            THE COURT:  Good.  Okay.

23            MR. GRIDELLI:  And the children.

24            MR. WILL:  Objection.  Speaking objections.

25  BY MR. GRIDELLI:

259

1  Q.  Would the knowledge of the engine manufacturer play

2  any role in any opinions that you --

3          THE COURT:  Sustained.

4          MR. GRIDELLI:  May I --

5          THE COURT:  No.  If you continue -- sidebar.

6          (Discussion at sidebar ensued as follows.)

7          THE COURT:  If you continue, I'm going to have

8  to declare a mistrial.  I have had it.

9          MR. GRIDELLI:  Your Honor, I don't understand

10  your ruling.

11          THE COURT:  I'm sorry.  I explained it so many

12  times.  I explained it in front of the jury.  You still

13  don't understand.  You better learn how to understand.

14          MR. GRIDELLI:  And I'm just asking you to let me

15  make a represent --

16          THE COURT:  You have made a record ten times.

17          MR. GRIDELLI:  No.  No.  Because the questions I

18  ask are appropriate, and if you object to it, at least let

19  me put them on the record so I can protect the record.

20          THE COURT:  I'm telling you right now, proceed

21  without that.  If you do it again, I will blow my top.

22          You don't like my ruling.  I can understand

23  that, but you are supposed to obey it.  That is the reason

24  we have appellate courts.

25          (Discussion at sidebar was concluded.)

260

1    BY MR. GRIDELLI:

2    Q.    Captain Clifford, have you ever consulted for the law

3    firm of Cellino & Barnes in any other case?

4    A.    No, sir.

5    Q.    Have you ever consulted for the law firm of John

6    Mulvehill, the prior attorney for Heather Gibson, in any

7    other case?

8    A.    No, sir.  This is the only one.

9          MR. GRIDELLI:  May I just have a moment to

10   review my notes, your Honor?

11         THE COURT:  Yes.

12   BY MR. GRIDELLI:

13   Q.    Having gone over all the announcements that were made

14   that night by the crew and/or the captain, do you have an

15   opinion whether such announcements were sufficient based

16   on --

17         THE COURT:  Asked and answered.  I ruled on

18   that.

19         MR. GRIDELLI:  All right.  I don't remember his

20   answer, your Honor.  I thought you objected last time.

21         THE COURT:  You thought I objected so you are

22   asking the same question again.

23         Sustained.

24         MR. GRIDELLI:  Okay.

25         Thank you, Captain.  Nothing further.

1          THE COURT:  Stop shaking your head.  I'm as

2    annoyed as you are, that you will refuse to follow what I

3    tell you to do.

4          Cross-examination.

5

6    CROSS-EXAMINATION

7    BY MR. WILL:

8          MR. WILL:  Thank you, your Honor.

9    BY MR. WILL:

10   Q.   Captain Clifford, in your report you stated the

11   announcement was made three times within ten minutes.

12   Correct?

13   A.   That's correct.

14   Q.   And I believe you had testified at your deposition

15   that these announcements alert passengers of impending

16   movement.  Correct?

17   A.   Of impending movement.  Yes.

18   Q.   And I believe you testified that the announcements

19   advised passengers that the vessel would be back up to

20   speed shortly.  Correct?

21   A.   That is what the announcement says.  Correct.

22   Q.   And just to confirm a few things from your report.  I

23   want to confirm from your report that Miss Gibson did not

24   report the incident to crew members nor did she seek

25   medical assistance either at New London or upon her return

262

1   to Orient Point.  Correct?

2   A.   That is correct.

3   Q.   And --

4        MR. WILL:  Your Honor, I have no further

5   questions.

6        THE COURT:  Any redirect?

7        MR. GRIDELLI:  Too afraid, your Honor.  No,

8   thank you.

9        THE COURT:  Sidebar.

10       (Discussion at sidebar ensued as follows.)

11       THE COURT:  You pull that again and I will hold

12  you in contempt.

13       MR. GRIDELLI:  Yes, sir.

14       THE COURT:  Do you understand what I just said?

15       MR. GRIDELLI:  Yes, sir.

16       MR. WILL:  Your Honor, at this time, the

17  plaintiff having concluded the fact witnesses and expert

18  witnesses, I'm moving to dismiss.  He hasn't made out a

19  case against my client.

20       THE COURT:  Denied.

21       (Discussion at sidebar was concluded.)

22       THE COURT:  Plaintiff's next witness.

23       MR. GRIDELLI:  As the court's aware, my doctor

24  is scheduled to come tomorrow morning.  So subject to

25  that, we rest with the factual portion of our

1 | presentation.

2 | THE COURT: Do you have any other witnesses
3 | other than the doctor tomorrow morning?

4 | MR. GRIDELLI: Other than the subpoena that was
5 | discussed in your chambers, no.

6 | THE COURT: All right. You rest then subject to
7 | those things?

8 | MR. GRIDELLI: Yes, your Honor.

9 | MR. WILL: Your Honor.

10 | THE COURT: Are you ready to go with your first
11 | witness?

12 | MR. WILL: Your Honor, I know I have witnesses
13 | in the courthouse. I just have to locate one or two.

14 | THE COURT: We will take a short break.

15 | MR. WILL: Thank you, your Honor.

16 | THE COURT: And then the defense will start
17 | their case subject to their doctor coming tomorrow
18 | morning.

19 | (Recess taken at 10:30 am.)

20 | MR. GRIDELLI: Most respectfully, I would like
21 | to place something on the record.

22 | THE COURT: Go ahead.

23 | MR. GRIDELLI: Your Honor, previously Mr.
24 | Mulvehill hired Mr. Twombly as an expert witness in this
25 | case. He did examine the boat, did go on the ship, et

1  cetera.  He died before any depositions were conducted of

2  him.

3  Two experts were retained prior to our firm

4  getting involved:  a Captain Stevens and a Captain

5  Clifford.  After the depositions of Captain Stevens and

6  Captain Clifford, which we were not a party to, we became

7  attorneys of record and I requested in writing of Mr. Will

8  permission to have one of these experts, since Mr. Twombly

9  died, inspect the subject ship, including but not limited

10  to the propulsion system and the wheelhouse, in a letter

11  dated November 17, 2011, copy filed with the court.

12  I would like to mark that as a Court Exhibit.

13  There was a response by Mr. Will dated

14  November 18, also filed with the court --

15  THE COURT:  You can be seated.  You don't have

16  to stand.

17  MR. GRIDELLI:  -- vehemently denying the

18  request.

19  Therefore, I think in equity the court should

20  not preclude my experts when we requested that they be

21  permitted since the original expert witness died and they

22  objected to it and now they are arguing that no expert

23  should be allowed to testify.

24  So I would like to mark these as two court

25  exhibits.

1          THE COURT:  You can mark them as court exhibits.

2          MR. WILL:  Your Honor, just for the record.  The

3    matter was brought before Magistrate Boyle and the request

4    was denied.

5          THE COURT:  By the magistrate?

6          MR. WILL:  Yes.

7          THE COURT:  Was an appeal taken?

8          MR. GRIDELLI:  No.

9          MR. WILL:  No, your Honor.

10         MR. GRIDELLI:  No appeal was taken.

11         THE COURT:  Okay.  Bring the jury in.

12         (The following ensued in the presence of the

13   jury.)

14         THE COURT:  Call your next witness.

15                  **EVIDENCE FOR DEFENSE**

16

17   **CHARLES JADAMEC**

18         called by the defense, having been first duly

19         sworn/affirmed, was examined and testified as

20         follows:

21

22   DIRECT EXAMINATION

23   BY MR. WILL:

24   Q.   Mr. Jadamec, would you move the microphone a little

25   bit closer to you.  Thank you very much.

1    Now, Mr. Jadamec, by whom are you currently

2  employed?

3  A.   I'm employed by Solar Turbines.

4  Q.   As an engineer?

5  A.   Yes.

6  Q.   In November of 2007 were you employed by Cross Sound

7  Ferry?

8  A.   Yes, I was.

9  Q.   In what capacity?

10  A.   I was an engineer.

11  Q.   How long have you worked as an engineer for Cross

12  Sound?

13  A.   I started employment in June of 2006.

14  Q.   Do you hold any Coast Guard licenses?

15  A.   I do.

16  Q.   What licenses do you hold?

17  A.   An unlimited tonnage.

18  Q.   And is that for all seas?

19  A.   All seas, all vessels, steam and diesel.

20  Q.   Where did you obtain that license?

21  A.   I graduated Maine Maritime Academy with that license

22  in 2005.

23  Q.   And I would like to show you a document and ask you

24  if you can identify it.

25  A.   That is the engineering log from the Sea Jet.

267

1  Q.    Is that your handwriting?

2  A.    It is.

3  Q.    And is that the engineering log from November 16,

4  2007?

5  A.    I can't see the date but --

6        MR. WILL:  Your Honor, this has already been

7  exchanged and I would like to offer it as an exhibit in

8  the case.

9        It is listed in the pretrial order.

10       THE COURT:  I'm waiting for a response.

11       MR. GRIDELLI:  I'm just looking for my pretrial

12 order.

13       What exhibit is it?

14       No objection, your Honor.

15       THE COURT:  In evidence.

16       (Unidentified Defense Exhibit in evidence.)

17 BY MR. WILL:

18 Q.    Mr. Jadamec, is that your handwriting?

19 A.    Yes, sir, it is.

20 Q.    And were you the engineer on duty on the 6 pm trip on

21 the Sea Jet on November 16, 2007?

22 A.    Yes, I was.

23 Q.    Now, there has been testimony in the case by

24 Miss Gibson about activities of the vessel during the jet

25 clearing; and the sum and substance of what you said was

268

1    that the vessel seemed like it suddenly engaged, took off,

2    came up out of the water, and slammed down.

3              Now, is this vessel capable of such

4    acceleration?

5    A.    No.

6              MR. GRIDELLI:  Objection, your Honor.

7              May we have a sidebar?

8              (Discussion at sidebar ensued as follows.)

9              MR. GRIDELLI:  Your Honor, he has been listed as

10   a fact witness.  He is now asking that an expert opinion

11   be rendered by this witness whether the boat can or can't

12   do it.

13             MR. WILL:  He is the operating engineer.

14             MR. GRIDELLI:  It doesn't matter.  He is not

15   listed as an expert witness.

16             THE COURT:  You didn't list him as an expert

17   witness, did you?

18             MR. GRIDELLI:  No report from him was filed or

19   exchanged.

20             THE COURT:  Ask him what were the conditions and

21   so forth.  I don't want his opinion.

22             MR. WILL:  Can he tell the technical reasons why

23   the vessel can't accelerate?

24             MR. GRIDELLI:  No.

25             THE COURT:  No.  That your expert is going to

269

1   do, isn't he?

2           MR. WILL:  Yes.  But he is the operating --

3           THE COURT:  So why didn't you list him as an

4   expert and give a report?

5           Was he deposed?

6           MR. GRIDELLI:  No.  No, your Honor.

7           THE COURT:  Sustained.

8           (Discussion at sidebar was concluded.)

9   BY MR. WILL:

10  Q.   Mr. Jadamec, I would just like to ask you about the

11  actual components of the propulsion system.

12          Is there an emission control built into the

13  engine system?

14  A.   Yes, there is.

15  Q.   And in your experience what effect does that have on

16  the operation of the vessel?

17          MR. GRIDELLI:  Objection, your Honor.  Calls for

18  an opinion.

19          MR. WILL:  In his experience with the vessel.

20          THE COURT:  You didn't list him as an expert?

21          MR. WILL:  No, your Honor.

22          THE COURT:  Sustained.

23          See, we have rules.  When an expert testifies,

24  he is supposed to be an expert in the particular field

25  that he is testifying about.  He has to have knowledge of

1   it and he has to give a written report and the other side

2   has a right to cross-examine him.

3          This witness may be an expert but he wasn't

4   listed as an expert and didn't turn in a report so I can't

5   allow him to give his opinion.

6          The other expert I wouldn't allow because in my

7   opinion he didn't have any expertise in that particular

8   field that he was going to testify about.  You can't call

9   a mathematician to be an expert when you are dealing with

10  nuclear things.  He doesn't know anything about it.  He is

11  no expert.  He may be an expert in another field.

12         But also, you have to follow what the rules are

13  as an expert.  You have to file a report.  You have to

14  list him as an expert.  If it wasn't done, he can't

15  testify as an expert.  He can tell us what happened on

16  that day and what he saw and what he did.

17         Go ahead.

18  BY MR. WILL:

19  Q.   Mr. Jadamec, based on the logbook and the entries,

20  was there any notation or evidence that the vessel

21  suddenly accelerated on November 16, 2007?

22  A.   There is nothing in the log book that says that.

23  Q.   Is there any evidence that the vessel engaged in any

24  unusual physical movements on that night?

25  A.   None to my knowledge.

1  Q.   And if the vessel had tipped up on one side and

2  slammed down, would that be something that would be in the

3  log?

4  A.   In an event like that, yes.

5  Q.   And if the vessel acted unusually and suddenly

6  accelerated, would that be something that would be put in

7  the engine log?

8  A.   Yes.

9  Q.   And that would be something that would be

10  subsequently investigated?

11  A.   Yes.

12  Q.   Is that something that would be out of the ordinary,

13  the sudden lurch of the vessel?

14  A.   Very much so.

15  Q.   So in your -- now I want to ask you a few questions

16  about if a jet becomes clogged.

17        Do you understand?

18  A.   Yes.

19  Q.   In your experience do jets become clogged?

20  A.   On a regular basis.

21  Q.   And that is a common occurrence?

22  A.   Yes.

23  Q.   And in looking at -- is there a procedure called

24  backflushing, to clear the obstruction?

25  A.   Yes, there is.

1  Q.   Does the log book indicate that a jet became clogged

2  on that night?

3  A.   Yes, it does.

4  Q.   And by the way, is backflushing a routine type

5  procedure?

6  A.   Yes.

7  Q.   Is that like a standard operating procedure to get

8  rid of a clog?

9  A.   Yes, it is.

10        MR. GRIDELLI:  Objection.  Leading.

11        THE COURT:  Yes.

12  BY MR. WILL:

13  Q.   Now, in looking at the log, was backflushing

14  performed on that voyage?

15  A.   Yes.

16  Q.   And did you perform the backflushing?

17  A.   Yes, I did.

18  Q.   And was the clog cleared?

19  A.   It states it was.  Yes.

20  Q.   Excuse me?

21  A.   Yes, it was.

22  Q.   Now, after backflushing did the vessel continue on

23  its voyage?

24  A.   As far as I know, yes.

25  Q.   And if there is anything unusual with respect to the

1   vessel movements in continuing on the voyage, would that

2   have been noted in the engine log?

3   A.   Yes.

4   Q.   Now, before today have you ever spoken to

5   Mr. Gridelli?

6   A.   I spoke to him briefly on the phone.

7   Q.   Did you tell him the same things you told me today?

8   A.   Yes.

9           MR. GRIDELLI:  Objection.

10          MR. WILL:  No further questions, your Honor.

11

12  CROSS-EXAMINATION

13  BY MR. GRIDELLI:

14  Q.   Good morning, sir.

15  A.   Good morning.

16  Q.   Do you recall the sea conditions the night of this

17  incident in the Shelter Island Sound?

18  A.   I do not recall anything specific about that night.

19  Q.   Do you recall the weather condition that night?

20  A.   No.

21  Q.   Do you recall if there were any major swells in the

22  ocean that could affect the ship?

23  A.   That particular night I can't speak to any of the

24  conditions.

25  Q.   And the backflushing process that night occurred

274

1    three times.  Correct?

2    A.   I have no idea how many times it occurred.  It is

3    just I note that it occurred that I backflushed the boat

4    and that it cleared.  That's all I can attest to.

5    Q.   Well, the boat eventually got to New London.

6    Correct?

7    A.   Yes.

8    Q.   And then on its voyage back --

9              MR. WILL:  Objection.

10             THE COURT:  I will allow it.

11   BY MR. GRIDELLI:

12   Q.   And then on its voyage back, it couldn't continue.

13   Correct?

14   A.   That's what it says in the log.  Yes.

15   Q.   So it had to go back to New London.  Correct?

16   A.   That's where we were headed.  Yes.

17   Q.   And there was an attempt to see what was causing the

18   problem in the port jet.  Correct?

19   A.   That's what it says.  Yes.

20   Q.   And you had to actually open up the inspection port

21   to see what was stuck in there.  Correct?

22   A.   Yes.

23   Q.   And there was some line stuck in there.  Correct?

24   A.   According to my notes.  Yes.

25   Q.   How much line was stuck in there?

1    A.   I can't say how much.

2    Q.   So when you said that everything was cleared before

3    it got to New London, that is not accurate, right?  That

4    line was there?

5    A.   I said it seemed to be okay.

6         Obviously, by the time we got back to New London

7    we felt the need to check further.

8    Q.   Now, when the backflushing operation occurs, is the

9    engine revved up in order to propel the water?

10   A.   No, because it will destroy a seal in the water jet.

11   Q.   So the water --

12        THE COURT:  Sidebar.

13        (Discussion at sidebar ensued as follows.)

14        THE COURT:  If you go into anything concerning

15   his expertise you are opening up the door for him to come

16   back.

17        MR. GRIDELLI:  I'm --

18        THE COURT:  I'm just warning you because I ruled

19   against him.

20        MR. GRIDELLI:  He was involved in the

21   backflushing, so I'm asking the factual things that he did

22   to do the backflushing.

23        THE COURT:  You can, but you may be opening up

24   the door.  I don't know what you are going to ask.  I'm

25   just telling you.

276

1  MR. WILL:  I'm --

2  THE COURT:  What are you going to tell me?  Why

3  does everybody have to speak?  I just put him on notice

4  that he may opening up the door.

5  What do you want to say?

6  MR. WILL:  I wanted to say that he is talking

7  about the next voyage.  It is not relevant.

8  THE COURT:  I'm allowing it.

9  (Discussion at sidebar was concluded.)

10 BY MR. GRIDELLI:

11 Q.  Were you personally involved in the backflushing

12 process on the trip that night, November 16, 2007, when

13 the vessel went from Orient Point to New London?

14 A.  I was the engineer.  Yes, I was.

15 Q.  And as the engineer, you were in the area where you

16 would have to push a lever in order to reverse the

17 impellers?

18 A.  You physically have to go into the engine room and

19 there's a lever on the reduction gear.

20 Q.  That is what you did that night?

21 A.  Yes.

22 Q.  I'm just asking you factual questions about what you

23 did and what you saw that night.

24 A.  That is what I did.

25 Q.  And when you pushed the lever, does that change the

277

1  flow of the water?

2  A.   It reverses the flow of the water through the water

3  jet.

4  Q.   And then when you are done with that process, do you

5  notify the person in the wheel house?

6  A.   Yes, I do.

7  Q.   And then at that point does he reengage the system?

8  A.   At that point the captain takes control of the

9  vessel.

10  Q.   And then at that point there is an acceleration of

11  the vessel?

12          MR. WILL:  Objection.

13          THE COURT:  Overruled.  Go ahead.

14  A.   At that point the captain would engage the engine and

15  accelerate the engine.  Yes.

16          MR. GRIDELLI:  Thank you, sir.

17          MR. WILL:  No redirect, your Honor.

18          THE COURT:  You may step down.  You're excused.

19          (The witness was excused.)

20          THE COURT:  Next witness.

21

22  **DAVID THOMAS**

23          called by the defense, having been first duly

24          sworn/affirmed, was examined and testified as

25          follows:

1

2    DIRECT EXAMINATION

3    BY MR. WILL:

4    Q.    Good morning, Captain Thomas.

5    A.    Good morning.

6    Q.    Are you currently employed by Cross Sound Ferry?

7    A.    Yes, I am.

8    Q.    What is your position?

9    A.    Captain.

10   Q.    How long have you been a captain with Cross Sound

11   Ferry?

12   A.    Been employed by Cross Sound Ferry since 1985.

13   Q.    Since 1985 would you tell us the different vessels or

14   types of vessels you have operated for Cross Sound.

15   A.    Yes.

16         I have operated all their vessels, ranging from

17   110-foot car ferry up to a 320-foot car ferry as well as

18   the catamarans.

19   Q.    And the operation of these vessels, are these in the

20   waters between Orient Point and New London?

21   A.    That's correct.

22   Q.    Do you currently hold a Coast Guard license?

23   A.    Yes, I do.

24   Q.    What license do you hold?

25   A.    I hold a 1600-ton inland masters license.

279

1   Q.   Now I want to ask you some questions about the Sea

2   Jet.

3            Do you understand?

4   A.   Yes, sir, I do.

5   Q.   On November 16, 2007, were you the master of the Sea

6   Jet?

7   A.   Yes, I was.

8   Q.   And prior to November 16, 2007, how long had you

9   served on the Sea Jet?

10  A.   Three years.

11  Q.   And is it fair to say you are familiar with the

12  vessels?

13  A.   Yes, I am.

14  Q.   And is one of your duties as captain, navigating the

15  vessel?

16  A.   Yes.

17  Q.   And as captain are you responsible for passenger

18  safety?

19  A.   Yes, I am.

20  Q.   As captain are you responsible for safety of the

21  vessel?

22  A.   Yes.

23  Q.   And what type of vessel is the Sea Jet?

24  A.   She is a catamaran.

25  Q.   Passenger?

280

1    A.    Passenger, yes.

2    Q.    And what type of propulsion does it have?

3    A.    Diesel engines drive water pumps.

4    Q.    Now I want to ask some questions about the 6 pm trip

5    on November 16, 2007, between Orient Point and New London.

6          Do you understand?

7    A.    Yes.

8    Q.    And you testified that you were the captain on that

9    trip?

10   A.    Yes.

11   Q.    Do you have a personal recollection of that voyage?

12   A.    Yes, I do.

13   Q.    Now I want to refer to the logbook.

14         THE COURT:  Is that in evidence?

15         MR. WILL:  Excuse me, your Honor?

16         THE COURT:  Is it in evidence?

17         MR. GRIDELLI:  Yes, it is.

18         MR. WILL:  Yes, it is, your Honor.

19         THE COURT:  Okay.  In evidence.

20   BY MR. WILL:

21   Q.    Defendant F.  Now in looking at the log, could you

22   tell me who the mate was that night.

23   A.    Mate is Norm Specter.

24   Q.    Were there deck hands?

25   A.    Yes.

281

1   Q.   How many?

2   A.   There was three deck hands.

3   Q.   Could you identify them, please.

4   A.   Sean Walsh, Earl Clements, and Jeremy Barboza.

5   Q.   Did the vessel leave on time on that 6 pm trip?

6   A.   Yes, it did.

7   Q.   Now, when the vessel first left Orient Point, did you

8   make an announcement?

9   A.   Yes.

10  Q.   And the announcement has been previously marked as

11  Plaintiff's Exhibit 3.  And I will put it up again.

12          Can you take a look at that.  And was that

13  announcement played upon leaving Orient Point?

14  A.   Yes, it was.

15  Q.   And was that the automated announcement?

16  A.   Yes, it is.

17  Q.   And what is the purpose of this announcement?

18  A.   The purpose of the announcement is to welcome people

19  on board, instruct them as to where the life jackets are

20  kept, tell them about the ride control system.

21  Informative message, just to tell them our basic

22  operation.

23  Q.   And what were the forecasted sea conditions on that 6

24  pm trip?

25  A.   Sea conditions were moderate.

282

1        MR. WILL:  Your Honor, at this time --

2   BY MR. WILL:

3   Q.    This was an automated announcement that you played?

4   A.    Yes.

5   Q.    And you have heard the automated announcement?

6   A.    Yes, I have.

7        MR. WILL:  Your Honor, I would like to play the

8   automated announcement for the jury.

9        THE COURT:  If this is in evidence and you both

10  agree to it, why do you have to play it?

11       MR. WILL:  Well --

12       THE COURT:  Is it something different?

13       MR. WILL:  I think it would benefit the jury to

14  hear the actual announcement that was made.  It is only a

15  few minutes.

16       THE COURT:  There is no objection.  Play it.

17       (Audio playing.)

18       THE COURT:  We can't hear a word of it.  Go

19  ahead.

20       MR. WILL:  Are you able to hear it now?

21       THE COURT:  Not a word.

22       Maybe the jury can hear it.  I can't.

23       MR. WILL:  I apologize.  The microphones are not

24  transmitting the announcement.

25  BY MR. WILL:

283

1    Q.    Now, Captain, is one of the purposes of the

2    announcement to inform the passengers that there could be

3    unexpected seas?

4    A.    Yes.

5    Q.    Now, what were the actual sea conditions when the

6    voyage started?

7    A.    They were calm.

8    Q.    Now I want to ask you some questions about the

9    beginning of the voyage on November 16 from Orient Point

10   to New London.

11          Do you understand?

12   A.    Yes, I do.

13   Q.    Now, you testified that the Sea Jet has water jets.

14   Correct?

15   A.    Correct.

16   Q.    Did one of the jets become clogged on this 6 pm trip?

17   A.    Yes.

18   Q.    Did you notice a slight vibration in the jet when

19   that happened?

20          MR. GRIDELLI:  Objection.  Leading.

21          THE COURT:  Sustained.

22   BY MR. WILL:

23   Q.    Did you notice -- how did you know the jet was

24   clogged?

25   A.    You could feel the vibration.

284

1    Q.   How soon after leaving Orient Point did you notice

2    the vibration?

3    A.   Right away.

4    Q.   Now, is a clogged jet a common occurrence?

5    A.   Yes, sir, it is.

6    Q.   Now I want to ask you some questions about the

7    procedure to remove the clog.

8             Do you understand?

9    A.   Yes, I do.

10   Q.   Is that procedure called backflushing?

11   A.   Yes, it is.

12   Q.   And did you perform a backflushing operation on that

13   voyage to remove the clog?

14   A.   Yes.

15             (Continued on the following page.)

16

17

18

19

20

21

22

23

24

25

285

1  DIRECT EXAMINATION  (Continued)

2  BY MR. WILL:

3  Q    Now is backflushing the method that was the standard

4  to remove the clog?

5  A    Yes, it is.

6  Q    And prior to the backflush operation did you make an

7  announcement about the backflush.

8  A    Yes, I did.

9  Q    I would like to show you the backflushing

10  announcement which was already marked as plaintiffs'

11  Exhibit 12 in evidence.

12         Captain, did you look at the announcement?

13         Now is this the announcement that you played?

14  A    Yes, it is.

15  Q    And what is the purpose of the backflush

16  announcement?

17  A    It's to let the passengers know what the vibration

18  was they were feeling, and why we're slowing down.

19  Q    And does it alert passengers that, the fact of the

20  speed slow down?

21         MR. GRIDELLI:  Objection, leading.

22  A    Yes.

23         THE COURT:  I'll allow it.

24  BY MR. WILL:

25  Q    When did you make a backflush announcement?

1    A    As soon as I slowed the vessel down to a stop.

2    Q    Now, in addition to the automated backflushing

3    operation, did you make any live announcements?

4    A    Yes, I did.

5    Q    How many did you make?

6    A    Two.

7    Q    And in what period of time did you make the automated

8    and two live announcements?

9    A    Over a period of ten minutes.

10   Q    Now, I think there has been testified to in this case

11   that she believes the vessel, or the alleged vessel

12   suddenly took off and engaged, accelerated, such that the

13   right side of the vessel came up out of the water and

14   slammed down.

15        Captain you were on the bridge.  Did this occur?

16   A    No.

17   Q    And have you ever been able to make this vessel

18   suddenly accelerate?

19        MR. GRIDELLI:  Objection.

20        THE COURT:  I'll allow it.

21   A    No.

22   BY MR. WILL:

23   Q    That night did the vessel's right side raise up out

24   of the water and slam down?

25   A    No, it did not.

1    Q    That night did the vessel suddenly accelerate during

2    the backflushing operation?

3    A    No, it did not.

4    Q    Now I'm going to ask you some questions about Heather

5    Gibson.  Do you understand?

6    A    Yes, I do.

7    Q    Do you remember Heather Gibson on the 6 pm trip?

8    A    Yes, I do.

9    Q    And did you speak to her?

10   A    Yes, I did.

11   Q    And what was the nature of the conversation?

12   A    Heather Gibson asked me if we were going to make it a

13   last trip out of the New London that evening.

14   Q    Now when you spoke to her, this was after the arrival

15   at the New London.  Correct?  When you spoke to her --

16   when exactly did you speak to her?

17   A    I spoke to her during the trip back to New London.

18   Q    Okay.  And at any time during that trip did Heather

19   Gibson tell you that she or her family had been involved

20   in any incident, or had fallen, they had fallen down, or

21   did anything unusual happen?

22   A    No, she did not.

23   Q    Now, did you see Heather Gibson on the return trip

24   from New London to Orient Point?

25   A    Yes, I did.

1  Q    Now on that trip, did Heather Gibson tell you that

2  she had been involved in any incident with her children

3  falling down, or anything unusual with the vessel on the

4  trip over?

5  A    No, she did not.

6  Q    And did you again see her on Sunday night?

7  A    Yes, I did.

8  Q    And did you see her going over to New London and

9  coming back to New London to Orient Point on Sunday night?

10 A    I saw her that evening, yes.

11 Q    And at any time did she tell you that she had been

12 injured, or that there had been an incident involving her

13 children on the trip over on Friday night?

14 A    No, she did not.

15 Q    Now, captain, if there had been an incident with

16 Ms. Gibson, would you have been notified as the master of

17 the vessel?

18 A    Yes, I would have.

19        MR. GRIDELLI:  Objection, your Honor.  Would

20 have or should have is my objection.

21        THE COURT:  You want the question would you, or

22 should you?

23        MR. GRIDELLI:  Yes, I would like --

24 BY MR. WILL:

25 Q    Is it the policy of the company that if you, if

1  someone was injured or there was an incident, it would

2  have been reported to you as the captain?

3        MR. GRIDELLI:  No objection to that question.

4        THE COURT:  Okay.

5  A    Yes, it would have.

6  BY MR. WILL:

7  Q    And were you notified by any of the crew members that

8  Heather Gibson or her family were involved in any incident

9  on that Friday night trip?

10  A    No, I was not.

11  Q    And if there was, had been an incident, would that

12  have been noted in the log book which has been marked as,

13  in evidence?

14  A    Yes, it would have.

15  Q    And is there any indication in the log book that

16  Heather Gibson had reported or had suffered any type of

17  injury or incident on that Friday night trip?  And I'll

18  put the log book back up.

19        By the way, captain, that is your signature on

20  the log?

21  A    Yes, it is.

22  Q    Is there any indication in the log book that Heather

23  Gibson had been injured, or there was any incident

24  involving Heather Gibson or any other passenger on that

25  night, Friday night, November 16, 2007?

290

 1   A     No, there is not.

 2   Q     Now, since November 2007, have you seen Heather

 3   Gibson on the Sea Jet?

 4   A     Yes, I have.

 5   Q     I want to show you a picture.

 6            Captain, is this a fair and accurate

 7   representation of Heather Gibson on the Sea Jet after

 8   November 162007?

 9   A     Yes, it is.

10   Q     And at any of the other occasions you saw her, did

11   she ever tell you or report an injury or a fall, or an

12   incident on November 16, 2007?

13            MR. GRIDELLI:  Objection, your Honor.

14            There is no testimony he saw her any other time

15   other than in this picture.

16            THE COURT:  Sustained.

17            Did you see her any other time.

18            THE WITNESS:  Yes.

19            THE COURT:  Could you pinpoint when or

20   approximately when?

21            THE WITNESS:  Not exact dates.

22            THE COURT:  How many times did you see her after

23   that incident.

24            THE WITNESS:  I don't recall.

25

1    BY MR. WILL:

2    Q    Captain, did you see her more than once?

3    A    Yes.

4    Q    Was it more than five times?

5    A    I don't recall.

6    Q    Okay now, when you observed her on the ferry, did she

7    show any difficulty walking or moving around?

8              MR. GRIDELLI:  Objection.  Outside the scope.

9              THE COURT:  Overruled.

10   A    No, she did not.

11   BY MR. WILL:

12   Q    Any difficulty boarding or disembarking the vessel?

13   A    No.

14   Q    Thank you?

15             MR. WILL:  No further questions.

16             Your Honor, I want to put the picture into

17   evidence?

18             THE COURT:  In evidence.  What number is it?

19             Did you put a number on it so we know?

20             MR. WILL:  G.

21             THE COURT:  Okay in evidence.

22             (Defense Exhibit G received in evidence.)

23             THE COURT:  You can take it down.

24             MR. GRIDELLI:  May I question about it?

25             THE COURT:  Oh, sure.

1    MR. GRIDELLI:  Thank you.

2

3  CROSS-EXAMINATION

4  BY MR. GRIDELLI:

5  Q    Good morning, Captain Thomas.  My name is George

6  Gridelli.  We never met other than in this litigation.  Is

7  that correct?

8  A    Good morning.

9  Q    The picture that you identified of Heather Gibson,

10  what part of the vessel is that?  Is that where they

11  board?

12  A    It's where we board, exit the vessel.

13  Q    Did you ever see a picture of her in the vessel that

14  day?

15  A    Not to my knowledge.

16  Q    Are you telling this jury that you're certain that

17  she rode the vessel that day, or had she just been

18  bringing her children and had one family member take them

19  over?

20  A    Would you repeat the question, please.

21  Q    Are you certain that Heather Gibson on that day, the

22  date on there, May 3, 2008, actually took the trip that

23  day, or could she have just been bringing her children on

24  and have one of the family members take them?

25  A    I know she is exiting the vessel here.

1   Q    The sea conditions were calm on November 16, 2007?

2   A    Sea conditions were moderate.

3   Q    How about the area where the backflushing occurred;

4   that would have been Shelter Island Bay?

5   A    No.  That's in the, I believe Orient Point,

6   Gardiners' Bay.

7   Q    Is that where with the sea conditions were calm

8   there?

9   A    That's correct.  That is where sea conditions were

10  calm.

11  Q    When did you first hear that Heather Gibson was

12  filing a claim or commencing a lawsuit with an attorney,

13  about what she claims happened that day?

14          MR. WILL:  Objection.

15          THE COURT:  Ask the question again.

16  BY MR. GRIDELLI:

17  Q    When is the first time that you heard that Heather

18  Gibson was filing a claim or commencing a lawsuit

19  concerning what she claimed happened on that trip?

20          THE COURT:  I'll allow it.

21  A    I don't recall.

22  BY MR. GRIDELLI:

23  Q    So as you sit here today you're telling this jury

24  that you have a distinct recollection of Heather Gibson on

25  a trip that occurred almost five years ago?  Is that what

1  you're telling us?

2  A    Which trip are you referring to?

3  Q    The trip where it is claimed that she was injured,

4  the trip from Orient Point to New London on November 16,

5  2007?

6  A    I do recall.

7  Q    You do recall it?

8  A    I do recall.

9  Q    And prior to November 16, 2007, she was on that ship

10  approximately every two weeks, correct?

11           MR. WILL:  Objection.

12           THE COURT:  Overruled.

13  A    I know she's one of the frequent passengers.  I don't

14  know exactly what her schedule was.

15  Q    Now do you list a number of passengers that would be

16  on the vessel for any trip in your log?

17  A    Yes, we do.

18  Q    I'm going to put the log up again.

19           Can you tell by looking at that how many

20  passengers were on the ferry that went from Orient Point

21  to New London the 16th of November?

22           THE COURT:  You mean September?

23           MR. GRIDELLI:  November 16, 2007, the date of

24  the incident.  Did I misspeak?

25           THE COURT:  Oh, I'm wrong.  It's November.

1    MR. GRIDELLI:  November 16, 2007.

2    THE COURT:  I'm wrong.

3  A    Would you repeat the question, please.

4  BY MR. GRIDELLI:

5  Q    Looking at the log -- if I don't have it in the right

6  area here you can tell me -- by looking at the log, does

7  it tell you how many passengers were on the ferry that

8  night, the ferry that went from Orient Point to New London

9  on November 16, 2007?

10  A    Yes, it does.

11  Q    And how many?

12  A    20 people.

13  Q    20 passengers.  And how many passengers does the

14  vessel hold?

15  A    400.

16  Q    Has this vessel ever been called or described by you

17  as a, by someone, as a fast ferry to you?

18  A    I'm sorry, I don't understand your question.

19  Q    Well, has anyone ever described the vessel in

20  conversation with you, described it as a fast ferry?

21  A    Not to my knowledge.

22  Q    Now the night in question, November 16, 2007, you

23  attempted the backflushing three times, correct?

24  A    I don't remember how many times.

25  Q    But you remember that Heather Gibson was on that trip

1  that night?

2          THE COURT:  Sustained.

3  BY MR. GRIDELLI:

4  Q    Now before you proceeded to Orient Point, did you

5  call anyone?  I'm sorry.  Before you proceeded to New

6  London, did you call anyone that night?

7          MR. WILL:  Objection.

8          THE COURT:  I want to see where he is going.  Go

9  ahead.

10 A    Would you ask the question again, please.  I'm sorry.

11 BY MR. GRIDELLI:

12 Q    And I'm sorry.  If you don't understand any of my

13 questions, tell me and I'm happy to repeat it or rephrase

14 it.

15          After the backflushing operation, whether it was

16 one, two,  three times, whatever -- at some point did you

17 call Mr. Sise who was the operations manager for the Cross

18 Sound Ferry?

19 A    Yes, I did, I called Richard Sise.

20 Q    Sorry, forgive me.

21          And that's in your note.  Is that right?

22 A    Yes, it is.

23 Q    And would you always call him when there is a

24 backflushing operation, or only certain times?

25 A    Not every time.

297

1    Q    And would it be fair to say that you called him on

2    this time because you still felt some vibration in the

3    vessel after you backflushed?

4    A    Yes.

5    Q    And isn't it true that you asked him to make a

6    decision whether you should go back to Orient Point or

7    proceed to New London?

8    A    No.

9    Q    You didn't ask him what you should do?

10    A    I was informing him what we were doing.

11    Q    And it was your decision to proceed to New London?

12    A    Yes.

13    Q    And you still felt some slight vibration as you

14    continued on, correct?

15    A    At what point?

16    Q    As you continued on after the number of backflushing

17    operations, you still felt the vibrations, did you not?

18            MR. WILL:  Objection.

19            THE COURT:  Overruled.

20    BY MR. GRIDELLI:

21    Q    Do you recall, sir?

22    A    Once we backflushed, we proceeded to New London.

23    Q    And I'm asking, do you recall any, feeling any

24    vibrations as you proceeded after the backflushing from

25    the point you did the backflushing to New London?

1    A    Yes.  There was a slight vibration.

2    Q    And it was still in the port engine, correct?

3    A    Port jet.

4    Q    Port jet, correct.

5         Now is it your understanding that Ms. Gibson's

6    claim is that the right side of the boat lifted up?

7              MR. WILL:  Objection.

8              THE COURT:  If he knows.

9    A    I don't know.

10   BY MR. GRIDELLI:

11   Q    Well, when Mr. Will was questioning you he was

12   talking about whether the right side of the boat lifted

13   up.

14        Do you recall that?

15   A    Yes, I remember that.

16   Q    And is it your understanding that that's the claim

17   that Ms. Gibson is making, that the right side of the boat

18   raised?

19   A    Yes.

20   Q    Do you know where she was sitting that night?

21   A    She was sitting over on the port side, the upper

22   passenger cabin.

23             THE COURT:  That would be the right side or the

24   left side?

25             THE WITNESS:  I'm sorry.  That would be on the

1  left side.

2  BY MR. GRIDELLI:

3  Q    So in order for someone to fall out of the benches on

4  the left side, the left side of the boat would have to be

5  raised, correct?

6          MR. WILL:  Objection.  He is asking for an

7  opinion, your Honor.  Objection.

8          THE COURT:  Overruled.  Do you know?

9  A    I don't know for certain.

10  BY MR. GRIDELLI:

11  Q    You don't know if there is a claim that someone fell

12  out of the seats on the port side, it would have to be the

13  port side of the boat that was raised?  You don't know

14  that?

15  A    That makes sense, yes.

16  Q    Now, there is an operation manual for the Sea Jet,

17  correct?

18  A    That's correct.

19  Q    And you had an opportunity to review it as captain of

20  this vessel or master of this vessel?

21  A    Yes, I have.

22  Q    By the way, you're still employed by Cross Sound

23  Ferry, correct?

24  A    Yes, I am.

25  Q    And what did you earn last year in 2011?

1    MR. WILL:  Objection.

2    THE COURT:  Sustained.

3    MR. GRIDELLI:  Goes to motive, your Honor.

4    THE COURT:  Sustained.

5  BY MR. GRIDELLI:

6  Q    Are you a member of a union that would protect you as

7  an employee of Cross Sound?

8    MR. WILL:  Objection.

9    THE COURT:  I'll let him answer that.

10 A    I am not a member of the union.

11 BY MR. GRIDELLI:

12 Q    Do you have a written employment contract that would

13 protect you from being discharged other than for cause?

14   MR. WILL:  Objection.

15   THE COURT:  I'll let him answer.

16 A    Would you repeat the question, please?

17   MR. GRIDELLI:  Your Honor, can I have that read

18 back?  I don't think I can do it as well.

19   THE COURT:  Try.

20 BY MR. GRIDELLI:

21 Q    Do you have any type of written employment contract

22 that would prevent you from being terminated other than

23 for cause?

24 A    No.

25 Q    So you're an employee at will for Cross Sound Ferry?

1  A    I'm an employee for -- would you repeat that?

2  Q    Are you an employ at will for Cross Sound?

3         THE COURT:  I don't know if he knows what is *at*

4  *will*.

5         MR. WILL:  Objection, your Honor.

6         THE COURT:  Sustained.

7  BY MR. GRIDELLI:

8  Q    Now, is it your testimony that you have a personal

9  recollection of that voyage that happened on the 16th?

10 A    Yes, I do.

11 Q    And it's not because the vessel did any type of

12 unusual maneuver?

13 A    That's correct.

14 Q    What is the highest speed that the vessel can obtain?

15 A    30 knots.

16        THE COURT:  What was that question?  What is the

17 highest speed it can or did?

18        MR. GRIDELLI:  Can.

19        THE COURT:  Can, okay.

20 BY MR. GRIDELLI:

21 Q    Now, there are a number of deck hands or crew members

22 on each voyage, correct?

23 A    That's correct.

24 Q    And if you go to the top right of this, where it says

25 *crew*, and I'm pointing to that, correct?

1   A    Yes.

2   Q    And below that was your name as the captain?

3   A    Yes.

4   Q    Mr. Spector, he is the first mate?

5   A    He is the mate.

6   Q    The mate, excuse me.

7        Clemens, what is his position?

8   A    Deck hand.

9   Q    Mr. Barboza?

10  A    Deck hand.

11  Q    Mr. Walsh?

12  A    Deck hand.

13  Q    And the next two names are the engineers?

14  A    Correct.

15  Q    And then at the bottom of the Exhibit, Plaintiff's 1,

16  it says *deck watch*, correct?

17  A    That's correct.

18  Q    And the crew members are assigned to do a certain

19  procedure or certain obligation known as a *deck watch*?

20  A    Yes, they are.

21  Q    And for each voyage, is there one crew member that's

22  assigned that job as the deck watch?

23  A    Yes, there is.

24  Q    And on a normal day or on a normal week back in

25  November of '07, how many trips would the ship take, or

1    the vessel take, let's say, on any Friday?

2    A    If you can scroll down again, I can look at the log

3    to refresh my memory.

4    Q    That's the end of the exhibit.  There you see

5    numbers?

6    A    Yes, I do.

7    Q    Would it be fair to say that normally there are eight

8    trips going there and coming back?

9    A    Yes.

10   Q    Four round trips, yes?

11   A    Yes.

12   Q    And listed on this deck watch is the deck hand that

13   is responsible for doing the deck watch procedure,

14   correct?

15   A    That's correct.

16   Q    And would it be fair to say that the deck watch

17   person, the crew member that is assigned the deck watch,

18   is to go around to make sure the passengers are okay, and

19   make sure everything is running normally with respect to

20   the cabins?

21   A    Yes, that's correct.

22   Q    And would you tell me what number voyage the 6 pm

23   flight (sic) was?  Would that be the 6th voyage?

24   A    Yes.

25   Q    And there is no -- correct me if I'm wrong, but there

1  is no one listed on the number 6 who would be in charge of

2  deck watch, correct?

3  A    That's correct.

4  Q    Do you know why that happened or why no one was

5  listed?

6  A    I do not.

7  Q    Could it have been that Mr. Barboza had the deck

8  watch for that trip?

9  A    Mr. Barboza would have had the eighth watch.

10  Q    How about Mr. Clemens -- well, do you have a personal

11  recollection who was in charge of deck watch for the trip,

12  the 6 pm trip from Orient Point?

13  A    I do not.

14        I can go back and look at one through four and

15  figure out who had that watch.  It would take me a moment.

16  Q    Now, you said that it was three backflush

17  announcements made in a ten-minute period that night?

18  A    That's correct.

19  Q    I'll put that up again on the screen.

20        Part of the sentence says, *In order to remove*

21  *the obstruction, we will be maneuvering at slow speeds for*

22  *the next couple of minutes.*

23        Is that what it says?

24  A    That's what it says.

25  Q    When you were doing the backflush operation, were you

1    maneuvering at the slow speed?

2    A    No.

3    Q    In fact, the vessel comes to a complete stop and

4    drifts?

5    A    That's correct.

6    Q    You said, that's correct?

7    A    Yes.  That evening, we were stopped.

8    Q    Now, when you made the two announcements, did you

9    basically read what the automated backflush announcement

10   says?

11   A    My own personal announcement?

12   Q    Yes.

13   A    I don't recall verbatim.

14   Q    Now, when the backflush occurs, what happens to the

15   RPMS on the engine?

16   A    Nothing.

17            THE COURT:  What does that mean, RPMs?

18            THE WITNESS:  The RPMs remain the same.

19            THE COURT:  And what is that, zero?

20            THE WITNESS:  It's at an idle.

21            THE COURT:  Okay, like when a car is in neutral?

22            THE WITNESS:  Yes.

23            THE COURT:  Okay.

24   BY MR. GRIDELLI:

25   Q    And did you increase the RPMs in order to determine

1  which port is blocked or which port has debris in it?

2  A    No.

3  Q    Let me -- do you recall being deposed in this case

4  back on November 18, 2008?

5  A    Yes, I do.

6  Q    It's been about almost exactly a year after this

7  incident, correct?

8  A    Yes.

9  Q    And have you had a chance to review your deposition

10  before testifying here today?

11  A    Yes.

12  Q    Reading from Page 42.  Let's start at line 7.

13        Question --

14        I'm reading a number of questions and answers

15  and I'll ask if you recall giving these responses,

16  Captain, okay?

17  A    Yes.

18  Q    *Question:  And you said, "Once again, the vibration*

19  *that you felt was caused by an obstruction in one of our*

20  *water jets."*

21        *How did you make a determination that the*

22  *obstruction was in one water jet as opposed to both?*

23        *Answer:  Each water jet can be operated*

24  *independently of each other, so you can very easily*

25  *determine which side the obstruction is in.*

1       *Question:  And how was that determined?*

2       *Answer:  It's determined once I stop the boat*

3   *because you can determine it by increasing the RPMs on the*

4   *port side, and then on the starboard side.  And if you*

5   *feel the vibration, it's in whichever one that you*

6   *increased the RPMs with.*

7       Do you recall giving those answers?

8   A   Yes.

9   Q   So when I asked you if you then increased the RPMs to

10  determine where the problem was, you said, No, you didn't?

11  A   I beg your pardon.  I think you said during the

12  backflush.  That was the question.

13  Q   Before you determined which port was clogged, I

14  initially asked you about backflushing.

15      I said, How do you determine which port it is?

16  Would you have to increase the RPMs?

17      And you said, No.

18      So would you increase the RPMs to determine

19  which port is affected?

20  A   Yes.  I'm sorry.  It was confusing.

21  Q   Is there any announcement made during any time in

22  that trip to remain seated unless there is rough seas?

23  A   To remain seated unless there are rough seas?

24  Q   Unless there are rough seas, do you tell passengers

25  to remain seated?  In any other situation, is there any

1   announcement to the passengers to remain seated?

2   A    You mean the announcement that we played was for

3   moderate seas.  It was a cautionary statement.  It says at

4   times sea conditions may be rough.

5   Q    But the area where this incident happened, the seas

6   were calm, not rough, correct?

7   A    That's correct.  It was calm.

8   Q    So let me ask you again.

9        Is there any announcement that, other than a

10  situation where you might experience rough seas, you

11  advise the passengers to remain seated?

12  A    No.

13  Q    In fact, there is a concession stand on the vessel,

14  correct?

15  A    Yes, there is.

16  Q    And I would think you would want people to use the

17  concession stand, correct?

18  A    Yes.

19  Q    And you have bathrooms for people in case they need

20  to use the facilities?

21  A    Yes.

22  Q    And they have to get up and walk around to do those

23  things, correct?

24  A    That's correct.

25  Q    And you anticipate that people move about the vessel,

1  correct?

2  A    Yes.

3  Q    It's quite common that people would maybe even change

4  decks if it's a nice day, go up to the top, correct?

5  A    Yes.

6  Q    Now, can the -- you are familiar with the operations

7  manual for the Sea Jet, correct?

8  A    Yes.

9  Q    Are you familiar specifically with Section 5.10.3 --

10  I'm sorry, 5.10.8?

11  A    Not by number.

12  Q    Are there any situations where the vessel -- based on

13  this manual for the vessel where it indicates that the

14  vessel can veer sharply?

15           MR. WILL:  Objection.

16           THE COURT:  Sustained.

17           MR. GRIDELLI:  Your Honor, this is in evidence.

18  May I read the exhibit?

19           MR. WILL:  Objection.

20           THE COURT:  Sidebar.

21           (The following occurred at sidebar.)

22           THE COURT:  How big is the Exhibit?

23           MR. GRIDELLI:  I just want --

24           THE COURT:  No, I mean how big is the exhibit?

25           MR. GRIDELLI:  The whole Exhibit is 40, 50

1    pages.

2              THE COURT:  That is what I mean.  You have to

3    show him what you're talking about.

4              MR. GRIDELLI:  I'll do that.

5              THE COURT:  So show it to him.

6              MR. GRIDELLI:  It's only one section.

7              MR. WILL:  It's not relevant.  It's not

8    relevant, your Honor.  I'm objecting because of the

9    relevance.

10             THE COURT:  What is the question?

11             MR. GRIDELLI:  My question is -- my question

12   was, is there anything in the manufacturer's handbook that

13   talks about whether the vessel can veer sharply.  And

14   there is, right here in Section 10.8.

15             THE COURT:  Show it to him and let him see it so

16   he knows.  Because if I asked you section and procedure,

17   you wouldn't know what I'm talking about.

18             MR. GRIDELLI:  I was going to put it on the

19   screen.

20             THE COURT:  Show it to him so he has an idea of

21   what you're talking about.

22             MR. GRIDELLI:  May I put it on the screen so he

23   can see it that way, or do you want --

24             THE COURT:  No.  Just ask him.  Show it to him.

25             (The following occurred in open court.)

1    MR. WILL:  Your Honor, may I approach?

2    (The following occurred at sidebar.)

3    MR. WILL:  Your Honor, he is not an expert

4  witness.  And that is when only when the vessel is at high

5  speed.  It's totally irrelevant.

6    THE COURT:  Overruled.  He can cross-examine

7  him.

8    (The following occurred in open court.)

9    THE COURT:  When people ask for a specific

10  section out of a book, most of us don't know a specific

11  section, including myself.  So I asked how many pages

12  there are, show him what you're referring to, not just the

13  number.

14    And as I said, if you ask me page 36 of the

15  Rules of Procedure, I wouldn't know what they are unless

16  you showed it to me.  Then you ask the question.

17    Go ahead, show it to him.

18    MR. GRIDELLI:  Should I approach the witness to

19  show it to him, your Honor?

20    THE COURT:  How many times did I say yes?

21    MR. GRIDELLI:  I didn't hear you.  I'm sorry.

22    THE COURT:  When you were up there, you didn't

23  hear me?  I made the ruling in your favor, and you didn't

24  hear me?

25

1   BY MR. GRIDELLI:

2   Q    Would you look at Section 5.10.8.  Just look at it to

3   yourself and read it to yourself.

4          Have you read that section previously?

5   A    Yes, I have.

6          MR. GRIDELLI:  Can I take it back, your Honor,

7   and put it on the screen?

8          THE COURT:  Sure.

9          MR. GRIDELLI:  Thank you.

10  BY MR. GRIDELLI:

11  Q    We're referring to this Section 5.10.8, correct?

12  A    Yes.

13  Q    You can see it on the screen now.

14         And it says, *Navigation buoys, vessels and*

15  *hazards should be given a wide birth when operating at*

16  *high speed.*

17         Have I read it so far correctly?

18  A    Yes.

19  Q    *Mechanical failure or ingestion of a lobster*

20  *pot/debris into one of the jets may cause the vessel to*

21  *veer sharply at any time.*

22         Correct?

23  A    That is what it says.

24  Q    Do you know who authored this manual?

25  A    No, I do not.

1 Q    Is it the manufacturer of the boat that authored the

2 manual?

3 A    Again, I do not know.

4 Q    Did you personally --

5        MR. GRIDELLI:  This is my last question, your

6 Honor.

7        THE COURT:  Normally, it's not a good sign when

8 he says this is the last.  Go ahead.  They always call it

9 to my attention when they say it's the last question.  Go

10 ahead.

11       MR. GRIDELLI:  This is the last question.

12 BY MR. GRIDELLI:

13 Q    You said that it's policy that if somebody is

14 injured, you're supposed to be notified, correct?

15 A    That's correct.

16 Q    And if one of the crew members asked Ms. Gibson if

17 she was all right and she said she thought so and she

18 thought her boys were all right, you wouldn't be notified

19 of that because there is no claim of injury, correct?

20 A    That's correct.

21 Q    Did you ever direct anyone either by prerecorded

22 announcement or verbally to remain seated during the

23 backflush operation or after the backflush operation?

24 A    Would you repeat the question again, please.

25 Q    Did you ever make an announcement, either prerecorded

1  or orally, during the backflush or immediately after the

2  backflush to -- for passengers to remain seated?

3  A    No, I did not.

4  Q    Do you know if anyone on the vessel did that through

5  the public address system?

6  A    Not through the public address system.

7          MR. GRIDELLI:  Thank you, Captain.

8          THE COURT:  Redirect.

9          And the same rules apply, that apply on direct.

10          MR. WILL:  Thank you, your Honor.

11

12  REDIRECT EXAMINATION

13  BY MR. WILL:

14  Q    Captain, just before -- when you talked about the

15  port side, we're talking about the left side of the

16  vessel?

17  A    That's correct.

18  Q    And when you talk about the starboard side, you're

19  talking about the right side of the vessel?

20          THE COURT:  I already asked him that question.

21          Go ahead.

22  BY MR. WILL:

23  Q    Now Captain, counsel brought your attention to the

24  section of the manual of 5.10.8.

25          Let's take a look at that again, please.

1    Now, Captain, is it correct that that caution is

2  for when the vessel is operating at high speed?

3  A    Yes.

4  Q    It would have no application to when you're stopped

5  and backflushing?

6  A    That's correct.

7  Q    Now Captain, will you describe for me how you brought

8  the vessel after the backflushing, back on the voyage,

9  what you did physically?

10    MR. GRIDELLI:  Objection.  Outside the scope of

11  cross.

12    THE COURT:  I'll allow it.

13  A    After the backflushing, we slowly brought the vessel

14  up to speed and proceeded to New London.

15  BY MR. WILL:

16  Q    And you brought it slowly up to speed.  Were you

17  determining if the clog was clear for you to proceed?

18    MR. GRIDELLI:  Objection.

19    THE COURT:  Sustained.

20  BY MR. WILL:

21  Q    What was the purpose of proceeding in that manner?

22  A    Just general good seamanship.  Make sure that the

23  clog is -- that the jet is free and bring the vessel

24  slowly up to speed.

25    MR. WILL:  Thank you.

1    No further questions, your Honor.

2    MR. GRIDELLI:  May I, your Honor?

3    THE COURT:  Yes.

4

5    RECROSS-EXAMINATION

6    BY MR. GRIDELLI:

7    Q    5.10.8, the last few words of the last sentence says,

8    *cause the vessel to veer sharply at any time.*

9    Do you see that?

10   A    Yes, I see that.

11   Q    It doesn't say cause the vessel to veer sharply at

12   high speed, does it?

13   A    Not in that sentence.

14   Q    So your term taking is it's only referring to high

15   speed?

16   A    The first part of that paragraph, yes.

17   MR. GRIDELLI:  Thank you.

18   No further questions.

19   THE COURT:  You may step down.

20   MR. WILL:  Anything further?

21   THE COURT:  You may step down.  We'll take a

22   short break, about 10, 15 minutes.  I have another case.

23   (A recess was taken at 11:39 a.m.)

24   (The jury entered the courtroom.)

25   THE COURT:  Be seated.  Next witness.

1    NORMAN SPECTOR

2            called as a witness, having been first duly sworn,

3            was examined and testified as follows:

4            THE COURT:  Give us your name and spell it,

5    please.

6            THE WITNESS:  My name is Norman Spector,

7    S-P-E-C-T-O-R.

8            THE COURT:  And talk into the mike and bring the

9    mike closer so the jury can hear you.

10           MR. WILL:  May I proceed, your Honor?

11           THE COURT:  Yes.

12           MR. WILL:  Thank you.

13

14   DIRECT EXAMINATION

15   BY MR. WILL:

16   Q    Mr. Spector, are you currently employed by Cross

17   Sound Ferry?

18   A    Yes, I am.

19   Q    And how long have you been employed by Cross Sound

20   Ferry?

21   A    Eight years.

22   Q    And would you tell me about your prior ship or

23   sailing experience?

24   A    I've operated ten different water powered catamarans

25   for various companies.

1  Q    And is it fair to say you were employed by Cross

2  Sound Ferry in November of 2007?

3  A    Yes.

4  Q    And do you currently hold a mate's license from the

5  United States Coast Guard?

6  A    I have a masters license which covers mate.

7  Q    So you have a captain's license?

8  A    It's above a mate's license, right.

9  Q    And how long have you had the captain's license?

10 A    Since 1996.

11 Q    And is it fair to say that you were then qualified as

12 a licensed mate in November of 2007?

13 A    Yes.

14 Q    And as a licensed mate, do you assist the captain in

15 navigating the vessel?

16 A    Yes.

17 Q    And are you in charge of supervising the deck hands?

18 A    Yes.

19 Q    And is -- in the chain of command, is doe the captain

20 supervise you?

21 A    Yes.

22 Q    So the captain supervises you and you supervise the

23 deck hands?

24 A    Correct.

25 Q    And are you familiar with what the deck hands do?

1  A    Yes.

2  Q    And is one of the duties of deck hands to patrol the

3  decks?

4  A    Yes.

5  Q    Now, on this particular voyage, were there three deck

6  hands?

7  A    Three deck hands, yes.

8  Q    And could you tell me what their individual duties

9  were.

10  A    The deck hands' duties involve, you know, one deck

11  hand would serve as a helmsman, one deck hand would serve

12  as a deck patrol, and he would be on lookout for any

13  safety concerns, housekeeping concerns and the other deck

14  hand is off on a particular trip.

15  Q    Does the duty of the deck hand on the lookout relate

16  to anything to do with passenger safety?

17  A    Yes.

18  Q    And anything, if anything unusual happens on the

19  voyage, is that reported to you as the mate?

20  A    Yes.

21  Q    And I'm going to ask some questions about incident

22  reports, okay?

23         Do you have a rule of thumb with respect to

24  reporting incidents?

25  A    I do.

1    If any of the crew members give so much as a

2    Band-Aid, it gets filled out in an incident report.

3    Q    And if there is any type of incident, a report of a

4    problem, a fall with respect to passengers, is that

5    reported to you?

6    A    Yes.

7    Q    Any complaint involving passengers' safety comes back

8    to you, correct?

9    A    Correct.

10   Q    And would an incident report be filled out?

11   A    Yes, absolutely.

12   Q    I'm going to ask some questions about November 16,

13   2007, the 6 pm trip from Orient Point to New London.  Do

14   you understand?

15        Were you working as a mate that day?

16   A    Yes.

17   Q    Are these duties as a mate the same as you described

18   a moment ago?

19   A    Yes, they were.

20   Q    And is it fair to say you supervised that crew during

21   that 6 pm trip?

22   A    Yes.

23   Q    There were three deck hands?

24   A    Yes.

25   Q    And the duties of those deck hands were the same as

1   you described a few minutes ago?

2   A    Yes.

3   Q    And what is the purpose of the deck patrol?

4   A    The deck patrol roams about the vessel and looks for

5   any, as I said, passenger safety-related concerns, vessel

6   safety-related concerns, housekeeping duties.  Supposed to

7   be the eyes and ears.

8   Q    I want to ask you some questions about the deck

9   hand's duty to report to you.  Do you understand?

10  A    Uh-huh.

11  Q    Were the decks hands responsible for being on the

12  lookout for anything related to passenger safety during

13  the 6 pm trip?

14  A    Yes.

15  Q    And do you recall anything happening that was unusual

16  on that trip?

17  A    No.

18  Q    And how do you know that?

19  A    Well, it would have been in the log book if there was

20  something unusual.

21  Q    And if something had happened, would you recall that?

22  A    I would.

23  Q    And was anything reported to you by any of the deck

24  hands, any unusual activity or passenger incident?

25  A    No.

322

1  Q    And how do you know that?

2  A    I would have remembered.

3  Q    Did the crew members report any passenger injury to

4  you that night?

5  A    No.

6  Q    And did the crew report any incident to Heather

7  Gibson or her children on that 6 pm trip on November 16,

8  2007?

9  A    No.

10  Q    And how do you know that?

11  A    There is no incident report.  It's not in the log

12  book, and I don't recall.

13  Q    And if it had happened, would you remember that?

14  A    I would.

15  Q    Now, at any time during that trip, did Ms. Gibson

16  make any complaint to you that her children had fallen or

17  she had injured herself, or that there was some unusual

18  movement and that food fell on the deck?

19  A    I have never spoken to Mrs. Gibson.

20  Q    Now, let me ask you questions about Mrs. Gibson.

21        Are you familiar with her?

22  A    I am.

23  Q    And have you seen her prior to November 16, 2007 on

24  the ferry?

25  A    I have.

1  Q    Does she usually sit in the same spot?

2  A    Usually.

3  Q    And where is that?

4  A    It's in the upper deck on the port side of the vessel

5  behind the wheel house.

6  Q    And where were you stationed that night?

7  A    I was in the wheel house.

8  Q    And was that in the vicinity of where Ms. Gibson was?

9  A    It was very nearby, yes.

10 Q    Were you aware of any commotion with Ms. Gibson or

11 her children during that 6 pm trip?

12 A    No.

13 Q    And would you remember if there were?

14 A    Sure, yes.

15 Q    Now, I want to ask you some questions about the

16 ship's movement on that night.

17       If the vessel had come up out of the water and

18 slammed down, would that be something that would be put in

19 the ship's log?

20 A    Absolutely.  The vessel doesn't come out of the

21 water.

22 Q    And if any unusual --

23       MR. GRIDELLI:  Objection, your Honor.  Move to

24 strike as unresponsive.

25       THE COURT:  I'll let it stand.

1  BY MR. WILL:

2  Q    Would that be something in the log?

3  A    Sure.

4        If the vessel came out of the water, we would

5  have to check for some sort of damage that would have

6  happened.

7  Q    And were you in the wheel house at the time?

8  A    Correct.

9  Q    Do you recall the vessel engaging in any movement

10 like that?

11 A    No.  It was calm that night.

12 Q    And during the backflushing operation, did the vessel

13 engage in any unusual movement such as described by

14 Mrs. Gibson?

15 A    No.

16        MR. WILL:  I have no further questions.

17

18 CROSS-EXAMINATION

19 BY MR. GRIDELLI:

20 Q    Good afternoon, Mr. Spector.  My name is

21 George Gridelli.  I met you once before during your

22 deposition, correct?

23 A    Yes.

24 Q    Now, you say there are certain procedures about what

25 should be entered into the log, and review the log for

1  that trip.  Is that correct?

2  A    Correct.

3  Q    And one of the things that is supposed to be entered

4  is who is on deck watch, correct?

5  A    Correct.

6  Q    Would it be fair to say that on occasion, things that

7  are supposed to be entered in the log are not entered in

8  the log?

9  A    I suppose that's possible.

10  Q    Well, look at the log that night.  You can look right

11  at the screen, sir, on your desk if you don't want to look

12  up there.

13  A    Those spots are left blank because those trips were

14  cancelled.  So there were no people in that position that

15  night.

16  Q    So which is -- which trip would have been the 6 pm

17  trip?  First of all, let me withdraw the question.

18          Aren't there eight trips, four round trips

19  during the day?

20  A    There are four round trips, correct.

21  Q    So that would be eight trips?

22  A    Correct.

23  Q    And you have listed on the deck watch eight spaces,

24  correct?

25  A    Correct.

1  Q    So the 6 pm trip would be the sixth trip, correct?

2  A    That's correct.

3         And if you notice because there is three deck

4  hands, they would simply repeat on the corresponding line

5  next to them.

6  Q    So you're saying that they don't write in, as a rule

7  of thumb, the name of the person on the deck watch for the

8  fifth, sixth, seventh or eighth?

9  A    I can't answer for the captain what he normally does.

10 Q    And you said you worked for Cross Sound Ferry for how

11 long?

12 A    Eight years.

13 Q    And you were assigned to work on the Sea Jet third on

14 the 6 pm Orient Point to New London trip?

15 A    Correct.

16        MR. WILL:  Objection.

17 BY MR. GRIDELLI:

18 Q    And you still work in the Cross Sound Ferry, right?

19 A    I do.

20 Q    What was your --

21        MR. WILL:  Objection.

22        THE COURT:  Sustained.

23 BY MR. GRIDELLI:

24 Q    Are you a member of any union that protects your

25 employment with Cross Sound Ferry?

1    A    No, I'm not.

2    Q    Do you have a written employment contract that would

3    protect you from being discharged other than for cause?

4              MR. WILL:  Objection, your Honor.

5              THE COURT:  I'll allow it.

6    A    Could you repeat the question?

7    BY MR. GRIDELLI:

8    Q    Do you have any type of written employment contract

9    with Cross Sound Ferry that would protect you from being

10   discharged other than for cause?

11   A    No, I don't.

12   Q    Do you have an independent specific recollection of

13   November 16, 2007, 6 pm trip?

14   A    No, only what we've discussed here.

15   Q    And prior to that time, you saw Ms. Gibson on the

16   ferry quite a few times?

17   A    She was a regular customer.

18   Q    When you say she was on the upper deck, would that be

19   the second deck or the covered deck?

20   A    Yes, inside of the cabin.

21   Q    And she would sit on the port side?

22   A    Correct.

23   Q    Now, if somebody fell during the trip, would it be

24   the responsibility of the person on deck watch to go and

25   check it out and see what happened?

1   A   Yes.

2   Q   And that person would attempt to inquire, are you all

3   right, what happened, everything okay?

4   A   Yes.

5   Q   And if the deck hand received a response that we're

6   all okay, then that would be fine, correct?

7   A   I would normally fill out an incident report.

8   Q   No one handed out any Band Aids that night, right?

9   A   No.

10  Q   No one claimed they were injured that night, correct?

11  A   Correct.

12  Q   Do you know who Chris Anglin is?

13  A   I do.

14  Q   What is his position with the company?

15  A   He is the facility manager.

16  Q   Is he still with the company?

17  A   Yes.

18  Q   And at the top of the log, Plaintiff's Exhibit 1,

19  that is a list of the crew, correct?

20  A   Yes.

21  Q   And Mr. Clemens would have been a deck hand?

22  A   Yes.

23  Q   Mr. Barboza a deck hand?

24  A   Yes.

25  Q   Mr. Walsh a deck hand?

1   A    Yes.

2   Q    And during each trip, one of them is assigned the

3   deck watch?

4   A    Correct.

5   Q    Now, have you ever been employed on the last trip

6   back from New London to Orient Point back in '07?

7   A    The last trip is from Orient Point to New London.

8   Q    The last trip is from -- okay.

9         But the last trip that would go from New London

10  to Orient Point.  It might be, it may not be the last trip

11  for that day?

12        But the last trip starts at what time from New

13  London?

14  A    It departs at seven o'clock.

15  Q    And do you recall, were you assigned to the return

16  trip that night?

17  A    Yes.

18  Q    And the vessel could not be used, correct?

19  A    Correct.

20  Q    It went for a couple of miles and then returned to

21  port?

22  A    Correct.

23  Q    And they had to find out what was still wrong with

24  the port jet?

25  A    Correct.

330

1  Q   And did you determine -- was it determined that there

2  was some line in the port jet?

3  A   I believe so.

4  Q   Do you know how much line was in there?

5  A   I do not.

6  Q   And then were the passengers transferred from the Sea

7  Jet to another type of ferry?

8  A   Yes.

9  Q   Do you recall what time that ferry got back to Orient

10 Point?

11 A   I have no idea.

12 Q   Would that be any place on the log?

13 A   It would not be in our log.  It would be in our

14 vessels log.

15 Q   By the way, what time do the officers close at Orient

16 Point on Friday?

17 A   I have no idea.

18 Q   You don't know if it closes at 9:00, 8:00, or 10:00?

19 A   I don't.

20 Q   Nothing further.

21         MR. GRIDELLI:  Thank you, sir.

22         MR. WILL:  No redirect.

23         THE COURT:  Next witness.

24         We're going to have to break because I have a

25 criminal matter and I have two more conferences to go, so

1    we'll make it 1:30.

2                Don't discuss the case.  We'll see you at 1:30.

3                (A luncheon recess was taken at 12:13 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       A F T E R N O O N   S E S S I O N

2                           1:35 pm

3

4           (The following ensued in the presence of the

5       jury.)

6

7       **EARL BERNARD CLEMENTS**

8               called by the defense, having been first duly

9               sworn/affirmed, was examined and testified as

10              follows:

11

12      DIRECT EXAMINATION

13      BY MR. WILL:

14      Q    Were you employed by Cross Sound Ferry in November

15      2007?

16      A    Yes.

17      Q    Now my questions are directed to your employment with

18      Cross Sound.

19              Do you understand?

20      A    Yes.

21      Q    Were you working as a deck hand?

22      A    Yes.

23      Q    And I'm going to ask you some questions about the 6

24      pm trip on November 16, 2007.  Okay?

25      A    Okay.

1  Q    Were you working as a deck hand at that time?

2  A    Yes.

3  Q    And if you could, look at the screen.  And that is

4  the logbook.

5         Do you see your name on the log?

6  A    Yes.

7  Q    And on that voyage, do you remember anyone being

8  involved in any type of incident, fall, or complaints

9  about vessel movement during that trip?

10 A    No.

11 Q    Did anyone make a claim of being injured while

12 falling, to your knowledge?

13 A    No.

14 Q    If anyone was involved in an incident, would you have

15 reported it to the mate?

16 A    Yes.

17 Q    If anyone was injured or involved in an incident,

18 would it be reported in the logbook?

19 A    Yes.

20 Q    Now, do you recall Miss Gibson being involved in an

21 incident or reporting an incident on the 6 pm trip on

22 November 16, 2007?

23 A    No.

24         MR. WILL:  No further questions, your Honor.

25

334

1   CROSS-EXAMINATION

2   BY MR. GRIDELLI:

3   Q    Good afternoon, Mr. Clements.

4   A    Hi.

5   Q    We met once before when I questioned you at your

6   deposition.

7   A    Yes.

8   Q    Are you still employed by Cross Sound Ferry?

9   A    Yes.

10  Q    And can you tell me what your yearly income is --

11         MR. WILL:  Objection.

12         THE COURT:  Sustained.

13         MR. GRIDELLI:  Your Honor, may I -- can I just

14  get the question out so it is on the record so he can

15  object and you can rule?  Most respectfully.

16         THE COURT:  Go ahead.

17  BY MR. GRIDELLI:

18  Q    Can you tell me --

19         THE COURT:  You have done it three times before.

20  I ruled three times before.  You want to do it a fourth?

21  Go ahead.

22         MR. GRIDELLI:  I'm going to do it with each

23  witness, your Honor, in case some other court thinks that

24  maybe I am right.  That's all.  So I just have to put it

25  on the record.  That's all.  I just request your

335

1    permiss --

2              THE COURT:  Well, do it.

3    BY MR. GRIDELLI:

4    Q    Can you tell us what your income was as a result of

5    your employment with Cross Sound Ferry in the year 2011.

6              MR. WILL:  Objection.

7              THE COURT:  Sustained.

8              MR. GRIDELLI:  Thank you, your Honor.

9    BY MR. GRIDELLI:

10   Q    Are you a member of any union, sir?

11   A    Am I a member of a union?

12   Q    Yes.

13   A    Yes.

14   Q    What union is that?

15   A    Teamsters.  I'm retired.  I'm retired from the

16   Teamsters.

17   Q    Are you a member of any union that relates to your

18   position at Cross Sound Ferry?

19   A    No.

20   Q    You don't have any type of union employment.

21   Correct?

22   A    No.

23   Q    Did you know these were the type of questions I was

24   about to ask you?

25   A    No.

336

1  Q    You didn't discuss with the other deck hands who

2  earlier testified, the questions I was asking?

3  A    No.

4  Q    Really?

5        Have you been here since this morning?

6  A    Yes.

7  Q    And you didn't ask the other witnesses who came out

8  what Mr. Gridelli asked you?

9  A    No.

10        MR. WILL:  Objection.

11        THE COURT:  Sustained.  Well, it is answered.

12  BY MR. GRIDELLI:

13  Q    Do you have a specific recollection, sir, as you sit

14  here today, about the trip on November 16, 2007, from

15  Orient Point to New London, Connecticut?

16  A    No, I don't.

17  Q    Do you know if you were the deck watch person for

18  that trip?

19  A    No, I wasn't.

20  Q    Was a Jeremy Barboza a deck hand on that trip?

21  A    He was there.  He was on the deck watch.

22  Q    I'm just asking if he was one of the crew members or

23  deck hand.

24  A    He was a crew member there.

25  Q    I'm sorry?

1  A    Yes.

2  Q    Did he have a crewcut back in November of 2007?

3  A    I don't remember.

4  Q    So do you know if he wore glasses back in 2007?

5       THE COURT:  Sustained.

6  BY MR. GRIDELLI:

7  Q    No one reported to you that there was any injury on

8  that trip?

9  A    Correct.  No.

10  Q    Do you recall whether that trip required any type of

11  backflushing?

12  A    I don't remember.

13  Q    Thank you, sir.

14  A    Okay.

15       MR. WILL:  Nothing.

16       THE COURT:  You may step down.  You are excused.

17       (The witness was excused.)

18       THE COURT:  Next witness.

19

20  **SEAN DONALD WALSH**

21       called by the defense, having been first duly

22       sworn/affirmed, was examined and testified as

23       follows:

24

25  DIRECT EXAMINATION

338

1  BY MR. WILL:

2  Q    Mr. Walsh, are you currently employed by Cross Sound

3  Ferry?

4  A    Yes, I am.

5  Q    How long have you worked for Cross Sound?

6  A    Approximately ten years.

7  Q    In what position?

8  A    I'm a deck hand.

9  Q    How long have you worked as a deck hand?

10  A    Approximately seven years.

11  Q    And is it fair to say you were a deck hand in

12  November of 2007?

13  A    Yes.

14  Q    And all my of my questions relate to your employment

15  as a deck hand on Cross Sound Ferry.

16       Do you understand?

17  A    Yes, I do.

18  Q    Did you work as a deck hand aboard the Sea Jet?

19  A    Yes, I did.

20  Q    As a deck hand aboard the Sea Jet, was one of your

21  duties to patrol the deck; deck patrol?

22  A    Yes.  That's correct.

23  Q    And when you patrolled the deck, does that mean you

24  are observing the passengers?

25  A    Correct.  Yes.

1  Q    What would you be looking for?

2  A    Anything unusual.  You make sure nobody is doing

3  anything they're not supposed to be doing.  Basically,

4  just patrol the deck, watching the passengers.

5  Q    I'm going to ask you some questions about

6  November 16, 2007.

7           Do you understand?

8  A    Yes.

9  Q    Were you a deck hand on the Sea Jet on November 16,

10 2007?

11 A    Yes, I was.

12 Q    And would you look at the screen.  And do you see

13 your name on the logbook?

14 A    Yes, I do.

15 Q    And were you assigned to the deck patrol on the 6 pm

16 trip that day?

17 A    Yes, I was.

18 Q    And at any time did you fill out an incident report

19 on the 6 pm trip in connection with anyone being injured

20 or any unusual type of activity with passengers?

21 A    No, I did not.

22 Q    And if you had filled out an incident report, would

23 it be in the log?

24 A    Yes, it would.

25 Q    And could you look at the log.  Is there any

1  indication whatsoever of any incident during that trip

2  involving a passenger?

3  A    No, there is not.

4  Q    Is there any indication that th ere was any incident

5  involving a passenger on that trip?

6  A    No.

7  Q    Now, did anyone tell you during that trip that they

8  were involved in an incident or an accident?

9  A    No.

10 Q    Now, if a passenger does report an incident, even if

11 they say: *Look, I fell, or my children fell and were not*

12 *hurt*, would you report that to the mate?

13 A    Absolutely.  Yes.

14 Q    Would an incident report be generated?

15 A    Correct.  Yes.

16 Q    Would it be put in the log?

17 A    Yes.

18 Q    Now I want to ask you some questions about

19 Heather Gibson.

20        Did Miss Gibson tell you she was involved in an

21 incident that day with herself and her children?

22 A    No.

23 Q    And is there any indication in the log that

24 Miss Gibson was involved in an incident that day on that 6

25 pm trip?

1   A    No, there is not.

2   Q    Now, if the vessel had come up out of the water and

3   then slammed down, would that be something you would put

4   in the log?

5   A    Yes.  Yes.

6        I mean, if that had happened yes, probably.

7   Q    Would you remember that?

8   A    Oh, yes.  Yes.  Something --

9   Q    Do you have any recollection of the vessel coming up

10  out of the water and slamming down while you were on deck

11  patrol on November 16, 2007?

12  A    No.

13       MR. WILL:  I have no further questions, your

14  Honor.

15

16  CROSS-EXAMINATION

17  BY MR. GRIDELLI:

18  Q    Good afternoon, Mr. Walsh.

19  A    Good afternoon.

20  Q    We have met when I did your deposition earlier this

21  year?

22  A    Yes.

23  Q    Now, there is a list at the bottom of that exhibit as

24  to who is on deck watch.  Is that correct?

25  A    Yes, that's right.

1  Q    The 6 pm trip from Orient Point to New London, would

2  be number 6.  Is that correct?

3  A    That's correct.

4  Q    Has the order ever changed in the past where not

5  necessary -- withdrawn.

6            There is no one listed at No. 6.  Is that right?

7  A    That's correct.

8  Q    And no one listed at No. 5.

9  A    Correct.

10  Q    Is it the normal course that people listed 1 through

11  4 then become 5 through 8?

12  A    That's correct.  Yes.

13  Q    Has it ever changed in the past?

14  A    No, that has not.

15  Q    It has never changed where someone who is No. 2

16  always went to be number 6, and someone who was 3 always

17  went to be No. 7?

18  A    Since I have worked there, that has not.  The watch

19  routine has not changed.

20  Q    So no one has ever gotten ill or had to only make a

21  one-way trip, or words to that effect?

22            MR. WILL:  Objection.

23            THE COURT:  I will allow it.

24  A    If somebody is ill, they don't come in.  They have

25  somebody fill in for them.

343

1  BY MR. GRIDELLI:

2  Q    Now, you said that you would put in the log if the

3  boat lists or slammed down.

4         You don't put it in the log, do you?

5  A    Not me, personally, no.

6  Q    And was Jeremy Barboza also a deck hand on that trip

7  from Orient Point to New London that night?

8  A    Yes.

9  Q    And did he have a crewcut --

10        MR. WILL:  Objection.

11 BY MR. GRIDELLI:

12 Q    Did he have a crewcut back in November of '07?

13 A    No.

14 Q    He didn't.

15        Did he wear glasses back in '07?

16 A    I don't recall that.

17 Q    Do you have a specific recollection of this trip

18 November 16, 2007, the 6 pm trip?

19 A    No, I do not.

20 Q    When did you first hear there was a claim made by

21 Miss Gibson about an injury on this?

22        MR. WILL:  Objection.

23        THE COURT:  Overruled.

24 A    It was only about a couple of months ago now.  The

25 assistant operations manager Dave Riley called me and

1  asked me if I remembered anything about it.

2  Q    Well, you were deposed back in October of 2011.

3  Right?

4  A    Correct.

5  Q    Didn't anyone talk to you about that before October

6  of 2011?

7  A    No.

8  Q    Did Mr. Sise -- do you know who Mr. Sise is?

9  A    Yes.

10  Q    What's his position with the company?

11  A    He is also operations manager.

12  Q    And he didn't discuss with you about facts as you

13  recall about that incident any time, well, let's say the

14  first month of the incident?

15  A    No.

16  Q    And you were listed as a crew member.  Right?

17  A    That's correct.

18  Q    So he would have known you were on that 6 pm trip.

19  Correct?

20  A    Correct.

21  Q    And I assume you are not a member of any union for

22  working on the Sea Jet.  Correct?

23  A    No, we are not union.

24  Q    No employment contract?

25  A    No.

1    Q    And can you tell me what you earned in 2011 as an

2    employee of Cross Sound Ferry.

3              MR. WILL:  Objection.

4              THE COURT:  Sustained.

5              MR. GRIDELLI:  Thank you.  Nothing further.

6              MR. WILL:  Nothing further.

7              THE COURT:  You may step down.  You're excused.

8              (The witness was excused.)

9              THE COURT:  Next witness.

10

11   **JEREMY BARBOZA**

12              called by the defense, having been first duly

13              sworn/affirmed, was examined and testified as

14              follows:

15

16   DIRECT EXAMINATION

17   BY MR. WILL:

18   Q    Mr. Barboza, are you currently employed by Cross

19   Sound Ferry?

20   A    Yes, I am.

21   Q    Are you a veteran of the United States Marine Corps?

22   A    Yes, I am.

23   Q    Now, how long have you worked for Cross Sound Ferry?

24   A    For eight years.

25   Q    And my questions are directed at your employment with

1  Cross Sound.

2       Do you understand?

3  A    Yes.

4  Q    I am going to ask you some questions about November

5  16, 2007.

6       Do you understand that?

7  A    Yes.

8  Q    Were you working as a deck hand aboard the Sea Jet on

9  November 16, 2007?

10 A    Yes, I was.

11 Q    And do you see your name on the logbook in front of

12 you?

13 A    Yes, I do.

14 Q    And on that night, were you, did you report anything

15 unusual to the captain or the mate?

16 A    No, I did not.

17 Q    Was there any unusual vessel movement that night?

18 A    Not that I recall.

19 Q    Now, did any passengers tell you that they were

20 involved in any type of an incident on that particular

21 voyage?

22 A    No, they did not.

23 Q    Did Heather Gibson tell you she was involved in any

24 type of an incident with her family?

25 A    No, she did not.

1  Q    Did you see Heather Gibson getting injured that

2  night?

3  A    No, I did not.

4  Q    Now, if someone had told you they had been injured or

5  there was some kind of an incident where people fell out

6  of their seats or onto the deck, is that something that

7  you would remember?

8  A    Yes, it is.

9  Q    Is that something that you would report?

10  A    Yes, it is.

11  Q    Did you advise the mate that any passenger had been

12  involved in an incident that night?

13  A    I did not.

14  Q    Now I want to ask you some questions about

15  Heather Gibson's claim about talking to a crew member

16  named Jeremy that night.

17        Do you understand?

18  A    Yes.

19  Q    Heather Gibson testified that a crew member named

20  Jeremy heard her children fall.

21        Was that you?

22  A    No, it was not.

23  Q    Heather Gibson testified that this crew member asked

24  if everything was okay.

25        Was that you?

1  A    No, it was not.

2  Q    Heather Gibson described the crew member as 5 foot 11

3  with a crewcut, slender build, and wearing eye glasses.

4        Do you wear eye glasses?

5  A    No, I do not.

6  Q    Have you ever worn eye glasses?

7  A    No, I did not.

8  Q    Can you please stand up.

9        How tall are you?

10 A    5 foot 8.

11 Q    Did you have a beard in 2007?

12 A    Yes.

13 Q    Did you speak to Heather?

14       THE COURT:  I didn't hear the answer.

15 A    Yes.

16       THE COURT:  Oh, you had a beard.  Okay.

17 A    Yes.

18 BY MR. WILL:

19 Q    Now, I show you a transportation worker

20 identification credential and ask you if this is how you

21 looked --

22       MR. GRIDELLI:  Objection.  May we have a

23 sidebar?

24       (Discussion at sidebar ensued as follows.)

25       MR. GRIDELLI:  I just want him -- this document

1    was never turned over.  I have never seen this document,

2    so how he can use it at the trial.  I don't know.

3            MR. WILL:  Just asked him today, when he came

4    in, if he had any ID.

5            THE COURT:  I will allow it.

6            (Discussion at sidebar was concluded.)

7    BY MR. WILL:

8    Q    I want to show you a transportation worker

9    identification.  Would look at that please.

10           Is that how you looked in 2007?

11   A    Yes, it is.

12           MR. WILL:  Thank you.

13           Your Honor, we offer this as evidence.

14           MR. GRIDELLI:  Objection.

15           THE COURT:  Overruled.

16           In evidence.  What number is it?

17           MR. WILL:  H, your Honor.

18           THE COURT:  In evidence.

19           (Defense Exhibit H in evidence.)

20           MR. WILL:  No further questions, your Honor.

21

22   CROSS-EXAMINATION

23   BY MR. GRIDELLI:

24   Q    Good afternoon.  I questioned you at your deposition

25   approximately a year ago?

1  A   Yes.

2  Q   Is there anybody else named Jeremy that is a deck

3  hand that works on the Sea Jet?

4  A   No, there is not.

5  Q   You don't need a license to be a deck hand on the Sea

6  Jet.  Correct?

7  A   No, you do not.

8  Q   The normal hours for the Sea Jet back in November of

9  '07 were 6 am to 9 pm.  Correct?

10 A   Yes, they were.

11 Q   Usually eight trips or four round trips each day?

12 A   Yes.

13 Q   Back in November of '07?

14 A   Yes.

15 Q   And the 6 pm trip would be the sixth trip.  Correct?

16 A   Could you repeat the question?

17 Q   Of the eight trips --

18 A   Yes.

19 Q   -- would the 6 pm trip from Orient Point to New

20 London be the sixth trip?

21 A   Yes, sir, it would.

22 Q   You don't know if you were in charge of the deck

23 watch for that sixth trip.  Correct?

24 A   I don't know.  According to the log book, no, I was

25 not.

351

1  Q    Do you remember being asked these questions and

2  giving these answers?  Page 11, line 23.

3            *Question:  Okay.  Can you tell me by looking at*

4  *that document who is responsible to do the deck watch for*

5  *that sixth trip?*

6            *Answer:  No, that wasn't in there.*

7            *Question:  Because it wasn't listed there?*

8            *Answer:  Right.*

9            Do you remember --

10 A    Yes, sir.

11 Q    -- being asked those questions and giving those

12 answers?

13 A    Yes.

14 Q    And now you know who was the deck watch person that

15 day?

16 A    No.  Now I know that I was not the deck watch person

17 that day.  That's what you asked me.

18 Q    And who was the deck watch person?

19 A    There is nobody listed.

20 Q    Sorry?

21 A    There is nobody listed.  It's blank.

22 Q    Now, if you were on deck watch, would part of your

23 duties and responsibilities be to attend to someone if

24 there was an injury or a trip and fall or a slip and fall?

25 A    Yes.

1  Q    And if you heard some bodies hit the floor of the

2  second deck, would you go and investigate to see what the

3  problem was?

4  A    Yes.

5  Q    And if you were on the first deck, you would have to

6  go running up the stairs to the second deck?

7  A    Yes.

8  Q    And you would then inquire what happened:  *Is*

9  *everybody okay*?

10  A    Yes.

11  Q    And if the person that you were inquiring from said *I*

12  *think we're all okay*, would you write an incident report

13  for that?

14  A    Yes.

15  Q    You would.  Even though everyone said they were fine?

16  A    Yes.

17  Q    Now, there is one deck watch person for each trip.

18  Correct?

19  A    Yes.

20  Q    Even though there are three crew members on each

21  trip.  Correct?

22  A    Yes.

23  Q    I'm sorry?

24  A    Yes.

25  Q    Now, when the -- are you familiar with the

1   backflushing operation back in November of '07?

2              MR. WILL:  Objection.

3              THE COURT:  Overruled.

4   BY MR. GRIDELLI:

5   Q    You can answer.

6   A    Oh.  Yes.

7   Q    Were you personally involved in any backflushing

8   procedures in '07 or earlier?

9   A    Yes, I was.

10  Q    So you are familiar how it works?

11  A    Yes.

12  Q    Does the captain take the engines out of gear in

13  order for you to do the backflushing operation?

14             MR. WILL:  Objection, your Honor.  He is asking

15  him questions as some kind of an technical expert.  He is

16  a deck hand.

17             MR. GRIDELLI:  I'm asking fact questions because

18  he's done it.

19             THE COURT:  Are you both finished?

20             MR. GRIDELLI:  Yes, sir.

21             THE COURT:  What happened to my rules:  no

22  speaking objections?

23             MR. WILL:  Sorry, your Honor.  I apologize.

24             THE COURT:  And you?

25             MR. GRIDELLI:  I was getting a dirty look from

354

1    the clerk because we keep making him go back and forth.

2            THE COURT:  So you now take orders from the

3    clerk, not from me.  Okay.

4            Whoa!  What excuses.  Continue.

5            MR. GRIDELLI:  Thank you.

6    BY MR. GRIDELLI:

7    Q    Does the captain have to take the engines out of gear

8    in order for you to do so the backflushing?

9    A    He clutches out so they put it out of gear.

10   Q    So when you clutch out, it is out of gear?

11   A    Yes.

12   Q    Now, did somebody come -- withdraw.

13           Do you know who Mr. *Sees* is?

14   A    No.  Sise?

15   Q    Yes.  Sorry.

16   A    Yes.

17   Q    Did Mr. Sise come to you shortly after this incident

18   and ask you what happened?

19   A    About a week later.

20   Q    About a week later.  So Mr. Sise was aware within the

21   week that there was this claim being made?

22   A    I believe it was a week.

23   Q    Did Mr. Sise, to your knowledge, write up any type of

24   incident report?

25   A    No.  I don't know.

355

1  Q    Did you ever see an incident report or an accident

2  report from this case?

3  A    No, I did not.

4  Q    And I assume you are not a member of a union for

5  purposes of being a deck hand?

6  A    No.

7  Q    And you don't have any written employment contract?

8  A    No.

9        MR. GRIDELLI:  Thank you.  I won't ask the other

10  question.

11        MR. WILL:  No redirect.

12        THE COURT:  You may step down.  You are excused.

13        (The witness was excused.)

14        THE COURT:  Who is your next witness?  You want

15  a sidebar?

16        (Discussion at sidebar ensued as follows.)

17        MR. WILL:  We have two witnesses to call.

18        I know you pushed the case along so we have two

19  witnesses.

20        THE COURT:  So what do you want me to do?

21        MR. WILL:  I just wanted to tell you.

22        THE COURT:  Who are you calling next and when?

23        MR. WILL:  We're calling right now the fellow

24  from the surveillance company.

25        THE COURT:  What is he going to testify?

1    MR. WILL:  Just going to testify to the dates on

2  the tapes.

3         THE COURT:  Oh.  Okay.

4         MR. WILL:  That is quick.

5         THE COURT:  And who is your next witness?

6         MR. WILL:  Mr. Sise.

7         THE COURT:  And what is he?

8         MR. WILL:  He is the operations manager of the

9  company.

10         THE COURT:  Do you have an expert or a doctor?

11         MR. WILL:  Tomorrow.  Their doctor is coming

12  tomorrow and my doctor is following him and our expert

13  will follow him.

14         THE COURT:  Okay.  So who are you calling now?

15         MR. WILL:  The surveillance guy.

16         THE COURT:  He is going to be two minutes.  And

17  after that who?

18         MR. WILL:  Mr. Sise.

19         THE COURT:  Longer than two minutes.

20         MR. GRIDELLI:  If the court permits me.

21         THE COURT:  Yes.

22         MR. WILL:  Mr. Sise, the operations manager and

23  that is it.

24         THE COURT:  Okay.  Call them.

25         (Discussion at sidebar was concluded.)

357

1

2  **MATT ANDERSON**

3        called by the defense, having been first duly

4        sworn/affirmed, was examined and testified as

5        follows:

6

7  DIRECT EXAMINATION

8  BY MR. WILL:

9  Q    Good afternoon.  By what company are you employed?

10 A    McNellis Investigative Services.

11 Q    And what is the business of McNellis Investigative?

12 A    We do surveillance.

13 Q    And was your company retained in December of 2007 to

14 conduct a surveillance of Heather Gibson?

15 A    Yes.

16 Q    And were you involved in the task of arranging the

17 surveillance of Heather Gibson on December 15, 2007?

18 A    Yes.

19 Q    And were you involved in the task of arranging the

20 surveillance of Heather Gibson on December 21, 2008?

21 A    Yes.

22 Q    And were you involved in arranging the task of

23 surveillance on Heather Gibson for February 21, 2008?

24 A    Yes.

25 Q    And were you involved in the task for arranging the

1  surveillance of Heather Gibson on February 23, 2008?

2  A    Yes.

3  Q    And were you involved in the task of arranging the

4  surveillance of Heather Gibson on February 7, 2009?

5  A    Yes.

6  Q    And what was your job title at the time?

7  A    Field supervisor.

8  Q    And what did your job duties entail?

9  A    I ran 12 to 14 investigators and I oversaw their

10  daily operations throughout the day.

11  Q    Did you assign investigators to conduct surveillance

12  of Miss Gibson on those dates during the course of the day

13  on Long Island?

14  A    Yes.

15  Q    And was surveillance of Heather Gibson carried out on

16  those days?

17  A    Yes.

18  Q    Now, was the surveillance of Heather Gibson -- now,

19  were you in communication with the investigators on those

20  dates during the course of surveillance?

21  A    I was.

22  Q    And did you receive the original recordings of the

23  investigators' surveillance for those dates?

24  A    I did.

25  Q    Did you review the original recordings of the

1  surveillance for those dates?

2  A    Yes.

3  Q    Now, were the dates accurately reflected in the

4  surveillance videos that you played here in court, which

5  were marked as Defendant's Exhibit A and which have been

6  admitted into evidence?

7  A    Yes.

8            MR. GRIDELLI:  Objection.

9            THE COURT:  Overruled.

10            MR. GRIDELLI:  Sidebar, please?

11            (Discussion at sidebar ensued as follows.)

12            MR. GRIDELLI:  Your Honor, since he was not

13  personally involved in the surveillance, any information

14  he got would have been through hearsay, somebody telling

15  him something.

16            Therefore, it is not admissible for him to say

17  yes, that is the date of the video.  You need the person

18  who did the video.

19            THE COURT:  Overruled.

20            MR. GRIDELLI:  Thank you.

21            (Discussion at sidebar was concluded.)

22  BY MR. WILL:

23  Q    With respect to the video of --

24            THE COURT:  Excuse me.

25            (There was a pause in the proceedings.)

360

1    THE COURT:  Go ahead.

2  BY MR. WILL:

3  Q    Mr. Anderson, with respect to the video of

4  February 23, 2008, the business reports that were

5  submitted to you by the investigators confirm that

6  Heather Gibson was the person walking the adult

7  St. Bernard?

8  A    Yes.

9    MR. WILL:  Your Honor, I have no further

10  questions.

11

12  CROSS-EXAMINATION

13  BY MR. GRIDELLI:

14  Q    Good afternoon, Mr. Anderson.

15  A    Good afternoon.

16  Q    I met you on the first day of trial here.  Correct?

17  A    That is correct.

18  Q    And you sat the whole first day of court when the

19  testimony was rendered.  Correct?

20  A    That is right.

21  Q    Did you not know you were going to be a witness in

22  this case?

23  A    I didn't know at the time.

24  Q    Did Mr. Will not tell you that witnesses are not

25  permitted to stay in the courtroom other than the expert

1  Mr. Scott?

2  A    I didn't know I was going to be a witness at the

3  time.

4  Q    And you were the one who played the surveillance

5  video for the jury?

6  A    That's correct.

7  Q    Now, is it true -- do you have a copy of the report

8  in front of you?

9  A    I don't.

10  Q    Do you have a copy of the report here with you?

11  A    No.  Not all of them, no.

12  Q    Well, where are the reports?

13  A    Mr. Will and yourself have them, I believe.

14  Q    Well, do you have your set?

15  A    No, I don't.

16        THE COURT:  You have yours.  Produce them.

17        MR. GRIDELLI:  I do, your Honor.  I would like

18  to know if he brought his.  He was coming to testify

19  today.

20  BY MR. GRIDELLI:

21  Q    Is it true that she was surveilled on December 15,

22  2007?

23  A    Yes.

24  Q    December 16, 2007?

25  A    I can't go through all the dates without having the

1  reports in front of me.

2  Q    Can you get your reports so we can see.

3            THE COURT:  Sidebar.

4            (Discussion at sidebar ensued as follows.)

5            THE COURT:  Is this the witness you subpoenaed?

6            MR. GRIDELLI:  I subpoenaed just for the basis

7  of the videos, the custodian, your Honor, to bring them.

8            THE COURT:  So you subpoenaed somebody from

9  their company to come forward?

10            MR. GRIDELLI:  Right.

11            THE COURT:  Did you know he was sitting here?

12            MR. GRIDELLI:  No, I was introduced to him.  I

13  didn't know his position.  I would have excluded him as a

14  witness if I knew he was in the courtroom.

15            MR. WILL:  We needed him to play the videos,

16  your Honor.  I mean, we weren't capable.  We needed him

17  for the --

18            THE COURT:  So the record is clear.  They called

19  him as -- they did not intend to call him as a witness.

20  You subpoenaed the records so they called him as a

21  witness.

22            MR. GRIDELLI:  No, that is not true, your Honor.

23  They called him as a witness because I made an objection

24  that there is no one who can confirm the dates.

25            THE COURT: You subpoenaed the records and we had

1    a hearing on it, not a hearing, a discussion and I said

2    we'll see what happens?

3              MR. GRIDELLI:  This morning Mr. Will made a

4    motion to try to quash the subpoena.

5              THE COURT:  Yes.

6              MR. GRIDELLI:  So yes, that was the discussion

7    we had.

8              THE COURT:  That is why they called him after.

9              MR. GRIDELLI:  Well, they called him today, yes.

10             THE COURT:  Okay.

11             (Discussion at sidebar was concluded.)

12             THE COURT:  So that the record is clear.  The

13   witness was sitting in the courtroom.  It was our

14   understanding he wasn't supposed to be called as a

15   witness.  Plaintiff's lawyer then subpoenaed the records

16   of the company.  Defendant tried to exclude those

17   subpoenas.  I didn't rule on it.  So he is now called also

18   as a witness because of the circumstances that occurred

19   before.

20             So there was no duty to exclude at that time

21   because, one, defendant didn't intend to call him and

22   plaintiff didn't know he was a witness.  He didn't think

23   he was a witness.

24             After the subpoena by the plaintiff was served

25   on the company, that changed the situation.

364

1    Am I correct?

2    MR. GRIDELLI:  Other than the last sentence,

3    your Honor.  We had a discussion in your chambers about

4    whether we needed proper foundation for the dates, and

5    that is when Mr. Will told you he would call somebody for

6    the proper foundation of the dates.

7    Remember, I asked --

8    THE COURT:  You said you were subpoenaing

9    somebody.

10   MR. GRIDELLI:  I was subpoenaing the records,

11   the written records, and the bills and the custodian.

12   THE COURT:  A person has to bring it, right?

13   MR. GRIDELLI:  Custodian of records.

14   THE COURT:  That is when the witness was called.

15   Okay.  Go ahead.

16   BY MR. GRIDELLI:

17   Q    Do you have the reports in front of you now?

18   A    I don't.

19   MR. GRIDELLI:  Your Honor, can Mr. Will produce

20   his set?

21   THE COURT:  Why don't you produce your set?

22   MR. GRIDELLI:  Because I have only one set.

23   THE COURT:  Maybe he only has one set.  Go up

24   there and give it him and you can stand there and watch

25   him.

365

1          MR. GRIDELLI:  Wow.

2          THE COURT:  Wow.  Sidebar.

3          (Discussion at sidebar ensued as follows.)

4          THE COURT:  Counsel, I have had it with you.

5   There may be a contempt hearing after the trial.  Your

6   attitude, you're slamming things.

7          Sit down.  You're disgusted with me.  I can't

8   take it any more.

9          (Discussion at sidebar was concluded.)

10          (Continued on the following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  CROSS-EXAMINATION  (Continued)

2  BY MR. GRIDELLI:

3  Q    Mr. Anderson, take a look at those reports.  Those

4  are the reports from the surveillance that was conducted?

5  A    That's correct.

6  Q    Now you said there was a surveillance on December 15,

7  '07.  Is that accurate?

8  A    That's correct.

9  Q    December 16th, '07?

10 A    You're talking about 2008?  This is 2008.

11 Q    No, December 16, 2007?

12 A    Correct.

13 Q    December 27, 2007?

14 A    Correct.

15 Q    December 28, 2007?

16 A    Correct.

17 Q    January 2, 2008?

18 A    Correct.

19 Q    January 16, 2008?

20 A    Correct.

21 Q    January 19, 2008?

22 A    Correct.

23 Q    January 21, 2008?

24 A    Correct.

25 Q    February 20, 2008?

367

1    A    Correct.

2    Q    February 21, 2008?

3    A    Correct.

4    Q    February 23, 2008?

5    A    Correct.

6    Q    Any other surveillance after the 23rd?

7    A    I can't say for sure.

8    Q    It's not in those reports, right?

9    A    That's correct.

10   Q    So the dates that are listed, that was 11 days.  Is

11   that correct?

12   A    That's correct.

13   Q    And you were present in court and actually physically

14   played some of the surveillance for the jury, correct?

15   A    That is correct.

16   Q    Now did you play the entire surveillance video from

17   12/15/07?

18   A    No.

19   Q    Which dates did you play?

20   A    Without the CD in front of me I couldn't tell you.

21   Q    Well, it's in evidence.

22        MR. GRIDELLI:  Could we produce it for the

23   witness, your Honor?

24        THE COURT:  Sure.

25

1    BY MR. GRIDELLI:

2    Q    Would that help you, or do you have to show it?

3    A    Do you want me to read the dates it was played on

4    Thursday, last week?

5    Q    Yes.

6    A    It was December 15, 2007, January 21, 2008, February

7    21, 2008, February 23, 2008, and February 7, 2009.

8    Q    February 7th?

9    A    That's correct.

10   Q    2009?

11   A    That's correct.

12   Q    Is there any note in any of those reports that deals

13   with February 7, 2009?

14   A    No.

15   Q    Was a report prepared for February 7, 2009?

16   A    It was.

17   Q    Was it given to Mr. Will or his associate for 2009?

18   A    Yes.

19        MR. GRIDELLI:  Your Honor, I'm going to object

20   to all of this that was never produced, February 7, 2009,

21   or the report.

22        MR. WILL:  Your Honor all -- sidebar?

23        THE COURT:  Well he spoke, you speak.

24        MR. WILL:  Your Honor, all of the videos were

25   turned over.  First we turned them over, and the second

1  that they had -- I have a transmittal of videotapes on May

2  1, 2009 to Andrea Enchhowski (ph). And I have another

3  letter of May -- March 18, 2010 to Mr. Mulvehill,

4  transferring all of the videos and reports to the prior

5  counsel.

6          THE COURT: Okay.

7          MR. GRIDELLI: May I see the letter?

8          (Handing)

9  BY MR. GRIDELLI:

10  Q    The video that you played for the jury on February --

11  for February 15, 2007. Did you play the entire

12  surveillance video for that day?

13  A    What was the date?

14  Q    December 15, 2007?

15  A    No.

16  Q    Did you play the entire surveillance video for

17  January 21, 2008?

18  A    No.

19  Q    Did you play the entire surveillance video for

20  February 21, 2008?

21  A    No.

22  Q    Did you play the entire surveillance video for

23  February 23, 2008?

24  A    No.

25  Q    Did you play the entire surveillance video for

1   February 7, 2009?

2   A   No.

3   Q   And is there a fee that you charge to do this type of

4   surveillance?

5           MR. WILL:  Objection.

6           THE COURT:  Overruled.

7   A   There is.

8   BY MR. GRIDELLI:

9   Q   Can you tell us what the total fees were for the

10  surveillance that you performed on Heather Gibson?

11  A   The entire investigation, or for a certain day?

12  Q   The entire investigation?

13  A   I couldn't tell you without looking at it.

14  Q   Give me a ballpark figure, Mr. Anderson?

15  A   If I gave you a figure it would be speaking out of

16  turn, because I couldn't tell you that number.

17  Q   So you don't know what the cost is for 12 days of

18  surveillance?

19  A   It was about 12 days.  That would be, I would say

20  around $9,000.

21  Q   $9,000 for an incident that allegedly didn't occur,

22  right?

23          THE COURT:  Sustained.

24  BY MR. GRIDELLI:

25  Q   Now do you know if your office was served with a

1  subpoena recently?

2  A    Which day?

3          MR. WILL:  Objection, your Honor.

4          MR. GRIDELLI:  Friday.

5          MR. WILL:  Subject to a motion.

6  A    Yes.

7  BY MR. WILL:

8  Q    Is somebody coming in response to that subpoena

9  tomorrow?

10          MR. WILL:  Objection.

11          THE COURT:  Sustained.

12  BY MR. GRIDELLI:

13  Q    And how did you determine what parts of the videos to

14  play and what parts of the video not to play?

15  A    On Thursday of last week?

16  Q    When it took place.

17  A    It was discussed with Mr. Will and myself.

18  Q    So Mr. Will and you decided which parts of the video

19  to play and which parts --

20          THE COURT:  Are you looking at the witness or

21  the jury?

22          MR. GRIDELLI:  I like to talk to the jury.

23          THE COURT:  Talk to the witness.

24          MR. GRIDELLI:  You don't want me to face the

25  jury now, is that it?  I didn't know that was the rule.

1    THE COURT:  You didn't know that was the rule.

2  Okay.  Maybe you want to go there and sit with them, that

3  is not in the rule books either.

4    MR. GRIDELLI:  I don't think you would permit me

5  that.

6    THE COURT:  Oh.

7  A    Would you repeat the question?

8  BY MR. GRIDELLI:

9  Q    So you and Mr. Will decided what parts of the video

10  to play.  Is that accurate?

11  A    He had the video so he knew what days that he would

12  like to bring to trial, yes.

13  Q    So he decided what parts of the video to play, and

14  you did the mechanical snipping up the playing?

15  A    I wouldn't say snipping.  I would say we put together

16  a CD for you, yes.

17    MR. WILL:  Objection.

18    THE COURT:  Overruled.

19  BY MR. GRIDELLI:

20  Q    Would editing be a better word than snipping?

21  A    I would just --

22    THE COURT:  Sustained.

23  BY MR. GRIDELLI:

24  Q    On the DVD you termed it a *snip*, correct?

25  A    Yes, *snip shot*.

373

1      MR. GRIDELLI:  Nothing further.

2

3   REDIRECT EXAMINATION

4   BY MR. WILL:

5   Q    Mr. Anderson, when you talk about a *snip shot*, aren't

6   you talking about a small close-up taken from the video?

7   A    That's right.

8            MR. GRIDELLI:  Objection leading.

9            THE COURT:  Overruled.

10  BY MR. WILL:

11  Q    Now Mr. Anderson, if we had played all of the video,

12  how long would we be sitting here in court?

13  A    Hours.

14  Q    And did I ask you to prepare the highlight video?

15  A    Yes.

16  Q    And were there days where there was surveillance

17  where nothing took place?

18  A    That's correct.

19  Q    And although there are days logged in, there was

20  nothing to report and nothing to film?

21  A    That's correct.

22  Q    So what was stored were essentially the highlights in

23  the surveillance.

24           MR. GRIDELLI:  Objection.

25           THE COURT:  Sustained.

1    MR. WILL:  I have no further questions.

2

3  RECROSS-EXAMINATION

4  BY MR. GRIDELLI:

5  Q    Mr. Wills, just said that sometimes there is a

6  surveillance, and there is no tape-recording of that

7  surveillance?

8  A    That is correct.

9  Q    Well, the dates I gave you was 12 days.  There was

10  actually videotapes surveillance done, correct?

11  A    Can I look at the reports to make sure?

12  Q    Please.  If you want to go date by date.

13  A    Yes.  I mean I don't want to say yes or no when there

14  is no activity on one of them and I'm speaking out of

15  turn.

16         December 15, yes.  December 16th 2007 there was

17  no videotape.

18  Q    How about the 27th of December?

19  A    There was no tape, but there were observations made.

20  Q    How about the 28th?

21  A    There was videotape obtained.

22  Q    From the 27th your surveillance people do an

23  observation but decided not to record it?

24  A    No.  There are circumstances that prevent you from

25  being able to.

1  Q    So by looking at that, can you give me, without

2  belaboring it, on the 12 days that there was surveillance

3  done, how many days did you produce an actual video,

4  whether it be 30 seconds or two hours?

5  A    I would have to go through it every day and count the

6  days.  I don't want to say every day we had a videotape

7  and we didn't have a videotape without looking at the

8  facts on the report.

9         MR. GRIDELLI:  Don't bother.  Thank you.

10

11  REDIRECT EXAMINATION

12  BY MR. WILL:

13  Q    Mr. Anderson, just refer to the December 27th,

14  looking at the report:  Nine am no activity.  Ten a.m. --

15         MR. GRIDELLI:  Objection, your Honor.  The

16  report is not in evidence.  Now he is reading from it.

17         THE COURT:  I'll allow it.  And you opened up

18  the door.  Go ahead.

19         Sit down, please.

20  BY MR. WILL:

21  Q    10:00 o'clock 10:05, 11:00 o'clock, no activity.

22         Are these reports filled with blank periods

23  where there is absolutely no activity and no filming, but

24  surveillance was conducted?

25  A    That's correct.

376

1    MR. WILL:  Nothing further.

2    MR. GRIDELLI:  Nothing, your Honor.

3    THE COURT:  You may step down.

4    Next witness.

5    I understand that is the last witness for the

6    day.

7

8    **RICHARD SISE**

9    called as a witness, having been first duly sworn,

10    was examined and testified as follows:

11

12    DIRECT EXAMINATION

13    BY MR. WILL:

14    Q    Are you employed by Cross Sound Ferry?

15    A    Yes.

16    Q    What is your current position?

17    A    Operations manager.

18    Q    How long have you been employed as the operations

19    manager?

20    A    Since 1983.

21    Q    And is it fair to say you were the operating manager

22    for Cross Sound Ferry, November 2007?

23    A    Yes.

24    Q    And who do you report to?

25    A    The owner of the company.

1  Q    And as operations manager you are responsible for

2  insuring the vessel complies with United States Coast

3  Guard regulations?

4  A    Yes.

5  Q    And as operations manager do you occasionally ride on

6  the company vessels?

7  A    Yes.

8  Q    As operations manager have you personally operated

9  the company vessels?

10  A    Yes.

11  Q    Have you ever held a captain's license?

12  A    Yes.

13  Q    As operations manager are you responsible for

14  reviewing or investigating passenger complaints?

15  A    Yes.

16  Q    I'm going to ask you some questions briefly about the

17  company Cross Sound Ferry.  Do you understand?

18  A    Yes.

19  Q    You said the company was owned by a John Wronoski?

20  A    Correct.

21  Q    And how many full-time employees does it have?

22  A    Anywhere from 200 to 250.

23  Q    And what about in the summer months?

24  A    Upwards of 400.

25  Q    Now, I just want to touch briefly on Cross Sound's

1    involvement in the community.

2         Has Cross Sound Ferry ever been involved in any

3    fund-raising activities for the east end of Long Island?

4         MR. GRIDELLI:  Objection, relevance.

5         THE COURT:  Sustained.

6    BY MR. WILL:

7    Q    I want to ask you some questions about a vessel

8    called Sea Jet.  Understand?

9    A    Yes.

10   Q    First, does Cross Sound Ferry own the Sea Jet?

11   A    Yes.

12   Q    And is it a passenger ferry boat?

13   A    Correct.

14   Q    And does it operate between Orient Point and New

15   London?

16   A    Yes.

17   Q    I want to show you a document and ask you if you can

18   identify it.

19   A    It's the certificate of inspection for the Sea Jet.

20        MR. WILL:  And that has been marked in the

21   pretrial order, and we would like to offer it into

22   evidence.

23        MR. GRIDELLI:  No objection your Honor.

24        THE COURT:  In evidence.

25        (Defense Exhibit -- received in evidence.)

379

1  BY MR. WILL:

2  Q    I want to show you another document and see if you

3  can identify this.

4          Can you say what this is?

5  A    Certificate of inspection form.

6          MR. WILL:  That was Exhibit I.

7          (Defense Exhibit I received in evidence.)

8  BY MR. WILL:

9  Q    And can you identify that document?

10         This is now Exhibit J.

11 A    Certificate of documentation for the Sea Jet I.

12         MR. WILL:  Your Honor that document in the

13 pretrial order.  And we offer it into evidence.

14         MR. GRIDELLI:  No objection.

15         THE COURT:  In evidence.

16         (Defense Exhibit J received in evidence.)

17 BY MR. WILL:

18 Q    Can you tell me how long the Sea Jet is?

19 A    Approximately 109 feet, 51 feet wide.

20 Q    And what does it weigh?

21 A    Approximately 130 tons.

22 Q    And I want to show you a picture and ask you if this

23 is a -- I'll just put it up -- a fair and accurate

24 representation of the Sea Jet?

25 A    Yes, it is.

1   Q    Now, and is it a fair and accurate representation of

2   the Sea  Jet as it existed on November 16, 2007?

3   A    Yes.

4          MR. WILL:  Your Honor, I offer this picture into

5   evidence.

6          MR. GRIDELLI:  No objection.

7          THE COURT:  In evidence.

8          (Defense Exhibit -- received in evidence.)

9   BY MR. WILL:

10  Q    Now you indicated the United States Coast Guard has

11  -- the Sea Jet has a United States Coast Guard inspection

12  certificate.  Can you tell us what that means?

13  A    It's a certificate that authorizes the use of the Sea

14  Jet as a passenger ferry under the Subchapter T -- manning

15  lifesaving equipment operating parameters.

16  Q    And does the United States Coast Guard send people on

17  board to inspect the vessel periodically?

18  A    Yes, they do.

19  Q    Now were you personally involved in the purchase of

20  the Sea Jet?

21  A    Yes.

22  Q    And what was your involvement?

23  A    Survey of the vessel, dry docking, sea trials,

24  recommending it to the owner to buy or not to buy.

25  Q    Now, I'm going ask some questions about the physical

1    characteristics.

2              What type of propulsion does the Sea Jet have?

3    A    It's a water jet-propelled vessel.

4    Q    And how many decks does it have?

5    A    Three decks.

6    Q    Please tell me how the seating is arranged on the

7    second deck where Ms. Gibson allegedly was sitting that

8    night?

9    A    There are booth seats for passenger, booth seats

10   located on the exterior bulkheads, and row seating on the

11   central part of the vessel.

12   Q    I'm going to show you two pictures and ask you if

13   they're fair and accurate representations of the seating

14   arrangements on the Sea Jet as it was in November 16,

15   2007.

16   A    Yes.

17             THE COURT:  Put the picture back up.

18             MR. WILL:  I'm going to offer Exhibit L into

19   evidence.

20             MR. GRIDELLI:  No objection.

21             THE COURT:  In evidence.

22             (Defense Exhibit L received in evidence.)

23   BY MR. WILL:

24   Q    This picture Mr. Sise, is this a fair and accurate

25   representation of the seating arrangement on the Sea Jet

1   on November 16, 2007?

2   A    Yes, it is.

3           MR. WILL:  I would like to offer that into

4   evidence as M.

5           MR. GRIDELLI:  No objection.

6           THE COURT:  In evidence.

7           (Defense Exhibit M received in evidence.)

8   BY MR. WILL:

9   Q    Now, will you describe to me the seats themselves?

10  A    They are cushioned, foam cushion with fabric overlay,

11  bench-type seating with tables in between.

12  Q    I want to show you a picture and ask you if it's a

13  fair and accurate representation of the seat cushions that

14  were on the Sea Jet on November 16, 2007?  Exhibit N.

15  A    Yes, that's a fair and accurate representation.

16          MR. WILL:  Your Honor, I would like to offer

17  Exhibit N into evidence.

18          MR. GRIDELLI:  No objection.

19          THE COURT:  In evidence.

20          (Defense Exhibit N received in evidence.)

21  BY MR. WILL:

22  Q    I want to ask you some questions about a trip on the

23  Sea Jet on November 2007.  Do you understand?

24  A    Yes.

25  Q    You testified that the Sea Jet is a passenger ferry

383

1   between Orient Point and Connecticut?

2   A    Correct.

3   Q    And a typical trip is from New London to Orient and

4   then back again?

5   A    Typical trip.

6   Q    Now in November of 2007, what did the typical crew on

7   board the Sea Jet consist of?

8   A    Master mate, three deck hands, one engineer.

9   Q    And do you know what the Coast Guard requirement is

10  for manning?

11  A    For this particular schedule; a master, three deck

12  hands, and one unlicensed engineer.

13  Q    And can you tell me whether in connection with the

14  voyage of November 16, 2007, the manning exceeded the

15  Coast Guard requirements?

16  A    Yes, it did.

17  Q    Now, you have been sitting here listening to the

18  testimony of the case, and you have heard Ms. Gibson

19  testify, correct?

20  A    Correct.

21  Q    Now, have you ever observed, or has it ever been

22  reported to you that the vessel had taken off suddenly and

23  raised up out of the water and slammed down during or

24  after a backflushing procedure?

25  A    No.

1  Q    And how long has the Sea Jet been running for Cross

2  Sound?

3  A    Since 1995.

4  Q    Now, I want to show you a photograph of the vessel

5  and ask you if this is a fair and accurate representation

6  of the Sea Jet as it appeared on November 16, 2007?

7  A    Yes.

8       MR. WILL:  Your Honor, I would like to offer

9  Exhibit O into evidence.

10      MR. GRIDELLI:  No objection.

11      THE COURT:  In evidence.

12      (Defense Exhibit O received in evidence.)

13 BY MR. WILL:

14 Q    Now, you have testified earlier that as operations

15 manager you're responsible for investigating and reviewing

16 passenger complaints, injuries and incidents in connection

17 with the operation of the vessel, correct?

18 A    Correct.

19 Q    Did it prove, before any incidents or complaints by

20 any passenger at the conclusion of the 6 pm trip on

21 November 16, 2007?

22 A    No.

23 Q    Were any passenger incidents reports filled out for

24 this trip?

25 A    No.

385

1  Q    Were any entries made in the log book concerning an

2  incident, passenger injury or complaints?

3  A    No.

4  Q    Now, do you know whether Heather Gibson reported an

5  injury or an incident to the crew at the conclusion of the

6  6 pm trip on November 16, 2007?

7  A    No.

8  Q    Did there come a time after the voyage when you were

9  advised that Heather Gibson claimed to have been injured

10  on the 6 pm trip on November 16, 2007?

11  A    Yes.

12  Q    And what were the circumstances of that?

13  A    I believe I was passed a phone number by Chris

14  Anglin, stating that the individual claims to have had an

15  incident aboard the vessel.

16  Q    And what, if anything, did you do?

17  A    I called the number and spoke with her husband.

18  Q    Did you ever speak with Heather Gibson?

19  A    Not that I remember or are aware of.

20  Q    And what was Chris Anglin's involvement, if any?

21  A    He passed me the phone number stating that they had

22  called the reservation department and notified them of an

23  incident aboard the vessel.

24  Q    Now, did you investigate the claim?

25  A    Yes.

1    Q    And what exactly did you do?

2    A    I went on board the vessel and talked to the captain,

3    the mate, and a few of the deckhands, and asked them if

4    they had, were aware of any incident that had occurred

5    that night, or any injury that had been reported.  And

6    they all said they were not aware of any incident or

7    injury report.

8         MR. WILL:  I have no further questions.

9         MR. GRIDELLI:  Your Honor, can we turn the

10   lights up, please?

11

12   CROSS-EXAMINATION

13   BY MR. GRIDELLI:

14   Q    Good afternoon, Mr. Sise.

15   A    Good afternoon.

16   Q    We've met once before when I took your deposition?

17   A    Yes.

18   Q    You're not claiming that Heather Gibson and her

19   family weren't on that ferry that night, were you, are

20   you?

21   A    No, did I?

22   Q    I'm just asking.  I want to make it clear.  You're

23   not claiming -- I mean, you've seen the receipts that she

24   kept?

25        MR. WILL:  Objection.

1          THE COURT:  Sustained.

2     BY MR. GRIDELLI:

3     Q    Look at what has been marked as Plaintiffs' 24 in

4     evidence.

5          THE COURT:  Are those the receipts?

6          MR. GRIDELLI:  Those are the receipts.

7          THE COURT:  Sustained.

8          MR. GRIDELLI:  Your Honor, this is on the list

9     of exhibits that he didn't object to in the pretrial.

10         THE COURT:  If he didn't object, then it's in

11    evidence.

12         MR. GRIDELLI:  Thank you.

13    BY MR. GRIDELLI:

14    Q    Would you look at those receipts?

15         THE COURT:  The lawyers submit or agree what is

16    coming in, and I'm not going to upset it.  Unless there is

17    no agreement, I would settle it.

18         There is no objection, and that she wasn't there

19    or that she was there.  It's conceded that she was there.

20    We don't need the receipts, but they offered it so it's

21    there.

22    BY MR. GRIDELLI:

23    Q    Are those the receipts for the 11/16/2007 trip?

24         THE COURT:  Sustained.

25         There is no issue as to that.

1    MR. GRIDELLI:  Your Honor, in my summation maybe

2  then it will become clear why I want them in.

3           THE COURT:  Sustained.

4           MR. GRIDELLI:  Okay.

5  BY MR. GRIDELLI:

6  Q    Does the Cross Sound Ferry have a website?

7  A    Yes.

8  Q    And on the website is there a description of the Sea

9  Jet?

10 A    Yes.

11 Q    And I think you testified you personally piloted the

12 Sea Jet?

13 A    Yes.

14 Q    And you have done in excess of 30 knots?

15           MR. WILL:  Objection, your Honor.  He said --

16           THE COURT:  Overruled.

17 BY MR. GRIDELLI:

18 Q    That means you can answer.

19           Have you ever seen it go in excess of 30 knots?

20 A    I have never seen it go in excess of 30 knots.

21 Q    Are you familiar with your own website concerning the

22 description?

23 A    I would like to take a look at it.

24 Q    Sure.  See if this -- sure, you can refresh your

25 recollection.

1    MR. WILL:  Objection.

2    THE COURT:  Sidebar.

3    (A discussion was held at sidebar off the

4    record, after which the following occurred.)

5    THE COURT:  Overruled.

6  BY MR. GRIDELLI:

7  Q    Have you had a chance to look at that?

8  A    Yes, I have.

9  Q    Does it give the speed of the vessel?

10  A    Yes.  You might consider that bragging rights.

11  Q    You're telling me that what you put on your website

12  is not accurate?

13  A    It says 30, in excess of 30 knots.  I have never seen

14  the boat --

15  Q    It says in excess of 30 knots, correct?

16  A    That is what it says.

17  Q    And you were responsible, or participated in the

18  decision to buy the vessel, correct?

19  A    Correct.

20  Q    And Nicholas Brothers, they built the vessel,

21  correct?

22  A    Correct.

23  Q    Did you ever look at the specs from Nicholas Brothers

24  to see how fast the vessel could go?

25  A    Yes.

1  Q    Doesn't it also say that it goes in excess of 30

2  knots?

3  A    I believe when the boat was built it went 32 knots.

4         MR. GRIDELLI:  May I approach the witness?

5  BY MR. GRIDELLI:

6  Q    Does this refresh your recollection of the Nicholas

7  Brothers, the builder --

8  A    Nichols Brothers.

9  Q    Nichols Brothers, forgive me.

10         MR. WILL:  Objection.

11         THE COURT:  He is asking whether it refreshes

12  his recollection.  If it doesn't, he says, No.  If it does

13  refresh his recollection, it is not what it says.

14         Does that refresh your recollection?

15         THE WITNESS:  Right.  Yes.  This is a fair and

16  accurate representation of the vessel when it was built.

17  BY MR. GRIDELLI:

18  Q    And does it refresh your recollection as to the

19  cruising speed and the maximum speed?

20  A    Right.  This is the --

21  Q    Can you tell us what the cruising speed is and what

22  the maximum speed is?

23  A    The cruising speed is 32, maximum is 36.

24  Q    We're talking about knots, correct?

25  A    Yes.  This was also prior to the installation of the

1   -- control system.

2   Q    I haven't asked you a question.

3         Now, is it true you became aware of the claim

4   within a few days of the incident?

5   A    Yes.

6   Q    And it was your understanding back then that she

7   bruised her tail bone?

8   A    That was my understanding.

9   Q    Did you have an opportunity to review your deposition

10  prior to testifying here today?

11  A    Yes.

12  Q    And in that deposition you said that you became aware

13  that she bruised her tail bone, correct?

14  A    Correct.

15  Q    She was making a claim that it happened on your

16  vessel?

17  A    Correct.

18  Q    And did you then prepare an incident report the way

19  everyone says that you and everyone makes a claim about an

20  injury?

21  A    No.

22  Q    You didn't.  And did you direct someone under your

23  employ to prepare that incident report because someone is

24  now claiming they were injured?

25  A    No.

1   Q    As you sit here today, is there any incident report,

2   even though you admit that someone within a few days --

3          THE COURT:  Sustained.

4          You can ask your question, but not a summation.

5   BY MR. GRIDELLI:

6   Q    Are you aware of any incident report that was ever

7   prepared in this case?

8   A    No.

9   Q    Now you mentioned the name Chris Anglin.  Can you

10  spell his last name for me?

11  A    A-N-G-L-I-N.

12  Q    Is he still with the company?

13  A    Yes.

14  Q    Now, in your investigation of this incident, did you

15  eventually learn that they found a lobster pot buoy and

16  line clogging the port jet of the Sea Jet?

17  A    Yes.

18  Q    Did the offices at Orient Point have regular hours

19  back in November of '07?

20  A    Yes.

21  Q    What were the, what time did it open, what time did

22  it close?

23  A    I'm not aware of when they open and close.

24         MR. WILL:  Objection.

25         THE COURT:  What is your objection?

1    MR. WILL:  Your Honor --

2    THE COURT:  It's a claim.  He has a right to

3  ask.

4    MR. WILL:  Just beyond the scope of direct, your

5  Honor.

6    THE COURT:  Well, there is no such thing as

7  beyond the scope.  Both of them use that argument.  That

8  is ancient history in the 20s, beyond the scope.  They

9  both still argue it's beyond the scope.

10  BY MR. GRIDELLI:

11  Q    I'm sorry, you're not familiar with what the hours

12  were for the offices on Orient Point back in November of

13  '07?

14  A    I would not know what their hours were in 2007,

15  correct.

16  Q    Have the hours changed?

17  A    They changed with the schedule.

18  Q    Do they change with the season also?

19  A    Correct.

20  Q    I mean winter the hours are less than let's say in

21  the summer?

22  A    Yes.  Less in the week and more on the weekends.

23  Q    The last ferry that leaves New London and lands in

24  Orient Point back during the weekdays of November of '07,

25  when was it scheduled to arrive?

1  A    The last ferry, the last Sea Jet ferry?

2  Q    The last Sea Jet ferry to leave New London coming to

3  Orient Point.

4  A    It would leave at seven and arrive at 7:45.

5  Q    About a 45 minutes trip, correct, with the Sea Jet?

6  A    Correct, weather depending.

7  Q    And the other ferries that the company owns and uses,

8  correct?

9  A    Correct.

10 Q    They're not faster ferries or ferries that go 30

11 knots, correct?

12 A    Correct.

13 Q    And if one of those is used, how long does it take on

14 average?

15       THE COURT:  Sustained.

16 BY MR. GRIDELLI:

17 Q    Do you know whether the --

18       THE COURT:  You're looking frustrated.  But

19 we're dealing with this ferry.  It's a different type of

20 ferry.

21       MR. GRIDELLI:  Your Honor, the testimony is that

22 a different ferry came back.  I'm allowed to explore.

23 There is testimony that the offices were closed when they

24 got back so she couldn't make a claim.  And you prevented

25 me from doing that.

1    THE COURT:  I haven't prevented you from doing

2    anything, counselor.

3         Go ahead with your question.

4    BY MR. GRIDELLI:

5    Q    How long does the other ferries that are not Sea Jet

6    ferries, take to travel from New London to Orient Point?

7    A    An hour and 20 minutes, an hour and-a-half.

8    Q    And do you know whether that type of -- withdrawn.

9         Do you know if the Sea Jet made the return trip

10   that night?

11   A    At seven o'clock, no, it did not.

12   Q    It did not.  Some other type of vessel was used to

13   return the passengers, correct?

14   A    Correct.

15   Q    And that was one of the slower vessels that take an

16   hour and 20 minutes, or whatever?

17        MR. WILL:  Objection.

18        THE COURT:  He asked it, but I'll allow it.

19   A    Yes, an hour and-a-half, an hour and 20 minutes.

20   BY MR. GRIDELLI:

21   Q    Do you know what time that vessel arrived at the

22   Orient Point offices?

23   A    No, I do not.

24   Q    Is there anyone there around the clock to take a

25   complaint or a claim if somebody is injured?

1    A    We have a security guard.

2    Q    No one in the offices themselves?

3    A    Not that I'm aware of.

4    Q    You have been present every day and heard the

5    testimony, correct?

6    A    Correct.

7    Q    And you said you conducted an investigation about

8    this claim, correct?

9    A    Yes.

10    Q    But you didn't speak to every deckhand, did you?

11    A    That's correct.

12    Q    And you heard the testimony of one of these deckhands

13    today, I believe it was Sean.  And he said he was never

14    questioned by anyone concerning this incident?

15    A    I don't recall exactly who I queried, but apparently

16    if he said I didn't call him.

17    Q    Do you know if Chris Anglin ever had any conversation

18    with Ms. Gibson?

19    A    I'm not aware of any.

20    Q    Do you know if he had any conversation with

21    Mr. Gibson?

22    A    I'm not aware of any.

23         MR. GRIDELLI:  Nothing further..  thank you,

24    sir.

25

1  REDIRECT EXAMINATION

2  BY MR. WILL:

3  Q    Mr. Sise, you indicated that after you were advised

4  of the possibility of a claim or injury, you did not

5  prepare an incident report?

6  A    Correct.

7  Q    And why is that?

8  A    The incident reports are prepared on the scene at the

9  time of an incident.  We do not prepare an incident report

10 after the fact.  Only we report it, make note of it, but

11 in terms of filling out an incident report it's always

12 done on the scene.

13 Q    Now, when you queried the crew members they advised

14 you that there had been no incidents, injuries, falls on

15 that particular trip, November 16, 2007, correct?

16          MR. GRIDELLI:  Objection.

17          MR. WILL:  He brought this out on direct.

18          THE COURT:  Sustained.

19          MR. WILL:  No further questions, your Honor.

20

21 RECROSS-EXAMINATION

22 BY MR. GRIDELLI:

23 Q    Other than an incident report, did you make any diary

24 notations?

25          THE COURT:  Sustained.  You asked that.

1    MR. GRIDELLI:  No, I asked about an incident

2  report.  Now I'm asking a diary note.

3    THE COURT:  Sustained.  You asked a diary

4  report.  You want to go through the record?

5    MR. GRIDELLI:  If your Honor remembers it, then

6  no.  I just don't recall.  Sorry.

7    THE COURT:  Okay.

8  BY MR. GRIDELLI:

9  Q    Did you make any notation about this claim?

10    THE COURT:  You've asked that too.

11  BY MR. GRIDELLI:

12  Q    Did you render a claim number to Ms. Gibson?

13    THE COURT:  Sustained.

14    MR. GRIDELLI:  Thank you.

15    THE COURT:  You may step down.

16    No more witnesses?

17    MR. WILL:  No more witnesses today, your Honor.

18    THE COURT:  Tomorrow we have three, I guess.

19    MR. GRIDELLI:  We have my doctor, and the person

20  I subpoenaed from the surveillance camera.

21    THE COURT:  We'll discuss that later.

22    MR. GRIDELLI:  Yes, your Honor.

23    THE COURT:  What it's about.

24    MR. GRIDELLI:  Yes, sir.

25    THE COURT:  You have two witnesses tomorrow?

1    MR. WILL:  Yes, your Honor.

2    THE COURT:  Okay.

3    Tomorrow morning at 9:30.

4    MR. GRIDELLI:  Would it be possible to start at

5    ten o'clock tomorrow, your Honor?

6    THE COURT:  No.

7    9:30 tomorrow morning.

8    (The jury left the courtroom at 2:49 p.m.)

9    THE COURT:  Since there are going to be experts

10   tomorrow, do you know what my rule is on experts?  If not,

11   you better find out.  If you want me to explain them, I'll

12   explain them.  But you better follow them.

13   MR. GRIDELLI:  If the court would please explain

14   them, I would be happy to listen so I try to follow your

15   ruling.

16   THE COURT:  They're not only written down, I did

17   give you copies.  It's in the law journal.  But I'll

18   explain it again.

19   MR. GRIDELLI:  It's not -- I thought you were

20   offering to, your Honor.  If you feel you don't want to,

21   that is fine.  I'll read it.

22   THE COURT:  I didn't say I don't want to.  I

23   told you where it's published.

24   MR. GRIDELLI:  And I have a copy of your rules.

25   Thank you.

1      THE COURT:  I'll explain it then.

2      You call your experts.  You may sit down.

3      You call your expert.  You qualify him.  And you

4   don't ask any hypothetical questions and he gives his

5   opinion.

6      No, hypothetical questions.  Very simple.

7   Doctor, what happened?  Expert, what happened?  And let

8   him talk.  And then see what the cross-examination is, and

9   then you have a right to rehabilitate him.

10     It moves much quicker.

11     MR. GRIDELLI:  Thank you.

12     THE COURT:  Now, when did you serve the

13  subpoena?

14     MR. GRIDELLI:  I don't have the actual date of

15  service.  I believe it was served Friday.  Mr. Will

16  claimed his people received it Friday.

17     THE COURT:  When did you get their reports?

18     MR. GRIDELLI:  I got the reports that I have,

19  and I don't believe I have them all.  I got from

20  Mr. Mulvehill's --

21     THE COURT:  When did he get them?  Did you ever

22  issue a subpoena before then?

23     MR. GRIDELLI:  I never issued a subpoena, no.

24  But your Honor, once again it was based on how the

25  testimony came in, in the case.

1    THE COURT:  Okay.  How far is the witness that

2  you subpoenaed from the company.

3    MR. WILL:  Over 150 miles, your Honor.

4    MR. GRIDELLI:  Your Honor, we have Mr. Anderson

5  who is a principal of that company.  He allegedly is here

6  today.  They knew on Friday.  I subpoenaed the records.

7  He could have easily brought them in.

8    THE COURT:  But you could have easily requested

9  them.  You could have easily made a motion.  You had all

10  of the time in the world, and you didn't do it.

11    See you tomorrow at 9:30.

12    MR. GRIDELLI:  Thank you.

13    (Whereupon the trial was adjourned at

14  2:52 p.m.).

15

16

17

18

19

20

21

22

23

24

25

I N D E X

**WILLIAM EDWARD CLIFFORD**                     230
DIRECT EXAMINATION                              230
BY MR. GRIDELLI
VOIR DIRE EXAMINATION                           237
BY MR. WILL
DIRECT EXAMINATION (Continued)                  243
BY MR. GRIDELLI
CROSS-EXAMINATION                               261
BY MR. WILL


**EVIDENCE FOR DEFENSE**                        265


**CHARLES JADAMEC**
DIRECT EXAMINATION                              265
BY MR. WILL
CROSS-EXAMINATION                               273
BY MR. GRIDELLI


**DAVID THOMAS**                                277
DIRECT EXAMINATION                              278
BY MR. WILL
CROSS-EXAMINATION                               292
BY MR. GRIDELLI
CROSS-EXAMINATION                               292
BY MR. GRIDELLI
REDIRECT EXAMINATION                            314
BY MR. WILL
RECROSS-EXAMINATION                             316
BY MR. GRIDELLI


**NORMAN SPECTOR**
DIRECT EXAMINATION                              317
BY MR. WILL
CROSS-EXAMINATION                               324
BY MR. GRIDELLI


**EARL BERNARD CLEMENTS**
DIRECT EXAMINATION                              332
BY MR. WILL
CROSS-EXAMINATION                               334
BY MR. GRIDELLI

**SEAN DONALD WALSH**
DIRECT EXAMINATION                                    337
BY MR. WILL
CROSS-EXAMINATION                                     341
BY MR. GRIDELLI

**JEREMY BARBOZA**
DIRECT EXAMINATION                                    345
BY MR. WILL
CROSS-EXAMINATION                                     349
BY MR. GRIDELLI

**MATT ANDERSON**
DIRECT EXAMINATION                                    357
BY MR. WILL
CROSS-EXAMINATION                                     360
BY MR. GRIDELLI
REDIRECT EXAMINATION                                  373
BY MR. WILL
RECROSS-EXAMINATION                                   374
BY MR. GRIDELLI
REDIRECT EXAMINATION                                  375
BY MR. WILL

**RICHARD SISE**
DIRECT EXAMINATION                                    376
BY MR. WILL
CROSS-EXAMINATION                                     386
BY MR. GRIDELLI
REDIRECT EXAMINATION                                  397
BY MR. WILL
RECROSS-EXAMINATION                                   397
BY MR. GRIDELLI


                    E X H I B I T S

Unidentified Defense Exhibit in evidence     267
Defense Exhibit G received in evidence       291
Defense Exhibit H in evidence                349
Unidentified Defense Exhibit in evidence     378
Defense Exhibit I received in evidence       379
Defense Exhibit J received in evidence       379
Unidentified Defense Exhibit in evidence     380
Defense Exhibit L received in evidence       381
Defense Exhibit M received in evidence       382
Defense Exhibit N received in evidence       382
Defense Exhibit O received in evidence       384

## $

**$1,750** [1] - 243:21
**$175** [1] - 243:20
**$9,000** [2] - 370:20, 370:21

## '

**'07** [13] - 302:25, 329:6, 343:12, 343:15, 350:9, 350:13, 353:1, 353:8, 366:7, 366:9, 392:19, 393:13, 393:24
**'80s** [1] - 234:1

## 0

**08-CV-474** [1] - 229:4

## 1

**1** [5] - 244:13, 302:15, 328:18, 342:10, 369:2
**10** [1] - 316:22
**10.8** [1] - 310:14
**100** [1] - 232:21
**106** [1] - 229:15
**109** [1] - 379:19
**10:00** [2] - 330:18, 375:21
**10:05** [1] - 375:21
**10:30** [1] - 263:19
**11** [3] - 348:2, 351:2, 367:10
**11/16/2007** [1] - 387:23
**110-foot** [1] - 278:17
**11501-4404** [1] - 229:16
**11530-2045** [1] - 229:13
**11722** [1] - 229:21
**1180** [1] - 229:21
**11:00** [1] - 375:21
**11:39** [1] - 316:23
**12** [6] - 285:11, 358:9, 370:17, 370:19, 374:9, 375:2
**12/15/07** [1] - 367:17
**12:13** [1] - 331:3
**130** [1] - 379:21
**14** [1] - 358:9
**15** [8] - 316:22, 357:17, 361:21, 366:6, 368:6, 369:11, 369:14, 374:16

**150** [2] - 232:20, 401:3
**16** [45] - 245:9, 248:4, 267:3, 267:21, 270:21, 276:12, 279:5, 279:8, 280:5, 283:9, 289:25, 290:12, 293:1, 294:4, 294:9, 294:23, 295:1, 295:9, 295:22, 320:12, 322:7, 322:23, 327:13, 332:24, 333:22, 336:14, 339:6, 339:9, 341:11, 343:18, 346:5, 346:9, 361:24, 366:11, 366:19, 380:2, 381:14, 382:1, 382:14, 383:14, 384:6, 384:21, 385:6, 385:10, 397:15
**1600-ton** [1] - 278:25
**162007** [1] - 290:8
**16th** [4] - 294:21, 301:9, 366:9, 374:16
**17** [1] - 264:11
**18** [3] - 264:14, 306:4, 369:3
**19** [1] - 366:21
**1973** [2] - 230:19, 230:24
**1979** [1] - 231:11
**1983** [1] - 376:20
**1985** [3] - 233:4, 278:12, 278:13
**1989** [1] - 233:24
**1995** [2] - 233:4, 384:3
**1996** [1] - 318:10
**1998** [1] - 233:24
**1:30** [2] - 331:1, 331:2
**1:35** [1] - 332:2

## 2

**2** [2] - 342:15, 366:17
**20** [9] - 235:21, 248:7, 256:19, 295:12, 295:13, 366:25, 395:7, 395:16, 395:19
**200** [2] - 233:12, 377:22
**2005** [1] - 266:22
**2006** [1] - 266:13
**2007** [66] - 245:9, 248:3, 266:6, 267:4, 267:21, 270:21, 276:12, 279:5,

**279:8, 280:5,
289:25, 290:2,
290:12, 293:1,
294:5, 294:9,
294:23, 295:1,
295:9, 295:22,
318:2, 318:12,
320:13, 322:8,
322:23, 327:13,
332:15, 332:24,
333:22, 336:14,
337:2, 337:4,
338:12, 339:6,
339:10, 341:11,
343:18, 346:5,
346:9, 348:11,
349:10, 357:13,
357:17, 361:22,
361:24, 366:11,
366:13, 366:15,
368:6, 369:11,
369:14, 374:16,
376:22, 380:2,
381:15, 382:1,
382:14, 382:23,
383:6, 383:14,
384:6, 384:21,
385:6, 385:10,
393:14, 397:15**
**2008** [21] - 292:22, 306:4, 357:20, 357:23, 358:1, 360:4, 366:10, 366:17, 366:19, 366:21, 366:23, 366:25, 367:2, 367:4, 368:6, 368:7, 369:17, 369:20, 369:23
**2009** [10] - 238:4, 358:4, 368:7, 368:10, 368:13, 368:15, 368:17, 368:20, 369:2, 370:1
**2010** [1] - 369:3
**2011** [6] - 264:11, 299:25, 335:5, 344:2, 344:6, 345:1
**2012** [1] - 229:7
**20s** [1] - 393:8
**21** [9] - 229:7, 357:20, 357:23, 366:23, 367:2, 368:6, 368:7, 369:17, 369:20
**23** [6] - 351:2, 358:1, 360:4, 367:4, 368:7, 369:23
**230** [2] - 402:3, 402:4
**237** [1] - 402:5
**23rd** [1] - 367:6

**24** [1] - 387:3
**243** [1] - 402:6
**25** [1] - 236:12
**250** [2] - 232:22, 377:22
**261** [1] - 402:7
**265** [2] - 402:8, 402:10
**267** [1] - 403:20
**27** [1] - 366:13
**273** [1] - 402:11
**277** [1] - 402:12
**278** [1] - 402:13
**27th** [3] - 374:18, 374:22, 375:13
**28** [1] - 366:15
**28th** [1] - 374:20
**291** [1] - 403:21
**292** [2] - 402:14, 402:15
**2:49** [1] - 399:8
**2:52** [1] - 401:14

## 3

**3** [5] - 246:1, 248:9, 281:11, 292:22, 342:16
**30** [11] - 256:20, 301:15, 375:4, 388:14, 388:19, 388:20, 389:13, 389:15, 390:1, 394:10
**314** [1] - 402:16
**316** [1] - 402:17
**317** [1] - 402:19
**32** [2] - 390:3, 390:23
**320-foot** [1] - 278:17
**324** [1] - 402:20
**332** [1] - 402:22
**334** [1] - 402:23
**337** [1] - 403:2
**341** [1] - 403:3
**345** [1] - 403:5
**349** [2] - 403:6, 403:21
**357** [1] - 403:8
**36** [2] - 311:14, 390:23
**360** [1] - 403:9
**373** [1] - 403:10
**374** [1] - 403:11
**375** [1] - 403:12
**376** [1] - 403:14
**378** [1] - 403:22
**379** [2] - 403:22, 403:23
**380** [1] - 403:23
**381** [1] - 403:24
**382** [2] - 403:24, 403:25
**384** [1] - 403:25

**386** [1] - 403:15
**39** [1] - 232:11
**397** [2] - 403:16, 403:17

## 4

**4** [3] - 248:9, 251:1, 342:11
**40** [3] - 232:11, 246:9, 309:25
**400** [2] - 295:15, 377:24
**42** [1] - 306:12
**45** [1] - 394:5

## 5

**5** [5] - 244:14, 342:8, 342:11, 348:2, 348:10
**5.10.3** [1] - 309:9
**5.10.8** [5] - 309:10, 312:2, 312:11, 314:24, 316:7
**50** [1] - 309:25
**500** [1] - 229:13
**51** [1] - 379:19

## 6

**6** [37] - 245:9, 248:3, 267:20, 280:4, 281:5, 281:23, 283:16, 287:7, 303:22, 304:1, 304:12, 320:13, 320:21, 321:13, 322:7, 323:11, 325:16, 326:1, 326:14, 327:13, 332:23, 333:21, 339:15, 339:19, 340:24, 342:1, 342:2, 342:6, 342:16, 343:18, 344:18, 350:9, 350:15, 350:19, 384:20, 385:6, 385:10
**600** [1] - 229:13
**631** [1] - 229:22
**65** [1] - 232:20
**6th** [1] - 303:23

## 7

**7** [8] - 306:12, 342:17, 358:4, 368:7, 368:13, 368:15, 368:20, 370:1

**712-6108** [1] - 229:22
**712-6124** [1] - 229:22
**7:45** [1] - 394:4
**7th** [1] - 368:8

## 8

**8** [2] - 342:11, 348:10
**8:00** [1] - 330:18

## 9

**9** [1] - 350:9
**9:00** [1] - 330:18
**9:30** [3] - 399:3, 399:7, 401:11
**9:40** [2] - 229:7, 230:2

## A

**A-N-G-L-I-N** [1] - 392:11
**a.m** [4] - 229:7, 230:2, 316:23, 375:14
**able** [3] - 282:20, 286:17, 374:25
**aboard** [9] - 234:11, 246:7, 247:6, 254:9, 338:18, 338:20, 346:8, 385:15, 385:23
**absolutely** [4] - 320:11, 323:20, 340:13, 375:23
**academy** [2] - 231:23, 232:10
**Academy** [5] - 230:18, 230:19, 231:22, 233:20, 266:21
**accelerate** [5] - 254:14, 268:23, 277:15, 286:18, 287:1
**accelerated** [4] - 240:10, 270:21, 271:6, 286:12
**acceleration** [5] - 239:20, 239:23, 252:19, 268:4, 277:10
**accept** [2] - 235:22, 235:23
**accident** [5] - 247:10, 258:18, 258:21, 340:8, 355:1
**according** [4] - 248:5, 251:25, 274:24, 350:24
**accurate** [13] - 275:3, 290:6, 366:7, 372:10, 379:23,

380:1, 381:13, 381:24, 382:13, 382:15, 384:5, 389:12, 390:16
**accurately** [4] - 247:7, 251:20, 254:10, 359:3
**acted** [1] - 271:5
**activities** [3] - 247:3, 267:24, 378:3
**activity** [6] - 321:24, 339:20, 374:14, 375:14, 375:21, 375:23
**actual** [5] - 269:11, 282:14, 283:5, 375:3, 400:14
**addition** [1] - 286:2
**address** [2] - 314:5, 314:6
**adjourned** [1] - 401:13
**Administration** [1] - 231:25
**admissible** [1] - 359:16
**admit** [1] - 392:2
**admitted** [1] - 359:6
**adult** [1] - 360:6
**advise** [2] - 308:11, 347:11
**advised** [4] - 261:19, 385:9, 397:3, 397:13
**advisor** [1] - 234:5
**advisory** [1] - 233:5
**affect** [1] - 273:22
**affected** [1] - 307:19
**afraid** [1] - 262:7
**afternoon** [10] - 324:20, 334:3, 341:18, 341:19, 349:24, 357:9, 360:14, 360:15, 386:14, 386:15
**ago** [8] - 235:22, 237:4, 244:6, 293:25, 320:18, 321:1, 343:24, 349:25
**agree** [2] - 282:10, 387:15
**agreement** [1] - 387:17
**ahead** [18] - 236:24, 255:4, 257:10, 263:22, 270:17, 277:13, 282:19, 296:9, 311:17, 313:8, 313:10, 314:21, 334:16, 334:21, 360:1,

364:15, 375:18, 395:3
**Aid** [1] - 320:2
**Aids** [1] - 328:8
**airplane** [1] - 232:6
**Airport** [2] - 231:8, 232:4
**aisles** [1] - 254:4
**alert** [2] - 261:15, 285:19
**ALFRED** [1] - 229:16
**alleged** [1] - 286:11
**allegedly** [3] - 370:21, 381:7, 401:5
**allow** [16] - 242:7, 243:4, 249:16, 257:10, 270:5, 270:6, 274:10, 285:23, 286:20, 293:20, 315:12, 327:5, 342:23, 349:5, 375:17, 395:18
**allowed** [2] - 264:23, 394:22
**allowing** [1] - 276:8
**allows** [1] - 235:6
**almost** [2] - 293:25, 306:6
**Ambrose** [1] - 234:8
**amount** [1] - 258:2
**ancient** [1] - 393:8
**and-a-half** [2] - 395:7, 395:19
**Anderson** [8] - 360:3, 360:14, 366:3, 370:14, 373:5, 373:11, 373:15, 401:4
**ANDERSON** [2] - 357:2, 403:8
**Andrea** [1] - 369:2
**Anglin** [4] - 328:12, 385:14, 392:9, 396:17
**Anglin's** [1] - 385:20
**ANN** [1] - 229:17
**Annapolis** [1] - 233:20
**announcement** [41] - 245:13, 247:12, 249:15, 250:20, 250:22, 250:24, 252:17, 252:25, 253:8, 253:9, 253:15, 254:12, 254:18, 261:11, 261:21, 281:8, 281:10, 281:13, 281:15, 281:17, 281:18, 282:3,

282:5, 282:8, 282:14, 282:24, 283:2, 285:7, 285:10, 285:12, 285:13, 285:16, 285:25, 305:9, 305:11, 307:21, 308:1, 308:2, 308:9, 313:22, 313:25
**Announcement** [3] - 245:20, 251:8, 253:25
**announcements** [19] - 241:11, 241:16, 242:9, 245:12, 252:12, 255:9, 257:4, 257:11, 257:13, 257:14, 257:17, 260:13, 260:15, 261:15, 261:18, 286:3, 286:8, 304:17, 305:8
**annoyed** [1] - 261:2
**answer** [8] - 256:1, 260:20, 300:9, 300:15, 326:9, 348:14, 353:5, 388:18
**Answer** [4] - 306:23, 307:2, 351:6, 351:8
**answered** [3] - 240:6, 260:17, 336:11
**answers** [4] - 306:14, 307:7, 351:2, 351:12
**anticipate** [1] - 308:25
**apologize** [3] - 251:18, 282:23, 353:23
**appeal** [2] - 265:7, 265:10
**appearance** [1] - 243:21
**APPEARANCES** [1] - 229:11
**appeared** [1] - 384:6
**appellate** [1] - 259:24
**application** [1] - 315:4
**apply** [2] - 314:9
**appreciate** [1] - 255:5
**approach** [3] - 311:1, 311:18, 390:4
**appropriate** [1] - 259:18
**area** [11] - 235:7, 235:8, 236:2, 247:14, 247:24, 248:19, 256:6, 276:15, 293:3, 295:6, 308:5
**argue** [1] - 393:9

**arguing** [2] - 249:23, 264:22
**argument** [1] - 393:7
**arranged** [1] - 381:6
**arrangement** [1] - 381:25
**arrangements** [1] - 381:14
**arranging** [5] - 357:16, 357:19, 357:22, 357:25, 358:3
**Arrival** [1] - 253:25
**arrival** [1] - 287:14
**arrive** [2] - 393:25, 394:4
**arrived** [1] - 395:21
**arriving** [2] - 253:16, 254:3
**art** [1] - 244:22
**article** [1] - 253:13
**assign** [1] - 358:11
**assigned** [7] - 302:18, 302:22, 303:17, 326:13, 329:2, 329:15, 339:15
**assist** [2] - 234:14, 318:14
**assistance** [1] - 261:25
**assistant** [1] - 343:25
**associate** [1] - 368:17
**association** [2] - 233:22, 234:2
**Association** [1] - 235:15
**assume** [2] - 344:21, 355:4
**Atmospheric** [1] - 231:24
**attempt** [4] - 252:3, 252:11, 274:17, 328:2
**attempted** [1] - 295:23
**attend** [1] - 351:23
**attended** [2] - 230:17, 231:4
**attention** [2] - 313:9, 314:23
**attest** [1] - 274:4
**attitude** [1] - 365:6
**attorney** [2] - 260:6, 293:12
**attorneys** [4] - 235:25, 236:3, 244:4, 264:7
**audio** [1] - 282:17
**authored** [2] - 312:24, 313:1
**Authority** [2] - 233:6, 233:7

authorizes [1] - 380:13
automated [8] - 250:24, 281:15, 282:3, 282:5, 282:8, 286:2, 286:7, 305:9
average [1] - 394:14
aware [14] - 245:1, 262:23, 323:10, 354:20, 385:19, 386:4, 386:6, 391:3, 391:12, 392:6, 392:23, 396:3, 396:19, 396:22

**B**

bachelor's [1] - 230:24
backflush [19] - 249:9, 252:3, 252:17, 254:12, 254:18, 255:8, 285:6, 285:7, 285:15, 285:25, 304:16, 304:25, 305:9, 305:14, 307:12, 313:23, 314:1, 314:2
Backflush [1] - 251:8
backflushed [3] - 274:3, 297:3, 297:22
backflushing [41] - 247:9, 249:14, 250:18, 250:21, 251:24, 252:11, 257:12, 271:24, 272:4, 272:13, 272:16, 272:22, 273:25, 275:8, 275:21, 275:22, 276:11, 284:10, 284:12, 285:3, 285:9, 286:2, 287:2, 293:3, 295:23, 296:15, 296:24, 297:16, 297:24, 297:25, 307:14, 315:5, 315:8, 315:13, 324:12, 337:11, 353:1, 353:7, 353:13, 354:8, 383:24
background [1] - 230:16
BADIAK [1] - 229:15
ballpark [1] - 370:14
Baltimore [1] - 231:7
Band [2] - 320:2, 328:8
Band-Aid [1] - 320:2
BARBOZA [2] -

345:11, 403:5
Barboza [8] - 281:4, 302:9, 304:7, 304:9, 328:23, 336:20, 343:6, 345:18
BARNES [1] - 229:12
Barnes [1] - 260:3
based [15] - 241:17, 241:19, 243:6, 250:9, 251:22, 252:23, 254:24, 255:7, 257:16, 258:10, 258:15, 260:15, 270:19, 309:12, 400:24
basic [1] - 281:21
basis [12] - 236:18, 240:9, 240:11, 240:12, 240:13, 240:14, 240:16, 240:18, 247:25, 248:1, 271:20, 362:6
bathrooms [1] - 308:19
Bay [4] - 233:11, 248:10, 293:4, 293:6
beard [2] - 348:11, 348:16
became [5] - 248:22, 264:6, 272:1, 391:3, 391:12
become [4] - 271:19, 283:16, 342:11, 388:2
becomes [1] - 271:16
BEFORE [1] - 229:10
beg [1] - 307:11
beginning [1] - 283:9
behalf [1] - 243:23
behind [1] - 323:5
belaboring [1] - 375:2
believes [2] - 242:17, 286:11
below [1] - 302:2
bench [2] - 246:13, 382:11
bench-type [1] - 382:11
benches [1] - 299:3
beneath [1] - 246:13
benefit [1] - 282:13
Bernard [1] - 360:7
BERNARD [2] - 332:7, 402:21
berth [2] - 234:15, 234:16
best [1] - 243:11
better [4] - 259:13, 372:20, 399:11, 399:12

between [5] - 278:20, 280:5, 378:14, 382:11, 383:1
beyond [4] - 393:4, 393:7, 393:8, 393:9
big [2] - 309:22, 309:24
biggest [2] - 234:3, 234:18
bills [1] - 364:11
birth [1] - 312:15
bit [1] - 265:25
blank [3] - 325:13, 351:21, 375:22
blocked [1] - 306:1
blow [1] - 259:21
blowing [1] - 248:13
blows [1] - 248:14
board [12] - 232:24, 234:2, 234:16, 235:15, 237:20, 239:13, 281:19, 292:11, 292:12, 380:17, 383:7, 386:2
Board [2] - 233:15, 233:16
boarding [1] - 291:12
boards [1] - 234:7
boat [27] - 232:17, 242:18, 251:10, 251:23, 252:14, 252:19, 254:14, 255:19, 255:23, 256:4, 256:9, 256:15, 263:25, 268:11, 274:3, 274:5, 298:6, 298:12, 298:17, 299:4, 299:13, 307:2, 313:1, 343:3, 378:12, 389:14, 390:3
boats [6] - 231:13, 232:15, 234:14, 234:17, 237:5, 247:23
bodies [1] - 352:1
body [1] - 247:16
bone [2] - 391:7, 391:13
book [11] - 270:22, 272:1, 289:12, 289:15, 289:18, 289:22, 311:10, 321:19, 322:12, 350:24, 385:1
books [1] - 372:3
booth [2] - 381:9
bother [1] - 375:9
bottom [2] - 302:15,

341:23
box [1] - 238:23
Boyle [1] - 265:3
boys [1] - 313:18
bragging [1] - 389:10
break [2] - 263:14, 316:22, 330:24
bridge [4] - 231:6, 231:9, 235:1, 286:15
briefly [3] - 273:6, 377:16, 377:25
bring [7] - 230:23, 265:11, 315:23, 317:8, 362:7, 364:12, 372:12
bringing [2] - 292:18, 292:23
Brothers [5] - 389:20, 389:23, 390:7, 390:8, 390:9
brought [8] - 265:3, 314:23, 315:7, 315:13, 315:16, 361:18, 397:17, 401:7
bruised [2] - 391:7, 391:13
build [1] - 348:3
builder [1] - 390:7
built [4] - 269:12, 389:20, 390:3, 390:16
bulkheads [1] - 381:10
buoy [1] - 392:15
buoys [1] - 312:14
business [2] - 357:11, 360:4
buy [3] - 380:24, 389:18
BY [180] - 229:14, 229:16, 230:13, 230:22, 237:2, 237:12, 240:2, 240:8, 241:1, 243:16, 246:6, 250:4, 251:6, 252:9, 252:22, 253:7, 253:14, 254:17, 254:23, 255:6, 255:12, 255:16, 255:22, 256:3, 256:12, 256:18, 256:22, 257:3, 257:8, 257:15, 258:1, 258:25, 260:1, 260:12, 261:7, 261:9, 265:23, 267:17, 269:9, 270:18,

272:12, 273:13, 274:11, 276:10, 278:3, 280:20, 282:2, 282:25, 283:22, 285:2, 285:24, 286:22, 288:24, 289:6, 291:1, 291:11, 292:4, 293:16, 293:22, 295:4, 296:3, 296:11, 297:20, 298:10, 299:2, 299:10, 300:5, 300:11, 300:20, 301:7, 301:20, 305:24, 312:1, 312:10, 313:12, 314:13, 314:22, 315:15, 315:20, 316:6, 317:15, 324:1, 324:19, 326:17, 326:23, 327:7, 332:13, 334:2, 334:17, 335:3, 335:9, 336:12, 337:6, 338:1, 341:17, 343:1, 343:11, 345:17, 348:18, 349:7, 349:23, 353:4, 354:6, 357:8, 359:22, 360:2, 360:13, 361:20, 364:16, 366:2, 368:1, 369:9, 370:8, 370:24, 371:7, 371:12, 372:8, 372:19, 372:23, 373:4, 373:10, 374:4, 375:12, 375:20, 376:13, 378:6, 379:1, 379:8, 379:17, 380:9, 381:23, 382:8, 382:21, 384:13, 386:13, 387:2, 387:13, 387:22, 388:5, 388:17, 389:6, 390:5, 390:17, 392:5, 393:10, 394:16, 395:4, 395:20, 397:2, 397:22, 398:8, 398:11, 402:4, 402:5, 402:6, 402:7, 402:10, 402:11, 402:13, 402:14, 402:15, 402:16, 402:17, 402:19, 402:20,

402:22, 402:23, 403:3, 403:4, 403:6, 403:7, 403:9, 403:10, 403:11, 403:12, 403:13, 403:15, 403:16, 403:17, 403:18

## C

**cabin** [3] - 246:23, 298:22, 327:20
**cabins** [2] - 246:14, 303:20
**cadets** [1] - 231:23
**calm** [13] - 241:20, 241:23, 247:15, 248:15, 248:18, 248:20, 283:7, 293:1, 293:7, 293:10, 308:6, 308:7, 324:11
**camera** [1] - 398:20
**cancelled** [1] - 325:14
**cannot** [1] - 258:18
**capable** [3] - 239:23, 268:3, 362:16
**capacity** [2] - 232:22, 266:9
**Captain** [26] - 230:5, 230:14, 244:13, 245:7, 248:16, 249:7, 249:19, 250:6, 250:9, 255:17, 256:13, 256:23, 260:25, 264:4, 264:5, 264:6, 278:4, 283:1, 291:2, 292:5, 306:16, 314:7, 314:23, 315:1, 315:7
**captain** [32] - 232:24, 245:7, 250:14, 250:22, 260:2, 260:14, 261:10, 277:8, 277:14, 278:9, 278:10, 279:14, 279:17, 279:20, 280:8, 285:12, 286:15, 288:15, 289:2, 289:19, 290:6, 299:19, 302:2, 314:14, 318:14, 318:19, 318:22, 326:9, 346:15, 353:12, 354:7, 386:2
**captain's** [3] - 318:7, 318:9, 377:11
**car** [3] - 278:17, 305:21

**carried** [2] - 232:20, 358:15
**carry** [2] - 247:1, 254:6
**carry-on** [2] - 247:1, 254:6
**carrying** [1] - 244:19
**case** [35] - 234:14, 236:23, 240:10, 241:18, 242:15, 242:24, 243:25, 244:5, 244:9, 244:10, 249:10, 252:2, 252:10, 255:17, 256:8, 257:17, 260:3, 260:7, 262:19, 263:17, 263:25, 267:8, 267:23, 286:10, 306:3, 308:19, 316:22, 331:2, 334:23, 355:2, 355:18, 360:22, 383:18, 392:7, 400:25
**catamaran** [1] - 279:24
**catamarans** [4] - 237:7, 237:10, 278:18, 317:24
**caused** [13] - 241:19, 249:17, 251:10, 251:14, 255:19, 256:4, 256:9, 256:14, 256:24, 258:18, 258:20, 306:19
**causing** [1] - 274:17
**caution** [2] - 246:22, 315:1
**cautionary** [1] - 308:3
**CD** [2] - 367:20, 372:16
**Cellino** [1] - 260:3
**CELLINO** [1] - 229:12
**central** [1] - 381:11
**Central** [2] - 229:6, 229:21
**certain** [9] - 235:6, 292:16, 292:21, 296:24, 299:9, 302:18, 302:19, 324:24, 370:11
**certainly** [2] - 245:4, 247:24
**certificate** [5] - 378:19, 379:5, 379:11, 380:12, 380:13
**certification** [1] -

235:3
**certifications** [2] - 234:23, 235:1
**cetera** [1] - 264:1
**chain** [1] - 318:19
**chambers** [2] - 263:5, 364:3
**chance** [2] - 306:9, 389:7
**change** [3] - 276:25, 309:3, 393:18
**changed** [7] - 342:4, 342:13, 342:15, 342:19, 363:25, 393:16, 393:17
**characteristics** [1] - 381:1
**charge** [8] - 243:17, 243:19, 243:21, 304:1, 304:11, 318:17, 350:22, 370:3
**CHARLES** [2] - 265:17, 402:9
**check** [3] - 275:7, 324:5, 327:25
**checks** [1] - 235:22
**children** [7] - 258:23, 288:2, 288:13, 292:18, 292:23, 322:7, 322:16, 323:11, 340:11, 340:21, 347:20
**Chris** [5] - 328:12, 385:13, 385:20, 392:9, 396:17
**circumstance** [1] - 255:9
**circumstances** [3] - 363:18, 374:24, 385:12
**City** [1] - 229:13
**civic** [1] - 235:12
**claim** [21] - 293:12, 293:18, 298:6, 298:16, 299:11, 313:19, 333:11, 343:20, 347:15, 354:21, 385:24, 391:3, 391:15, 391:19, 393:2, 394:24, 395:25, 396:8, 397:4, 398:9, 398:12
**claimed** [6] - 240:10, 293:19, 294:3, 328:10, 385:9, 400:16
**claiming** [3] - 386:18, 386:23, 391:24

**claims** [2] - 293:13, 385:14
**class** [2] - 235:4, 235:5
**clear** [7] - 254:4, 271:24, 315:17, 362:18, 363:12, 386:22, 388:2
**cleared** [3] - 272:18, 274:4, 275:2
**clearing** [1] - 267:25
**clearly** [1] - 239:25
**Clemens** [3] - 302:7, 304:10, 328:21
**Clements** [2] - 281:4, 334:3
**CLEMENTS** [2] - 332:7, 402:21
**clerk** [2] - 354:1, 354:3
**client** [1] - 262:19
**client's** [1] - 244:1
**Clifford** [11] - 230:5, 230:14, 237:3, 240:14, 255:17, 256:14, 256:23, 260:2, 261:10, 264:5, 264:6
**CLIFFORD** [2] - 230:7, 402:3
**clock** [1] - 395:24
**clog** [8] - 249:8, 272:8, 272:18, 284:7, 284:13, 285:4, 315:17, 315:23
**clogged** [8] - 248:23, 271:16, 271:19, 272:1, 283:16, 283:24, 284:4, 307:13
**clogging** [1] - 392:16
**close** [4] - 330:15, 373:6, 392:22, 392:23
**close-up** [1] - 373:6
**closed** [2] - 233:12, 394:23
**closer** [4] - 230:20, 230:23, 265:25, 317:9
**closes** [1] - 330:18
**closest** [1] - 237:25
**clubs** [1] - 235:18
**clutch** [2] - 239:1, 354:10
**clutches** [1] - 354:9
**CM** [1] - 229:19
**Coast** [15] - 231:2, 234:24, 235:6, 244:15, 244:25, 245:1, 266:14,

278:22, 318:5, 377:2, 380:10, 380:11, 380:16, 383:9, 383:15
**College** [1] - 232:3
**Combs** [1] - 229:20
**comfort** [1] - 246:21
**coming** [5] - 263:17, 288:9, 303:8, 341:9, 356:11, 361:18, 371:8, 387:16, 394:2
**command** [1] - 318:19
**commencing** [2] - 293:12, 293:18
**commission** [1] - 231:2
**Committee** [1] - 235:16
**common** [3] - 271:21, 284:4, 309:3
**commotion** [1] - 323:10
**communication** [1] - 358:19
**community** [1] - 378:1
**companies** [1] - 317:25
**company** [24] - 235:19, 235:21, 244:15, 245:5, 288:25, 328:14, 328:16, 344:10, 355:24, 356:9, 357:9, 357:13, 362:9, 363:16, 363:25, 376:25, 377:6, 377:9, 377:17, 377:19, 392:12, 394:7, 401:2, 401:5
**complaint** [4] - 320:7, 322:16, 395:25
**complaints** [5] - 333:8, 377:14, 384:16, 384:19, 385:2
**complete** [1] - 305:3
**complies** [1] - 377:2
**components** [1] - 269:11
**computer** [2] - 229:25, 246:20
**computer-operated** [1] - 246:20
**con** [1] - 234:12
**conceded** [1] - 387:19
**concerning** [13] - 231:18, 235:13, 236:23, 242:9, 245:8, 245:11,

250:7, 257:18,
275:14, 293:19,
385:1, 388:21,
396:14
**concerns** [4] - 319:13,
321:5, 321:6
**concession** [2] -
308:13, 308:17
**concluded** [12] -
243:3, 250:3,
259:25, 262:17,
262:21, 269:8,
276:9, 349:6,
356:25, 359:21,
363:11, 365:9
**conclusion** [2] -
384:20, 385:5
**conclusions** [1] -
244:9
**condition** [3] - 253:1,
255:18, 273:19
**conditions** [16] -
246:8, 246:23,
247:9, 248:2, 248:8,
268:20, 273:16,
273:24, 281:23,
281:25, 283:5,
293:1, 293:2, 293:7,
293:9, 308:4
**conduct** [2] - 357:14,
358:11
**conducted** [4] - 264:1,
366:4, 375:24, 396:7
**conferences** [1] -
330:25
**confirm** [4] - 261:22,
261:23, 360:5,
362:24
**confirmed** [1] - 248:6
**confusing** [1] - 307:20
**Connecticut** [3] -
250:12, 336:15,
383:1
**connection** [3] -
339:19, 383:13,
384:16
**consider** [1] - 389:10
**consist** [1] - 383:7
**consultant** [1] -
233:10
**consultation** [1] -
243:19
**consulted** [3] -
243:25, 260:2, 260:5
**contacted** [1] - 244:6
**container** [1] - 231:16
**contempt** [2] - 262:12,
365:5
**continue** [8] - 243:9,
246:5, 252:7, 259:5,

259:7, 272:22,
274:12, 354:4
**continued** [4] -
284:15, 297:14,
297:16, 365:10
**Continued** [4] -
243:15, 285:1,
366:1, 402:6
**continuing** [1] - 273:1
**contract** [6] - 300:12,
300:21, 327:2,
327:8, 344:24, 355:7
**contracted** [1] - 232:3
**control** [6] - 242:19,
246:20, 269:12,
277:8, 281:20, 391:1
**controls** [2] - 239:8,
239:10
**conversation** [4] -
287:11, 295:20,
396:17, 396:20
**cooperation** [1] -
251:19
**copies** [2] - 244:15,
399:17
**copy** [4] - 264:11,
361:7, 361:10,
399:24
**corporation** [1] -
235:23
**Corps** [1] - 345:21
**correct** [190] - 237:5,
237:6, 237:21,
237:22, 238:6,
238:17, 239:2,
239:6, 239:12,
239:18, 240:5,
241:2, 250:16,
250:24, 253:16,
253:17, 261:12,
261:13, 261:16,
261:20, 261:21,
262:1, 262:2, 274:1,
274:6, 274:13,
274:15, 274:18,
274:21, 274:23,
278:21, 283:14,
283:15, 287:15,
292:7, 293:9,
294:10, 295:23,
297:14, 298:2,
298:4, 299:5,
299:17, 299:18,
299:23, 301:13,
301:22, 301:23,
301:25, 302:14,
302:16, 302:17,
303:14, 303:15,
303:21, 303:25,
304:2, 304:3,

304:18, 305:5,
305:6, 306:7, 308:6,
308:7, 308:14,
308:17, 308:23,
308:24, 309:1,
309:4, 309:7,
312:11, 312:22,
313:14, 313:15,
313:19, 313:20,
314:17, 315:1,
315:6, 318:24,
320:8, 320:9, 324:8,
324:22, 325:1,
325:2, 325:4, 325:5,
325:20, 325:22,
325:23, 325:25,
326:1, 326:2,
326:15, 327:22,
328:6, 328:10,
328:11, 328:19,
329:4, 329:18,
329:19, 329:22,
329:25, 335:21,
337:9, 338:22,
338:25, 340:15,
341:24, 342:2,
342:3, 342:7, 342:9,
342:12, 344:4,
344:17, 344:19,
344:20, 344:22,
350:6, 350:9,
350:15, 350:23,
352:18, 352:21,
360:16, 360:17,
360:19, 361:6,
364:1, 366:5, 366:8,
366:12, 366:14,
366:16, 366:18,
366:20, 366:22,
366:24, 367:1,
367:3, 367:5, 367:9,
367:11, 367:12,
367:14, 367:15,
368:9, 368:11,
372:24, 373:18,
373:21, 374:8,
374:10, 375:25,
377:20, 378:13,
383:2, 383:19,
383:20, 384:17,
384:18, 389:15,
389:18, 389:19,
389:21, 389:22,
390:24, 391:13,
391:14, 391:17,
393:15, 393:19,
394:5, 394:6, 394:8,
394:9, 394:11,
394:12, 395:13,
395:14, 396:5,
396:6, 396:8,

396:11, 397:6,
397:15
**correctly** [1] - 312:17
**corresponding** [1] -
326:4
**cost** [1] - 370:17
**counsel** [4] - 255:14,
314:23, 365:4, 369:5
**Counsel** [1] - 258:7
**counselor** [3] -
240:15, 253:11,
395:2
**count** [1] - 375:5
**Country** [1] - 229:13
**couple** [9] - 233:25,
235:17, 244:6,
250:23, 251:12,
251:16, 304:22,
329:20, 343:24
**course** [4] - 248:19,
342:10, 358:12,
358:20
**COURT** [309] - 229:1,
230:3, 230:20,
236:21, 237:9,
237:11, 240:20,
240:24, 241:6,
241:15, 241:23,
241:25, 242:4,
242:7, 242:12,
242:14, 242:22,
243:1, 243:4,
243:12, 245:22,
245:24, 246:2,
246:5, 249:2, 249:4,
249:12, 249:16,
249:20, 249:23,
250:2, 251:3, 251:5,
252:7, 252:21,
253:3, 253:6,
253:11, 253:20,
254:16, 254:22,
255:1, 255:4,
255:11, 255:14,
255:21, 256:1,
256:11, 256:17,
256:21, 257:2,
257:10, 257:20,
257:23, 257:25,
258:6, 258:13,
258:22, 259:3,
259:5, 259:7,
259:11, 259:16,
259:20, 260:11,
260:17, 260:21,
261:1, 262:6, 262:9,
262:11, 262:14,
262:20, 262:22,
263:2, 263:6,
263:10, 263:14,

263:16, 263:22,
264:15, 265:1,
265:5, 265:7,
265:11, 265:14,
267:10, 267:15,
268:16, 268:20,
268:25, 269:3,
269:7, 269:20,
269:22, 272:11,
274:10, 275:12,
275:14, 275:18,
275:23, 276:2,
276:8, 277:13,
277:18, 277:20,
280:14, 280:16,
280:19, 282:9,
282:12, 282:16,
282:18, 282:21,
283:21, 285:23,
286:20, 288:21,
289:4, 290:16,
290:19, 290:22,
291:9, 291:18,
291:21, 291:23,
291:25, 293:15,
293:20, 294:12,
294:22, 294:25,
295:2, 296:2, 296:8,
297:19, 298:8,
298:23, 299:8,
300:2, 300:4, 300:9,
300:15, 300:19,
301:3, 301:6,
301:16, 301:19,
305:17, 305:19,
305:21, 305:23,
309:16, 309:20,
309:22, 309:24,
310:2, 310:5,
310:10, 310:15,
310:20, 310:24,
311:6, 311:9,
311:20, 311:22,
312:8, 313:7, 314:8,
314:20, 315:12,
315:19, 316:3,
316:19, 316:21,
316:25, 317:4,
317:8, 317:11,
323:25, 326:22,
327:5, 330:23,
334:12, 334:16,
334:19, 335:2,
335:7, 336:11,
337:16, 337:16,
337:18, 342:23,
343:23, 345:4,
345:7, 345:9,
348:14, 348:16,
349:5, 349:15,
349:18, 353:3,

353:19, 353:21, 353:24, 354:2, 355:12, 355:14, 355:20, 355:22, 355:25, 356:3, 356:5, 356:7, 356:10, 356:14, 356:16, 356:19, 356:21, 356:24, 359:9, 359:19, 359:24, 360:1, 361:16, 362:3, 362:5, 362:8, 362:11, 362:18, 362:25, 363:5, 363:8, 363:10, 363:12, 364:8, 364:12, 364:14, 364:21, 364:23, 365:2, 365:4, 367:24, 368:23, 369:6, 370:6, 370:23, 371:11, 371:20, 371:23, 372:1, 372:6, 372:18, 372:22, 373:9, 373:25, 375:17, 376:3, 378:5, 378:24, 379:15, 380:7, 381:17, 381:21, 382:6, 382:19, 384:11, 387:1, 387:5, 387:7, 387:10, 387:15, 387:24, 388:3, 388:16, 389:2, 389:5, 390:11, 392:3, 392:25, 393:2, 393:6, 394:15, 394:18, 395:1, 395:18, 397:18, 397:25, 398:3, 398:7, 398:10, 398:13, 398:15, 398:18, 398:21, 398:23, 398:25, 399:2, 399:6, 399:9, 399:16, 399:22, 400:1, 400:12, 400:17, 400:21, 401:1, 401:8
**Court** [2] - 229:19, 264:12
**court** [19] - 230:15, 236:8, 241:10, 243:21, 253:18, 264:11, 264:14, 264:19, 264:24, 265:1, 310:25,

311:8, 334:23, 356:20, 359:4, 360:18, 367:13, 373:12, 399:13
**court's** [4] - 230:4, 245:18, 258:11, 262:23
**courthouse** [1] - 263:13
**Courthouse** [2] - 229:5, 229:20
**courtroom** [5] - 316:24, 360:25, 362:14, 363:13, 399:8
**courts** [1] - 259:24
**cover** [1] - 247:12
**covered** [1] - 327:19
**covers** [1] - 318:6
**credential** [1] - 348:20
**crew** [27] - 246:18, 247:4, 260:14, 261:24, 289:7, 301:21, 301:25, 302:18, 302:21, 303:17, 313:16, 320:1, 320:20, 322:3, 322:6, 328:19, 336:22, 336:24, 344:16, 347:15, 347:19, 347:23, 348:2, 352:20, 383:6, 385:5, 397:13
**crewcut** [4] - 337:2, 343:9, 343:12, 348:3
**criminal** [1] - 330:25
**CROSS** [21] - 229:7, 261:6, 273:12, 292:3, 324:18, 334:1, 341:16, 349:22, 360:12, 366:1, 386:12, 402:7, 402:11, 402:14, 402:15, 402:20, 402:23, 403:3, 403:6, 403:9, 403:15
**Cross** [43] - 246:8, 247:5, 248:1, 250:7, 254:8, 266:6, 266:11, 278:6, 278:10, 278:12, 278:14, 296:17, 299:22, 300:7, 300:25, 301:2, 317:16, 317:19, 318:1, 326:10, 326:18, 326:25, 327:9, 332:14,

332:18, 334:8, 335:5, 335:18, 338:2, 338:5, 338:15, 345:2, 345:18, 345:23, 346:1, 376:14, 376:22, 377:17, 377:25, 378:2, 378:10, 384:1, 388:6
**cross** [5] - 261:4, 270:2, 311:6, 315:11, 400:8
**cross-examination** [2] - 261:4, 400:8
**CROSS-EXAMINATION** [20] - 261:6, 273:12, 292:3, 324:18, 334:1, 341:16, 349:22, 360:12, 366:1, 386:12, 402:7, 402:11, 402:14, 402:15, 402:20, 402:23, 403:3, 403:6, 403:9, 403:15
**cross-examine** [2] - 270:2, 311:6
**cruises** [1] - 233:1
**cruising** [3] - 390:19, 390:21, 390:23
**CSR** [2] - 229:19, 229:20
**current** [2] - 234:1, 376:16
**cushion** [1] - 382:10
**cushioned** [1] - 382:10
**cushions** [1] - 382:13
**custodian** [3] - 362:7, 364:11, 364:13
**customer** [1] - 327:17

# D

**daily** [1] - 358:10
**damage** [1] - 324:5
**date** [8] - 267:5, 292:22, 294:23, 359:17, 369:13, 374:12, 400:14
**dated** [2] - 264:11, 264:13
**dates** [15] - 290:21, 356:1, 358:12, 358:20, 358:23, 359:1, 359:3, 361:25, 362:24, 364:4, 364:6, 367:10, 367:19,

368:3, 374:9
**Dave** [1] - 343:25
**DAVID** [2] - 277:22, 402:12
**days** [13] - 358:16, 367:10, 370:17, 370:19, 372:11, 373:16, 373:19, 374:9, 375:2, 375:3, 375:6, 391:4, 392:2
**dealing** [2] - 270:9, 394:19
**deals** [1] - 368:12
**debris** [1] - 306:1
**December** [16] - 357:13, 357:17, 357:20, 361:21, 361:24, 366:6, 366:9, 366:11, 366:13, 366:15, 368:6, 369:14, 374:16, 374:18, 375:13
**decided** [4] - 371:18, 372:9, 372:13, 374:23
**decision** [3] - 297:6, 297:11, 389:18
**deck** [91] - 280:24, 281:2, 301:21, 302:8, 302:10, 302:12, 302:16, 302:19, 302:22, 303:12, 303:13, 303:16, 303:17, 304:2, 304:7, 304:11, 318:17, 318:23, 318:25, 319:2, 319:5, 319:7, 319:10, 319:11, 319:12, 319:13, 319:15, 320:23, 320:25, 321:3, 321:4, 321:8, 321:23, 322:18, 323:4, 325:4, 325:23, 326:3, 326:7, 327:18, 327:19, 327:24, 328:5, 328:21, 328:23, 328:25, 329:3, 332:21, 333:1, 336:1, 336:17, 336:20, 336:21, 336:23, 338:8, 338:9, 338:11, 338:15, 338:18, 338:20, 338:21, 338:23, 339:4, 339:9,

339:15, 341:10, 341:24, 343:6, 346:8, 347:6, 350:2, 350:5, 350:22, 351:4, 351:14, 351:16, 351:18, 351:22, 352:2, 352:5, 352:6, 352:17, 353:16, 355:5, 381:7, 383:8, 383:11
**deckhand** [1] - 396:10
**deckhands** [2] - 386:3, 396:12
**decks** [5] - 309:4, 319:3, 321:11, 381:4, 381:5
**declare** [1] - 259:8
**defendant** [4] - 243:23, 280:21, 363:16, 363:21
**Defendant** [1] - 229:8, 229:15
**Defendant's** [1] - 359:5
**defendants** [2] - 236:15, 242:21
**Defense** [22] - 267:16, 291:22, 349:19, 378:25, 379:7, 379:16, 380:8, 381:22, 382:7, 382:20, 384:12, 403:20, 403:21, 403:21, 403:22, 403:22, 403:23, 403:23, 403:24, 403:24, 403:25, 403:25
**DEFENSE** [2] - 265:15, 402:8
**defense** [7] - 263:16, 265:18, 277:23, 332:8, 337:21, 345:12, 357:3
**degree** [4] - 230:24, 252:23, 254:25, 255:7
**Delaware** [1] - 233:11
**denied** [3] - 242:23, 262:20, 265:4
**denoted** [1] - 235:9
**denying** [1] - 264:17
**Departing** [1] - 245:20
**department** [1] - 385:22
**departs** [1] - 329:14
**departure** [2] - 245:13, 255:13
**deposed** [3] - 269:5,

306:3, 344:2

**deposition** [17] - 244:1, 244:12, 244:13, 245:6, 248:16, 249:8, 250:19, 251:22, 261:14, 306:9, 324:22, 334:6, 341:20, 349:24, 386:16, 391:9, 391:12

**depositions** [2] - 264:1, 264:5

**describe** [2] - 315:7, 382:9

**described** [9] - 244:20, 248:19, 295:16, 295:19, 295:20, 320:17, 321:1, 324:13, 348:2

**description** [2] - 388:8, 388:22

**designation** [1] - 244:25

**desk** [1] - 325:11

**destroy** [1] - 275:10

**determination** [1] - 306:21

**determine** [9] - 248:17, 305:25, 306:25, 307:3, 307:10, 307:15, 307:18, 330:1, 371:13

**determined** [4] - 307:1, 307:2, 307:13, 330:1

**determining** [1] - 315:17

**diary** [3] - 397:23, 398:2, 398:3

**died** [3] - 264:1, 264:9, 264:21

**diesel** [2] - 266:19, 280:3

**different** [7] - 231:5, 235:17, 278:13, 282:12, 317:24, 394:19, 394:22

**difficulty** [2] - 291:7, 291:12

**dim** [1] - 245:16

**dinner** [3] - 232:17, 233:1, 237:5

**dire** [5] - 236:20, 236:21, 236:22, 239:25, 241:9

**DIRE** [2] - 237:1, 402:5

**DIRECT** [21] - 230:12,

243:15, 265:22, 278:2, 285:1, 317:14, 332:12, 337:25, 345:16, 357:7, 376:12, 402:4, 402:6, 402:10, 402:13, 402:19, 402:22, 403:2, 403:5, 403:8, 403:14

**direct** [5] - 313:21, 314:9, 391:22, 393:4, 397:17

**directed** [2] - 332:17, 345:25

**directors** [1] - 235:15

**directs** [1] - 234:12

**dirty** [1] - 353:25

**discharged** [3] - 300:13, 327:3, 327:10

**discuss** [5] - 249:15, 331:2, 336:1, 344:12, 398:21

**discussed** [3] - 263:5, 327:14, 371:17

**Discussion** [22] - 241:7, 243:3, 249:3, 250:3, 259:6, 259:25, 262:10, 262:21, 268:8, 269:8, 275:13, 276:9, 348:24, 349:6, 355:16, 356:25, 359:11, 359:21, 362:4, 363:11, 365:3, 365:9

**discussion** [4] - 363:1, 363:6, 364:3, 389:3

**disembarking** [1] - 291:12

**disgusted** [1] - 365:7

**dismiss** [1] - 262:18

**dispute** [1] - 249:9

**distinct** [1] - 293:24

**District** [1] - 229:20

**DISTRICT** [3] - 229:1, 229:1, 229:10

**division** [2] - 232:4, 232:7

**dixit** [1] - 242:2

**dock** [5] - 231:14, 234:10, 234:14, 238:2, 248:24, 254:3, 254:5

**docking** [2] - 231:13, 380:23

**doctor** [8] - 262:23, 263:3, 263:17,

356:10, 356:11, 356:12, 398:19, 400:7

**document** [8] - 266:23, 348:25, 349:1, 351:4, 378:17, 379:2, 379:9, 379:12

**documentation** [2] - 244:16, 379:11

**documents** [3] - 244:10, 245:25, 246:4

**doe** [1] - 318:19

**Dolly** [1] - 232:16

**Dominick** [1] - 229:19

**DomTursi@email. com** [1] - 229:22

**DONALD** [2] - 337:20, 403:2

**done** [8] - 270:14, 277:4, 334:19, 353:18, 374:10, 375:3, 388:14, 397:12

**door** [4] - 275:15, 275:24, 276:4, 375:18

**down** [29] - 241:23, 268:2, 271:2, 277:18, 285:18, 285:20, 286:1, 286:14, 286:24, 287:20, 288:3, 291:23, 303:2, 316:19, 316:21, 323:18, 337:16, 341:3, 341:10, 343:3, 345:7, 355:12, 365:7, 375:19, 376:3, 383:23, 398:15, 399:16, 400:2

**drifts** [1] - 305:4

**drive** [1] - 280:3

**dry** [1] - 380:23

**duly** [9] - 230:8, 265:18, 277:23, 317:2, 332:8, 337:21, 345:12, 357:3, 376:9

**during** [28] - 247:2, 250:20, 250:23, 251:23, 267:24, 287:1, 287:17, 287:18, 307:11, 307:21, 313:22, 314:1, 320:20, 321:12, 322:15, 323:11, 324:12,

324:21, 325:19, 327:23, 329:2, 333:9, 340:1, 340:7, 358:12, 358:20, 383:23, 393:24

**duties** [10] - 279:14, 319:2, 319:8, 319:10, 320:17, 320:25, 321:6, 338:21, 351:23, 358:8

**Dutton's** [1] - 233:17

**duty** [4] - 267:20, 319:15, 321:9, 363:20

**DVD** [1] - 372:24

## E

**EARL** [2] - 332:7, 402:21

**Earl** [1] - 281:4

**earn** [1] - 299:25

**earned** [1] - 345:1

**ears** [1] - 321:7

**easier** [1] - 230:23

**easiest** [1] - 234:19

**easily** [4] - 306:24, 401:7, 401:8, 401:9

**east** [1] - 378:3

**EASTERN** [1] - 229:1

**editing** [1] - 372:20

**educational** [1] - 230:16

**EDWARD** [2] - 230:7, 402:3

**effect** [2] - 269:15, 342:21

**eight** [9] - 303:7, 317:21, 325:18, 325:21, 325:23, 326:12, 345:24, 350:11, 350:17

**eighth** [2] - 304:9, 326:8

**either** [5] - 252:18, 261:25, 313:21, 313:25, 372:3

**Ellen** [1] - 229:20

**emergency** [1] - 246:18

**emission** [1] - 269:12

**employ** [2] - 301:2, 391:23

**employed** [17] - 266:2, 266:3, 266:6, 278:6, 278:12, 299:22, 317:16, 317:19, 318:1, 329:5, 332:14, 334:8,

338:2, 345:18, 357:9, 376:14, 376:18

**employee** [5] - 250:6, 300:7, 300:25, 301:1, 345:2

**employees** [1] - 377:21

**employment** [13] - 266:13, 300:12, 300:21, 326:25, 327:2, 327:8, 332:17, 335:5, 335:20, 338:14, 344:24, 345:25, 355:7

**Enchhowski** [1] - 369:2

**encourage** [1] - 247:2

**end** [3] - 255:14, 303:4, 378:3

**engage** [4] - 252:13, 254:13, 277:14, 324:13

**engaged** [4] - 232:17, 268:1, 270:23, 286:12

**engaging** [1] - 324:9

**engine** [12] - 238:18, 250:15, 259:1, 269:13, 271:7, 273:2, 275:9, 276:18, 277:14, 277:15, 298:2, 305:15

**engineer** [10] - 237:13, 266:4, 266:10, 266:11, 267:20, 268:13, 276:14, 276:15, 383:8, 383:12

**engineering** [6] - 238:16, 238:21, 238:25, 240:4, 266:25, 267:3

**engineers** [1] - 302:13

**engines** [7] - 250:11, 252:4, 252:13, 254:13, 280:3, 353:12, 354:7

**English** [2] - 253:23

**enjoy** [1] - 247:6

**Ensign** [1] - 231:3

**ensued** [14] - 230:1, 241:7, 249:3, 259:6, 262:10, 265:12, 268:8, 275:13, 332:4, 348:24, 355:16, 359:11, 362:4, 365:3

**entail** [1] - 358:8
**entered** [5] - 316:24, 324:25, 325:3, 325:7
**enters** [1] - 234:10
**entire** [8] - 367:16, 369:11, 369:16, 369:19, 369:22, 369:25, 370:11, 370:12
**entries** [2] - 270:19, 385:1
**equipment** [2] - 246:15, 380:15
**equipped** [1] - 246:19
**equity** [1] - 264:19
**ere** [1] - 340:4
**error** [1] - 242:19
**ESQ** [3] - 229:14, 229:16, 229:17
**essentially** [1] - 373:22
**et** [1] - 263:25
**evacuation** [1] - 246:15
**evening** [4] - 257:18, 287:13, 288:10, 305:7
**event** [2] - 246:18, 271:4
**eventually** [2] - 274:5, 392:15
**EVIDENCE** [2] - 265:15, 402:8
**evidence** [63] - 241:18, 245:22, 245:24, 246:2, 251:3, 251:4, 267:15, 267:16, 270:20, 270:23, 280:14, 280:16, 280:19, 282:9, 285:11, 289:13, 291:17, 291:18, 291:21, 291:22, 309:17, 349:13, 349:16, 349:18, 349:19, 359:6, 367:21, 375:16, 378:22, 378:24, 378:25, 379:7, 379:13, 379:15, 379:16, 380:5, 380:7, 380:8, 381:19, 381:21, 381:22, 382:4, 382:6, 382:7, 382:17, 382:19, 382:20, 384:9, 384:11, 384:12, 387:4, 387:11,

403:20, 403:21, 403:21, 403:22, 403:22, 403:23, 403:23, 403:24, 403:24, 403:25, 403:25
**exact** [1] - 290:21
**exactly** [5] - 287:16, 294:14, 306:6, 386:1, 396:15
**EXAMINATION** [57] - 230:12, 237:1, 243:15, 261:6, 265:22, 273:12, 278:2, 285:1, 292:3, 314:12, 316:5, 317:14, 324:18, 332:12, 334:1, 337:25, 341:16, 345:16, 349:22, 357:7, 360:12, 366:1, 373:3, 374:3, 375:11, 376:12, 386:12, 397:1, 397:21, 402:4, 402:5, 402:6, 402:7, 402:10, 402:11, 402:13, 402:14, 402:15, 402:16, 402:17, 402:19, 402:20, 402:22, 402:23, 403:2, 403:3, 403:5, 403:6, 403:8, 403:9, 403:10, 403:11, 403:12, 403:14, 403:15, 403:16, 403:17
**examination** [2] - 261:4, 400:8
**examine** [3] - 263:25, 270:2, 311:6
**examined** [9] - 230:9, 265:19, 277:24, 317:3, 332:9, 337:22, 345:13, 357:4, 376:10
**example** [1] - 257:12
**exceeded** [1] - 383:14
**excess** [7] - 236:12, 388:14, 388:19, 388:20, 389:13, 389:15, 390:1
**exchanged** [2] - 267:7, 268:19
**exclude** [2] - 363:16, 363:20
**excluded** [1] - 362:13
**excuse** [5] - 240:17, 272:20, 280:15,

302:6, 359:24
**excused** [8] - 277:18, 277:19, 337:16, 337:17, 345:7, 345:8, 355:12, 355:13
**excuses** [1] - 354:4
**Exhibit** [38] - 246:1, 251:1, 264:12, 267:16, 281:11, 285:11, 291:22, 302:15, 309:22, 309:25, 328:18, 349:19, 359:5, 378:25, 379:6, 379:7, 379:10, 379:16, 380:8, 381:18, 381:22, 382:7, 382:14, 382:17, 382:20, 384:9, 384:12, 403:20, 403:21, 403:21, 403:22, 403:22, 403:23, 403:23, 403:24, 403:24, 403:25, 403:25
**exhibit** [6] - 267:7, 267:13, 303:4, 309:18, 309:24, 341:23
**Exhibits** [1] - 244:13
**exhibits** [3] - 264:25, 265:1, 387:9
**existed** [1] - 380:2
**exit** [1] - 292:12
**exiting** [1] - 292:25
**experience** [14] - 232:8, 232:9, 239:16, 246:21, 247:20, 252:24, 255:8, 257:16, 258:15, 269:15, 269:19, 271:19, 308:10, 317:23
**experienced** [1] - 250:14
**expert** [39] - 235:24, 236:1, 236:4, 236:7, 236:10, 236:22, 243:17, 253:12, 253:21, 253:22, 258:14, 262:17, 263:24, 264:21, 264:22, 268:10, 268:15, 268:16, 268:25, 269:4, 269:20, 269:23, 269:24, 270:3, 270:4, 270:6, 270:9,

270:11, 270:13, 270:14, 270:15, 311:3, 353:15, 356:10, 356:12, 360:25, 400:3, 400:7
**expertise** [4] - 236:2, 236:23, 270:7, 275:15
**experts** [7] - 236:2, 264:3, 264:8, 264:20, 399:9, 399:10, 400:2
**explain** [7] - 242:18, 253:21, 399:11, 399:12, 399:13, 399:18, 400:1
**explained** [2] - 259:11, 259:12
**explaining** [1] - 240:15
**explore** [1] - 394:22
**extended** [1] - 248:12
**exterior** [1] - 381:10
**eye** [3] - 348:3, 348:4, 348:6
**eyes** [1] - 321:7

## F

**fabric** [1] - 382:10
**face** [1] - 371:24
**facilities** [1] - 308:20
**facility** [1] - 328:15
**fact** [11] - 235:21, 237:25, 238:7, 238:15, 262:17, 268:10, 285:19, 305:3, 308:13, 353:17, 397:10
**facts** [2] - 344:12, 375:8
**factual** [4] - 236:18, 262:25, 275:21, 276:22
**factually** [1] - 258:21
**failure** [1] - 312:19
**fair** [19] - 279:11, 290:6, 297:1, 303:7, 303:16, 318:1, 318:11, 320:20, 325:6, 338:11, 376:21, 379:23, 380:1, 381:13, 381:24, 382:13, 382:15, 384:5, 390:15
**fall** [7] - 290:11, 299:3, 320:4, 333:8, 347:20, 351:24
**fallen** [3] - 287:20,

322:16
**falling** [2] - 288:3, 333:12
**falls** [1] - 397:14
**familiar** [14] - 232:5, 235:19, 238:12, 250:17, 252:15, 279:11, 309:6, 309:9, 318:25, 322:21, 352:25, 353:10, 388:21, 393:11
**familiarize** [1] - 246:17
**family** [6] - 287:19, 289:8, 292:18, 292:24, 346:24, 386:19
**far** [3] - 272:24, 312:17, 401:1
**fast** [7] - 244:20, 244:22, 244:25, 245:2, 295:17, 295:20, 389:24
**faster** [3] - 244:21, 245:4, 394:10
**favor** [1] - 311:23
**Fax** [1] - 229:22
**February** [19] - 357:23, 358:1, 358:4, 360:4, 366:25, 367:2, 367:4, 368:6, 368:7, 368:8, 368:13, 368:15, 368:20, 369:10, 369:11, 369:20, 369:23, 370:1
**Federal** [1] - 229:21
**federal** [3] - 230:18, 236:7, 246:11
**fee** [1] - 370:3
**fees** [4] - 243:17, 243:20, 243:22, 370:9
**feet** [5] - 232:20, 232:21, 248:9, 379:19
**fell** [6] - 299:11, 322:18, 327:23, 340:11, 347:5
**fellow** [1] - 355:23
**felt** [7] - 251:10, 251:13, 275:7, 297:2, 297:13, 297:17, 306:19
**ferries** [6] - 245:4, 394:7, 394:10, 395:5, 395:6
**ferry** [33] - 238:1,

244:19, 244:20, 244:21, 244:23, 245:1, 245:2, 247:13, 247:24, 278:17, 291:6, 294:20, 295:7, 295:8, 295:17, 295:20, 322:24, 327:16, 330:7, 330:9, 378:12, 380:14, 382:25, 386:19, 393:23, 394:1, 394:2, 394:19, 394:20, 394:22

**Ferry** [34] - 246:8, 247:5, 248:1, 250:7, 254:9, 266:7, 278:6, 278:11, 278:12, 296:18, 299:23, 300:25, 317:17, 317:20, 318:2, 326:10, 326:18, 326:25, 327:9, 332:14, 334:8, 335:5, 335:18, 338:3, 338:15, 345:2, 345:19, 345:23, 376:14, 376:22, 377:17, 378:2, 378:10, 388:6

**FERRY** [1] - 229:7

**few** [11] - 246:16, 254:3, 261:22, 271:15, 282:15, 316:7, 321:1, 327:16, 386:3, 391:4, 392:2

**field** [5] - 253:22, 269:24, 270:8, 270:11, 358:7

**fifth** [1] - 326:8

**figure** [1] - 304:15, 370:14, 370:15

**file** [1] - 270:13

**filed** [3] - 264:11, 264:14, 268:18

**filing** [2] - 293:12, 293:18

**fill** [3] - 328:7, 339:18, 342:25

**filled** [5] - 320:2, 320:10, 339:22, 375:22, 384:23

**filling** [1] - 397:11

**film** [1] - 373:20

**filming** [1] - 375:23

**financial** [1] - 234:2

**fine** [4] - 246:5, 328:6, 352:15, 399:21

**finished** [1] - 353:19

**firm** [3] - 260:3, 260:5, 264:3

**first** [29] - 230:8, 232:16, 232:20, 235:4, 235:5, 249:6, 251:22, 263:10, 265:18, 277:23, 281:7, 293:11, 293:17, 302:4, 316:16, 317:2, 325:17, 332:8, 337:21, 343:20, 344:14, 345:12, 352:5, 357:3, 360:16, 360:18, 368:25, 376:9, 378:10

**first-class** [2] - 235:4, 235:5

**five** [2] - 291:4, 293:25

**flat** [1] - 248:15

**flight** [2] - 232:5, 303:23

**floor** [1] - 352:1

**flow** [2] - 277:1, 277:2

**foam** [1] - 382:10

**follow** [5] - 261:2, 270:12, 356:13, 399:12, 399:14

**following** [11] - 230:1, 265:12, 284:15, 309:21, 310:25, 311:2, 311:8, 332:4, 356:12, 365:10, 389:4

**follows** [20] - 230:10, 241:7, 249:3, 259:6, 262:10, 265:20, 268:8, 275:13, 277:25, 317:3, 332:10, 337:23, 345:14, 348:24, 355:16, 357:5, 359:11, 362:4, 365:3, 376:10

**food** [1] - 322:18

**foot** [2] - 348:2, 348:10

**FOR** [2] - 265:15, 402:8

**forecasted** [1] - 281:23

**forgive** [2] - 296:20, 390:9

**fork** [1] - 248:12

**form** [1] - 379:5

**former** [1] - 244:4

**forth** [2] - 268:21, 354:1

**forward** [3] - 236:18, 239:9, 362:9

**foundation** [2] - 364:4, 364:6

**four** [6] - 232:11, 303:10, 304:14, 325:18, 325:20, 350:11

**fourth** [1] - 334:20

**free** [1] - 315:23

**frequent** [1] - 294:13

**Friday** [10] - 288:13, 289:9, 289:17, 289:25, 303:1, 330:16, 371:4, 400:15, 400:16, 401:6

**front** [6] - 259:12, 346:11, 361:8, 362:1, 364:17, 367:20

**frustrated** [2] - 258:7, 394:18

**full** [1] - 377:21

**full-time** [1] - 377:21

**fund** [1] - 378:3

**fund-raising** [1] - 378:3

**further.** [1] - 396:23

# G

**Garden** [1] - 229:13

**Gardiners'** [1] - 293:6

**gear** [6] - 238:23, 276:19, 353:12, 354:7, 354:9, 354:10

**general** [3] - 245:3, 257:14, 315:22

**generated** [1] - 340:14

**gentlemen** [3] - 246:7, 251:9, 254:2

**GEORGE** [1] - 229:14

**George** [2] - 292:5, 324:21

**gibson** [1] - 313:16

**GIBSON** [2] - 229:3, 229:4

**Gibson** [65] - 244:13, 245:7, 252:3, 252:10, 260:6, 261:23, 267:24, 287:5, 287:7, 287:12, 287:19, 287:23, 288:1, 288:16, 289:8, 289:16, 289:23, 289:24, 290:3, 290:7, 292:9, 292:21, 293:11,

293:18, 293:24, 295:25, 298:17, 322:7, 322:15, 322:19, 322:20, 323:8, 323:10, 324:14, 327:15, 333:20, 340:19, 340:20, 340:24, 343:21, 346:23, 347:1, 347:19, 347:23, 348:2, 357:14, 357:17, 357:20, 357:23, 358:1, 358:4, 358:12, 358:15, 358:18, 360:6, 370:10, 381:7, 383:18, 385:4, 385:9, 385:18, 386:18, 396:18, 396:21, 398:12

**Gibson's** [4] - 240:22, 244:4, 298:5, 347:15

**given** [2] - 312:15, 368:17

**glasses** [5] - 337:4, 343:15, 348:3, 348:4, 348:6

**graduated** [3] - 230:19, 230:24, 266:21

**Grenoble** [1] - 231:7

**Gridelli** [4] - 273:5, 292:6, 324:21, 336:8

**GRIDELLI** [293] - 229:14, 230:4, 230:13, 230:22, 236:17, 239:24, 240:6, 241:4, 241:8, 241:17, 241:22, 241:24, 242:11, 242:13, 242:15, 242:24, 243:11, 243:13, 243:16, 245:16, 245:23, 245:25, 246:3, 246:6, 246:6, 249:14, 249:19, 249:21, 249:25, 250:4, 251:1, 251:4, 251:6, 252:9, 252:22, 253:4, 253:7, 253:14, 253:18, 253:25, 254:17, 254:23, 255:2, 255:5, 255:6, 255:12, 255:16, 255:22, 256:3, 256:12, 256:18, 256:22, 257:3,

257:8, 257:15, 257:21, 257:24, 258:1, 258:9, 258:19, 258:23, 258:25, 259:4, 259:9, 259:14, 259:17, 260:1, 260:9, 260:12, 260:19, 260:24, 262:7, 262:13, 262:15, 262:23, 263:4, 263:8, 263:20, 263:23, 264:17, 265:8, 265:10, 267:11, 268:6, 268:9, 268:14, 268:18, 268:24, 269:6, 269:17, 272:10, 273:9, 273:13, 274:11, 275:17, 275:20, 276:10, 277:16, 280:17, 283:20, 285:21, 286:19, 288:19, 288:23, 289:3, 290:13, 291:8, 291:24, 292:1, 292:4, 293:16, 293:22, 294:23, 295:1, 295:4, 296:3, 296:11, 297:20, 298:10, 299:2, 299:10, 300:3, 300:5, 300:11, 300:17, 300:20, 301:7, 301:18, 301:20, 305:24, 309:17, 309:23, 309:25, 310:4, 310:6, 310:11, 310:18, 310:22, 311:18, 311:21, 312:1, 312:6, 312:9, 312:10, 313:5, 313:11, 313:12, 314:7, 315:10, 315:18, 316:2, 316:6, 316:17, 323:23, 324:19, 326:17, 326:23, 327:7, 330:21, 334:2, 334:13, 334:17, 334:22, 335:3, 335:8, 335:9, 336:12, 337:6, 341:17, 343:1, 343:11, 345:5, 348:22, 348:25, 349:14, 349:23, 353:4, 353:17,

353:20, 353:25,
354:5, 354:6, 355:9,
356:20, 359:8,
359:10, 359:12,
359:20, 360:13,
361:17, 361:20,
362:6, 362:10,
362:12, 362:22,
363:3, 363:6, 363:9,
364:2, 364:10,
364:13, 364:16,
364:19, 364:22,
365:1, 366:2,
367:22, 368:1,
368:19, 369:7,
369:9, 370:8,
370:24, 371:4,
371:12, 371:22,
371:24, 372:4,
372:8, 372:19,
372:23, 373:1,
373:8, 373:24,
374:4, 375:9,
375:15, 376:2,
378:4, 378:23,
379:14, 380:6,
381:20, 382:5,
382:18, 384:10,
386:9, 386:13,
387:2, 387:6, 387:8,
387:12, 387:13,
387:22, 388:1,
388:4, 388:5,
388:17, 389:6,
390:4, 390:5,
390:17, 392:5,
393:10, 394:16,
394:21, 395:4,
395:20, 396:23,
397:16, 397:22,
398:1, 398:5, 398:8,
398:11, 398:14,
398:19, 398:22,
398:24, 399:4,
399:13, 399:19,
399:24, 400:11,
400:14, 400:18,
400:23, 401:4,
401:12, 402:4,
402:6, 402:11,
402:14, 402:15,
402:17, 402:20,
402:23, 403:4,
403:7, 403:10,
403:12, 403:16,
403:18

**Guard** [15] - 231:2,
234:24, 235:6,
244:15, 244:25,
245:1, 266:14,
278:22, 318:5,

377:3, 380:10,
380:11, 380:16,
383:9, 383:15
**guard** [1] - 396:1
**guess** [1] - 398:18
**guy** [1] - 356:15

## H

**half** [2] - 395:7, 395:19
**hand** [29] - 302:8,
302:10, 302:12,
303:12, 319:11,
319:14, 319:15,
328:5, 328:21,
328:23, 328:25,
332:21, 333:1,
336:20, 336:23,
338:8, 338:9,
338:11, 338:15,
338:18, 338:20,
339:9, 343:6, 346:8,
350:3, 350:5,
353:16, 355:5
**hand's** [1] - 321:9
**handbook** [1] - 310:12
**handed** [1] - 328:8
**Handing** [1] - 369:8
**handling** [4] - 231:6,
231:7, 231:23, 232:1
**hands** [18] - 239:11,
280:24, 281:2,
301:21, 318:17,
318:23, 318:25,
319:2, 319:6, 319:7,
320:23, 320:25,
321:11, 321:24,
326:4, 336:1, 383:8,
383:12
**hands'** [1] - 319:10
**hands-on** [1] - 239:11
**handwriting** [2] -
267:1, 267:18
**happy** [2] - 296:13,
399:14
**Harbor** [3] - 231:12,
235:10, 235:16
**harbor** [2] - 231:17,
234:10
**hazards** [1] - 312:15
**head** [2] - 234:2, 261:1
**headed** [1] - 274:16
**hear** [13] - 230:21,
243:12, 282:14,
282:18, 282:20,
282:22, 293:11,
311:21, 311:23,
311:24, 317:9,
343:20, 348:14
**heard** [12] - 242:4,

242:13, 242:22,
243:10, 252:8,
282:5, 293:17,
347:20, 352:1,
383:18, 396:4,
396:12
**hearing** [3] - 363:1,
365:5
**hearsay** [1] - 359:14
**HEATHER** [1] - 229:3
**Heather** [46] - 244:4,
245:6, 252:2,
252:10, 260:6,
287:4, 287:7,
287:12, 287:18,
287:23, 288:1,
289:8, 289:16,
289:22, 289:24,
290:2, 290:7, 292:9,
292:21, 293:11,
293:17, 293:24,
295:25, 322:6,
340:19, 346:23,
347:1, 347:15,
347:19, 347:23,
348:2, 348:13,
357:14, 357:17,
357:20, 357:23,
358:1, 358:4,
358:15, 358:18,
360:6, 370:10,
385:4, 385:9,
385:18, 386:18
**held** [3] - 233:21,
377:11, 389:3
**helmsman** [1] -
319:11
**help** [1] - 368:2
**helped** [2] - 233:9,
233:12
**helpful** [1] - 241:9
**herself** [2] - 322:17,
340:21
**hi** [1] - 334:4
**high** [5] - 311:4,
312:16, 315:2,
316:12, 316:14
**highest** [2] - 301:14,
301:17
**highlight** [1] - 373:14
**highlights** [1] - 373:22
**hired** [1] - 263:24
**history** [1] - 393:8
**hit** [1] - 352:1
**hold** [8] - 262:11,
266:14, 266:16,
278:22, 278:24,
278:25, 295:14,
318:4
**Honor** [115] - 236:17,

236:19, 237:3,
239:24, 240:23,
241:4, 242:1,
242:13, 242:25,
243:11, 245:16,
246:3, 249:1,
249:21, 251:2,
253:5, 253:19,
255:3, 257:19,
257:21, 258:9,
259:9, 260:10,
260:20, 261:8,
262:4, 262:7,
262:16, 263:8,
263:9, 263:12,
263:15, 263:23,
265:2, 265:9, 267:6,
267:14, 268:6,
268:9, 269:6,
269:17, 269:21,
273:10, 277:17,
280:15, 280:18,
282:1, 282:7,
288:19, 290:13,
291:16, 299:7,
300:3, 300:17,
301:5, 309:17,
310:8, 311:1, 311:3,
311:19, 312:6,
313:6, 314:10,
316:1, 316:2,
317:10, 323:23,
327:4, 333:24,
334:13, 334:23,
335:8, 341:14,
349:13, 349:17,
349:20, 353:14,
353:23, 359:12,
360:9, 361:17,
362:7, 362:16,
362:22, 364:3,
364:19, 367:23,
368:19, 368:22,
368:24, 371:3,
375:15, 376:2,
378:23, 379:12,
380:4, 382:16,
384:8, 386:9, 387:8,
388:1, 388:15,
393:1, 393:5,
394:21, 397:19,
398:5, 398:17,
398:22, 399:1,
399:5, 399:20,
400:24, 401:3, 401:4
**HONORABLE** [1] -
229:10
**Hook** [2] - 234:8,
234:9
**horsepower** [2] -
239:3, 258:2

**hour** [6] - 243:20,
395:7, 395:16,
395:19
**hours** [8] - 350:8,
373:13, 375:4,
392:18, 393:11,
393:14, 393:16,
393:20
**house** [4] - 277:5,
323:5, 323:7, 324:7
**housekeeping** [2] -
319:13, 321:6
**Hudson** [1] - 235:10
**hurt** [1] - 340:12
**husband** [1] - 385:17
**hyper** [1] - 241:25
**hypothetical** [2] -
400:4, 400:6

## I

**ID** [1] - 349:4
**idea** [4] - 274:2,
310:20, 330:11,
330:17
**identification** [2] -
348:20, 349:9
**identified** [1] - 292:9
**identify** [5] - 266:24,
281:3, 378:18,
379:3, 379:9
**idle** [1] - 305:20
**ill** [2] - 342:20, 342:24
**Immediately** [1] -
248:11
**immediately** [1] -
314:1
**impellers** [2] - 239:6,
276:17
**impending** [2] -
261:15, 261:17
**important** [2] -
242:16, 242:24
**incident** [73] - 247:14,
247:17, 248:4,
248:21, 261:24,
273:17, 287:20,
288:2, 288:12,
288:15, 289:1,
289:8, 289:11,
289:17, 289:23,
290:12, 290:23,
294:24, 306:7,
308:5, 319:21,
320:2, 320:3,
320:10, 321:24,
322:6, 322:11,
328:7, 333:8,
333:14, 333:17,
333:21, 339:18,

339:22, 340:1, 340:4, 340:8, 340:10, 340:14, 340:21, 340:24, 344:13, 344:14, 346:20, 346:24, 347:5, 347:12, 352:12, 354:17, 354:24, 355:1, 370:21, 385:2, 385:5, 385:15, 385:23, 386:4, 386:6, 391:4, 391:18, 391:23, 392:1, 392:6, 392:14, 396:14, 397:5, 397:8, 397:9, 397:11, 397:23, 398:1
**incidents** [5] - 319:24, 384:16, 384:19, 384:23, 397:14
**included** [1] - 238:25
**including** [6] - 231:5, 231:9, 232:10, 233:19, 264:9, 311:11
**income** [2] - 334:10, 335:4
**inconvenience** [1] - 251:18
**increase** [3] - 305:25, 307:16, 307:18
**increased** [2] - 307:6, 307:9
**increasing** [1] - 307:3
**independent** [1] - 327:12
**independently** [1] - 306:24
**indicate** [1] - 272:1
**indicated** [2] - 380:10, 397:3
**indicates** [1] - 309:13
**indication** [5] - 289:15, 289:22, 340:1, 340:4, 340:23
**individual** [2] - 319:8, 385:14
**indulgence** [1] - 258:12
**industry** [3] - 231:5, 244:22, 245:3
**inform** [3] - 246:11, 252:18, 283:2
**information** [2] - 249:4, 359:13
**informative** [1] - 281:21
**informing** [1] - 297:10

**ingestion** [1] - 312:19
**injured** [15] - 288:12, 289:1, 289:23, 294:3, 313:14, 322:17, 328:10, 333:11, 333:17, 339:19, 347:1, 347:4, 385:9, 391:24, 395:25
**injuries** [2] - 384:16, 397:14
**injury** [14] - 241:22, 289:17, 290:11, 313:19, 322:3, 337:7, 343:21, 347:24, 385:2, 385:5, 386:5, 386:7, 391:20, 397:4
**inland** [1] - 278:25
**inquire** [2] - 328:2, 352:8
**inquiring** [1] - 352:11
**inside** [5] - 234:10, 247:15, 247:18, 248:11, 327:20
**inspect** [2] - 264:9, 380:17
**inspected** [1] - 237:23
**inspection** [4] - 274:20, 378:19, 379:5, 380:11
**installation** [1] - 251:18
**Institute** [1] - 233:14
**instruct** [1] - 281:19
**instructions** [3] - 246:14, 246:17, 246:19
**insuring** [1] - 377:2
**intend** [2] - 362:19, 363:21
**introduced** [1] - 362:12
**investigate** [2] - 352:2, 385:24
**investigated** [1] - 271:10
**investigating** [2] - 377:14, 384:15
**investigation** [4] - 370:11, 370:12, 392:14, 396:7
**Investigative** [2] - 357:10, 357:11
**investigators** [4] - 358:9, 358:11, 358:19, 360:5
**investigators'** [1] - 358:23
**involve** - 319:10

**involved** [27] - 232:25, 233:17, 264:4, 275:20, 276:11, 287:19, 288:2, 289:8, 333:8, 333:14, 333:17, 333:20, 340:8, 340:20, 340:24, 346:20, 346:23, 347:12, 353:7, 357:16, 357:19, 357:22, 357:25, 358:3, 359:13, 378:2, 380:19
**involvement** [3] - 378:1, 380:22, 385:20
**involving** [5] - 288:12, 289:24, 320:7, 340:2, 340:5
**ipse** [1] - 242:1
**irrelevant** [1] - 311:5
**Island** [13] - 247:19, 247:21, 248:8, 248:10, 248:12, 248:13, 250:7, 254:9, 255:19, 273:17, 293:4, 358:13, 378:3
**Islip** [2] - 229:6, 229:21
**issue** [2] - 387:25, 400:22
**issued** [1] - 400:23
**issues** [4] - 231:19, 233:8, 235:13, 236:5
**items** [1] - 254:7
**itself** [1] - 236:23

# J

**jacket** [1] - 246:14
**jackets** [3] - 246:12, 281:19
**JADAMEC** [2] - 265:17, 402:9
**Jadamec** [5] - 265:24, 266:1, 267:18, 269:10, 270:19
**January** [6] - 366:17, 366:19, 366:21, 366:23, 368:6, 369:17
**Jeremy** [6] - 281:4, 336:20, 343:6, 347:16, 347:20, 350:2
**JEREMY** [1] - 345:11, 403:5
**Jersey** [1] - 233:10

**Jet** [71] - 237:15, 237:17, 237:19, 237:20, 237:21, 237:23, 238:4, 238:12, 239:11, 239:13, 239:14, 239:15, 239:17, 241:13, 244:14, 244:18, 244:19, 245:8, 246:7, 247:6, 247:25, 248:23, 254:9, 266:25, 267:21, 279:2, 279:6, 279:9, 279:23, 283:13, 290:3, 290:7, 299:16, 309:7, 326:13, 330:7, 338:18, 338:20, 339:9, 344:22, 346:8, 350:3, 350:6, 350:8, 378:8, 378:10, 378:19, 379:11, 379:18, 379:24, 380:2, 380:11, 380:14, 380:20, 381:2, 381:14, 381:25, 382:14, 382:23, 382:25, 383:7, 384:1, 384:6, 388:9, 388:12, 392:16, 394:1, 394:2, 394:5, 395:5, 395:9
**jet** [25] - 238:9, 241:15, 242:8, 243:5, 243:8, 243:8, 243:8, 258:16, 267:24, 271:16, 272:1, 274:18, 275:10, 277:3, 283:18, 283:23, 284:4, 298:3, 298:4, 306:22, 306:23, 315:23, 329:24, 330:2, 381:3, 392:16
**jet-propelled** [1] - 381:3
**jets** [7] - 251:11, 251:14, 271:19, 283:13, 283:16, 306:20, 312:20
**job** [5] - 243:1, 302:22, 358:6, 358:8
**John** [2] - 260:5, 377:19
**JONATHAN** [1] - 229:4
**journal** [1] - 399:17
**JUDGE** [1] - 229:10

**June** [1] - 266:13
**jury** [25] - 229:10, 230:2, 230:15, 237:3, 242:17, 253:11, 253:24, 259:12, 265:11, 265:13, 282:8, 282:13, 282:22, 292:16, 293:23, 316:24, 317:9, 332:5, 361:5, 367:14, 369:10, 371:21, 371:22, 371:25, 399:8

# K

**Kamewa** [1] - 238:12
**keep** [3] - 247:1, 254:4, 354:1
**keeping** [1] - 235:3
**kept** [2] - 281:20, 386:24
**key** [1] - 242:15
**kind** [3] - 231:15, 347:5, 353:15
**King's** [1] - 230:18
**knots** [11] - 248:8, 301:15, 388:14, 388:19, 388:20, 389:13, 389:15, 390:2, 390:3, 390:24, 394:11
**knowledge** [15] - 238:3, 239:11, 239:14, 240:3, 243:6, 243:7, 243:8, 258:2, 259:1, 269:25, 270:25, 292:15, 295:21, 333:12, 354:23
**known** [3] - 235:19, 302:19, 344:18
**knows** [5] - 242:2, 249:11, 298:8, 301:3, 310:16

# L

**labeled** [1] - 246:13
**ladies** [3] - 246:7, 251:9, 254:2
**LaGuardia** [2] - 231:8, 232:4
**lands** [1] - 393:23
**language** [1] - 253:21
**last** [24] - 260:20, 287:13, 299:25, 313:5, 313:8, 313:9, 313:11, 316:7, 329:5, 329:7, 329:8,

329:9, 329:10, 329:12, 364:2, 368:4, 371:15, 376:5, 392:10, 393:23, 394:1, 394:2

**law** [3] - 260:2, 260:5, 399:17

**lawsuit** [2] - 293:12, 293:18

**lawyer** [1] - 363:15

**lawyers** [1] - 387:15

**leading** [4] - 272:10, 283:20, 285:21, 373:8

**learn** [4] - 250:10, 258:11, 259:13, 392:15

**least** [2] - 255:2, 259:18

**leave** [3] - 281:5, 394:2, 394:4

**leaves** [1] - 393:23

**leaving** [3] - 248:24, 281:13, 284:1

**led** [1] - 240:20

**left** [9] - 245:9, 281:7, 298:24, 299:1, 299:4, 314:15, 325:13, 399:8

**LEONARD** [1] - 229:10

**less** [2] - 393:20, 393:22

**letter** [3] - 264:10, 369:3, 369:7

**lever** [3] - 276:16, 276:19, 276:25

**license** [15] - 231:1, 235:5, 235:9, 266:20, 266:21, 278:22, 278:24, 278:25, 318:4, 318:6, 318:7, 318:8, 318:9, 350:5, 377:11

**licensed** [3] - 234:24, 318:12, 318:14

**licenses** [3] - 234:23, 266:14, 266:16

**life** [4] - 246:12, 246:14, 281:19

**lifesaving** [1] - 380:15

**lift** [5] - 255:19, 255:23, 256:5, 256:9, 256:15

**lifted** [2] - 298:6, 298:12

**Light** [1] - 234:8

**lights** [2] - 245:17, 386:10

**limit** [1] - 249:13

**limited** [1] - 264:9

**line** [10] - 255:15, 274:23, 274:25, 275:4, 306:12, 326:4, 330:2, 330:4, 351:2, 392:16

**LISA** [1] - 229:17

**list** [8] - 268:16, 269:3, 269:20, 270:14, 294:15, 328:19, 341:23, 387:8

**listed** [18] - 242:18, 267:9, 268:9, 268:15, 270:4, 303:12, 304:1, 304:5, 325:23, 342:6, 342:8, 342:10, 344:16, 351:7, 351:19, 351:21, 367:10

**listen** [1] - 399:14

**listening** [1] - 383:17

**lists** [1] - 343:3

**litigation** [1] - 292:6

**live** [2] - 286:3, 286:8

**LLP** [1] - 229:15

**lobster** [2] - 312:19, 392:15

**locate** [1] - 263:13

**located** [2] - 246:12, 381:10

**location** [2] - 246:12, 247:21

**locations** [2] - 233:19, 246:15

**log** [43] - 266:25, 267:3, 270:22, 271:3, 271:7, 272:1, 272:13, 273:2, 274:14, 280:21, 289:12, 289:15, 289:18, 289:20, 289:22, 294:16, 294:18, 295:5, 295:6, 303:2, 321:19, 322:11, 323:19, 324:2, 324:25, 325:7, 325:8, 325:10, 328:18, 330:12, 330:13, 330:14, 333:5, 339:23, 339:25, 340:16, 340:23, 341:4, 343:2, 343:4, 350:24, 385:11

**logbook** [7] - 248:5, 270:19, 280:13, 333:4, 333:18, 339:13, 346:11

**logged** [1] - 373:19

**logs** [1] - 256:7

**London** [45] - 246:9, 247:13, 250:11, 253:16, 254:1, 254:2, 261:25, 274:5, 274:15, 275:3, 276:6, 276:13, 278:20, 280:5, 283:10, 287:13, 287:15, 287:17, 287:24, 288:8, 288:9, 294:4, 294:21, 295:8, 296:6, 297:7, 297:11, 297:22, 297:25, 315:14, 320:13, 326:14, 329:6, 329:7, 329:9, 329:13, 336:15, 342:1, 343:7, 350:20, 378:15, 383:3, 393:23, 394:2, 395:6

**look** [25] - 241:2, 254:5, 281:12, 285:12, 303:2, 304:14, 312:2, 314:25, 325:10, 325:11, 333:3, 339:12, 339:25, 340:11, 349:9, 353:25, 366:3, 374:11, 387:3, 387:14, 388:23, 389:7, 389:23

**looked** [3] - 244:16, 348:21, 349:10

**looking** [18] - 236:1, 239:4, 248:6, 267:11, 271:23, 272:13, 280:21, 294:19, 295:5, 295:6, 339:1, 351:3, 370:13, 371:20, 375:1, 375:7, 375:14, 394:18

**lookout** [3] - 319:12, 319:15, 321:12

**looks** [1] - 321:4

**lower** [1] - 246:13

**luggage** [1] - 247:1

**luncheon** [1] - 331:3

**lurch** [1] - 271:13

---

## M

**Madison** [1] - 232:16

**Magistrate** [1] - 265:3

**magistrate** [1] - 265:5

**Maine** [1] - 266:21

**major** [1] - 273:21

**man** [1] - 232:8

**management** [2] - 231:10, 235:2

**manager** [14] - 296:17, 328:15, 343:25, 344:11, 356:8, 356:22, 376:17, 376:19, 376:21, 377:1, 377:5, 377:8, 377:13, 384:15

**maneuver** [2] - 231:15, 301:12

**maneuvering** [4] - 251:15, 251:23, 304:21, 305:1

**maneuvers** [1] - 231:13

**manner** [1] - 315:21

**manning** [3] - 380:14, 383:10, 383:14

**manual** [9] - 241:2, 244:14, 244:15, 299:16, 309:7, 309:13, 312:24, 313:2, 314:24

**manufacturer** [2] - 259:1, 313:1

**manufacturer's** [1] - 310:12

**March** [1] - 369:3

**marine** [7] - 230:25, 231:8, 232:4, 232:6, 232:8, 233:10, 236:5

**Marine** [5] - 230:17, 231:22, 233:20, 235:17, 345:21

**Maritime** [3] - 230:18, 235:15, 266:21

**maritime** [6] - 231:19, 232:8, 235:13, 236:5, 252:24, 255:8

**mark** [3] - 264:12, 264:24, 265:1

**marked** [6] - 281:10, 285:10, 289:12, 359:5, 378:20, 387:3

**Mary** [1] - 234:20

**master** [7] - 234:5, 234:24, 279:5, 288:16, 299:20, 383:8, 383:11

**masters** [2] - 278:25, 318:6

**Mate** [1] - 231:1

**mate** [17] - 280:22, 280:23, 302:4, 302:5, 302:6, 318:6, 318:12, 318:14, 319:19, 320:15,

**major** 320:17, 333:15, 340:12, 346:15, 347:11, 383:8, 386:3

**mate's** [2] - 318:4, 318:8

**mathematician** [1] - 270:9

**MATT** [2] - 357:2, 403:8

**matter** [4] - 241:12, 265:3, 268:14, 330:25

**maximum** [3] - 390:19, 390:22, 390:23

**McNellis** [2] - 357:10, 357:11

**mean** [12] - 249:9, 294:22, 305:17, 308:2, 309:24, 310:2, 338:23, 341:6, 362:16, 374:13, 386:23, 393:20

**means** [3] - 236:22, 380:12, 388:18

**mechanical** [3] - 229:25, 312:19, 372:14

**mechanically** [1] - 239:22

**medical** [1] - 261:25

**member** [21] - 233:14, 235:12, 235:16, 247:4, 292:18, 300:6, 300:10, 302:21, 303:17, 326:24, 335:10, 335:11, 335:17, 336:24, 344:16, 344:21, 347:15, 347:19, 347:23, 348:2, 355:4

**members** [11] - 261:24, 289:7, 292:24, 301:21, 302:18, 313:16, 320:1, 322:3, 336:22, 352:20, 397:13

**memory** [1] - 303:3

**mentioned** [2] - 235:11, 392:9

**Merchant** [3] - 230:17, 231:21, 233:19

**message** [1] - 281:21

**met** [6] - 292:6, 324:21, 334:5, 341:20, 360:16, 386:16

method [1] - 285:3
mic [2] - 230:20, 230:23
microphone [1] - 265:24
microphones [1] - 282:23
might [6] - 252:18, 253:1, 257:11, 308:10, 329:10, 389:10
mike [2] - 317:8, 317:9
miles [2] - 329:20, 401:3
mine [1] - 235:9
Mineola [1] - 229:16
minute [2] - 237:4, 304:17
minutes [16] - 246:10, 251:12, 251:16, 254:4, 261:11, 282:15, 286:9, 304:22, 316:22, 321:1, 356:16, 356:19, 394:5, 395:7, 395:16, 395:19
Miss [8] - 244:12, 261:23, 267:24, 333:20, 340:20, 340:24, 343:21, 358:12
misspeak [1] - 294:24
mistrial [1] - 259:8
misunderstood [1] - 257:24
Moderate [1] - 245:20
moderate [6] - 246:9, 247:12, 248:18, 281:25, 293:2, 308:3
moment [3] - 260:9, 304:15, 320:18
moments [1] - 246:16
month [1] - 344:14
months [2] - 343:24, 377:23
morning [15] - 230:14, 237:3, 262:24, 263:3, 263:18, 273:14, 273:15, 278:4, 278:5, 292:5, 292:8, 336:5, 363:3, 399:3, 399:7
most [4] - 257:13, 263:20, 311:10, 334:15
motion [3] - 363:4, 371:5, 401:9
motive [1] - 300:3
move [9] - 234:17,

239:8, 246:24, 252:11, 255:15, 257:25, 265:24, 308:25, 323:23
movement [11] - 234:13, 246:22, 254:19, 261:16, 261:17, 322:18, 323:16, 324:9, 324:13, 333:9, 346:17
movements [2] - 270:24, 273:1
moves [1] - 400:10
moving [4] - 246:23, 251:12, 262:18, 291:7
MR [501] - 230:4, 230:13, 230:22, 236:17, 236:19, 237:2, 237:10, 237:12, 239:24, 240:1, 240:2, 240:6, 240:8, 241:1, 241:4, 241:8, 241:17, 241:21, 241:22, 241:24, 242:1, 242:11, 242:13, 242:15, 242:24, 243:11, 243:13, 243:16, 245:16, 245:23, 245:25, 246:3, 246:6, 248:25, 249:6, 249:11, 249:14, 249:19, 249:21, 249:25, 250:4, 251:1, 251:4, 251:6, 252:5, 252:9, 252:20, 252:22, 253:2, 253:4, 253:7, 253:14, 253:18, 253:25, 254:15, 254:17, 254:21, 254:23, 255:2, 255:5, 255:6, 255:10, 255:12, 255:16, 255:20, 255:22, 255:25, 256:3, 256:10, 256:12, 256:16, 256:18, 256:22, 257:1, 257:3, 257:7, 257:8, 257:15, 257:19, 257:21, 257:24, 258:1, 258:5, 258:9, 258:19, 258:23, 258:24, 258:25, 259:4, 259:9,

259:14, 259:17, 260:1, 260:9, 260:12, 260:19, 260:24, 261:7, 261:8, 261:9, 262:4, 262:7, 262:13, 262:15, 262:16, 262:23, 263:4, 263:8, 263:9, 263:12, 263:15, 263:20, 263:23, 264:17, 265:2, 265:6, 265:8, 265:9, 265:10, 265:23, 267:6, 267:11, 267:17, 268:6, 268:9, 268:13, 268:14, 268:18, 268:22, 268:24, 269:2, 269:6, 269:9, 269:17, 269:19, 269:21, 270:18, 272:10, 272:12, 273:9, 273:10, 273:13, 274:9, 274:11, 275:17, 275:20, 276:1, 276:6, 276:10, 277:12, 277:16, 277:17, 278:3, 280:15, 280:17, 280:18, 280:20, 282:1, 282:2, 282:7, 282:11, 282:13, 282:20, 282:23, 282:25, 283:20, 283:22, 285:2, 285:21, 285:24, 286:19, 286:22, 288:19, 288:23, 288:24, 289:3, 289:6, 290:13, 291:1, 291:8, 291:11, 291:15, 291:20, 291:24, 292:1, 292:4, 293:14, 293:16, 293:22, 294:11, 294:23, 295:1, 295:4, 296:3, 296:7, 296:11, 297:18, 297:20, 298:7, 298:10, 299:2, 299:6, 299:10, 300:1, 300:3, 300:5, 300:8, 300:11, 300:14, 300:17, 300:20, 301:5, 301:7, 301:18, 301:20, 305:24, 309:15, 309:17,

309:19, 309:23, 309:25, 310:4, 310:6, 310:7, 310:11, 310:18, 310:22, 311:1, 311:3, 311:18, 311:21, 312:1, 312:6, 312:9, 312:10, 313:5, 313:11, 313:12, 314:7, 314:10, 314:13, 314:22, 315:10, 315:15, 315:18, 315:20, 315:25, 316:2, 316:6, 316:17, 316:20, 317:10, 317:12, 317:15, 323:23, 324:1, 324:16, 324:19, 326:16, 326:17, 326:21, 326:23, 327:4, 327:7, 330:21, 330:22, 332:13, 333:24, 334:2, 334:11, 334:13, 334:17, 334:22, 335:3, 335:6, 335:8, 335:9, 336:10, 336:12, 337:6, 337:15, 338:1, 341:13, 341:17, 342:22, 343:1, 343:10, 343:11, 343:22, 345:3, 345:5, 345:6, 345:17, 348:18, 348:22, 348:25, 349:3, 349:7, 349:12, 349:14, 349:17, 349:20, 349:23, 353:2, 353:4, 353:14, 353:17, 353:20, 353:23, 353:25, 354:5, 354:6, 355:9, 355:11, 355:17, 355:21, 355:23, 356:1, 356:4, 356:6, 356:8, 356:11, 356:15, 356:18, 356:20, 356:22, 357:8, 359:8, 359:10, 359:12, 359:20, 359:22, 360:2, 360:9, 360:13, 361:17, 361:20, 362:6, 362:10, 362:12, 362:15, 362:22, 363:3, 363:6, 363:9,

364:2, 364:10, 364:13, 364:16, 364:19, 364:22, 365:1, 366:2, 367:22, 368:1, 368:19, 368:22, 368:24, 369:7, 369:9, 370:5, 370:8, 370:24, 371:3, 371:4, 371:5, 371:7, 371:10, 371:12, 371:22, 371:24, 372:4, 372:8, 372:17, 372:19, 372:23, 373:1, 373:4, 373:8, 373:10, 373:24, 374:1, 374:4, 375:9, 375:12, 375:15, 375:20, 376:1, 376:2, 376:13, 378:4, 378:6, 378:20, 378:23, 379:1, 379:6, 379:8, 379:12, 379:14, 379:17, 380:4, 380:6, 380:9, 381:18, 381:20, 381:23, 382:3, 382:5, 382:8, 382:16, 382:18, 382:21, 384:8, 384:10, 384:13, 386:8, 386:9, 386:13, 386:25, 387:2, 387:6, 387:8, 387:12, 387:13, 387:22, 388:1, 388:4, 388:5, 388:15, 388:17, 389:1, 389:6, 390:4, 390:5, 390:10, 390:17, 392:5, 392:24, 393:1, 393:4, 393:10, 394:16, 394:21, 395:4, 395:17, 395:20, 396:23, 397:2, 397:16, 397:17, 397:19, 397:22, 398:1, 398:5, 398:8, 398:11, 398:14, 398:17, 398:19, 398:22, 398:24, 399:1, 399:4, 399:13, 399:19, 399:24, 400:11, 400:14, 400:18, 400:23, 401:3, 401:4, 401:12,

402:4, 402:5, 402:6,
402:7, 402:10,
402:11, 402:13,
402:14, 402:15,
402:16, 402:17,
402:19, 402:20,
402:22, 402:23,
403:3, 403:4, 403:6,
403:7, 403:9,
403:10, 403:11,
403:12, 403:13,
403:15, 403:16,
403:17, 403:18
**Mulvehill** [4] - 244:6,
260:6, 263:24, 369:3
**Mulvehill's** [1] -
400:20
**Mystique** [1] - 232:17

## N

**name** [12] - 247:16,
292:5, 302:2, 317:4,
317:6, 324:20,
326:7, 333:5,
339:13, 346:11,
392:9, 392:10
**named** [3] - 347:16,
347:19, 350:2
**names** [1] - 302:13
**narrows** [1] - 234:10
**National** [1] - 231:24
**nature** [1] - 287:11
**nautical** [1] - 232:7
**Naval** [3] - 231:3,
232:2, 233:14
**navigated** [1] - 237:19
**navigating** [2] -
279:14, 318:15
**Navigation** [4] -
233:15, 233:16,
233:18, 312:14
**navigation** [2] -
233:18, 234:13
**Navy** [2] - 231:23,
232:2
**nearby** [1] - 323:9
**nearest** [1] - 247:3
**necessary** [2] -
246:24, 342:5
**need** [7] - 253:12,
253:21, 275:7,
308:19, 350:5,
359:17, 387:20
**needed** [3] - 362:15,
362:16, 364:4
**neutral** [1] - 305:21
**never** [20] - 237:15,
237:17, 237:19,
237:20, 237:21,

237:23, 238:9,
239:13, 239:15,
239:19, 292:6,
322:19, 342:15,
349:1, 368:20,
388:20, 389:13,
396:13, 400:23
**NEW** [1] - 229:1
**New** [58] - 229:13,
229:16, 229:21,
231:12, 231:16,
232:18, 233:7,
233:9, 233:24,
234:6, 235:9,
235:16, 235:17,
246:9, 247:13,
250:11, 253:16,
253:25, 254:2,
261:25, 274:5,
274:15, 275:3,
275:6, 276:13,
278:20, 280:5,
283:10, 287:13,
287:15, 287:17,
287:24, 288:8,
288:9, 294:4,
294:21, 295:8,
296:5, 297:7,
297:11, 297:22,
297:25, 315:14,
320:13, 326:14,
329:6, 329:7, 329:9,
329:12, 329:15,
342:1, 343:7,
350:19, 378:14,
383:3, 393:23,
394:2, 395:6
**next** [19] - 230:3,
238:2, 251:12,
251:16, 262:22,
265:14, 276:7,
277:20, 302:13,
304:22, 316:25,
326:5, 330:23,
337:18, 345:9,
355:14, 355:22,
356:5, 376:4
**nice** [1] - 309:4
**Nicholas** [3] - 389:20,
389:23, 390:6
**Nichols** [2] - 390:8,
390:9
**night** [53] - 245:8,
247:10, 248:2,
250:7, 250:11,
255:23, 256:4,
260:14, 270:24,
272:2, 273:16,
273:18, 273:19,
273:23, 273:25,

276:12, 276:20,
276:23, 280:22,
286:23, 287:1,
288:6, 288:9,
288:13, 289:9,
289:17, 289:25,
295:8, 295:22,
296:1, 296:6,
298:20, 304:17,
322:4, 323:6,
323:16, 324:11,
325:10, 325:15,
328:8, 328:10,
329:16, 343:7,
346:14, 346:17,
347:2, 347:12,
347:16, 381:8,
386:5, 386:19,
395:10
**nine** [1] - 375:14
**NOAA** [1] - 231:24
**nobody** [3] - 339:2,
351:19, 351:21
**Noel** [1] - 248:6
**none** [1] - 270:25
**Norm** [1] - 280:23
**normal** [5] - 244:21,
302:24, 342:10,
350:8
**normally** [6] - 247:18,
303:7, 303:19,
313:7, 326:9, 328:7
**NORMAN** [2] - 317:1,
402:18
**Norman** [1] - 317:6
**north** [1] - 248:12
**northwest** [2] - 248:7,
248:13
**notation** [1] - 270:20,
398:9
**notations** [1] - 397:24
**note** [5] - 274:3,
296:21, 368:12,
397:10, 398:2
**noted** [3] - 248:24,
273:2, 289:12
**notes** [2] - 260:10,
274:24
**nothing** [18] - 239:8,
242:2, 242:20,
249:11, 260:25,
270:22, 305:16,
330:20, 337:15,
345:5, 345:6, 373:1,
373:17, 373:20,
376:1, 376:2, 396:23
**notice** [5] - 276:3,
283:18, 283:23,
284:1, 326:3
**notified** [5] - 288:16,

289:7, 313:14,
313:18, 385:22
**notify** [2] - 252:25,
277:5
**November** [67] -
245:9, 248:3, 248:4,
264:11, 264:14,
266:6, 267:3,
267:21, 270:21,
276:12, 279:5,
279:8, 280:5, 283:9,
289:25, 290:2,
290:8, 290:12,
293:1, 294:4, 294:9,
294:21, 294:23,
294:25, 295:1,
295:9, 295:22,
302:25, 306:4,
318:2, 318:12,
320:12, 322:7,
322:23, 327:13,
332:14, 332:24,
333:22, 336:14,
337:2, 338:12,
339:6, 339:9,
341:11, 343:12,
343:18, 346:4,
346:9, 350:8,
350:13, 353:1,
376:22, 380:2,
381:14, 382:1,
382:14, 382:23,
383:6, 383:14,
384:6, 384:21,
385:6, 385:10,
392:19, 393:12,
393:24, 397:15
**nuclear** [1] - 270:10
**number** [21] - 231:4,
231:9, 247:23,
291:18, 291:19,
294:15, 297:16,
301:21, 303:22,
304:1, 306:14,
309:11, 311:13,
342:2, 342:16,
349:16, 370:16,
385:13, 385:17,
385:21, 398:12
**numbers** [1] - 303:5
**NY** [1] - 229:6

## O

**o'clock** [6] - 248:3,
329:14, 375:21,
395:11, 399:5
**obey** [1] - 259:23
**object** [5] - 259:18,
334:15, 368:19,
387:9, 387:10

**objected** [3] - 260:20,
260:21, 264:22
**objecting** [1] - 310:8
**objection** [88] -
239:24, 240:6,
241:4, 241:8,
248:25, 252:5,
252:20, 253:2,
254:15, 254:21,
255:10, 255:20,
255:25, 256:10,
256:16, 257:1,
257:7, 257:19,
258:5, 258:24,
267:14, 268:6,
269:17, 272:10,
273:9, 274:9,
277:12, 282:16,
283:20, 285:21,
286:19, 288:20,
289:3, 291:8,
293:14, 294:11,
296:7, 297:18,
298:7, 299:6, 299:7,
300:1, 300:8,
300:14, 301:5,
309:15, 309:19,
315:10, 315:18,
326:16, 326:21,
327:4, 334:11,
335:6, 336:10,
342:22, 343:10,
343:22, 345:3,
348:22, 349:14,
353:2, 353:14,
359:8, 362:23,
370:5, 371:3,
371:10, 372:17,
373:8, 373:24,
378:4, 378:23,
379:14, 380:6,
381:20, 382:5,
382:18, 384:10,
386:25, 387:18,
388:15, 389:1,
390:10, 392:24,
392:25, 395:17,
397:16
**Objection** [4] -
288:19, 290:13,
323:23, 375:15
**objections** [2] -
258:24, 353:22
**obligation** [1] - 302:19
**observation** [1] -
374:23
**observations** [1] -
374:19
**observed** [2] - 291:6,
383:21

**observing** [1] - 338:24
**obstruction** [9] - 251:10, 251:11, 251:14, 251:15, 271:24, 304:21, 306:19, 306:22, 306:25
**obtain** [2] - 266:20, 301:14
**obtained** [1] - 374:21
**Obviously** [1] - 242:15
**obviously** [1] - 275:6
**occasion** [2] - 250:6, 325:6
**occasionally** [2] - 232:23, 377:5
**occasions** [1] - 290:10
**occur** [2] - 286:15, 370:21
**occurred** [16] - 244:4, 257:18, 258:20, 258:21, 273:25, 274:2, 274:3, 293:3, 293:25, 309:21, 310:25, 311:2, 311:8, 363:18, 386:4, 389:4
**occurrence** [3] - 250:7, 271:21, 284:4
**occurs** [2] - 275:8, 305:14
**ocean** [1] - 273:22
**Oceanic** [1] - 231:24
**October** [2] - 344:2, 344:5
**odd** [1] - 235:22
**OF** [2] - 229:1, 229:9
**offer** [9] - 267:7, 349:13, 378:21, 379:13, 380:4, 381:18, 382:3, 382:16, 384:8
**offered** [1] - 387:20
**offering** [1] - 399:20
**office** [2] - 233:21, 370:25
**officer** [1] - 231:25
**officers** [1] - 330:15
**offices** [5] - 392:18, 393:12, 394:23, 395:22, 396:2
**Old** [1] - 229:13
**onboard** [1] - 239:15
**once** [11] - 235:5, 239:15, 251:13, 254:8, 291:2, 297:22, 307:2, 324:21, 334:5, 386:16, 400:24

**Once** [1] - 306:18
**one** [59] - 231:7, 231:8, 234:11, 234:19, 241:11, 243:25, 245:25, 246:3, 248:23, 251:10, 251:14, 260:8, 263:13, 264:8, 271:1, 279:14, 283:1, 283:16, 292:18, 292:24, 294:13, 296:16, 302:21, 304:1, 304:4, 304:14, 306:19, 306:22, 307:5, 310:6, 312:20, 313:16, 319:2, 319:10, 319:11, 325:3, 328:8, 328:10, 329:2, 336:22, 337:7, 338:20, 342:6, 342:8, 342:20, 342:21, 352:17, 361:4, 362:24, 363:21, 364:22, 364:23, 374:14, 383:8, 383:12, 394:13, 395:15, 396:2, 396:12
**one-way** [1] - 342:21
**open** [6] - 233:9, 274:20, 310:25, 311:8, 392:21, 392:23
**opened** [1] - 375:17
**opening** [3] - 275:15, 275:23, 276:4
**operate** [1] - 378:14
**operated** [15] - 232:12, 232:15, 232:23, 237:17, 238:9, 239:6, 239:7, 239:19, 246:8, 246:20, 278:14, 278:16, 306:23, 317:24, 377:8
**operating** [9] - 233:13, 256:19, 268:13, 269:2, 272:7, 312:15, 315:2, 376:21, 380:15
**operation** [20] - 251:24, 252:12, 269:16, 275:8, 278:19, 281:22, 284:12, 285:6, 286:3, 287:2, 296:15, 296:24,

299:16, 304:25, 313:23, 324:12, 353:1, 353:13, 384:17
**operations** [16] - 244:14, 296:17, 297:17, 309:6, 343:25, 344:11, 356:8, 356:22, 358:10, 376:17, 376:18, 377:1, 377:5, 377:8, 377:13, 384:14
**Operations** [1] - 235:16
**opinion** [24] - 238:4, 240:18, 240:21, 242:1, 244:5, 248:17, 249:13, 252:23, 254:24, 255:7, 255:18, 256:6, 256:14, 256:23, 257:16, 258:3, 260:15, 268:10, 268:21, 269:18, 270:5, 270:7, 299:7, 400:5
**opinions** [7] - 241:10, 242:10, 245:8, 245:11, 249:17, 250:5, 259:2
**opportunity** [2] - 299:19, 391:9
**opposed** [1] - 306:22
**orally** [1] - 314:1
**order** [16] - 244:8, 250:5, 250:16, 251:14, 267:9, 267:12, 275:9, 276:16, 299:3, 304:20, 305:25, 342:4, 353:13, 354:8, 378:21, 379:13
**orders** [1] - 354:2
**ordinary** [2] - 253:21, 271:12
**organizations** [1] - 235:13
**Orient** [43] - 245:20, 247:13, 247:15, 247:18, 248:11, 244:14, 262:1, 276:13, 278:20, 280:5, 281:7, 281:13, 283:9, 284:1, 287:24, 288:9, 293:5, 294:4, 294:20, 295:8, 296:4, 297:6,

304:12, 320:13, 326:14, 329:6, 329:7, 329:10, 330:9, 330:15, 336:15, 342:1, 343:7, 350:19, 378:14, 383:1, 383:3, 392:18, 393:12, 393:24, 394:3, 395:6, 395:22
**original** [3] - 264:21, 358:22, 358:25
**outside** [4] - 236:2, 239:25, 291:8, 315:10
**overlay** [1] - 382:10
**overruled** [16] - 277:13, 291:9, 294:12, 297:19, 299:8, 311:6, 343:23, 349:15, 353:3, 359:9, 359:19, 370:6, 372:18, 373:9, 388:16, 389:5
**oversaw** [1] - 358:9
**own** [6] - 237:4, 244:17, 258:16, 305:11, 378:10, 388:21
**owned** [4] - 232:12, 232:15, 232:23, 377:19
**owner** [2] - 376:25, 380:24
**owns** [1] - 394:7

## P

**p.m** [2] - 331:3, 399:8
**p.m.)** [1] - 401:14
**Page** [1] - 306:12
**page** [6] - 284:15, 311:14, 351:2, 365:10
**pages** [2] - 310:1, 311:11
**paragraph** [1] - 316:16
**parameters** [1] - 380:15
**pardon** [1] - 307:11
**part** [7] - 242:15, 258:3, 292:10, 304:20, 316:16, 351:22, 381:11
**participated** [1] - 389:17
**particular** [9] - 253:22, 269:24, 270:7, 273:23, 319:5,

319:14, 346:20, 383:11, 397:15
**partners** [1] - 234:11
**parts** [6] - 371:13, 371:14, 371:18, 371:19, 372:9, 372:13
**party** [1] - 264:6
**passage** [1] - 245:9
**passed** [2] - 385:13, 385:21
**passenger** [30] - 231:16, 232:15, 237:5, 244:19, 246:14, 252:18, 256:19, 279:17, 279:25, 280:1, 289:24, 298:22, 319:16, 321:5, 321:12, 321:24, 322:3, 340:2, 340:5, 340:10, 347:11, 377:14, 378:12, 380:14, 381:9, 382:25, 384:16, 384:20, 384:23, 385:2
**passenger-carrying** [1] - 244:19
**passengers** [32] - 232:13, 232:21, 232:22, 233:1, 241:14, 247:1, 252:25, 254:13, 254:18, 261:15, 261:19, 283:2, 285:17, 285:19, 294:13, 294:15, 294:20, 295:7, 295:13, 303:18, 307:24, 308:1, 308:11, 314:2, 320:4, 330:6, 338:24, 339:4, 339:20, 346:19, 395:13
**passengers'** [1] - 320:7
**passing** [1] - 238:1
**past** [5] - 236:13, 236:15, 241:9, 342:4, 342:13
**patrol** [9] - 319:2, 319:12, 321:3, 321:4, 338:21, 339:4, 339:15, 341:11
**patrolled** [1] - 338:23
**pause** [2] - 242:6, 359:25

payment [1] - 235:23
people [14] - 232:6, 281:18, 295:12, 308:16, 308:19, 308:25, 309:3, 311:9, 325:14, 342:10, 347:5, 374:22, 380:16, 400:16
perform [2] - 272:16, 284:12
performed [2] - 272:14, 370:10
period [4] - 233:3, 286:7, 286:9, 304:17
periodically [1] - 380:17
periods [1] - 375:22
permiss [1] - 335:1
permission [3] - 230:4, 245:18, 264:8
permit [1] - 253:23, 372:4
permits [1] - 356:20
permitted [2] - 264:21, 360:25
person [15] - 277:5, 303:17, 326:7, 327:24, 328:2, 336:17, 351:14, 351:16, 351:18, 352:11, 352:17, 359:17, 360:6, 364:12, 398:19
personal [5] - 239:14, 280:11, 301:8, 304:10, 305:11
personally [8] - 276:11, 313:4, 343:5, 353:7, 359:13, 377:8, 380:19, 388:11
personnel [1] - 232:7
ph) [1] - 369:2
phone [3] - 273:6, 385:13, 385:21
photograph [1] - 384:4
physical [2] - 270:24, 380:25
physically [3] - 276:18, 315:9, 367:13
picture [10] - 290:5, 290:15, 291:16, 292:9, 292:13, 379:22, 380:4, 381:17, 381:24, 382:12
pictures [1] - 381:12

pilot [17] - 231:12, 231:13, 234:4, 234:5, 234:6, 234:7, 234:9, 234:10, 234:12, 234:25, 235:4, 235:5, 235:6, 235:24, 242:19, 243:7
Pilotage [1] - 235:8
piloted [5] - 231:11, 234:18, 234:21, 237:15, 388:11
piloting [3] - 242:17, 242:19, 256:24
Pilots [2] - 233:24, 233:25
pilots [3] - 232:6, 233:21, 234:1
pinpoint [1] - 290:19
place [4] - 263:21, 330:12, 371:16, 373:17
Plaintiff [1] - 229:12
plaintiff [6] - 230:8, 243:23, 249:6, 262:17, 363:22, 363:24
plaintiff's [6] - 240:24, 246:1, 258:17, 258:19, 262:22, 363:15
Plaintiff's [4] - 251:1, 281:11, 302:15, 328:18
plaintiffs [1] - 236:13
Plaintiffs [1] - 229:5
Plaintiffs' [1] - 387:3
plaintiffs' [1] - 285:10
play [18] - 258:3, 259:1, 282:7, 282:10, 282:16, 362:15, 367:16, 367:19, 369:11, 369:16, 369:19, 369:22, 369:25, 371:14, 371:19, 372:10, 372:13
played [10] - 281:13, 282:3, 285:13, 308:2, 359:4, 361:4, 367:14, 368:3, 369:10, 373:11
playing [2] - 282:17, 372:14
Plaza [1] - 229:21
pleasure [2] - 237:5, 247:23
plus [2] - 241:9, 249:7
pm [33] - 245:9, 267:20, 280:4,

281:5, 281:24, 283:16, 287:7, 303:22, 304:12, 320:13, 320:21, 321:13, 322:7, 323:11, 325:16, 326:1, 326:14, 327:13, 332:2, 332:24, 333:21, 339:15, 339:19, 340:25, 342:1, 343:18, 344:18, 350:9, 350:15, 350:19, 384:20, 385:6, 385:10
Point [43] - 230:18, 245:21, 247:13, 247:15, 247:18, 248:11, 248:14, 262:1, 276:13, 278:20, 280:5, 281:7, 281:13, 283:9, 284:1, 287:24, 288:9, 293:5, 294:4, 294:20, 295:8, 296:4, 297:6, 304:12, 320:13, 326:14, 329:6, 329:7, 329:10, 330:10, 330:16, 336:15, 342:1, 343:7, 350:19, 378:14, 383:1, 392:18, 393:12, 393:24, 394:3, 395:6, 395:22
point [9] - 236:18, 248:11, 277:7, 277:8, 277:10, 277:14, 296:16, 297:15, 297:25
pointing [1] - 301:25
policy [2] - 288:25, 313:13
Port [7] - 233:6, 233:7, 233:9, 233:11, 234:6, 235:10, 235:15
port [22] - 250:15, 274:18, 274:20, 298:2, 298:3, 298:4, 298:21, 299:12, 299:13, 306:1, 307:4, 307:13, 307:15, 307:19, 314:15, 323:4, 327:21, 329:21, 329:24, 330:2, 392:16

portion [1] - 262:25
position [9] - 278:8, 302:7, 325:14, 328:14, 335:18, 338:7, 344:10, 362:13, 376:16
possibility [1] - 397:4
possible [2] - 325:9, 399:4
posted [1] - 246:15
pot [1] - 392:15
pot/debris [1] - 312:20
powered [1] - 317:24
preclude [1] - 264:20
prefer [1] - 253:18
prepare [5] - 373:14, 391:18, 391:23, 397:5, 397:9
prepared [4] - 236:17, 368:15, 392:7, 397:8
prerecorded [2] - 313:21, 313:25
presence [3] - 230:1, 265:12, 332:4
present [2] - 367:13, 396:4
presentation [1] - 263:1
president [2] - 233:23, 233:25
pretrial [5] - 267:9, 267:11, 378:21, 379:13, 387:9
prevent [2] - 300:22, 374:24
prevented [2] - 394:24, 395:1
previously [4] - 235:11, 263:23, 281:10, 312:4
principal [1] - 401:5
problem [7] - 250:10, 250:16, 253:1, 274:18, 307:10, 320:4, 352:3
procedure [9] - 271:23, 272:5, 272:7, 284:7, 284:10, 302:19, 303:13, 310:16, 383:24
Procedure [1] - 311:15
procedures [2] - 324:24, 353:8
proceed [5] - 259:20, 297:7, 297:11, 315:17, 317:10
proceeded [2] - 296:4, 296:5, 297:22,

297:24, 315:14
proceeding [1] - 315:21
proceedings [2] - 242:6, 359:25
Proceedings [1] - 229:25
process [5] - 250:21, 250:23, 273:25, 276:12, 277:4
produce [5] - 361:16, 364:19, 364:21, 367:22, 375:3
produced [2] - 229:25, 368:20
professional [1] - 235:12
propel [1] - 275:9
propelled [2] - 238:7, 381:3
propellers [4] - 238:8, 239:6, 239:7, 248:23
proper [2] - 364:4, 364:6
propulsion [12] - 238:5, 238:9, 240:4, 242:8, 243:5, 243:8, 258:14, 258:16, 264:10, 269:11, 280:2, 381:2
protect [5] - 259:19, 300:6, 300:13, 327:3, 327:9
protects [1] - 326:24
prove [1] - 384:19
provide [1] - 235:25
prudent [1] - 255:13
public [3] - 314:5, 314:6
published [1] - 399:23
pull [1] - 262:11
pumps [1] - 280:3
purchase [1] - 380:19
purpose [5] - 281:17, 281:18, 285:15, 315:21, 321:3
purposes [2] - 283:1, 355:5
push [1] - 276:16
pushed [2] - 276:25, 355:18
put [24] - 255:2, 259:19, 271:6, 276:3, 281:11, 289:18, 291:16, 291:19, 294:18, 304:19, 310:18, 310:22, 312:7, 323:18, 334:24, 340:16, 341:3,

343:2, 343:4, 354:9, 372:15, 379:23, 381:17, 389:11

## Q

**qualified** [1] - 318:11
**qualify** [1] - 400:3
**quash** [1] - 363:4
**Queen** [1] - 234:20
**queried** [2] - 396:15, 397:13
**questioned** [3] - 334:5, 349:24, 396:14
**questioning** [3] - 236:22, 255:15, 298:11
**questions** [49] - 238:3, 259:17, 262:5, 271:15, 273:10, 276:22, 279:1, 280:4, 283:8, 284:6, 287:4, 291:15, 296:13, 306:14, 316:1, 316:18, 319:21, 320:12, 321:8, 322:20, 323:15, 324:16, 332:17, 332:23, 333:24, 335:23, 336:2, 338:14, 339:5, 340:18, 341:13, 345:25, 346:4, 347:14, 349:20, 351:1, 351:11, 353:15, 353:17, 360:10, 374:1, 377:16, 378:7, 380:25, 382:22, 386:8, 397:19, 400:4, 400:6
**quick** [1] - 356:4
**quicker** [1] - 400:10
**quickly** [2] - 252:14, 254:14
**quite** [2] - 309:3, 327:16

## R

**radar** [1] - 231:9, 235:1
**raise** [1] - 286:23
**raised** [4] - 298:18, 299:5, 299:13, 383:23
**raising** [1] - 378:3
**ran** [1] - 358:9
**ranging** [1] - 278:16
**read** [21] - 240:16,

240:19, 240:20, 245:19, 247:7, 250:6, 251:7, 251:20, 253:11, 253:18, 253:20, 253:24, 254:10, 300:17, 305:9, 309:18, 312:3, 312:4, 312:17, 368:3, 399:21
**reading** [5] - 249:7, 249:17, 306:12, 306:14, 375:16
**ready** [1] - 263:10
**really** [1] - 336:4
**reason** [2] - 250:1, 259:23
**reasonable** [3] - 252:23, 254:24, 255:7
**reasons** [1] - 268:22
**receipts** [6] - 386:23, 387:5, 387:6, 387:14, 387:20, 387:23
**receive** [1] - 358:22
**received** [18] - 291:22, 328:5, 378:25, 379:7, 379:16, 380:8, 381:22, 382:7, 382:20, 384:12, 400:16, 403:21, 403:22, 403:23, 403:24, 403:24, 403:25, 403:25
**recently** [2] - 235:14, 371:1
**Recess** [1] - 263:19
**recess** [2] - 316:23, 331:3
**recognize** [1] - 234:19
**recollection** [14] - 280:11, 293:24, 301:9, 304:11, 327:12, 336:13, 341:9, 343:17, 388:25, 390:6, 390:12, 390:13, 390:14, 390:18
**recommending** [1] - 380:24
**record** [14] - 255:3, 259:16, 259:19, 263:21, 264:7, 265:2, 334:14, 334:25, 362:18, 363:12, 374:23, 389:4, 398:4
**recorded** [1] - 229:25

**recording** [2] - 256:7, 374:6
**recordings** [2] - 358:22, 358:25
**records** [7] - 362:20, 362:25, 363:15, 364:10, 364:11, 364:13, 401:6
**RECROSS** [6] - 316:5, 374:3, 397:21, 402:17, 403:11, 403:17
**RECROSS-EXAMINATION** [6] - 316:5, 374:3, 397:21, 402:17, 403:11, 403:17
**redirect** [5] - 262:6, 277:17, 314:8, 330:22, 355:11
**REDIRECT** [8] - 314:12, 373:3, 375:11, 397:1, 402:16, 403:10, 403:12, 403:16
**reduction** [1] - 276:19
**Reefs** [1] - 235:20
**reengage** [1] - 277:7
**refer** [4] - 236:1, 244:10, 280:13, 375:13
**referral** [1] - 235:25
**referred** [1] - 247:19
**referring** [4] - 294:2, 311:12, 312:11, 316:14
**reflected** [1] - 359:3
**refresh** [5] - 303:3, 388:24, 390:6, 390:13, 390:14, 390:11
**refreshes** [1] - 390:11
**refuse** [1] - 261:2
**regular** [5] - 247:25, 248:1, 271:20, 327:17, 392:18
**regulations** [2] - 246:11, 377:3
**rehabilitate** [1] - 400:9
**reissuing** [1] - 233:17
**relate** [2] - 319:15, 338:14
**related** [3] - 321:5, 321:6, 321:12
**relates** [1] - 335:17
**relevance** [2] - 310:9, 378:4
**relevant** [3] - 276:7, 310:7, 310:8
**relied** [1] - 258:17,

258:19
**remain** [11] - 246:24, 253:8, 254:4, 305:18, 307:22, 307:23, 307:25, 308:1, 308:11, 313:22, 314:2
**remember** [16] - 260:19, 287:7, 295:24, 295:25, 298:15, 322:13, 323:13, 333:7, 337:3, 337:12, 341:7, 347:7, 351:1, 351:9, 364:7, 385:19
**remembered** [2] - 322:2, 344:1
**remembers** [1] - 398:5
**remove** [6] - 251:11, 251:15, 284:7, 284:13, 285:4, 304:20
**render** [5] - 241:11, 244:5, 250:5, 258:4, 398:12
**rendered** [3] - 238:4, 268:11, 360:19
**rendering** [1] - 244:9
**reopen** [1] - 233:12
**reopening** [1] - 233:10
**repeat** [10] - 292:20, 295:3, 296:13, 300:16, 301:1, 313:24, 326:4, 327:6, 350:16, 372:7
**rephrase** [1] - 296:13
**report** [54] - 244:11, 244:17, 244:20, 247:3, 261:10, 261:22, 261:23, 261:24, 268:18, 269:4, 270:1, 270:4, 270:13, 290:11, 320:2, 320:3, 320:10, 321:9, 322:3, 322:6, 322:11, 328:7, 339:18, 339:22, 340:10, 340:12, 340:14, 346:14, 347:9, 352:12, 354:24, 355:1, 355:2, 361:7, 361:10, 368:15, 368:21, 373:20, 375:8, 375:14, 375:16, 376:24, 386:7, 391:18, 391:23, 392:1, 392:6, 397:5, 397:9,

397:10, 397:11, 397:23, 398:2, 398:4
**reported** [11] - 289:2, 289:16, 319:19, 320:5, 321:23, 333:15, 333:18, 337:7, 383:22, 385:4, 386:5
**Reporter** [1] - 229:19
**reporting** [2] - 319:24, 333:21
**reports** [18] - 248:6, 319:22, 360:4, 361:12, 362:1, 362:2, 364:17, 366:3, 366:4, 367:8, 368:12, 369:4, 374:11, 375:22, 384:23, 397:8, 400:17, 400:18
**represent** [1] - 259:15
**representation** [8] - 290:7, 379:24, 380:1, 381:25, 382:13, 382:15, 384:5, 390:16
**representations** [1] - 381:13
**request** [4] - 236:19, 264:18, 265:3, 334:25
**requested** [3] - 264:7, 264:20, 401:8
**require** [1] - 246:11
**required** [1] - 337:10
**requirement** [1] - 383:9
**requirements** [1] - 383:15
**research** [2] - 243:19, 243:20
**reservation** [1] - 385:22
**Reserves** [1] - 231:3
**respect** [6] - 272:25, 303:19, 319:23, 320:4, 359:23, 360:3
**respectfully** [2] - 263:20, 334:15
**response** [4] - 264:13, 267:10, 328:5, 371:8
**responses** [1] - 306:15
**responsibilities** [1] - 351:23
**responsibility** [1] - 327:24
**responsible** [9] - 279:17, 279:20, 303:13, 321:11,

351:4, 377:1, 377:13, 384:15, 389:17
**rest** [2] - 262:25, 263:6
**restricted** [1] - 235:8
**result** [1] - 335:4
**retained** [3] - 244:3, 264:3, 357:13
**retired** [2] - 335:15
**return** [5] - 261:25, 287:23, 329:15, 395:9, 395:13
**returned** [1] - 329:20
**reverse** [2] - 234:15, 276:16
**reverses** [1] - 277:2
**review** [9] - 244:4, 244:8, 255:17, 260:10, 299:19, 306:9, 324:25, 358:25, 391:9
**reviewed** [4] - 244:1, 244:10, 246:4, 256:13
**reviewing** [4] - 245:6, 248:16, 377:14, 384:15
**revved** [1] - 275:9
**revving** [2] - 252:4, 252:13
**Reynolds** [1] - 233:25
**RICHARD** [2] - 376:8, 403:14
**Richard** [1] - 296:19
**rid** [1] - 272:8
**ride** [3] - 246:20, 281:20, 377:5
**rights** [1] - 389:10
**Riley** [1] - 343:25
**River** [1] - 235:10
**Road** [1] - 229:13
**roams** [1] - 321:4
**Rocks** [1] - 235:19
**rode** [1] - 292:17
**role** [1] - 259:2
**room** [1] - 276:18
**rough** [9] - 246:24, 247:10, 248:18, 307:22, 307:23, 307:24, 308:4, 308:6, 308:10
**round** [4] - 303:10, 325:18, 325:20, 350:11
**routes** [1] - 246:15
**routine** [2] - 272:4, 342:19
**row** [1] - 381:10
**rowboat** [2] - 234:22, 241:13

**RPMS** [1] - 305:15
**RPMs** [8] - 305:17, 305:18, 305:25, 307:3, 307:6, 307:9, 307:16, 307:18
**rule** [8] - 319:23, 326:6, 334:15, 363:17, 371:25, 372:1, 372:3, 399:10
**ruled** [3] - 260:17, 275:18, 334:20
**Rules** [1] - 311:15
**rules** [5] - 269:23, 270:12, 314:9, 353:21, 399:24
**ruling** [13] - 242:5, 242:7, 242:12, 243:4, 243:10, 250:1, 257:24, 258:10, 258:13, 259:10, 259:22, 311:23, 399:15
**rulings** [1] - 243:2
**running** [1] - 303:19, 352:6, 384:1

## S

**S-P-E-C-T-O-R** [1] - 317:7
**safety** [14] - 231:8, 232:4, 232:5, 245:20, 246:14, 257:13, 279:18, 279:20, 319:13, 319:16, 320:7, 321:5, 321:6, 321:12
**safety-related** [2] - 321:5, 321:6
**Sail** [2] - 233:9, 235:10
**sailboat** [1] - 241:13
**sailing** [4] - 234:16, 247:5, 254:8, 317:23
**Sandy** [2] - 234:8, 234:9
**sat** [1] - 360:18
**saw** [7] - 250:19, 270:16, 276:23, 288:10, 290:10, 290:14, 327:15
**scene** [2] - 397:8, 397:12
**schedule** [3] - 294:14, 383:11, 393:17
**scheduled** [2] - 262:24, 393:25
**school** [2] - 231:6, 231:25
**schools** [1] - 231:5
**scientific** [3] - 240:9,

240:12, 240:14
**SCOGNAMILLO** [1] - 229:17
**scope** [6] - 291:8, 315:10, 393:4, 393:7, 393:8, 393:9
**Scott** [1] - 361:1
**screen** [8] - 304:19, 310:19, 310:22, 312:7, 312:13, 325:11, 333:3, 339:12
**scroll** [1] - 303:2
**sea** [15] - 234:7, 234:12, 246:8, 246:23, 248:8, 273:16, 281:23, 281:25, 283:5, 293:1, 293:2, 293:7, 293:9, 308:4, 380:23
**Sea** [70] - 237:15, 237:17, 237:19, 237:20, 237:21, 237:23, 238:4, 239:11, 239:13, 239:14, 239:15, 239:17, 241:13, 244:14, 244:18, 244:19, 245:8, 246:7, 247:6, 247:25, 248:23, 254:9, 266:25, 267:21, 279:1, 279:5, 279:9, 279:23, 283:13, 290:3, 290:7, 299:16, 309:7, 326:13, 330:6, 338:18, 338:20, 339:9, 344:22, 346:8, 350:3, 350:5, 350:8, 378:8, 378:10, 378:19, 379:11, 379:18, 379:24, 380:2, 380:11, 380:13, 380:20, 381:2, 381:14, 381:25, 382:14, 382:23, 382:25, 383:7, 384:1, 384:6, 388:8, 388:12, 392:16, 394:1, 394:2, 394:5, 395:5, 395:9
**seal** [1] - 275:10
**seamanship** [4] - 231:18, 231:22, 255:13, 315:22
**SEAN** [2] - 337:20, 403:2

**Sean** [2] - 281:4, 396:13
**seas** [11] - 241:20, 247:12, 266:18, 266:19, 283:3, 307:22, 307:23, 307:24, 308:3, 308:5, 308:10
**season** [1] - 393:18
**seat** [1] - 382:13
**seated** [12] - 246:24, 253:8, 254:4, 264:15, 307:22, 307:23, 307:25, 308:1, 308:11, 313:22, 314:2, 316:25
**seating** [5] - 381:6, 381:10, 381:13, 381:25, 382:11
**seats** [7] - 246:13, 254:6, 299:12, 347:6, 381:9, 382:9
**second** [7] - 232:16, 232:21, 327:19, 352:2, 352:6, 368:25, 381:7
**seconds** [1] - 375:4
**Section** [4] - 309:9, 310:14, 312:2, 312:11
**section** [6] - 310:6, 310:16, 311:10, 311:11, 312:4, 314:24
**secured** [1] - 254:5
**security** [1] - 396:1
**see** [37] - 249:14, 253:9, 253:24, 267:5, 269:23, 274:17, 274:21, 287:23, 288:6, 288:8, 290:17, 290:22, 291:2, 292:13, 296:8, 303:4, 310:15, 310:23, 312:13, 316:9, 316:10, 327:25, 331:2, 333:5, 339:12, 346:11, 347:1, 352:2, 355:1, 362:2, 363:2, 369:7, 379:2, 388:24, 389:24, 400:8, 401:11
**seek** [1] - 261:24
**Sees** [1] - 354:13
**send** [1] - 380:16
**sense** [1] - 299:15
**sent** [1] - 244:12

**sentence** [4] - 304:20, 316:7, 316:13, 364:2
**September** [1] - 294:22
**serve** [4] - 234:1, 319:11, 400:12
**served** [5] - 233:14, 279:9, 363:24, 370:25, 400:15
**service** [2] - 235:25, 400:15
**SERVICES** [1] - 229:7
**Services** [1] - 357:10
**set** [6] - 243:17, 361:14, 364:20, 364:21, 364:22, 364:23
**settle** [1] - 387:17
**seven** [4] - 329:14, 338:10, 394:4, 395:11
**seventh** [1] - 326:8
**several** [1] - 233:23
**shaking** [1] - 261:1
**sharply** [5] - 309:14, 310:13, 312:21, 316:8, 316:11
**Shelter** [1] - 247:19, 247:21, 248:10, 255:19, 273:17, 293:4
**ship** [18] - 231:6, 231:7, 234:6, 234:8, 234:12, 234:13, 234:14, 234:15, 234:16, 234:17, 242:17, 263:25, 264:9, 273:22, 294:9, 302:25, 317:22
**ship's** [2] - 323:16, 323:19
**ships** [3] - 231:11, 231:16, 231:17
**Shoals** [1] - 235:20
**short** [2] - 263:14, 316:22
**shortly** [3] - 251:17, 261:20, 354:17
**shot** [2] - 372:25, 373:5
**show** [21] - 266:23, 285:9, 290:5, 291:7, 310:3, 310:5, 310:15, 310:20, 310:24, 311:12, 311:17, 311:19, 348:19, 349:8, 368:2, 378:17, 379:2, 379:22,

381:12, 382:12, 384:4

**showed** [2] - 254:12, 311:16

**showing** [2] - 258:8

**sic** [1] - 303:23

**side** [26] - 243:25, 248:15, 270:1, 271:1, 286:13, 286:23, 298:6, 298:12, 298:17, 298:21, 298:23, 298:24, 299:1, 299:4, 299:12, 299:13, 306:25, 307:4, 314:15, 314:18, 314:19, 323:4, 327:21

**sidebar** [41] - 241:5, 241:7, 243:3, 249:1, 249:3, 250:3, 252:6, 253:4, 257:22, 259:5, 259:6, 259:25, 262:9, 262:10, 262:21, 268:7, 268:8, 269:8, 275:12, 275:13, 276:9, 309:20, 309:21, 311:2, 348:23, 348:24, 349:6, 355:15, 355:16, 356:25, 359:10, 359:11, 359:21, 362:3, 362:4, 363:11, 365:3, 365:9, 368:22, 389:2, 389:3

**Sidebar** [1] - 365:2

**sign** [1] - 313:7

**signature** [1] - 289:19

**simple** [1] - 400:6

**simply** [1] - 326:4

**simulations** [2] - 231:5, 231:6

**simulator** [1] - 232:3

**SISE** [2] - 376:8, 403:14

**Sise** [14] - 296:17, 296:19, 344:8, 354:14, 354:17, 354:20, 354:23, 356:6, 356:18, 356:22, 381:24, 386:14, 397:3

**sit** [10] - 232:9, 293:23, 323:1, 327:21, 336:13, 365:7, 372:2, 375:19, 392:1, 400:2

**sitting** [7] - 298:20,

298:21, 362:11, 363:13, 373:12, 381:7, 383:17

**situation** [3] - 307:25, 308:10, 363:25

**situations** [1] - 309:12

**sixth** [6] - 326:1, 326:8, 350:15, 350:20, 350:23, 351:5

**size** [1] - 232:19

**slam** [1] - 286:24

**slammed** [7] - 268:2, 271:2, 286:14, 323:18, 341:3, 343:3, 383:23

**slamming** [2] - 341:10, 365:6

**slender** [1] - 348:3

**slight** [3] - 283:18, 297:13, 298:1

**slip** [1] - 351:24

**slow** [5] - 251:12, 251:15, 285:20, 304:21, 305:1

**slowed** [1] - 286:1

**slower** [2] - 251:23, 395:15

**slowing** [1] - 285:18

**slowly** [3] - 315:13, 315:16, 315:24

**small** [1] - 373:6

**smallest** [1] - 234:21

**snip** [3] - 372:24, 372:25, 373:5

**snipping** [3] - 372:14, 372:15, 372:20

**Society** [1] - 235:17

**Solar** [1] - 266:3

**some-odd** [1] - 235:22

**someone** [11] - 289:1, 295:17, 299:3, 299:11, 342:15, 342:16, 347:4, 351:23, 391:22, 391:23, 392:2

**sometimes** [1] - 374:5

**somewhere** [2] - 233:4, 248:7

**soon** [2] - 284:1, 286:1

**sorry** [18] - 240:1, 245:23, 259:11, 295:18, 296:5, 296:10, 296:12, 298:25, 307:20, 309:10, 311:21, 336:25, 351:20, 352:23, 353:23, 354:15, 393:11,

398:6

**Sorry** [1] - 296:20

**sort** [2] - 243:8, 324:5

**Sound** [45] - 246:8, 247:5, 247:19, 247:21, 248:1, 248:8, 248:13, 266:6, 266:12, 273:17, 278:6, 278:10, 278:12, 278:14, 296:18, 299:22, 300:7, 300:25, 301:2, 317:17, 317:19, 318:2, 326:10, 326:18, 326:25, 327:9, 332:14, 332:18, 334:8, 335:5, 335:18, 338:2, 338:5, 338:15, 345:2, 345:19, 345:23, 346:1, 376:14, 376:22, 377:17, 378:2, 378:10, 384:2, 388:6

**SOUND** [1] - 229:7

**Sound's** [1] - 377:25

**spaces** [1] - 325:23

**Speaking** [1] - 258:24

**speaking** [3] - 353:22, 370:15, 374:14

**specific** [10] - 244:25, 245:2, 257:11, 257:13, 273:18, 311:9, 311:10, 327:12, 336:13, 343:17

**specifically** [1] - 309:9

**specs** [2] - 239:4, 389:23

**Specter** [1] - 280:23

**Spector** [2] - 302:4, 317:6

**SPECTOR** [2] - 317:1, 402:18

**spector** [2] - 317:16, 324:20

**speculating** [1] - 241:21

**speculation** [1] - 241:22

**speed** [20] - 251:17, 261:20, 285:20, 301:14, 301:17, 305:1, 311:5, 312:16, 315:2, 315:14, 315:16, 315:24, 316:12, 316:15, 389:9,

390:19, 390:21, 390:22, 390:23

**speeds** [4] - 251:12, 251:16, 251:23, 304:21

**spell** [2] - 317:4, 392:10

**spoken** [2] - 273:4, 322:19

**spot** [1] - 323:1

**spots** [1] - 325:13

**St** [1] - 360:7

**stairs** [1] - 352:6

**stand** [6] - 264:16, 308:13, 308:17, 323:25, 348:8, 364:24

**standard** [2] - 272:7, 285:3

**standards** [1] - 235:2

**starboard** [2] - 307:4, 314:18

**start** [3] - 263:16, 306:12, 399:4

**started** [3] - 235:21, 266:13, 283:6

**starting** [1] - 254:20

**starts** [1] - 329:12

**statement** [1] - 308:3

**States** [10] - 230:17, 231:1, 231:3, 231:21, 318:5, 345:21, 377:2, 380:10, 380:11, 380:16

**STATES** [2] - 229:1, 229:10

**states** [2] - 250:14, 272:19

**stating** [2] - 385:14, 385:21

**stationed** [1] - 323:6

**stay** [1] - 360:25

**STCW** [1] - 235:2

**steam** [1] - 266:19

**stenography** [1] - 229:25

**Step** [1] - 242:4

**step** [8] - 277:18, 316:19, 316:21, 337:16, 345:7, 355:12, 376:3, 398:15

**Stevens** [2] - 264:4, 264:5

**stick** [1] - 243:10

**still** [14] - 233:13, 246:21, 259:12, 297:2, 297:13, 297:17, 298:2,

299:22, 326:18, 328:16, 329:23, 334:8, 392:12, 393:9

**stop** [5] - 239:19, 261:1, 286:1, 305:3, 307:2

**stopped** [4] - 250:15, 252:1, 305:7, 315:4

**stored** [1] - 373:22

**Street** [1] - 229:15

**strike** [1] - 323:24

**stuck** [3] - 274:21, 274:23, 274:25

**Subchapter** [1] - 380:14

**subject** [5] - 262:24, 263:6, 263:17, 264:9, 371:5

**submission** [1] - 246:1

**submit** [1] - 387:15

**submitted** [1] - 360:5

**subpoena** [8] - 263:4, 363:4, 363:24, 371:1, 371:8, 400:13, 400:22, 400:23

**subpoenaed** [9] - 362:5, 362:6, 362:8, 362:20, 362:25, 363:15, 398:20, 401:2, 401:6

**subpoenaing** [2] - 364:8, 364:10

**subpoenas** [1] - 363:17

**subsequently** [1] - 271:10

**substance** [1] - 267:25

**sudden** [4] - 239:23, 252:19, 254:19, 271:13

**suddenly** [8] - 240:10, 268:1, 270:21, 271:5, 286:12, 286:18, 287:1, 383:22

**suffered** [1] - 289:16

**sufficient** [4] - 252:25, 255:9, 257:18, 260:15

**Suite** [1] - 229:13

**sum** [1] - 267:25

**summation** [2] - 388:1, 392:4

**summer** [2] - 377:23, 393:21

**Sunday** [2] - 288:6, 288:9

**supervise** [2] - 318:20, 318:22
**supervised** [1] - 320:20
**supervises** [1] - 318:22
**supervising** [1] - 318:17
**supervisor** [1] - 358:7
**suppose** [1] - 325:9
**supposed** [8] - 259:23, 269:24, 313:14, 321:6, 325:3, 325:7, 339:3, 363:14
**surveillance** [40] - 355:24, 356:15, 357:12, 357:14, 357:17, 357:20, 357:23, 358:1, 358:4, 358:11, 358:15, 358:18, 358:20, 358:23, 359:1, 359:4, 359:13, 361:4, 366:4, 366:6, 367:6, 367:14, 367:16, 369:12, 369:16, 369:19, 369:22, 369:25, 370:4, 370:10, 370:18, 373:16, 373:23, 374:6, 374:7, 374:10, 374:22, 375:2, 375:24, 398:20
**surveilled** [1] - 361:21
**survey** [1] - 380:23
**suspicious** [1] - 247:3
**sustained** [45] - 252:21, 253:3, 254:16, 254:22, 255:1, 255:11, 255:21, 256:11, 256:17, 256:21, 257:2, 257:20, 258:6, 259:3, 260:23, 269:7, 269:22, 283:21, 290:16, 296:2, 300:2, 300:4, 301:6, 309:16, 315:19, 326:22, 335:7, 336:11, 337:5, 345:4, 370:23, 371:11, 372:22, 373:25, 378:5, 387:1, 387:7, 387:24, 388:3, 392:3, 394:15,

397:18, 397:25, 398:3, 398:13
**Sustained** [1] - 334:12
**swells** [1] - 273:21
**sworn** [3] - 250:9, 317:2, 376:9
**sworn/affirmed** [7] - 230:9, 265:19, 277:24, 332:9, 337:22, 345:13, 357:4
**system** [14] - 234:7, 238:10, 238:13, 238:16, 240:4, 246:20, 264:10, 269:11, 269:13, 277:7, 281:20, 314:5, 314:6, 391:1

## T

**tables** [1] - 382:11
**tail** [2] - 391:7, 391:13
**talks** [1] - 310:13
**tall** [1] - 348:9
**tankers** [1] - 231:16
**tape** [2] - 374:6, 374:19
**tape-recording** [1] - 374:6
**tapes** [1] - 356:2
**task** [5] - 357:16, 357:19, 357:22, 357:25, 358:3
**taught** [4] - 231:18, 231:21, 231:22, 232:2
**teamsters** [1] - 335:15
**Teamsters** [1] - 335:16
**technical** [3] - 240:3, 268:22, 353:15
**ten** [9] - 233:2, 259:16, 261:11, 286:9, 304:17, 317:24, 338:6, 375:14, 399:5
**ten-minute** [1] - 304:17
**term** [7] - 244:22, 245:2, 245:3, 250:17, 250:19, 316:14
**termed** [1] - 372:24
**terminated** [1] - 300:22
**terms** [1] - 397:11
**testified** [28] - 230:9, 236:4, 236:7, 236:10, 236:13, 236:15, 237:4,

237:25, 249:7, 261:14, 261:18, 265:19, 277:24, 280:8, 283:13, 286:10, 317:3, 332:9, 336:2, 337:22, 345:13, 347:19, 347:23, 357:4, 376:10, 382:25, 384:14, 388:11
**testifies** [1] - 269:23
**testify** [13] - 239:22, 242:8, 242:9, 243:5, 250:5, 258:14, 264:23, 270:8, 270:15, 355:25, 356:1, 361:18, 383:19
**testifying** [6] - 242:2, 242:16, 243:22, 269:25, 306:10, 391:15
**testimony** [27] - 240:16, 240:18, 240:20, 240:22, 240:24, 241:20, 243:6, 245:6, 250:9, 251:22, 251:25, 252:2, 252:10, 252:15, 258:16, 258:17, 258:20, 267:23, 290:14, 301:8, 360:19, 383:18, 394:21, 394:23, 396:5, 396:12, 400:25
**text** [1] - 233:18
**th** [1] - 340:4
**THE** [320] - 229:10, 230:3, 230:20, 236:21, 237:9, 237:11, 240:20, 240:22, 240:24, 240:25, 241:6, 241:15, 241:23, 241:25, 242:4, 242:7, 242:12, 242:14, 242:22, 243:1, 243:4, 243:12, 245:22, 245:24, 246:2, 246:5, 249:2, 249:4, 249:12, 249:16, 249:20, 249:23, 250:2, 251:3, 251:5, 252:7, 252:21, 253:3, 253:6, 253:11, 253:20, 254:16, 254:22,

255:1, 255:4, 255:11, 255:14, 255:21, 256:1, 256:11, 256:17, 256:21, 257:2, 257:10, 257:20, 257:23, 257:25, 258:6, 258:13, 258:22, 259:3, 259:5, 259:7, 259:11, 259:16, 259:20, 260:11, 260:17, 260:21, 261:1, 262:6, 262:9, 262:11, 262:14, 262:20, 262:22, 263:2, 263:6, 263:10, 263:14, 263:16, 263:22, 264:15, 265:1, 265:5, 265:7, 265:11, 265:14, 267:10, 267:15, 268:16, 268:20, 268:25, 269:3, 269:7, 269:20, 269:22, 272:11, 274:10, 275:12, 275:14, 275:18, 275:23, 276:2, 276:8, 277:13, 277:18, 277:20, 280:14, 280:16, 280:19, 282:9, 282:12, 282:16, 282:18, 282:21, 283:21, 285:23, 286:20, 288:21, 289:4, 290:16, 290:18, 290:19, 290:21, 290:22, 290:24, 291:9, 291:18, 291:21, 291:23, 291:25, 293:15, 293:20, 294:12, 294:22, 294:25, 295:2, 296:2, 296:8, 297:19, 298:8, 298:23, 298:25, 299:8, 300:2, 300:4, 300:9, 300:15, 300:19, 301:3, 301:6, 301:16, 301:19, 305:17, 305:18, 305:19, 305:20, 305:21, 305:22, 305:23, 309:16, 309:20, 309:22, 309:24, 310:2, 310:5,

310:10, 310:15, 310:20, 310:24, 311:6, 311:9, 311:20, 311:22, 312:8, 313:7, 314:8, 314:20, 315:12, 315:19, 316:3, 316:19, 316:21, 316:25, 317:4, 317:6, 317:8, 317:11, 323:25, 326:22, 327:5, 330:23, 334:12, 334:16, 334:19, 335:2, 335:7, 336:11, 337:5, 337:16, 337:18, 342:23, 343:23, 345:4, 345:7, 345:9, 348:14, 348:16, 349:5, 349:15, 349:18, 353:3, 353:19, 353:21, 353:24, 354:2, 355:12, 355:14, 355:20, 355:22, 355:25, 356:3, 356:5, 356:7, 356:10, 356:14, 356:16, 356:19, 356:21, 356:24, 359:9, 359:19, 359:24, 360:1, 361:16, 362:3, 362:5, 362:8, 362:11, 362:18, 362:25, 363:5, 363:8, 363:10, 363:12, 364:8, 364:12, 364:14, 364:21, 364:23, 365:2, 365:4, 367:24, 368:23, 369:6, 370:6, 370:23, 371:11, 371:20, 371:23, 372:1, 372:6, 372:18, 372:22, 373:9, 373:25, 375:17, 376:3, 378:5, 378:24, 379:15, 380:7, 381:17, 381:21, 382:6, 382:19, 384:11, 387:1, 387:5, 387:7, 387:10, 387:15, 387:24, 388:3, 388:16, 389:2, 389:5, 390:11, 390:15, 392:3,

392:25, 393:2, 393:6, 394:15, 394:18, 395:1, 395:18, 397:18, 397:25, 398:3, 398:7, 398:10, 398:13, 398:15, 398:18, 398:21, 398:23, 398:25, 399:2, 399:6, 399:9, 399:16, 399:22, 400:1, 400:12, 400:17, 400:21, 401:1, 401:8

**themselves** [2] - 382:9, 396:2
**therefore** [3] - 258:14, 264:19, 359:16
**thinks** [1] - 334:23
**third** [4] - 252:3, 252:11, 253:15, 326:13
**Third** [2] - 229:15, 231:1
**THOMAS** [2] - 277:22, 402:12
**Thomas** [9] - 244:13, 245:7, 249:19, 250:6, 250:9, 250:14, 250:22, 278:4, 292:5
**Thomas'** [2] - 248:16, 249:7
**three** [21] - 240:7, 249:9, 252:12, 261:11, 274:1, 279:10, 281:2, 295:23, 296:16, 304:16, 319:5, 319:7, 320:23, 326:3, 334:19, 334:20, 352:20, 381:5, 383:8, 383:11, 398:18
**throughout** [2] - 246:16, 358:10
**thumb** [1] - 319:23, 326:7
**Thursday** [2] - 368:4, 371:15
**tilt** [7] - 241:18, 255:19, 255:24, 256:5, 256:9, 256:15, 256:25
**tilting** [1] - 252:19
**tipped** [1] - 271:1
**title** [1] - 358:6
**today** [17] - 232:9, 233:13, 243:21, 250:5, 273:4, 273:7,

293:23, 306:10, 336:14, 349:3, 361:19, 363:9, 391:10, 392:1, 396:13, 398:17, 401:6
**together** [1] - 372:15
**tomorrow** [13] - 262:24, 263:3, 263:17, 356:11, 356:12, 371:9, 398:18, 398:25, 399:3, 399:5, 399:7, 399:10, 401:11
**tonnage** [1] - 266:17
**tons** [1] - 379:21
**took** [6] - 268:1, 286:12, 292:22, 371:16, 373:17, 386:16
**top** [4] - 259:21, 301:24, 309:4, 328:18
**total** [1] - 370:9
**totally** [1] - 311:5
**touch** [1] - 377:25
**towards** [1] - 234:13
**trade** [1] - 232:17
**train** [2] - 232:6, 232:7
**training** [4] - 231:5, 235:2, 252:24, 255:8
**transcript** [1] - 229:25
**TRANSCRIPT** [1] - 229:9
**transferred** [1] - 330:6
**transferring** [1] - 369:4
**transmission** [1] - 238:20
**transmittal** [1] - 369:1
**transmitting** [1] - 282:24
**transportation** [3] - 230:25, 348:19, 349:8
**travel** [1] - 395:6
**traveling** [2] - 246:20, 250:11
**TRIAL** [1] - 229:9
**trial** [5] - 349:2, 360:16, 365:5, 372:12, 401:13
**trials** [1] - 380:23
**tried** [2] - 249:8, 363:16
**trip** [98] - 245:7, 246:9, 247:2, 247:6, 247:13, 267:20, 276:12, 280:4, 280:9, 281:5,

281:24, 283:16, 287:7, 287:13, 287:17, 287:18, 287:23, 288:1, 288:4, 288:13, 289:9, 289:17, 292:22, 293:19, 293:25, 294:2, 294:3, 294:4, 294:16, 295:25, 304:8, 304:11, 304:12, 307:22, 319:14, 320:13, 320:21, 321:13, 321:16, 322:7, 322:15, 323:11, 325:1, 325:16, 325:17, 326:1, 326:14, 327:13, 327:23, 329:2, 329:5, 329:7, 329:8, 329:9, 329:10, 329:12, 329:16, 332:24, 333:9, 333:21, 336:14, 336:18, 336:20, 337:8, 337:10, 339:16, 339:19, 340:1, 340:5, 340:7, 340:25, 342:1, 342:21, 343:6, 343:17, 343:18, 344:18, 350:15, 350:19, 350:20, 350:23, 351:5, 351:24, 352:17, 352:21, 382:22, 383:3, 383:5, 384:20, 384:24, 385:6, 385:10, 387:23, 394:5, 395:9, 397:15
**trips** [11] - 302:25, 303:8, 303:10, 325:13, 325:18, 325:20, 325:21, 350:11, 350:17
**true** [6] - 234:15, 297:5, 361:7, 361:21, 362:22, 391:3
**try** [3] - 300:19, 363:4, 399:14
**trying** [1] - 258:11
**tug** [3] - 231:13, 234:14, 234:17
**Turacamo** [1] - 233:24
**Turbines** [1] - 266:3
**turn** [4] - 270:4, 370:16, 374:15,

386:9
**turned** [3] - 349:1, 368:25
**Tursi** [1] - 229:19
**two** [20] - 232:15, 234:7, 237:4, 263:13, 264:3, 264:24, 286:6, 286:8, 294:10, 296:16, 302:13, 305:8, 330:25, 355:17, 355:18, 356:16, 356:19, 375:4, 381:12, 398:25
**two-pilot** [1] - 234:7
**Twombly** [2] - 263:24, 264:8
**type** [29] - 232:12, 233:5, 238:5, 238:18, 244:18, 257:5, 272:4, 279:23, 280:2, 289:16, 300:21, 301:11, 320:3, 327:8, 330:7, 333:8, 335:20, 335:23, 337:10, 339:20, 346:20, 346:24, 354:23, 370:3, 381:2, 382:11, 394:19, 395:8, 395:12
**types** [1] - 278:14
**typical** [3] - 383:3, 383:5, 383:6
**typically** [1] - 234:6

## U

**under** [3] - 255:9, 380:14, 391:22
**unexpected** [2] - 246:22, 283:3
**unfamiliar** [1] - 239:10
**Unidentified** [4] - 267:16, 403:20, 403:22, 403:23
**union** [11] - 300:6, 300:10, 326:24, 335:10, 335:11, 335:14, 335:17, 335:20, 344:21, 344:23, 355:4
**United** [10] - 230:17, 231:1, 231:2, 231:21, 318:5, 345:21, 377:2, 380:10, 380:11, 380:16
**UNITED** [2] - 229:1,

229:10
**unless** [6] - 246:24, 307:22, 307:23, 307:24, 311:15, 387:16
**unlicensed** [1] - 383:12
**unlimited** [2] - 234:25, 266:17
**Unlimited** [1] - 231:1
**unresponsive** [1] - 323:24
**unusual** [17] - 254:19, 270:24, 272:25, 287:21, 288:3, 301:12, 319:18, 321:15, 321:20, 321:24, 322:17, 323:22, 324:13, 339:2, 339:20, 346:15, 346:17
**unusually** [1] - 271:5
**up** [42] - 241:16, 244:16, 251:16, 254:20, 261:19, 268:2, 271:1, 274:20, 275:9, 275:15, 275:23, 276:4, 278:17, 281:11, 286:13, 286:23, 289:18, 294:18, 298:6, 298:13, 304:19, 308:22, 309:4, 311:22, 315:14, 315:16, 315:24, 323:17, 325:12, 341:2, 341:9, 348:8, 352:6, 354:23, 364:23, 372:14, 373:6, 375:17, 379:23, 381:17, 383:23, 386:10
**upper** [4] - 246:13, 298:21, 323:4, 327:18
**upset** [1] - 387:16
**upwards** [1] - 377:24
**US** [5] - 229:5, 229:20, 231:23, 234:24, 244:15
**uses** [1] - 394:7

## V

**variety** [2] - 233:8, 233:19
**various** [1] - 317:25
**veer** [5] - 309:14, 310:13, 312:21, 316:8, 316:11

**vehemently** [1] - 264:17
**verbally** [1] - 313:22
**verbatim** [1] - 305:13
**vessel** [138] - 231:15, 231:22, 231:25, 232:3, 232:20, 232:21, 234:3, 234:5, 234:9, 234:18, 234:21, 238:6, 238:16, 238:20, 238:22, 238:24, 239:9, 239:17, 239:19, 239:22, 240:9, 241:12, 242:3, 244:16, 244:18, 246:16, 246:19, 246:21, 250:15, 251:25, 254:5, 254:20, 256:24, 257:5, 257:6, 257:9, 257:11, 257:13, 258:3, 261:19, 267:24, 268:1, 268:3, 268:23, 269:16, 269:19, 270:20, 270:23, 271:1, 271:5, 271:13, 272:22, 273:1, 276:13, 277:9, 277:11, 279:15, 279:21, 279:23, 281:5, 281:7, 286:1, 286:11, 286:13, 286:17, 287:1, 288:3, 288:17, 291:12, 292:10, 292:12, 292:13, 292:17, 292:25, 294:16, 295:14, 295:16, 295:19, 297:3, 299:20, 301:11, 301:14, 303:1, 305:3, 308:13, 308:25, 309:12, 309:13, 309:14, 310:13, 311:4, 312:20, 314:4, 314:16, 314:19, 315:2, 315:8, 315:13, 315:23, 316:8, 316:11, 318:15, 321:4, 321:5, 323:4, 323:17, 323:20, 324:4, 324:9, 324:12, 329:18, 333:9, 341:2, 341:9, 346:17, 377:2,

378:7, 380:17, 380:23, 381:3, 381:11, 383:22, 384:4, 384:17, 385:15, 385:23, 386:2, 389:9, 389:18, 389:20, 389:24, 390:16, 391:16, 395:12, 395:21
**vessel's** [4] - 239:4, 240:3, 241:2, 286:23
**vessels** [18] - 231:12, 231:14, 232:12, 232:19, 235:6, 247:25, 256:19, 266:19, 278:13, 278:14, 278:16, 278:19, 279:12, 312:14, 330:14, 377:6, 377:9, 395:15
**veteran** [1] - 345:21
**vibration** [13] - 248:24, 250:15, 251:9, 251:13, 283:18, 283:25, 284:2, 285:17, 297:2, 297:13, 298:1, 306:18, 307:5
**vibrations** [2] - 297:17, 297:24
**vicinity** [1] - 323:8
**video** [21] - 359:17, 359:18, 359:23, 360:3, 361:5, 367:16, 369:10, 369:12, 369:16, 369:19, 369:22, 369:25, 371:14, 371:18, 372:9, 372:11, 372:13, 373:6, 373:11, 373:14, 375:3
**videos** [6] - 359:4, 362:7, 362:15, 368:24, 369:4, 371:13
**videotape** [4] - 374:17, 374:21, 375:6, 375:7
**videotapes** [2] - 369:1, 374:10
**voir** [5] - 236:20, 236:21, 236:22, 239:25, 241:9
**VOIR** [2] - 237:1, 402:5
**voyage** [22] - 272:14, 272:23, 273:1, 274:8, 274:12,

276:7, 280:11, 283:6, 283:9, 284:13, 301:9, 301:22, 302:21, 303:22, 303:23, 315:8, 319:5, 319:19, 333:7, 346:21, 383:14, 385:8

# W

**wait** [1] - 241:23
**waiting** [1] - 267:10
**walk** [1] - 308:22
**walking** [2] - 291:7, 360:6
**Walsh** [5] - 281:4, 302:11, 328:25, 338:2, 341:18
**WALSH** [1] - 337:20, 403:2
**War** [1] - 232:2
**warning** [1] - 275:18
**watch** [30] - 235:3, 302:16, 302:19, 302:22, 303:12, 303:13, 303:16, 303:17, 304:2, 304:8, 304:9, 304:11, 304:15, 325:4, 325:23, 326:7, 327:24, 329:3, 336:17, 336:21, 341:24, 342:18, 350:23, 351:4, 351:14, 351:16, 351:18, 351:22, 352:17, 364:24
**watching** [1] - 339:4
**water** [29] - 238:9, 247:15, 247:16, 248:14, 248:17, 251:10, 255:18, 268:2, 275:9, 275:10, 275:11, 277:1, 277:2, 280:3, 283:13, 286:13, 286:24, 306:20, 306:22, 306:23, 317:24, 323:17, 323:21, 324:4, 341:2, 341:10, 381:3, 383:23
**Water** [1] - 238:12
**waters** [3] - 247:20, 248:20, 278:20
**wear** [2] - 343:15, 348:4
**wearing** [1] - 348:3

**weather** [9] - 241:20, 244:16, 248:2, 248:5, 248:6, 255:23, 256:4, 273:19, 394:6
**website** [4] - 388:6, 388:8, 388:21, 389:11
**week** [8] - 302:24, 354:19, 354:20, 354:21, 354:22, 368:4, 371:15, 393:22
**weekdays** [1] - 393:24
**weekends** [1] - 393:22
**weeks** [1] - 294:10
**weigh** [1] - 379:20
**Welcome** [2] - 246:7, 254:2
**welcome** [1] - 281:18
**WEXLER** [1] - 229:10
**whale** [2] - 256:8, 256:11
**whatsoever** [1] - 258:15, 340:1
**wheel** [4] - 277:5, 323:5, 323:7, 324:7
**wheelhouse** [1] - 264:10
**whichever** [1] - 307:5
**whoa** [1] - 354:4
**whole** [2] - 309:25, 360:18
**wide** [2] - 312:15, 379:19
**WILL** [211] - 229:15, 229:16, 236:19, 237:2, 237:10, 237:12, 240:1, 240:2, 240:8, 241:1, 241:21, 242:1, 248:25, 249:11, 252:5, 252:20, 253:2, 254:15, 254:21, 255:10, 255:20, 255:25, 256:10, 256:16, 257:1, 257:7, 257:19, 258:5, 258:24, 261:7, 261:8, 261:9, 262:4, 262:16, 263:9, 263:12, 263:15, 265:2, 265:6, 265:9, 265:23, 267:6, 267:17, 268:13, 268:22, 269:2, 269:9, 269:19, 269:21, 270:18, 272:12, 273:10,

274:9, 276:1, 276:6, 277:12, 277:17, 278:3, 280:15, 280:18, 280:20, 282:1, 282:2, 282:7, 282:11, 282:13, 282:20, 282:23, 282:25, 283:22, 285:2, 285:24, 286:22, 288:24, 289:6, 291:1, 291:11, 291:15, 291:20, 293:14, 294:11, 296:7, 297:18, 298:7, 299:6, 300:1, 300:8, 300:14, 301:5, 309:15, 309:19, 310:7, 311:1, 311:3, 314:10, 314:13, 314:22, 315:15, 315:20, 315:25, 316:20, 317:10, 317:12, 317:15, 324:1, 324:16, 326:16, 326:21, 327:4, 330:22, 332:13, 333:24, 334:11, 335:6, 336:10, 337:15, 338:1, 341:13, 342:22, 343:10, 343:22, 345:3, 345:6, 345:17, 348:18, 349:3, 349:7, 349:12, 349:17, 349:20, 353:2, 353:14, 353:23, 355:11, 355:17, 355:21, 355:23, 356:1, 356:4, 356:6, 356:8, 356:11, 356:15, 356:18, 356:22, 357:8, 359:22, 360:2, 360:9, 362:15, 368:22, 368:24, 370:5, 371:3, 371:5, 371:7, 371:10, 372:17, 373:4, 373:10, 374:1, 375:12, 375:20, 376:1, 376:13, 378:6, 378:20, 379:1, 379:6, 379:8, 379:12, 379:17, 380:4, 380:9, 381:18, 381:23, 382:3, 382:8, 382:16, 382:21,

384:8, 384:13, 386:8, 386:25, 388:15, 389:1, 390:10, 392:24, 393:1, 393:4, 395:17, 397:2, 397:17, 397:19, 398:17, 399:1, 401:3, 402:5, 402:7, 402:10, 402:13, 402:16, 402:19, 402:22, 403:3, 403:6, 403:9, 403:11, 403:13, 403:15, 403:17

**William** [1] - 230:5
**WILLIAM** [2] - 230:7, 402:3
**wills** [1] - 374:5
**wind** [1] - 248:12
**winds** [1] - 248:6
**winter** [1] - 393:20
**withdraw** [2] - 325:17, 354:12
**withdrawn** [4] - 234:3, 248:21, 342:5, 395:8
**witness** [50] - 230:3, 235:24, 236:4, 236:11, 262:22, 263:11, 263:24, 264:21, 265:14, 268:10, 268:11, 268:15, 268:17, 270:3, 277:19, 277:20, 311:4, 311:18, 316:25, 317:2, 330:23, 334:23, 337:17, 337:18, 345:8, 345:9, 355:13, 355:14, 356:5, 360:21, 361:2, 362:5, 362:14, 362:19, 362:21, 362:23, 363:13, 363:15, 363:18, 363:22, 363:23, 364:14, 367:23, 371:20, 371:23, 376:4, 376:5, 376:9, 390:4, 401:1
**WITNESS** [11] - 240:22, 240:25, 290:18, 290:21, 290:24, 298:25, 305:18, 305:20, 305:22, 317:6, 390:15
**witnesses** [13] - 236:1, 248:19,

262:17, 262:18, 263:2, 263:12, 336:7, 355:17, 355:19, 360:24, 398:16, 398:17, 398:25
**word** [3] - 282:18, 282:21, 372:20
**words** [2] - 316:7, 342:21
**wore** [1] - 337:4
**worker** [2] - 348:19, 349:8
**works** [2] - 350:3, 353:10
**world** [1] - 401:10
**worn** [1] - 348:6
**wow** [2] - 365:1, 365:2
**write** [3] - 326:6, 352:12, 354:23
**writing** [1] - 264:7
**written** [8] - 270:1, 300:12, 300:21, 327:2, 327:8, 355:7, 364:11, 399:16
**Wronoski** [1] - 377:19

## Y

**yacht** [1] - 235:17
**year** [5] - 299:25, 306:6, 335:5, 341:21, 349:25
**yearly** [1] - 334:10
**years** [18] - 232:8, 232:10, 232:11, 233:2, 233:12, 234:1, 235:22, 236:10, 236:12, 244:6, 256:20, 279:10, 293:25, 317:21, 326:12, 338:6, 338:10, 345:24
**YORK** [1] - 229:1
**York** [12] - 229:13, 229:16, 229:21, 231:12, 231:16, 232:18, 233:7, 233:24, 234:7, 235:9, 235:16, 235:17
**yourself** [4] - 246:17, 312:3, 361:13

## Z

**zero** [1] - 305:19