591

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X
                          :
HEATHER GIBSON and
JONATHAN GIBSON,                  08-CV-474
                          :
              Plaintiffs,

                                  US Courthouse
        -against-        :        Central Islip, NY

CROSS SOUND FERRY SERVICES,       date
                                  Time ^ a.m. ^ p.m.

              Defendant. :
- - - - - - - - - - - - - X

        TRANSCRIPT OF TRIAL
        BEFORE THE HONORABLE LEONARD D. WEXLER
        UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff:    CELLINO & BARNES
                      600 Old Country Road, Suite 500
                      Garden City, New York 11530-2045
                      BY:  GEORGE R. GRIDELLI, ESQ.


For the Defendant:    BADIAK & WILL LLP
                      106 Third Street
                      Mineola, New York 11501-4404
                      BY:  ALFRED J. WILL, ESQ.
                           LISA ANN SCOGNAMILLO, ESQ.



Court Reporter:       Dominick M. Tursi, CM, CSR
                      ^ Ellen Combs, CSR
                      US District Courthouse
                      1180 Federal Plaza
                      Central Islip, New York 11722
                      (631) 712-6108 Fax:  712-6124
                      DomTursi@email.com



        Proceedings recorded by mechanical stenography.
        Transcript produced by computer.

592

1          (The following ensued outside the jury at 9:30

2     am.)

3          MR. GRIDELLI:  Good morning, your Honor.

4          I'm making a request that, instead of 25

5     minutes, you give me 30 minutes.  And the reason being is

6     that I know it is a short number of days but we have had

7     14 witnesses.

8          THE COURT:  Denied.

9          MR. GRIDELLI:  Thank you.

10          (Recess take.)

11          (The following ensued in the presence of the

12     jury at 9:40 am.)

13          THE COURT:  Be seated.

14          As I said yesterday, what we will do now is have

15     the summations by the lawyers.  I put time limits on them

16     and I will tell them when they have five minutes left.

17          But remember, what lawyers say is not evidence.

18     It is only what the witnesses have said and the documents.

19     Listen to the lawyers, though.  They may be able to put it

20     all together for you.  But what they say is not evidence.

21          One of the jurors asked can we take notes.  You

22     can but I don't think you need them.  I see you don't have

23     a pad or a pencil.

24          A JUJROR:  I decided against it.

25          THE COURT:  Good.  Pay attention.

1    If you did take notes, I would tell you the

2    notes are only for you.  You cannot reveal it to the

3    others because it is your interpretation of what is said.

4    That is why we have a court reporter.

5    With that we will start the opening statements.

6    Again, what lawyers say is not evidence.  Plaintiff goes

7    first, defendant goes second, and plaintiff gets a short

8    rebuttal.

9    Plaintiff.

10    MR. GRIDELLI:  Thank you, your Honor.

11    SUMMATION FOR PLAINTIFF

12

13    MR. GRIDELLI:  Judge Wexler, Mr. Will,

14    Ms. Scognamillo, Heather and Jonathan Gibson, ladies and

15    gentlemen of the jury.

16    I would like to say first thank you very much

17    for your time, your attention, your dedication to your

18    responsibilities as jurors.

19    As you know, during the trial I wasn't allowed

20    to greet you, acknowledge you, have any conversation with

21    you.  And that is because those are the rules of the

22    court.  I just don't want you to think that I'm a snob or

23    I am rude.  I put my head down if I saw you in the hallway

24    and walked right by you.

25    So I apologize for that.  That is the one of the

1    rules of the court, and I'm sure Judge Wexler would have

2    hoped I listened to his other rules about speaking

3    objections as well as I did about not interacting with the

4    jurors.

5           We have a limited time to do these opening

6    remarks.  I'm going to use my notes extensively because I

7    am compressed.  Normally I like to do more of a

8    conversation type of closing but I can't and I will deal

9    with it as best I can.

10          At the end of the case, if you want to, you can

11   talk to any of the lawyers.  I love to talk to jurors

12   regardless of verdicts because that is how I learn.  I get

13   feedback and usually I hope it makes me a better lawyer.

14   Now I would like to talk about the case.

15          Number one, did the vessel list or tilt?  This

16   is not a case where you have to prove anything beyond a

17   reasonable doubt.  The judge told you at the beginning it

18   is a fair preponderance of the evidence.  And I ask jurors

19   when we have that type of situation to consider it this

20   way.  Think of the scales of justice.  On any issue that

21   is in contention, put the evidence that is favorable to me

22   on one side and the evidence that is favorable to the

23   defendant on the other side.  If it tips to any degree in

24   my favor, that is a fair preponderance of the credible

25   evidence.  To any degree.  If it tips to the defendant,

595

1   then I haven't proven my point on that issue.  Or actually

2   even if I can't prove it, either.  But if it tips to any

3   degree, then I have proven that point.

4           Let's talk about what the defendant can say

5   about the fact that the vessel did not tip.  He brought in

6   the three crew members:  The engineer, the captain, and

7   Mr. Scott.  And they all said nothing happened that night.

8           Now, you probably heard about the term the *Blue*

9   *Wall of Silence*.  There is a theory that police officers

10  will never testify against each other or never testify and

11  say anything that could hurt another police officer.  I

12  don't know if that is true in the seamen industry, in the

13  marine industry, but you know they all came in and they

14  said it didn't happen.

15          I wanted to ask them about:  *Well, I know you*

16  *are still employed.  I guess all but one are still*

17  *employed.  What do you earn?*  Because I think it would be

18  important to know.  If they are making minimum wage, they

19  probably don't have any loyalty to their employer.  But if

20  they are making 50, 100, 300, whatever, that might be some

21  motive for them to maybe side on the favor of the

22  defendant.  But we asked those questions; Mr. Will

23  objected.

24          You had Mr. Scott, the defendant's expert.  He

25  testified that he went out on that boat -- on that vessel;

596

1  I think it is called a boat.  I'm learning -- and he tried

2  to steer it in such a way that it would recreate what the

3  plaintiff said occurred.  But he made it completely

4  different.  He didn't do it when there was a clog in one

5  of the ports.  Right?  Use your common sense.  It is not

6  the same type of test.

7          Remember, I asked him did you put line in there?

8  Because that is what was found.  It was so bad for the Sea

9  Jet that night that it couldn't make the return trip.  It

10  went out down the river and went back to New London.  They

11  had to change ships.  She had to go back on a different,

12  slow ferry if you will.

13          So Mr. Scott says:  Well, it couldn't happen

14  because I tried to do it.

15          I just hope there were no passengers on that

16  vessel when he tried to do it.  And do you really think

17  that if he could have tipped the vessel, he would have?

18  Or do you really think he would have come in and told you

19  that he did?  This is a man who has been consulting for

20  over ten years with the defendant's attorneys and

21  testified and comes in.

22          And then remember Mr. Scott.  He said the

23  captain would never accelerate quickly.  And he said

24  because that would be, and then there was that dramatic

25  pause.  Remember?  He was thinking that would be -- and he

597

 1    waited and waited and waited, and finally he said:  *That*

 2    *would be bad*.  Do you remember that?

 3           Now, any part of the testimony you can ask the

 4    judge if they will read it back to you.  And if my

 5    recollection is inconsistent with yours, ladies and

 6    gentlemen, it is what you remember.  Okay?  Sometimes I

 7    think something is in the case and it is not; because, you

 8    look at all those boxes.  This is five years of

 9    litigation, four and a half years, whatever.  So I

10    apologize.  It is your recollection that counts.

11           But then I asked him, I said:  Mr. Scott, when

12    you were thinking about a word to use, did you ever think

13    of the word *negligent*?  Oh, no.  It was *bad*.

14           So you know now that a captain can do something

15    by accelerating quickly that would make something bad

16    happen to the vessel.  He also said something about:

17    Well, it can never veer.  It could never tip sharply.

18    *"Really.  Never?"  "No.  It could never."*

19           And then I showed him the manual here.  See, it

20    says it can.  Oh, only at high speed.

21           Well, we could argue whether it is just at high

22    speed or not, but he had denied that it could ever do it

23    until I confronted him with that manual.  And then it was:

24    Oh, well, at high speed.

25           Is that the type of testimony, the quality of

1    testimony, that you want to base your verdict on?  I

2    submit that it isn't.  Let's look at the evidence to show

3    that there was a listing or a tilting.

4           Heather Gibson testified.  I'm not going to go

5    over what she said.  You know what she said.  Jessica

6    Gibson, her daughter.  Stephen Gibson, her son.  Nicholas

7    Gibson.  I would hope I had more moms on this jury but I

8    don't, because I think any mom would realize you would

9    never bring your kids in to do something to get them

10   involved in a court proceeding and tell them to lie about

11   something.  What kind of mother would do that?

12          In this case Heather Gibson didn't.  She just

13   had to call her children in and say just tell them what

14   happened.

15          And you know this whole conspiracy theory about

16   the defendant that this was all made up?  Please, ladies

17   and gentlemen, if you want to make up a story, just say:

18   *I'm on the ship.  I stepped out of the booth.  There is*

19   *water, soda.  I slip.  I fall.  I landed on my butt.*

20   *That's my case.*

21          That is so much easier.  We don't have to talk

22   about whether the boat can list or not list.  We don't

23   have to bring experts in.  It is very simple.  I slipped

24   and fell on something.  It was an unsafe condition.  What

25   an easy case this would be.

1    But that isn't what happened.  This is what

2    happened.  The boat listed, threw the kids off the seat,

3    she had to go try to help her children, as any mother, as

4    any parent would, reach to get them.  The boat came

5    slamming down.  She hurt herself.

6    So what does she do?  Does she tell anyone on

7    the ship I'm hurt?  No.  She did say to her children I

8    think my spine went into my head.  And they make a big

9    thing about it.

10    And you didn't notify anybody on that ship?  You

11    didn't notify anybody on that ship?  When she came back,

12    she tried to notify somebody.  Remember, at Orient Point?

13    And all the offices were closed.  So I asked the gentleman

14    there, the chief operator of the whole system:  When do

15    the offices close?  Back then.  Gee, I don't know.  Then I

16    asked I think the captain, at least one of the crew

17    members:  When did the offices close?  Now, this is

18    November, remember.  It is winter.  So likely they close

19    earlier.  But he didn't give us that answer either.

20    Is that believable?  It is unbelievable.  They

21    don't want you to know.  It is consistent with her story

22    that she tried to make a complaint.  But what happens?

23    Next day she calls.  She speaks to a Mary.

24    Ladies and gentlemen, what is a good indicia of

25    truthfulness is details.  Details.  She says I spoke to a

600

1  woman.  She remembers her name:  Mary.  Mary said call

2  back Sunday.  Speak to William.  I called back Sunday.  I

3  speak to William.  He says I'm the wrong guy.  Call back

4  Monday and speak to Chris England.  She called back

5  Monday.

6         But talking about details, remember the two

7  boys?  They said they fell out?  Their giggling?  They

8  weren't injured.  And their food came off the table.

9  Those are details.  How Heather said, with the children

10  there:  Gee, I felt like my spine went in my head.  Well,

11  kids remember that.  Those are details.

12         So she calls, leaves a message for Chris

13  England, who I think is the assistant manager or operating

14  officer, I don't remember his title, but you remember he

15  still works for them.

16         I asked Mr. Sise, I asked the captain, does

17  Chris England still work there?  Yes, he does.  Remember

18  that because that is important.

19         So she goes to the hospital.  She tells them

20  what her problem is and they diagnose a fractured coccyx,

21  at Peconic Bay.  And later on there is an MRI that says it

22  is not fractured.  Fine.  Whether it is fractured or not

23  is not the issue.  The point is that where did she get

24  this injury?

25         Even their doctor said:  Well, there was trauma

601

1   to the coccyx.  Doesn't that tell us that is what

2   happened?  That is why it was on the boat?  That is why

3   the boat did this?  We have proof.  They have an injury.

4   Are they going to say:  Oh, no.  This happened two days

5   later.  She rolled out of bed, fell on her buttocks and

6   hurt her back?  That is ridiculous.  So the injury,

7   itself, proves that something happened that night.

8              What about Captain Thomas?  He specifically

9   remembers her being on the ship that night.  Wow!  Now,

10  remember, she had been taking that ship for about a

11  year-and-a-half almost every other weekend round-trip.

12  That is, what, 70, 80 trips?  And if nothing happened that

13  night, why would Captain Thomas remember specifically that

14  she was on the ship that night?

15             You know why?  Because something happened.

16  That's why.  Otherwise, there would be absolutely no

17  reason for him to be able to specifically remember, on 70

18  or 80 trips, oh, yes, she was there on that one.

19             What about Jessica Gibson?  Her story is

20  consistent with how the boat tilted.  But she also said I

21  could tell my mom was hurt, so I didn't go visit my dad.

22  I came back with my mom back to Orient Point.

23             Remember that?  That is what she said.  I could

24  see my mom was hurt.  I didn't want to leave her alone.

25  Even in the defendant's opening statement, he said that

602

1    Heather Gibson, in sum and substance, is trying to take

2    advantage of what occurred on the voyage.

3           Take advantage of what?  It can't be the

4    backflushing system.  The boat is completely calm.  And a

5    lot of the defendants witnesses said it happens quite

6    often.  And she is on the boat 70 or 80 times.  So

7    obviously it happens quite often.

8           So what event, what incident, is the defendant

9    saying she is trying to take advantage of?  Obviously, the

10   fact that the boat listed.

11          But every trial attorney tries to look for that

12   one piece of evidence that we would call the smoking gun,

13   the piece of evidence that is so strong it is going to

14   prove, it is going to win the case for you, it is going to

15   prove the point for you.

16          And in this case we have a smoking gun.  And I

17   bet you you know what it is, and if you don't I'm going to

18   tell you what it is.  It is the conversation between

19   Heather Gibson and that Chris England.

20          Remember on Monday?  He is the third person she

21   talks to.  What does Chris England say?  I spoke to the

22   crew and know what happened Friday night.  I spoke to the

23   crew and I know what happened Friday night.  Here's a

24   claim number.  And some other stuff.

25          What happened?  The crew said nothing happened

Summation for Plaintiff/Mr. Gridelli

603

1   to you but they obviously said something happened to Chris

2   England.  That is why he said I know what happened Friday

3   night.

4           And remember, as I said, two witness said he

5   still works there.  Chris England:  Was he in this court

6   today to deny I never said that or I didn't refer to that

7   or I didn't mean that?  Why didn't they call him?

8   Mr. Sise and one of the other witnesses said he still

9   works there.  Well, maybe he is the one guy that says:

10  You know what?  I draw the line at perjury.

11          So now you know the incident happened.  How do

12  you feel when the defense produces evidence that basically

13  is trying the pull the wool over your eyes?  You know, the

14  defendant could have said:  You know what?  The incident

15  happened.  Let's just argue over the extent of her

16  injuries.  That would be fair.  I would understand that.

17  But to deny that the incident even happened?  No, they

18  just blatantly deny it did.

19          Mr. Will called her an opportunist and then he

20  used some examples.

21          9:38?  48.  I have, what, about six more

22  minutes, your Honor?

23          She is an opportunist because she married

24  Jonathan Gibson.  Jonathan Gibson was on disability.  She

25  knew that.  When I wanted to ask her what did Jonathan

604

1   make before disability, to show you know that it was much,

2   much more than what he made now, who objected again?  Al

3   Will, defense attorney.

4          He said in his opening:  Oh, and she got her

5   name on the deed.  And then I asked Jonathan Gibson:

6   Well, how did that happen?  Oh, I asked her to add it.

7   She didn't even want to.  I had to pretty much convince

8   her.

9          So why is that being said?  Why is Mr. Will

10  trying to paint my client in such a way?  He brought out

11  the fact that she filed for bankruptcy.  He brought out

12  the fact that she was terminated from two jobs.  He

13  brought out the fact that she married Mr. Gibson within

14  four months of her divorce.

15         Why is he demeaning her?  Why is he degrading

16  her?  It is a personal injury case.  Let's stay with the

17  facts.  He asked her about birth control pills?  He has

18  access to her OB-GYN records.  Oh, my goodness.

19         You know, the most important thing in any trial

20  is credibility of witnesses.  And I submit to you the

21  second most important thing is credibility of the

22  attorneys.  And yes, what we say is not evidence but we

23  are allowed to make argument to you.  We are allowed to

24  sum up the evidence.  We are allowed to tell you what we

25  think the evidence shows.  So hopefully I have earned your

605

1   trust and I ask you to consider whether the other side has

2   earned your trust.

3           THE COURT:  You have five minutes left.

4           MR. GRIDELLI:  I'm sorry?

5           THE COURT:  You have five minutes left.

6           MR. GRIDELLI:  Sorry.  Then I have to skip quite

7   a bit.

8           Oh.  Receipts.  Remember, I brought in the

9   receipts and I said, the judge said why do you need the

10  receipts?  Everyone admitted she was on the ship.

11          That's true.  But this is why the receipts were

12  important.  If you are injured you don't know if they are

13  going to admit that you were on the boat, you keep the

14  receipt.  This is proof that something happened.  Why does

15  somebody keep a receipt for years?  It is to prove, I

16  don't know, maybe they are going to say I wasn't on the

17  vessel.  Hey, I have proof.  That's why.  That is evidence

18  that something happened.

19          And you remember all the details that they went

20  into about her sexual life between two of them, et cetera,

21  et cetera.

22          When I was reading the depositions, and I wasn't

23  the attorney when it happened, I got the impression of:

24  My!  It's like the rape victim.  You know, you accuse

25  somebody of rape and then, boy, they go after you.  They

606

1   just try to bury you.  They just try to hurt you so that

2   you don't proceed.  They try to make that person a victim

3   two times.

4          Don't let Heather Gibson be a victim again.

5          But I think the most important statement from

6   two of the witnesses is this:  When we asked Nicholas

7   Gibson what happened and he said I thought the ferry or I

8   thought the boat hit a rock.  Remember that?  Out of the

9   mouth of babes.

10         I will get a chance to come back to talk more

11  about the injuries, because I'm going to run out of time

12  on this.  But the first question on the jury voir dire

13  sheet is:  *Were the defendants negligent?*  Sure.  They

14  caused the boat to list.  It wasn't the water.  It wasn't

15  the weather.  I asked even their own expert:  Well, what

16  can it be?  It wasn't any outside influence.  He said:

17  Well, it is the Loch Ness Monster.  Ha-ha!

18         Okay.  Please use your common sense.  You know

19  it had to be how they maneuvered the boat.  They did it.

20  They made a mistake.  Fine.  Let's own up to it.  Let's

21  move forward.

22         When you talk about the defendant, remember the

23  defendant in this case is Cross Sound Ferry.  But it is a

24  company.  It acts through its individuals.  So if the

25  pilot did something wrong, Cross Sound Ferry did something

607

1   wrong.  You understand that.  We are not going after an

2   individual.  It is the company that is responsible for the

3   actions of its employers.

4           So now she goes, she has a coccyx injury.  She

5   has herniated disks in her lumbar spine.  She starts

6   treating.  She treats with Peconic Bay.  She treats with

7   Long Island Spine.  She treats with New York Orthopedist.

8   She eventually treats with St. Catherine Siena.  She

9   treats with Dr. Davis.  She has epidural injections, just

10  to relieve the pain.

11          And she says, she admits, yes, it is good for

12  about three or four weeks and then the pain comes back.

13  It is like three injections.  Then she has the tingling in

14  her hand.  And remember, my expert said look, even my

15  doctor said everything was related to this.  It is like

16  hitting the coccyx and everything is right above it, each

17  bone, and it affects it and it goes up the ladder, if you

18  will.

19          Their expert said no.  He said the spinal fusion

20  wasn't related because it is three-and-a-half years ago

21  and said the reason why, the main reason why, was because

22  she didn't complain of anything for ten months.  So when

23  cross-examined him I said:  *Doctor, is that in your*

24  *opinion the main reason?*  He said:  *Yes, the main reason.*

25  Then I asked him again, and he said:  *Well, one of the*

608

1  *main reasons.*  He is an expert witness.  He's testified

2  hundreds of times.  He knew I was going after him.

3  　　　　Then I said:  *Doctor, instead of ten months how*

4  *about five months?  If the plaintiff came in after five*

5  *months, would you change your opinion that it wasn't*

6  *related?  No, I wouldn't.*

7  　　　　How about three months?  One month?  Whatever I

8  asked:  *No.*

9  　　　　He knew I was setting a trap for him.  And what

10  did he have to say?  To protect his opinion, he said it

11  was only because, I would only agree if the symptoms were

12  one or two days after the incident.

13  　　　　One or two days?  Heather Gibson didn't even get

14  to the hospital for three-and-a-half days.  It means no

15  matter what she had, the doctor would say well, it is more

16  than one or two days.

17  　　　　Then we showed you within I think ten days she

18  had marks on her hand; that she has this numbness or this

19  tingling or whatever.  And every doctor agreed the nerves

20  coming in and out of the C6/7, which is where the fusion

21  was, affects that part of her body.

22  　　　　There it is, ladies and gentlemen, proof that

23  even the initial injury was affecting that part of her

24  spine.

25  　　　　So the first question:  *Was there negligence?*

609

1   Clearly.

2          Boat listed?  That is a dangerous condition.

3          Two.  *Was that negligence a proximate cause of*

4   *the injury*?  Meaning, would a reasonable person say --

5          THE COURT:  Your time is up on this first

6   section.

7          MR. GRIDELLI:  -- this is what caused the

8   injury.

9          I will be back to discuss the injuries in a

10  little more detail.

11         Thank you.

12                  SUMMATION FOR DEFENSE

13

14         MR. WILL:  Good morning.  It is good to be in

15  front of you again.

16         It has been a good trial and I want to thank you

17  for being attentive and listening to the evidence and in

18  watching the videos.

19         And I'm sure you observed Heather refer

20  throughout the trial and you have seen Heather sitting at

21  the witness stand, craning her neck, looking back at the

22  videos as they were being played.

23         A lot of things have been said by the plaintiff

24  but not a lot has been proven.  I want to first point out

25  with respect to her allegations in this case.

610

1        As we said during the trial, she filed a lawsuit

2    almost immediately after the injury.  When she filed the

3    lawsuit, she alleged that she was caused to be thrown from

4    her seat.

5        But then during the course of the litigation she

6    filed papers where she said that the Sea Jet was engaged

7    in a counterclockwise turn.  And then she goes on to say

8    the ferry hit a wave that was made by the ferry.  She

9    keeps changing the story.

10       Roy Scott, the marine expert who we had, former

11   Coast Guard inspector, indicated that her story does not

12   comport with the laws of physics because if she had been

13   up when the vessel accelerated going forward, she would

14   have been thrown this way.  She wouldn't have been thrown

15   back, she would have gone forward.  He made the analogy.

16   It is very clear she would not have gone in any direction

17   but over the table.  Her allegations were not supported

18   that there was any incident, by the captain, the crew, or

19   the engineer.

20       Counsel has brought out that, oh, code of

21   silence.  Well, if I hadn't brought the crew members in

22   and I didn't want to bore you with these crew members,

23   what do you think he would have been saying?  Where are

24   the crew members?  Why weren't they here?  But we brought

25   them in.

Case 2:08-cv-00474-TCP-ETB   Document 125   Filed 01/09/13   Page 21 of 72 PageID #: 1275

1    In addition, we brought in Mr. Jadamec who was

2    the engineer that night who doesn't work for the company.

3    He came in on his own to tell you nothing happened that

4    night.  In his own books, the engine log, there is not one

5    notation of anything unusual.  Not one.  Nor is there any

6    notation in the vessel's log that anything unusual

7    happened during or after the backflush.

8    Sure, they backflush.  It was a common

9    occurrence to get something in a jet.  They would stop,

10   they would backflush, and then the captain would proceed.

11   Heather Gibson's testimony on that is just not credible.

12   It is an election year and we hear about flip-flopping.

13   That is what we see here, flip-flopping stories.  I get

14   thrown back.  I get thrown out.  And then we have the

15   testimony that it was the children who fell out of their

16   seats.  Well, who was it when you filed the complaint?

17   Did you fall out of your seat or was it the children?

18   Now, Expert Scott has testified that it is

19   physically and mechanically impossible for sudden

20   acceleration of that vessel.  It is a catamaran and it is

21   an inherently stable craft.  And during deliberations you

22   will see the pictures that we entered into evidence

23   showing that it is a very large and very stable craft.

24   This is not a vessel which is going to go up and come out

25   of the water.  The analogy of the bicycle and the car.

612

1    It's got dual hulls on either side (sic) which make it

2    extremely stable.  It is just not going to happen.  It

3    didn't happen because it couldn't happen.

4          Now, counsel has entered into evidence a page

5    from the operations manual.  And again he claims, you

6    know, this is her claim, sudden acceleration.  But the

7    operation manual for the Kamewa system clearly states that

8    there is a significant delay between the jet response time

9    and vessel response time.

10          I mean, this is from the engine manufacturer.

11   There is a delay.  So where is sudden engagement?  Where

12   is the proof?  Where is the proof that anything happened?

13   Other than Heather Gibson, who is looking in this case to

14   collect.  This is a stable, properly manned United States

15   Coast Guard vessel.  It didn't happen because it couldn't

16   happen.

17          I want to talk briefly about her medical claims.

18   Here again she changed her story.  First of all, it was

19   the coccyx.  Well, I injured my coccyx.  But when the

20   x-ray, itself, and the MRI film are actually looked at by

21   Dr. Sultan, he said there is no evidence of a fractured

22   coccyx and no evidence that it was ever fractured.  There

23   the no evidence of healing.

24          Dr. Marcus, on the other hand, indicated that it

25   could have been fractured but he never looked at any of

1    the films.  All he looked at was the report.  The evidence

2    is in the film, itself.  Sultan reviewed the MRIs.

3    Marcus, who they just hired last month, Dr. Marcus was

4    just brought on board as their hired expert last month.

5    Of course.  What do you think he is going to say?  He is

6    getting paid $4,000 to come in here and follow the story

7    line.  But did he look at the films?  No.  He was given

8    selective records and he said based on my experience and

9    what I think, it is connected.  Three and a half years

10   later.

11            I mean, let's be realistic here.  She changed

12   her story in connection with her lower back, and when she

13   realized it wasn't a lower back claim she switched gears

14   three-and-a-half years later:  Oh, my neck.  Now it is my

15   neck.  Somehow it migrated from her butt up to her neck

16   three-and-a-half years later.  She has surgery.  She paid

17   a nontreating physician to come in and give an opinion

18   solely on what she said.

19            In other words, this case resolves around one

20   thing:  What she said.  There are no witnesses.  Unless

21   you credit the children, who testified I would do anything

22   for my mother.  I would do anything for my mother.  That

23   is the essence of bias.

24            Dr. Marcus also admitted that when he reviewed

25   the records he saw no contemporaneous medical support for

614

1   an injury to her neck.  He reviewed the Peconic records,

2   which were a few days later, and he reviewed Long Island

3   Spine.  There was nothing to indicate a neck injury.  Of

4   course Dr. Sultan indicated that to have surgery in

5   connection with the neck injury you need a traumatic event

6   that is reported within a matter of a couple of days; a

7   reasonable time.

8           Of course they are talking about the tingling in

9   the fingers and all of this.  These little tinglings.  But

10  she failed to tell Dr. Marcus that she had shoulder

11  problems and she was complaining of tingling in 2006.

12  They didn't disclose those records to Marcus.  Why do you

13  think?  Because he would say:  Well, maybe we have a

14  problem here.  No.  They held those records back.  But you

15  saw them and we saw them.  2006.  Shoulder problems,

16  tingling, weakness in her right side.  It is all there.

17          Now, both Dr. Sultan and Dr. Marcus testified

18  that the neck surgery was specifically to resolve

19  arthritic osteophytes.  These are things which the doctors

20  testified developed over years.  Osteophyte is a

21  degenerative process.  And both Dr. Sultan and Marcus

22  testified that the condition, and this is very important,

23  the condition for which she had the surgery, the herniated

24  disks in 2011, didn't exist in 2008.  A comparison of the

25  two MRI reports.  And again, Sultan reviewed the MRIs,

615

1    Marcus didn't, but he agreed with the reports.  He

2    indicated this condition didn't exist.  They are trying to

3    pin something on Cross Sound Ferry for a condition that

4    did not exist.

5            Further, Dr. Sultan's review of the operative

6    report points out that the problem was a tear in a

7    ligament, which was where the herniation was.  Distal

8    material through the ligament.  He said:  Look.  This

9    condition didn't exist in 2008, and looking at the MRI

10   there is no evidence of healing.  This is a new condition.

11           This is a new condition.  The herniation is not

12   related to any incident three and a half years later.

13   This was a new condition.  They are trying to bootstrap

14   some tingling, for which she had prior issues with her

15   shoulder, into a major surgery that is not related.

16           Further, Dr. Sultan testified that during her

17   examination she was exaggerating her symptoms.  She was

18   resisting, not moving her neck.  But when he did different

19   types of tests he was able to tell that she did have the

20   range of motion even though she was trying to phony up the

21   symptoms.

22           Further, he found that her complaints were not

23   based on any dermatol distribution or objective medical

24   finding.

25           Speaking of medicals and speaking of witnesses

Summation for Defense/Mr. Will

616

1   who don't appear.  She was treated by Long Island Spine

2   for this lower back issue for about three years and then

3   she switched over to Dr. Chernoff for another year.  Where

4   are they today?  How come Dr. Chernoff isn't sitting here

5   to testify and say it is causally related?  And where is

6   Dr. Abbasi and Dr. Dowling from Long Island Spine?  How

7   come they aren't sitting here?  How come they haven't

8   testified to say, yes, in our opinion this condition that

9   she had, the surgery, was related to some incident?  They

10  don't want to be involved.

11          So they went out and they hired a hired gun, Dr.

12  Marcus, a few weeks ago.  Just got his report a few weeks

13  ago.  Oh, now we have Marcus.  Who is he?  Well, they

14  didn't want to testify, their doctors did not want to

15  testify, so they went out and they brought Marcus.

16          MR. GRIDELLI:  Objection, your Honor.  Side bar.

17          THE COURT:  Overruled.

18          What lawyers say is not evidence, therefore it

19  doesn't matter.

20          Go ahead.

21          MR. WILL:  Now, Heather Gibson admitted that she

22  didn't report this so-called trip to any crew member that

23  night.  That night, over and back.  Or on the return trip.

24  Nor on Sunday night.

25          But don't you think that if she hurt her back

Summation for Defense/Mr. Will

617

1    and her kids fell out and her daughter, her daughter said

2    mom, I'm going to come back with you on the night trip

3    because you are telling me you hurt, don't you think that

4    when she was hurt on that trip they would hunt down a crew

5    member and say we've got a problem here?  I hurt myself?

6    Didn't happen.  It didn't happen.

7         Why didn't she tell the night watchman at Orient

8    Point?  Why didn't she tell Captain Thomas when he was

9    walking the deck and he saw her?

10         Now, counsel made a point of saying, oh, Captain

11   Thomas remembered speaking to her.  Yes, Captain Thomas

12   remembers because she went and asked about the return

13   trip.  They had a few conversations.  And she had ample

14   opportunity to say:  You know something?  My kids fell

15   down.  I jammed my spine.  I hurt myself.

16         Didn't happen.  This whole event didn't happen

17   because it couldn't happen.  Mechanically.

18         It is a question of her credibility.  There she

19   is.  She is here, making a claim.

20         Nor did she seek any medical attention Friday

21   night.  If her back was hurting her so much with her

22   daughter, why didn't she go to the emergency room?  She

23   didn't.  Not Friday night.  Not Saturday night.  Not

24   Sunday.

25         As I said in my opening, this is an

618

1   afterthought.  And her attempt to implicate and identify

2   this former US Marine, Jeremy Barboza, as someone who

3   heard the commotion, that was really embarrassing.  I

4   mean, this guy is only 5-8.  He has never worn eye

5   glasses.  Has a shaved head.  And he has a distinctive

6   beard.

7           She described him as 5-10, crewcut, glasses.  I

8   mean, it was an embarrassment.  An embarrassment for him

9   and an embarrassment for us.

10          So I'm asking you, do you think that an incident

11  that she is claiming of that particular magnitude, if she

12  is claiming the vessel went up and slammed down and no

13  other passenger was affected, nobody else spilled their

14  coffee or no one else dropped something or fell, just her,

15  it just happened to her, isn't that funny?  Just happened

16  to Heather and her family on the second deck.

17          Sure, there were other passengers.  The records

18  show there were more than just Heather and her family.

19  But no one complained.  It didn't happen because it

20  couldn't happen.  The vessel physically does not do what

21  they claim it did.  And it is not capable of sudden

22  acceleration.

23          Now let's talk about the announcement.  First of

24  all, when the vessel left port there was a Moderate Sea

25  Announcement advising passengers to remain seated.  You

619

1    are on the water.  Let's use our heads here.  Right?

2           Captain Thomas made three backflushing

3    announcements, three within the space of 10 minutes,

4    saying we are slowing the vessel down.  We are going to

5    clear a clog and we will be back up to speed shortly.

6           Their own expert, Clifford, testified that he

7    was aware that three backflushing announcements were made

8    in ten minutes.  And these announcements advise passengers

9    of impending movement and that the vessel is going to be

10   moving shortly, back up to speed shortly.  Those were his

11   words.  That is where their expert, he admitted that.

12          Roy Scott, the Coast Guard investigator, said

13   the captain made three announcements in 10 minutes.  That

14   is certainly reasonable care.  Right?  What more are you

15   supposed to do?  Walk around the ship and tell everybody?

16   To hold their hands?  The bottoms line is, the three

17   announcements were made within ten minutes.  And everybody

18   knew the ship was going to be moving.  And moving slowly.

19          The judge is going to tell you that in order to

20   find any negligence on the part of my client, you have to

21   find both a foreseeable danger of injury and conduct which

22   is unreasonable in proportion to the danger.  Two things

23   you have to find.

24          Now, you have heard the operations manager, Dick

25   Sise, say it has never been reported to him that the

Summation for Defense/Mr. Will

620

1    vessel has suddenly engaged, gone up out of the water, and

2    slammed down.  Right?  So there was no foreseeable danger.

3    There was nothing that they said:  Oh, well, we have had

4    this problem before so we have got to be aware of it.

5    There is no notice of any type of a condition.

6              And, secondly, there was no foreseeable danger

7    given that Clifford's testimony was that these

8    announcements were made, three within ten minutes.

9    Neither of the conditions are satisfied and there can be

10   no finding of anything improper by Cross Sound.  Even

11   assuming, even assuming for the stretch of the

12   imagination, anything occurred, there was no foreseeable

13   danger.

14              (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

Summation - Defense/Mr. Will

621

1          MR. WILL:  Now let's talk about bias.  And again

2     he talks about the blue code of silence.  But the real

3     bias, as I indicated earlier is seeing with Ms. Gibson's

4     children who testified at their position at a trial.  I

5     would do anything for my mother.  I mean let's face it,

6     they're kids.  And they were taken, and we've established,

7     and the evidence shows that they were coached and

8     rehearsed.  Not only by her, by Mr. Gridelli.

9          The words *slammed down*, the word *backflushing*.

10     Again, what the funny thing is, in that announcement,  the

11     backflushing announcement, they say, *we're going to flush*

12     *the clog out*.  They don't use the word *backflushing*.  It's

13     not used.  You will see the announcement.

14          So where did they get the word *backflushing*

15     from?  Answer:  Coaching.  All right, let's go over the

16     words; *slam down, backflushing*.

17          In fact Nicholas testified that it was

18     Mr. Gridelli who said, Did the boat go up and down, turn

19     and slam down?  Is that a leading question or a piped in

20     answer, if I have heard it.

21          And you know, I find it amazing that Nicholas,

22     who was five at the time couldn't remember some simple

23     details.  But he could remember that his mother said, Hum,

24     felt like her spine went right through her head.  Wow, he

25     remembered that.  It's like right on cue.  It's like we

622

1    all sat in on that meeting.

2           Okay, what are you going to say?  Oh, slam down

3    backflushing, oh it went right through her spine.  Isn't

4    that convenient?  Right?  Let's just tie-in right up the

5    chain right to her head.  Come on.

6           It's a disgrace.  Quite frankly I was

7    uncomfortable questioning the kid.  I have four kids of my

8    own.  Maybe I don't look like I have four kids, but I do.

9           THE COURT:  We're not interested in your family.

10          Continue.

11          MR. WILL:  Thank you, your Honor.

12          I was very uncomfortable questioning the kids,

13   but I didn't put her up.  I didn't put these kids up there

14   and subject them to the scrutiny, she did.  Again, she's

15   the plaintiff.  No, this was unwitnessed unless you

16   believe these coached children.  They sat there and they

17   skipped and hesitated on questions and other details.  But

18   yet on certain words, bing, they came right in on cue.

19          Let's just talk a second about the loss of

20   services claimed by Jonathan over there.  The evidence has

21   shown that they can and still do everything that they used

22   to do together.  Four years since this.  Four vacations;

23   Florida for ten days, Disney World walking around,

24   Universal.  Jersey shore.  They had old boats.  They have

25   new boats.  They go out for hours at a time on the boats.

623

1    They go fishing.  They go shopping together.  They go out

2    to eat.  She cooks for him.  She cleans for him.  They go

3    to the kids' games.  Nothing has changed.  Life goes on as

4    usual.  Nothing has changed.  There was no interruption in

5    their lives, and that is proven by the videos.

6            And even to this day, she sits there and said

7    I'm almost at a hundred percent.

8            Now let's talk a minute about the videos.  You

9    saw the videos of Heather Gibson in December of 2007.  And

10   this incident happened when?  In November.  Wow, she's out

11   and about, going shopping, going to the donut store, going

12   to videotapes.  That was in December.

13           And in January of 2008, a couple of months

14   later, no interruption.  I mean she is walking around

15   business as usual.  And in February of 2008, selling and

16   walking those dogs, carrying those dogs.  She may say,

17   well I had a back injection.  Well that back injection

18   wasn't until April of 2008, well after these videos were

19   taken.

20           Now --

21           THE COURT:  You have five minutes left.

22           MR. WILL:  Thank you, your Honor.

23           Now what did we see in the videos?  We've seen

24   her bending.  Oh, but at the deposition, it's too painful

25   to bend.  And what do we see her doing?  Oh, she's at the

Summation - Defense/Mr. Will

624

1   basketball game, squatting for what, a minute and-a-half,

2   squatting on the balls of her feet for a minute

3   and-a-half, bouncing a basketball.  I mean, come on.

4           And we've got the video of her being pulled

5   around by this massive, massive Saint Bernard.  I mean is

6   that a woman who has a disability?

7           And of course, the dog loving photo.  Yes,

8   carrying that, and holding that dog for an unlimited

9   amount of time, this big Saint Bernard puppy squirming in

10  her hands.  Look at the smile on her face.  Is she

11  grimacing?  Does she look like she's in pain?  Of course

12  not, absolutely not.

13          There was no interruption of what they did;

14  bending, running, squatting, carrying the dog.  You've

15  seen the videos of her.  She said, Oh, I can't get in my

16  car.  I can't get out of my car.  I can't move easily,

17  everything is stiff.

18          You saw the videos, moving fluidly.  You saw her

19  turning her head, like I said in the beginning, like an

20  owl.  I mean there she was, pulling out of that parking

21  spot, this way, and that way, this way, nothing wrong with

22  her neck.  Come on.  And this was shortly after the

23  incident.  Three and-a-half years later, oh, geeze, I need

24  surgery.

25          Members of the jury, how can you not be

Rebuttal Summation - Plaintiff/Mr. Gridelli

625

1   persuaded by the videos?  How could you not be persuaded

2   by the videos?  You've seen them.

3           The evidence is there. Cross Sound Ferry didn't

4   do anything wrong.  It didn't happen because it couldn't

5   happen.  You're savvy New Yorkers, all of you.  And savvy

6   New Yorkers are not fooled.  They're not fooled.

7           And I'm asking you to return a verdict for the

8   defendant.

9           Thank you very much.

10

11          REBUTTAL SUMMATION - PLAINTIFF/Mr. Gridelli

12          MR. GRIDELLI:  Ladies and gentlemen, I only have

13  five minutes.  This is going to be quick.

14          Remember I said credibility of attorneys, how

15  important that is when they argue something?

16          Where in this case is there any evidence that

17  the doctors who treated her didn't want to testify, didn't

18  want to come in and testify?  Point now, I'll go sit down

19  and say they win.  Point out any evidence in this case

20  that he said the doctors refused to testify, didn't want

21  to get involved.  Credibility of attorneys when they tell

22  you something.

23          He said no one else spilled coffee on the ship.

24  No one else was injured.  Is there any testimony in this

25  case about that?  Any testimony?  Other than Mr. Will

Rebuttal Summation - Plaintiff/Mr. Gridelli

626

1    telling you that. Credibility when an attorney tells you

2    something, I hope you should be able to rely on it.

3         And the complaint says she was thrown from her

4    seat. Have you dealt with attorneys? Did you ever do a

5    contract, or buy a house, or sell a house? Did you read

6    the contract, or does the attorney say just, sign here.

7    Maybe other than your will, I would think you would read,

8    most attorneys don't. And maybe that is why Mr. Mulvehill

9    who drafted the complaint is no longer her attorney.

10        The announcement. We know from Scott's only

11   testimony that the boat can, remember accelerate quickly,

12   a very bad thing can happen. So we know. You know, and

13   he said it. That's his expert. A very bad thing can

14   happen. So there should be an announcement: Ladies and

15   gentlemen we're about to proceed now. We finished the

16   backflush. Okay? Something could happen where the boat

17   could tilt or list. Please remain seated, just secure

18   yourself. That's the only announcement we need, and

19   nothing would have happened.

20        I got to get to the medicals.

21        Both experts said she had a degenerative disc

22   condition, and that many, many people have that. But she

23   was asymptomatic. That means she had no symptoms. She

24   was symptom free.

25        Now the trauma comes and it produces pain. She

Rebuttal Summation - Plaintiff/Mr. Gridelli

627

1    goes from a symptom-free condition to a painful condition.

2              So, and listen to the judge's charge.  If they

3    cause an injury like a herniated disc, they're

4    responsible.  If they create a condition or exacerbate a

5    previous condition, exacerbate a previous condition -- in

6    this case the degenerative disc disease -- they're

7    responsible.  She was sympton free.  Her whole life, she

8    was 36, never had a problem.  And now for four and-a-half

9    years she has been treating with doctors and had to have

10   surgery.

11             Quickly, let's talk about the video,

12   surveillance video, 12 days, 13 days.  Yes, they have her

13   walking.  Yes, they have her squatting.  Yes, they have

14   her bending in the car.  Yes, they have her holding coffee

15   and doughnuts.  Where is the video of her playing soccer

16   with her daughter?  Where's the video of her walking the

17   three miles?  Where is the video of her doing any type of

18   athletic activity at this time?  Where is the video of her

19   playing with her kids?  Where is the video of her shell

20   fishing, fishing, or doing any type of athletic activity?

21   They got her walking around.  We never said she was

22   crippled.  We never said that she was paralyzed.  What did

23   she say?  Yes, I could squat down.  The pain is when I get

24   back up.

25             The hardest thing for a plaintiff's trial

Rebuttal Summation - Plaintiff/Mr. Gridelli

628

1    attorney is to get a jury to, to appreciate the injuries

2    of a client.  And I have to take some of these expert

3    quotes.

4           Aristotle said:  The aim of the wise is to avoid

5    pain and secure pleasure.

6           Stephen King:  There is no tyrant as merciless

7    as pain.

8           Saint Augustine:  The greatest evil is physical

9    pain.

10          Julius Caesar:  It is easier to find a man who

11   will volunteer to die, than to find those who are willing

12   to endure pain with patience.

13          And my favorite George Orwell.  Of pain you

14   could wish only one thing, that it should stop.  Nothing

15   in the world is so bad as physical pain.  It is the face

16   of pain -- In the face of pain there are no heroes.

17          You're going to be asked to award damages if you

18   find the defendant was negligent and caused her injuries

19   or exacerbated her injuries.  And if you award it -- and

20   it says on the jury verdict sheet *past damages*.  That

21   means pain and suffering, because there is no lost wages

22   claimed here.  She was just starting a business.  We

23   couldn't prove what she was going to earn.  We were trying

24   to be credible to you.

25          Past pain and suffering, four and-a-half years.

## Rebuttal Summation - Plaintiff/Mr. Gridelli

629

1   You know the whole story; treated, injections, surgery.

2           I submit to you that if you came back with a

3   verdict of $10 million dollars, that would be excessive.

4   But if you came back with a verdict of $1 million dollars

5   for past pain and suffering, I submit to you that would be

6   inadequate.

7           Let's talk about future pain and suffering.  She

8   is 41.  There is a life expectancy of 35.3 years.  And the

9   judge will tell you that we use that actuary table because

10  we don't know how long people are going to live.  That is

11  the fairest way.

12          THE COURT:  You have one minute left.

13          MR. GRIDELLI:  How much do you award somebody

14  for 35.3 years of her life is changed.  Remember Jonathan

15  Gibson said she is about 70 percent of what she was.

16          I submit to you that if you awarded $5 million

17  dollars for the next 35 years, that would be excessive.

18  But if you awarded less than a million, that would be

19  inadequate.

20          And ladies and gentlemen, remember if you award

21  something that justice says is 90 percent less or 90

22  percent of what you should, you're not giving 90 percent

23  of justice, you're giving the ten percent of injustice.

24          With Jonathan Gibson, I believe his past loss of

25  services claim -- remember they were just starting their

**COURT'S CHARGE**

630

1    life.  They were married.  This was their honeymoon time

2    for the first couple of years.  And boom, this happened.

3    $250,000 would be reasonable, I submit to you for past

4    loss of services.  Future loss of services, $300,000 for

5    the next 35 years.

6              Thank you very much.

7              THE COURT:  Why don't we take a five minute

8    break.  I will take about 15 minutes.  So don't talk about

9    the case.  Five minutes.

10             (A recess was taken at 10:28 a.m.)

11             (After recess the following occurred.)

12

13                    **THE COURT'S CHARGE**

14             THE COURT:  Now that the evidence in the case

15   has been presented and the attorneys for the parties have

16   concluded their closing arguments, it's my responsibility

17   to instruct you as to the law that governs this case.  My

18   instructions will be in three parts.

19             First, I'll give you instructions regarding the

20   general rules that define and govern the duties of a jury

21   in a civil case.

22             Second, I will instruct you as to the legal

23   elements of the cause of action relative to this case.

24             And third and finally some general rules

25   defining your deliberations as jurors.

631

1      It is your responsibility and duty to find the

2  facts from all the evidence in this case.  You are the

3  sole judges of the facts, not counsel and not myself.  I

4  want to impress upon you again the importance of that

5  role.  It is for you and you alone to pass on the weight

6  of the evidence, and resolve such conflicts as may have

7  appeared in the evidence, and to draw such inferences as

8  you deem to be reasonable and warranted from the evidence

9  or the lack of evidence.

10      With respect to any question concerning the

11  facts, it is your recollection of the evidence, and yours

12  alone that controls.

13      Parties are equal before the court.  This case

14  should be considered and decided by you as an action

15  between parties of equal standing in the community.  All

16  persons, corporations and entities stand equal before the

17  law and are to be dealt with as equals in this court.  All

18  parties are entitled to equal consideration.  No party is

19  entitled to sympathy or favor.  You must judge the facts

20  and apply the law as I shall instruct you without bias

21  prejudice or sympathy either for the plaintiffs or the

22  defendants.

23      Burden of proof.  In a civil case such as this

24  the plaintiff has the burden of proving the essential

25  elements of their claims against the defendant by a

632

1    preponderance of the evidence.  To establish a claim by

2    the preponderance of the evidence, means simply to prove

3    that something is more likely.  A preponderance of the

4    evidence means the greater part of the evidence.  It does

5    not mean the greater number of witnesses, or the greater

6    length of time taken by either side.

7           The phrase *preponderance of the evidence* refers

8    to the quality of the evidence, the weight and effect it

9    has on your minds.

10          If the plaintiffs are to win, the evidence that

11   supports their claim must appeal to you as more nearly

12   representing what took place, than the evidence opposed to

13   their claim.  To put it differently, if you put plaintiffs

14   and defendants evidence on opposite sides of a scale, the

15   plaintiff would have to make the scales tip slightly in

16   their favor.

17          If the evidence weighs so evenly that you are

18   unable to say there is a preponderance on either side,

19   then you must resolve it in the defendant's favor.  To

20   recapitulate briefly; the preponderance of the evidence

21   means such evidence as when you considered and compared

22   with  that opposed to it, produces in your mind that the

23   belief of what is sought to be proved is more likely the

24   case than not the case.

25          Now the evidence upon which you are to decide

1   what the facts are comes in several forms; sworn testimony

2   of witnesses both on direct and cross-examination, and

3   regardless who has called them; exhibits the court

4   received in evidence; and facts to which the lawyers have

5   agreed or stipulated.

6          Certain things are not evidence, and are to be

7   disregarded in deciding what the facts are.  Again,

8   arguments or statements by lawyers are not evidence.

9   Objections to questions you don't consider.  And testimony

10  that has been excluded or stricken, is irrelevant,

11  disregard it.  And anything you may have seen or heard

12  outside the courtroom is not evidence.

13         In deciding what the facts are you must consider

14  all the evidence that has been offered.  In doing this you

15  must decide which testimony to believe, and which

16  testimony not to believe.  In making that decision there

17  are a number of factors you may take into account,

18  including the following:

19         The witness's opportunity to observe the events

20  he or she described; the witness's intelligence and

21  memory; the witness's manner while testifying.  Does the

22  witness have an interest in the outcome of the case?  Does

23  the witness have any bias or prejudice concerning any part

24  of the matter involved in this case?  The reasonableness

25  of the witness' testimony considered in light of all the

634

1   evidence in the case.

2           In considering the testimony of the plaintiffs

3   or the defendant you must apply the same standards as you

4   apply to any other witness.

5           If you find that a witness's testimony is

6   contradicted by what that witness has said or done at

7   another time, or the testimony of other witnesses, you may

8   disbelieve all or any part of the witness' testimony.  But

9   in deciding whether or not to believe the witness, keep

10  this in mind.  People sometimes forget things.  A

11  contradiction may be an innocent lapse of memory, or it

12  may be an intentional falsehood.  Consider therefore,

13  whether it has to do with an important fact, or only a

14  small detail.  Different people who remember the same

15  event, may remember it differently, and therefore testify

16  about it differently.

17          You may consider these factors in deciding how

18  much weight to give to the testimony.  You are not to give

19  any greater weight or credence to a witness solely because

20  of his title or position.

21          Now ordinarily opinions of witnesses are not

22  received in evidence.  However, opinions of expert

23  witnesses qualified by training and experience in a

24  particular field of specialized learning are received in

25  evidence.  And the expert witness is committed and

1  expected to give you the reasons for, and the basis of his

2  or her opinion.

3         You should weigh and evaluate the testimony of

4  an expert witness precisely as you weigh the testimony of

5  any other witness.

6         We now go to the law portion of the case.

7         Law portion.  This case is brought by the

8  plaintiffs, Heather Gibson and her husband Jonathan Gibson

9  against defendant Cross Sound Ferry Service, Inc, who I

10  shall refer to as the defendant.

11        As a corporation, Cross Sound Ferry Services

12  acts only through its employees.  When I refer to the

13  defendant in this case, I am referring to Cross Sound

14  Ferry Services, Inc and its employees.

15        Defendant owns and operates a ferry known as the

16  Sea Jet that runs between Orient Point, New York, and New

17  London, Connecticut, which I will refer to as the ferry.

18        Plaintiff Heather Gibson alleges that she

19  suffered personal injuries as a result of defendant's

20  negligence while she was a passenger on the ferry.

21        Plaintiff Jonathan Gibson seeks damages due to

22  the loss of his wife's services.  Defendant denies all of

23  plaintiffs' claims.

24        You will first determine whether defendant's

25  negligence was the legal cause of plaintiff Heather

636

1  Gibson's injury.  If, and only if the defendant is found

2  to have been negligent, will you determine the claim of

3  Jonathan Gibson for the loss of the wife's services, as I

4  will explain that claim to you.

5       For Heather Gibson to prevail on her claim of

6  negligence, she must prove the following three elements by

7  a preponderance of the evidence.

8       1.  Negligence of the defendant.

9       2.  Proximate cause.

10       3.  Damages.

11       The burden of proof as to the defendant's

12  negligence is on the plaintiff.  If she fails to sustain

13  her burden you will find for the defendant.

14       I will now further explain plaintiffs' claims

15  and provide you with further definitions and instructions.

16       Negligence defined.  Negligence is the lack of

17  ordinary care.  It's the failure to use that degree of

18  care that a reasonable, prudent person would have used

19  under the same circumstances.  Negligence may arise from

20  doing an act that a reasonable, prudent person would not

21  have done under the same circumstances.  Or on the other

22  hand, from failing to do an act that a reasonable, prudent

23  person would have done under the same circumstances.

24       In this case defendant owed a duty of reasonable

25  care to act for the safety of its passengers.  Heather

1   Gibson's claim of negligence is that defendant failed to

2   exercise such reasonable care in the operation of the

3   ferry.

4           *Reasonable care* means that degree of care that a

5   reasonable, prudent ship owner would use under the same

6   circumstances, taking into account the foreseeable risk of

7   injury.

8           A ship owner is not an insurer of passenger

9   safety.  Instead there must be some failure to exercise

10  reasonable care before liability may be imposed.

11          Because starting, slowing or stopping may not

12  always be done smoothly, and occasionally there may be

13  some jolting.  The ferry operator is not liable for

14  passengers' -- injuries to a passenger when that happens.

15  The operator of a ferry must, however, avoid sudden,

16  unusual and violent jerks, lurks or stops.

17          If you find that the movement of the ferry was

18  sudden, unusual and violent, then you will find that

19  defendant was negligent.  If, however, you find that a

20  stop or movement was not sudden, unusual or violent, you

21  will find that the defendant was not negligent.

22          Ultimately you will decide whether defendant

23  acted reasonably under the totality of the circumstances.

24          *Proximate cause*.  I think I'm skipping a page.

25          *Foreseeable* defined.  Negligence requires a

COURT'S CHARGE

638

1   reasonable foreseeable danger of injury to another, and

2   conduct that is unreasonable in proportion to that danger.

3           A ship owner is only responsible for the results

4   of his conduct if the risk of injury is reasonably

5   foreseeable.  The exact occurrence or exact injuries does

6   not have to be foreseeable.  But injury as a result of

7   negligent conduct must be not merely possible, but

8   probable.  There is negligence if a reasonable, prudent

9   ship owner could foresee injury as a result of his

10  conduct, and acted unreasonably in light of what he could

11  foresee.

12          On the other hand, there is no negligence if a

13  reasonably prudent ship owner could not have foreseen any

14  injury as a result of his conduct, or acted reasonably in

15  light of what he could have foreseen.

16          *Proximate cause*.  In all causes of action the

17  wrong or fault must have been a proximate cause of the

18  injury.  I will define proximate cause.  And act or

19  omission is a proximate cause of an injury, if it was a

20  substantial factor in bringing about the injury.  That is,

21  if it had such an effect in producing the injury that a

22  reasonable person would regard it as the cause of the

23  injury.

24          *Damages*.  If you find that plaintiff is liable

25  for the injuries suffered by Heather Gibson, then you must

1    determine the amount of damages that she is entitled to

2    recover.  My charges to you on the law of damages must not

3    be taken as a suggestion that you should find for Heather

4    Gibson.  It is for you to decide from the evidence

5    presented and the rules of law that I have given you,

6    whether she is entitled to recover from defendants.

7          If you decide that she is not entitled to

8    recover, you go no further in considering damages.  Only

9    if you decide that Heather Gibson is entitled to recover,

10   will you consider the measure of damages.

11         If you decide that Heather Gibson is entitled to

12   a verdict, any award of damages must be reasonable.  You

13   may award her only such damages as would reasonably

14   compensate her for past and future conscious pain and

15   suffering.  In assessing damages you will have to take

16   into account any injury which you find was caused by the

17   defendant's negligence.

18         If you find that Heather Gibson had a

19   preexisting medical condition, and that as a result of the

20   negligence of the defendant this preexisting condition was

21   aggravated, you shall award damages for the aggravation of

22   the preexisting condition.  But you should not award any

23   damages for the preexisting condition itself.

24         *Conscious pain and suffering* means pain and

25   suffering of which there was some level awareness by the

1  plaintiff.  Pain and suffering includes loss of enjoyment

2  of life.  Loss of enjoyment of life involves a loss of the

3  ability to perform daily functions, to participate in

4  activities which were part of life before the injuries.

5          You are not permitted to award speculative

6  damages.

7          *Permanency of injuries; life expectancy.*  To the

8  extent that you determine that any of Heather Gibson's

9  injuries are permanent, she is entitled to recover for

10 future damages.  In this regard you will consider her age

11 and life expectancy.  Evidence of life expectancy is found

12 in the life expectancy tables.  Heather Gibson has a

13 remaining life expectancy of 35.3 years.  Life expectancy

14 tables provide nothing more than a statistical average.  A

15 person may live longer or die sooner than the time

16 indicated by those tables.

17         *Loss of services.*  Jonathan Gibson, plaintiff

18 Heather Gibson's husband has a separate claim in this

19 lawsuit.  His claim is for the loss of services of his

20 wife.  This claim will be considered by you only if you

21 find for Heather Gibson, and find there was negligence.

22         If you find that Jonathan Gibson is entitled to

23 recover, you will award him damages for the pecuniary loss

24 which you found he sustained by the loss of his wife's

25 services and society.

1       Although sometimes this is referred to as loss

2   of society, not only services, but also such elements as

3   love, companionship, affection, society and sexual

4   relations.  You will award Jonathan Gibson such an amount

5   based upon the evidence, based on your own observations,

6   experience and knowledge, conscientiously applied to the

7   facts and circumstances as in your judgment will

8   compensate Jonathan Gibson for the pecuniary loss you find

9   he has sustained, and is reasonably certain to sustain in

10  the future by reason of his wife's inability to perform

11  such services and provide society as a result of her

12  injuries.

13          We now come to the conclusion, which is very

14  brief.

15          I remind you once again that it is your

16  responsibility to judge the facts in this case from all

17  the evidence submitted during the trial, and to apply the

18  law as I have just given it to you.

19          Your deliberations should include a rational

20  discussion of the evidence in this case by all of you.  In

21  other words, I am now saying, discuss the case amongst

22  yourselves.

23          In your deliberations you're entitled to your

24  own opinion, but you should exchange views with your

25  fellow jurors, and listen carefully to each other.  While

COURT'S CHARGE

642

1  you should not hesitate to change your opinion if you are

2  convinced that another opinion is correct, your decision

3  must be your own.

4          If you wish to have some of the testimony

5  repeated, you may make such a request.  I'll call you into

6  court, and have the reporter read those portions that you

7  desire to hear.  If you wish to hear some portions of

8  these instructions repeated, make that same request.

9  Either can be accomplished by giving a note to the clerk,

10  to Joe.

11          If it becomes necessary during your

12  deliberations to communicate with me for any reason, send

13  me a note through Joe.  No communication, except by a

14  writing, which is the note.  The court will not

15  communicate with any member on the jury on any subject

16  touching on the merits of the case, other than by writing

17  or orally in open court.

18          By that I mean sometimes you'll send in a note,

19  and I can answer it by just writing on the note itself.

20  Sometimes we can't.  Sometimes you want to hear the

21  testimony.  Sometimes you want to hear the flavor of the

22  testimony.  So assuming this was an accident case, and you

23  wrote, asked through your note, What was, what did witness

24  A say the color of the light was?

25          Any note you send me has to go to the lawyers.

1    They read it.  If they agree and I agree with hit, we'll

2    put *red* on it and send it right back.

3         Sometimes you want to hear the flavor of what a

4    particular witness started out to say, or something like

5    that.  So you ask for that witness.  We will play that

6    testimony.

7         When you all are satisfied you have heard

8    enough, stop the reading.  You don't have to go back to

9    continue with the reading.  You don't have to listen to

10   cross-examination.  You don't have to read the redirect,

11   or anything like that.  If you are all satisfied, stop the

12   reading.  You're not penalized because you asked for a

13   particular thing.

14        But it has to be unanimous.  Anything you do as

15   a jury has to be unanimous.

16        I know when you know when you've heard enough.

17   I can see your heads looking at each other and saying; *did*

18   *we hear enough*?  And everyone is saying; *yeah*.  And I'll

19   ask you, *do you all agree you heard enough*?  And if you

20   say *enough*, I send you back.

21        There is another rule.  You're not supposed to

22   tell me where you stand.  You can't say it's six to one,

23   four to three, or anything like that.  Not that I'm not

24   supposed to know.  Remember I said anything you send me I

25   have to give to the lawyers.  They're not supposed to

1    know.

2              So don't, if you send me a note, don't tell me

3    how you stand numerically, unless you all unanimously

4    agree on the verdict.

5              Again, I will repeat, any verdict you reach must

6    be unanimous.  Your oath sums up your duty that you will

7    without fear or favor to any persons conscientiously and

8    truly try the issues before you according to the evidence

9    given to you in open court.

10             Now as you notice, I have read my charge to you.

11   I now have a sidebar with the lawyers to see, did I miss a

12   page, or miss a paragraph, or did I say something wrong.

13             So lawyers, sidebar.

14             (The following occurred at sidebar.)

15             THE COURT:  Did I read it correctly?

16             MR. GRIDELLI:  *If you find that plaintiff is*

17   *liable*.  It should be *defendant*.

18             (The following occurred in open court.)

19             THE COURT:  Okay.  I read it wrong, they tell

20   me.  At the beginning I said,  *If you find that defendant*

21   *is liable*.  That is what I should have said.

22             They said I said, *If you find plaintiff is*

23   *liable*.  Obviously that is wrong, and I correct it.

24             MR. GRIDELLI:  Thank you, your Honor.

25             THE COURT:  Now let me tell you what is going to

1   happen.

2           I told you not to make notes of my summation --

3   I mean my charge to you on the law.  There is a reason.

4   I'm sending you in what I read, the law portion only.  So

5   everyone of you is going to get a copy of it.  So if there

6   is something you missed, or you want to see what I said,

7   you're going to have a copy.  That's why.

8           We will now have the lawyers get all of the

9   exhibits together.  Anything that is marked in evidence,

10  and I always say *in evidence*, and it gets boring after a

11  while.  Why am I saying it?  Because if there is a dispute

12  we go to the record and we see what the evidence is.

13          My statement was *in evidence*.  If it is not my

14  statement, it doesn't come in.  You will get everything

15  that is marked in evidence.

16          The first thing you have to do is find a

17  foreperson.  Do that quickly.  That person doesn't get

18  more money, doesn't get two votes.  They only have one

19  vote.  They can't change the vote.  But that person will

20  be in charge, because I'm going to send in, as I said, the

21  law portion.

22          I'm going to send in -- I'm going to send in the

23  verdict sheet.  And if you follow the verdict sheet it

24  will help.  And the foreperson, whoever he or she is will

25  see that if you follow the verdict sheet it will tell you;

646

```
 1    Point 1, go to 2, go to 3.  So if you follow that it will
 2    go much easier for you.
 3              I think I covered everything.  I think I can
 4    send you out.  Oh, lunch you'll have at twelve o'clock.
 5              Start your deliberations.  You will get the
 6    charge that I gave you on the law, and we'll get together
 7    all of the evidence.
 8              THE CLERK:  Did they review it, judge, and the
 9    verdict sheet?
10              THE COURT:  Yes.
11              You all agree that the verdict sheet has been
12    examined by all of you?
13              MR. GRIDELLI:  Yes, your Honor.
14              THE COURT:  So the law and the verdict sheet and
15    the evidence come in.
16              Good luck.
17              (The jury left the courtroom at 11:00 a.m. to
18    begin deliberations.)
19              THE COURT:  Now make sure what is in evidence
20    goes in, and not something else.  Have you gone offer it?
21              MR. GRIDELLI:  Not together, your Honor.
22              THE COURT:  Well, it would help if you do it
23    together.
24              MR. GRIDELLI:  Yes, right.  We'll do it now.
25              THE CLERK:  Court Exhibit Number 1, letter dated
```

647

1    November 17, 2011.

2              Court Exhibit 2, a letter dated November 18,

3    2011.

4              Court Exhibit 3 is a verdict sheet.

5              Court Exhibit 4 is the charge.

6              (A recess was taken at 11:00 a.m.)

7              (Continued on the following page.)

8              (The following ensued in the presence of the

9    jury at 12:20 pm.)

10

11                        **VERDICT**

12             THE COURT:  We have a note from the jury, marked

13   Court Exhibit No. 5:  *"Your Honor, we have reached a*

14   *verdict."*

15             I will have the clerk take the verdict.

16             THE COURTROOM DEPUTY:  Yes, judge.

17             Madam forelady, please rise.

18             Has the jury reached a verdict?  Yes or no?

19             THE FOREPERSON:  Yes.

20             THE COURTROOM DEPUTY:  Please refer to the

21   verdict sheet.

22             *Question No. 1.  Was the defendant negligent?*

23             *Yes or no*?

24             THE FOREPERSON:  No.

25             THE COURTROOM DEPUTY:  Be seated, please.

648

1          THE COURT:  Poll the jury.

2          THE COURTROOM DEPUTY:  Ladies and gentlemen, as

3    the court has received your verdict, you say you find in

4    favor of the defendant and against the plaintiffs.

5          Juror No. 1, is that your verdict?

6          JUROR NO. 1:  Yes.

7          THE COURTROOM DEPUTY:  Juror No. 2, is that your

8    verdict?

9          JUROR NO. 2:  Yes.

10          THE COURTROOM DEPUTY:  Juror No. 3, is that your

11    verdict?

12          JUROR NO. 3:  Yes.

13          THE COURTROOM DEPUTY:  Juror No. 4, is that your

14    verdict?

15          JUROR NO. 4:  Yes.

16          THE COURTROOM DEPUTY:  Juror No. 5, is that your

17    verdict?

18          JUROR NO. 5:  Yes.

19          THE COURTROOM DEPUTY:  Juror No. 6, is that your

20    verdict?

21          JUROR NO. 6:  Yes.

22          THE COURTROOM DEPUTY:  Juror No. 7, is that your

23    verdict?

24          JUROR NO. 7:  Yes.

25          THE COURTROOM DEPUTY:  And so say you all?

649

1          THE JURY:  Yes.

2          THE COURTROOM DEPUTY:  Jury polled, judge.

3          THE COURT:  The jury is excused with the thanks

4    of to he court.

5          I will come in and talk with you.  I understand

6    your lunch is here.  I will come in and talk to you.

7          You are discharged.

8          (The following ensued in the absence of the

9    jury.)

10          THE COURT:  Any motions?

11          MR. GRIDELLI:  Yes, your Honor.

12          Most respectfully, I would move tos et aside the

13    verdict as against the weight of the evidence in this

14    case.

15          THE COURT:  Denied.

16          Thank you.  I will talk to the jury.  They are

17    going to have their lunch and they are free to leave.

18          (Proceedings adjourned at 12:25 pm.)

19

20

21

22

23

24

25

650

# I N D E X

SUMMATION FOR PLAINTIFF                     593

SUMMATION FOR DEFENSE                       609

REBUTTAL SUMMATION - PLAINTIFF             625

COURT'S CHARGE                             630

VERDICT                                    647

## $

**$10** [1] - 629:3
**$250,000** [1] - 630:3
**$300,000** [1] - 630:4
**$4,000** [1] - 613:6

## 0

**08-CV-474** [1] - 591:4

## 1

**1** [7] - 629:4, 636:8, 646:1, 646:25, 647:22, 648:5, 648:6
**10** [2] - 619:3, 619:13
**100** [1] - 595:20
**106** [1] - 591:15
**10:28** [1] - 630:10
**11501-4404** [1] - 591:16
**11530-2045** [1] - 591:13
**11722** [1] - 591:21
**1180** [1] - 591:21
**11:00** [2] - 646:17, 647:6
**12** [1] - 627:12
**12:20** [1] - 647:9
**12:25** [1] - 649:18
**13** [1] - 627:12
**14** [1] - 592:7
**15** [1] - 630:8
**17** [1] - 647:1
**18** [1] - 647:2

## 2

**2** [5] - 636:9, 646:1, 647:2, 648:7, 648:9
**2006** [2] - 614:11, 614:15
**2007** [1] - 623:9
**2008** [5] - 614:24, 615:9, 623:13, 623:15, 623:18
**2011** [3] - 614:24, 647:1, 647:3
**25** [1] - 592:4

## 3

**3** [5] - 636:10, 646:1, 647:4, 648:10, 648:12
**30** [1] - 592:5
**300** [1] - 595:20
**35** [2] - 629:17, 630:5
**35.3** [3] - 629:8, 629:14, 640:13

**36** [1] - 627:8

## 4

**4** [3] - 647:5, 648:13, 648:15
**41** [1] - 629:8
**48** [1] - 603:21

## 5

**5** [4] - 629:16, 647:13, 648:16, 648:18
**5-10** [1] - 618:7
**5-8** [1] - 618:4
**50** [1] - 595:20
**500** [1] - 591:13
**593** [1] - 650:3

## 6

**6** [2] - 648:19, 648:21
**600** [1] - 591:13
**609** [1] - 650:4
**625** [1] - 650:5
**630** [1] - 650:6
**631** [1] - 591:22
**647** [1] - 650:7

## 7

**7** [2] - 648:22, 648:24
**70** [4] - 601:12, 601:17, 602:6, 629:15
**712-6108** [1] - 591:22
**712-6124** [1] - 591:22

## 8

**80** [3] - 601:12, 601:18, 602:6

## 9

**90** [3] - 629:21, 629:22
**9:30** [1] - 592:1
**9:38** [1] - 603:21
**9:40** [1] - 592:12

## A

**a.m** [4] - 591:7, 630:10, 646:17, 647:6
**Abbasi** [1] - 616:6
**ability** [1] - 640:3
**able** [4] - 592:19, 601:17, 615:19, 626:2
**absence** [1] - 649:8
**absolutely** [2] -

601:16, 624:12
**accelerate** [2] - 596:23, 626:11
**accelerated** [1] - 610:13
**accelerating** [1] - 597:15
**acceleration** [3] - 611:20, 612:6, 618:22
**access** [1] - 604:18
**accident** [1] - 642:22
**accomplished** [1] - 642:9
**according** [1] - 644:8
**account** [3] - 633:17, 637:6, 639:16
**accuse** [1] - 605:24
**acknowledge** [1] - 593:20
**act** [4] - 636:20, 636:22, 636:25, 638:18
**acted** [3] - 637:23, 638:10, 638:14
**action** [3] - 630:23, 631:14, 638:16
**actions** [1] - 607:3
**activities** [1] - 640:4
**activity** [2] - 627:18, 627:20
**acts** [2] - 606:24, 635:12
**actuary** [1] - 629:9
**add** [1] - 604:6
**addition** [1] - 611:1
**adjourned** [1] - 649:18
**admit** [1] - 605:13
**admits** [1] - 607:11
**admitted** [4] - 605:10, 613:24, 616:21, 619:11
**advantage** [3] - 602:2, 602:3, 602:9
**advise** [1] - 619:8
**advising** [1] - 618:25
**affected** [1] - 618:13
**affecting** [1] - 608:23
**affection** [1] - 641:3
**affects** [2] - 607:17, 608:21
**afterthought** [1] - 618:1
**age** [1] - 640:10
**aggravated** [1] - 639:21
**aggravation** [1] - 639:21
**ago** [3] - 607:20, 616:12, 616:13

**agree** [6] - 608:11, 643:1, 643:19, 644:4, 646:11
**agreed** [3] - 608:19, 615:1, 635:5
**ahead** [1] - 616:20
**aim** [1] - 628:4
**al** [1] - 604:2
**ALFRED** [1] - 591:16
**allegations** [2] - 609:25, 610:17
**alleged** [1] - 610:3
**alleges** [1] - 635:18
**allowed** [3] - 593:19, 604:23, 604:24
**almost** [3] - 601:11, 610:2, 623:7
**alone** [3] - 601:24, 631:5, 631:12
**amazing** [1] - 621:21
**amount** [2] - 624:9, 639:1, 641:4
**ample** [1] - 617:13
**analogy** [2] - 610:15, 611:25
**and-a-half** [5] - 624:1, 624:3, 624:23, 627:8, 628:25
**ANN** [1] - 591:17
**announcement** [7] - 618:23, 621:10, 621:11, 621:13, 626:10, 626:14, 626:18
**Announcement** [1] - 618:25
**announcements** [6] - 619:3, 619:7, 619:8, 619:13, 619:17, 620:8
**answer** [4] - 599:19, 621:15, 621:20, 642:19
**apologize** [2] - 593:25, 597:10
**appeal** [1] - 632:11
**appear** [1] - 616:1
**APPEARANCES** [1] - 591:11
**appeared** [1] - 631:7
**applied** [1] - 641:6
**apply** [4] - 631:20, 634:3, 634:4, 641:17
**appreciate** [1] - 628:1
**April** [1] - 623:18
**argue** [3] - 597:21, 603:15, 625:15
**argument** [1] - 604:23
**arguments** [2] - 630:16, 633:8

**arise** [1] - 636:19
**Aristotle** [1] - 628:4
**arthritic** [1] - 614:19
**aside** [1] - 649:12
**assessing** [1] - 639:15
**assistant** [1] - 600:13
**assuming** [3] - 620:11, 642:22
**asymptomatic** [1] - 626:23
**athletic** [2] - 627:18, 627:20
**attempt** [1] - 618:1
**attention** [3] - 592:25, 593:17, 617:20
**attentive** [1] - 640:2
**attorney** [7] - 602:11, 604:3, 605:23, 626:1, 626:6, 626:9, 628:1
**attorneys** [7] - 596:20, 604:22, 625:14, 625:21, 626:4, 626:8, 630:15
**Augustine** [1] - 628:8
**average** [1] - 640:14
**avoid** [2] - 628:4, 637:15
**award** [11] - 628:17, 628:19, 629:13, 629:20, 639:12, 639:13, 639:21, 639:22, 640:5, 640:23, 641:4
**awarded** [2] - 629:16, 629:18
**aware** [2] - 619:7, 620:4
**awareness** [1] - 639:25

## B

**babes** [1] - 606:9
**backflush** [4] - 611:7, 611:8, 611:10, 626:16
**backflushing** [9] - 602:4, 619:2, 619:7, 621:9, 621:11, 621:12, 621:14, 621:16, 622:3
**bad** [7] - 596:8, 597:2, 597:13, 597:15, 626:12, 626:13, 628:15
**BADIAK** [1] - 591:15
**balls** [1] - 624:2
**bankruptcy** [1] - 604:11

**bar** [1] - 616:16
**Barboza** [1] - 618:2
**BARNES** [1] - 591:12
**base** [1] - 598:1
**based** [4] - 613:8, 615:23, 641:5
**basis** [1] - 635:1
**basketball** [2] - 624:1, 624:3
**Bay** [2] - 600:21, 607:6
**beard** [1] - 618:6
**becomes** [1] - 642:11
**bed** [1] - 601:5
**BEFORE** [1] - 591:10
**begin** [1] - 646:18
**beginning** [3] - 594:17, 624:19, 644:20
**belief** [1] - 632:23
**believable** [1] - 599:20
**bend** [1] - 623:25
**bending** [3] - 623:24, 624:14, 627:14
**Bernard** [2] - 624:5, 624:9
**best** [1] - 594:9
**bet** [1] - 602:17
**better** [1] - 594:13
**between** [5] - 602:18, 605:20, 612:8, 631:15, 635:16
**beyond** [1] - 594:16
**bias** [5] - 613:23, 621:1, 621:3, 631:20, 633:23
**bicycle** [1] - 611:25
**big** [2] - 599:8, 624:9
**bing** [1] - 622:18
**birth** [1] - 604:17
**bit** [1] - 605:7
**blatantly** [1] - 603:18
**blue** [1] - 621:2
**Blue** [1] - 595:8
**board** [1] - 613:4
**boat** [19] - 595:25, 596:1, 598:22, 599:2, 599:4, 601:2, 601:3, 601:20, 602:4, 602:6, 602:10, 605:13, 606:8, 606:14, 606:19, 609:2, 621:18, 626:11, 626:16
**boats** [3] - 622:24, 622:25
**body** [1] - 608:21
**bone** [1] - 607:17
**books** [1] - 611:4
**boom** [1] - 630:2

**booth** [1] - 598:18
**bootstrap** [1] - 615:13
**bore** [1] - 610:22
**boring** [1] - 645:10
**bottoms** [1] - 619:16
**bouncing** [1] - 624:3
**boxes** [1] - 597:8
**boy** [1] - 605:25
**boys** [1] - 600:7
**break** [1] - 630:8
**brief** [1] - 641:14
**briefly** [2] - 612:17, 632:20
**bring** [2] - 598:9, 598:23
**bringing** [1] - 638:20
**brought** [12] - 595:5, 604:10, 604:11, 604:13, 605:8, 610:20, 610:21, 610:24, 611:1, 613:4, 616:15, 635:7
**burden** [4] - 631:23, 631:24, 636:11, 636:13
**bury** [1] - 606:1
**business** [2] - 623:15, 628:22
**butt** [2] - 598:19, 613:15
**buttocks** [1] - 601:5
**buy** [1] - 626:5
**BY** [2] - 591:14, 591:16

## C

**C6/7** [1] - 608:20
**Caesar** [1] - 628:10
**calm** [1] - 602:4
**cannot** [1] - 593:2
**capable** [1] - 618:21
**captain** [3] - 595:6, 596:23, 597:14, 599:16, 600:16, 610:18, 611:10, 619:2, 619:13
**Captain** [5] - 601:8, 601:13, 617:8, 617:10, 617:11
**car** [4] - 611:25, 624:16, 627:14
**care** [8] - 619:14, 636:17, 636:18, 636:25, 637:2, 637:4, 637:10
**carefully** [1] - 641:25
**carrying** [3] - 623:16, 624:8, 624:14
**case** [41] - 594:10,

594:14, 594:16, 597:7, 598:12, 598:20, 598:25, 602:14, 602:16, 604:16, 606:23, 609:25, 612:13, 613:19, 625:16, 625:19, 625:25, 627:6, 630:9, 630:14, 630:17, 630:21, 630:23, 631:2, 631:13, 631:23, 632:24, 633:22, 633:24, 634:1, 635:6, 635:7, 635:13, 636:24, 641:16, 641:20, 641:21, 642:16, 642:22, 649:14
**catamaran** [1] - 611:20
**Catherine** [1] - 607:8
**causally** [1] - 616:5
**caused** [5] - 606:14, 609:7, 610:3, 628:18, 639:16
**causes** [1] - 638:16
**CELLINO** [1] - 591:12
**Central** [2] - 591:6, 591:21
**certain** [3] - 622:18, 633:6, 641:9
**certainly** [1] - 619:14
**cetera** [2] - 605:20, 605:21
**chain** [1] - 622:5
**chance** [1] - 606:10
**change** [5] - 596:11, 608:5, 642:1, 645:19
**changed** [5] - 612:18, 613:11, 623:3, 623:4, 629:14
**changing** [1] - 610:9
**charge** [6] - 627:2, 644:10, 645:3, 645:20, 646:6, 647:5
**CHARGE** [2] - 630:13, 650:6
**charges** [1] - 639:2
**Chernoff** [2] - 616:3, 616:4
**chief** [1] - 599:14
**children** [9] - 598:13, 599:3, 599:7, 600:9, 611:15, 611:17, 613:21, 621:4, 622:16
**Chris** [7] - 600:4, 600:12, 600:17, 602:19, 602:21,

603:1, 603:5
**circumstances** [6] - 636:19, 636:21, 636:23, 637:6, 637:23, 641:7
**City** [1] - 591:13
**civil** [2] - 630:21, 631:23
**claim** [16] - 602:24, 612:6, 613:13, 617:19, 618:21, 629:25, 632:1, 632:11, 632:13, 636:2, 636:4, 636:5, 637:1, 640:18, 640:19, 640:20
**claimed** [2] - 622:20, 628:22
**claiming** [2] - 618:11, 618:12
**claims** [5] - 612:5, 612:17, 631:25, 635:23, 636:14
**cleans** [1] - 623:2
**clear** [2] - 610:16, 619:5
**clearly** [2] - 609:1, 612:7
**CLERK** [2] - 646:8, 646:25
**clerk** [2] - 642:9, 647:15
**client** [3] - 604:10, 619:20, 628:2
**Clifford** [1] - 619:6
**Clifford's** [1] - 620:7
**clog** [3] - 596:4, 619:5, 621:12
**close** [3] - 599:15, 599:17, 599:18
**closed** [1] - 599:13
**closing** [2] - 594:8, 630:16
**CM** [1] - 591:19
**coached** [2] - 621:7, 622:16
**coaching** [1] - 621:15
**Coast** [3] - 610:11, 612:15, 619:12
**coccyx** [7] - 600:20, 601:1, 607:4, 607:16, 612:19, 612:22
**code** [2] - 610:20, 621:2
**coffee** [3] - 618:14, 625:23, 627:14
**collect** [1] - 612:14
**color** [1] - 642:24
**Combs** [1] - 591:20

**coming** [1] - 608:20
**committed** [1] - 634:25
**common** [3] - 596:5, 606:18, 611:8
**commotion** [1] - 618:3
**communicate** [2] - 642:12, 642:15
**communication** [1] - 642:13
**community** [1] - 631:15
**companionship** [1] - 641:3
**company** [3] - 606:24, 607:2, 611:2
**compared** [1] - 632:21
**comparison** [1] - 614:24
**compensate** [2] - 639:14, 641:8
**complain** [1] - 607:22
**complained** [1] - 618:19
**complaining** [1] - 614:11
**complaint** [4] - 599:22, 611:16, 626:3, 626:9
**complaints** [1] - 615:22
**completely** [2] - 596:3, 602:4
**comport** [1] - 610:12
**compressed** [1] - 594:7
**computer** [1] - 591:25
**concerning** [2] - 631:10, 633:23
**concluded** [1] - 630:16
**conclusion** [1] - 641:13
**condition** [22] - 598:24, 609:2, 614:22, 614:23, 615:2, 615:3, 615:9, 615:10, 615:11, 615:13, 616:8, 620:5, 626:22, 627:1, 627:4, 627:5, 639:19, 639:20, 639:22, 639:23
**conditions** [1] - 620:9
**conduct** [6] - 619:21, 638:2, 638:4, 638:7, 638:10, 638:14
**conflicts** [1] - 631:6
**confronted** [1] - 597:23

connected [1] - 613:9
Connecticut [1] - 635:17
connection [2] - 613:12, 614:5
conscientiously [2] - 641:6, 644:7
conscious [2] - 639:14, 639:24
consider [8] - 594:19, 605:1, 633:9, 633:13, 634:12, 634:17, 639:10, 640:10
consideration [1] - 631:18
considered [4] - 631:14, 632:21, 633:25, 640:20
considering [2] - 634:2, 639:8
consistent [2] - 599:21, 601:20
conspiracy [1] - 598:15
consulting [1] - 596:19
contemporaneous [1] - 613:25
contention [1] - 594:21
continue [2] - 622:10, 643:9
continued [1] - 620:14
Continued [1] - 647:7
contract [2] - 626:5, 626:6
contradicted [1] - 634:6
contradiction [1] - 634:11
control [1] - 604:17
controls [1] - 631:12
convenient [1] - 622:4
conversation [3] - 593:20, 594:8, 602:18
conversations [1] - 617:13
convince [1] - 604:7
convinced [1] - 642:2
cooks [1] - 623:2
copy [2] - 645:5, 645:7
corporation [1] - 635:11
corporations [1] - 631:16
correct [2] - 642:2, 644:23
correctly [1] - 644:15

counsel [4] - 610:20, 612:4, 617:10, 631:3
counterclockwise [1] - 610:7
Country [1] - 591:13
counts [1] - 597:10
couple [3] - 614:6, 623:13, 630:2
course [6] - 610:5, 613:5, 614:4, 614:8, 624:7, 624:11
Court [4] - 591:19, 647:4, 647:5, 647:13
COURT [25] - 591:1, 592:8, 592:13, 592:25, 605:3, 605:5, 609:5, 616:17, 622:9, 623:21, 629:12, 630:7, 630:14, 644:15, 644:19, 644:25, 646:10, 646:14, 646:19, 646:22, 647:12, 648:1, 649:3, 649:10, 649:15
court [17] - 593:4, 593:22, 594:1, 598:10, 603:5, 631:13, 631:17, 633:3, 642:6, 642:14, 642:17, 644:9, 644:18, 646:25, 647:2, 648:3, 649:4
COURT'S [2] - 630:13, 650:6
Courthouse [2] - 591:5, 591:20
courtroom [2] - 633:12, 646:17
COURTROOM [12] - 647:16, 647:20, 647:25, 648:2, 648:7, 648:10, 648:13, 648:16, 648:19, 648:22, 648:25, 649:2
covered [1] - 646:3
craft [2] - 611:21, 611:23
craning [1] - 609:21
create [1] - 627:4
credence [1] - 634:19
credibility [6] - 604:20, 604:21, 617:18, 625:14, 625:21, 626:1
credible [3] - 594:24, 611:11, 628:24

credit [1] - 613:21
crew [11] - 595:6, 599:16, 602:22, 602:23, 602:25, 610:18, 610:21, 610:22, 610:24, 616:22, 617:4
crewcut [1] - 618:7
crippled [1] - 627:22
Cross [8] - 606:23, 606:25, 615:3, 620:10, 625:3, 635:9, 635:11, 635:13
cross [3] - 607:23, 633:2, 643:10
CROSS [1] - 591:7
cross-examination [1] - 633:2, 643:10
cross-examined [1] - 607:23
CSR [2] - 591:19, 591:20
cue [2] - 621:25, 622:18

D

dad [1] - 601:21
daily [1] - 640:3
damages [17] - 628:17, 628:20, 635:21, 636:10, 638:24, 639:1, 639:2, 639:8, 639:10, 639:12, 639:13, 639:15, 639:21, 639:23, 640:6, 640:10, 640:23
danger [7] - 619:21, 619:22, 620:2, 620:6, 620:13, 638:1, 638:2
dangerous [1] - 609:2
date [1] - 591:7
dated [2] - 646:25, 647:2
daughter [5] - 598:6, 617:1, 617:22, 627:16
Davis [1] - 607:9
days [12] - 592:6, 601:4, 608:12, 608:13, 608:14, 608:16, 608:17, 614:2, 614:6, 622:23, 627:12
deal [1] - 594:8
dealt [2] - 626:4,

631:17
December [2] - 623:9, 623:12
decide [7] - 632:25, 633:15, 637:22, 639:4, 639:7, 639:9, 639:11
decided [2] - 592:24, 631:14
deciding [4] - 633:7, 633:13, 634:9, 634:17
decision [2] - 633:16, 642:2
deck [2] - 617:9, 618:16
dedication [1] - 593:17
deed [1] - 604:5
deem [1] - 631:8
Defendant [2] - 591:8, 591:15
defendant [32] - 593:7, 594:23, 594:25, 595:4, 595:22, 598:16, 602:8, 603:14, 606:22, 606:23, 625:8, 628:18, 631:25, 634:3, 635:9, 635:10, 635:13, 635:15, 635:22, 636:1, 636:8, 636:13, 636:24, 637:1, 637:19, 637:21, 637:22, 639:20, 644:17, 644:20, 647:22, 648:4
defendant's [8] - 595:24, 596:20, 601:25, 632:19, 635:19, 635:24, 636:11, 639:17
defendants [5] - 602:5, 606:13, 631:22, 632:14, 639:6
DEFENSE [2] - 609:12, 650:4
defense [2] - 603:12, 604:3
define [2] - 630:20, 638:18
defined [2] - 636:16, 637:25
defining [1] - 630:25
definitions [1] - 636:15
degenerative [3] -

614:21, 626:21, 627:6
degrading [1] - 604:15
degree [5] - 594:23, 594:25, 595:3, 636:17, 637:4
delay [2] - 612:8, 612:11
deliberations [7] - 611:21, 630:25, 641:19, 641:23, 642:12, 646:5, 646:18
demeaning [1] - 604:15
denied [3] - 592:8, 597:22, 649:15
denies [1] - 635:22
deny [3] - 603:6, 603:17, 603:18
deposition [1] - 623:24
depositions [1] - 605:22
DEPUTY [12] - 647:16, 647:20, 647:25, 648:2, 648:7, 648:10, 648:13, 648:16, 648:19, 648:22, 648:25, 649:2
dermatol [1] - 615:23
described [2] - 618:7, 633:20
desire [1] - 642:7
detail [2] - 609:10, 634:14
details [8] - 599:25, 600:6, 600:9, 600:11, 605:19, 621:23, 622:17
determine [4] - 635:24, 636:2, 639:1, 640:8
developed [1] - 614:20
diagnose [1] - 600:20
Dick [1] - 619:24
die [2] - 628:11, 640:15
different [4] - 596:4, 596:11, 615:18, 634:14
differently [3] - 632:13, 634:15, 634:16
dire [1] - 606:12
direct [1] - 633:2
direction [1] - 610:16
disability [3] - 603:24,

604:1, 624:6
**disbelieve** [1] - 634:8
**disc** [3] - 626:21,
627:3, 627:6
**discharged** [1] - 649:7
**disclose** [1] - 614:12
**discuss** [2] - 609:9,
641:21
**discussion** [1] -
641:20
**disease** [1] - 627:6
**disgrace** [1] - 622:6
**disks** [2] - 607:5,
614:24
**Disney** [1] - 622:23
**dispute** [1] - 645:11
**disregard** [1] - 633:11
**disregarded** [1] -
633:7
**distal** [1] - 615:7
**distinctive** [1] - 618:5
**distribution** [1] -
615:23
**DISTRICT** [3] - 591:1,
591:1, 591:10
**District** [1] - 591:20
**divorce** [1] - 604:14
**doctor** [5] - 600:25,
607:15, 607:23,
608:15, 608:19
**Doctor** [1] - 608:3
**doctors** [5] - 614:19,
616:14, 625:17,
625:20, 627:9
**documents** [1] -
592:18
**dog** [3] - 624:7, 624:8,
624:14
**dogs** [2] - 623:16
**dollars** [3] - 629:3,
629:4, 629:17
**Dominick** [1] - 591:19
**DomTursi@email.
com** [1] - 591:22
**done** [4] - 634:6,
636:21, 636:23,
637:12
**donut** [1] - 623:11
**doubt** [1] - 594:17
**doughnuts** [1] -
627:15
**Dowling** [1] - 616:6
**down** [15] - 593:23,
596:10, 599:5,
617:4, 617:15,
618:12, 619:4,
620:2, 621:9,
621:16, 621:18,
621:19, 622:2,
625:18, 627:23

**Dr** [17] - 607:9, 612:21,
612:24, 613:3,
613:24, 614:4,
614:10, 614:17,
614:21, 615:5,
615:16, 616:3,
616:4, 616:6, 616:11
**drafted** [1] - 626:9
**dramatic** [1] - 596:24
**draw** [1] - 603:10,
631:7
**dropped** [1] - 618:14
**dual** [1] - 612:1
**due** [1] - 635:21
**during** [8] - 593:19,
610:1, 610:5, 611:7,
611:21, 615:16,
641:17, 642:11
**duties** [1] - 630:20
**duty** [3] - 631:1,
636:24, 644:6

## E

**earn** [2] - 595:17,
628:23
**earned** [2] - 604:25,
605:2
**easier** [3] - 598:21,
628:10, 646:2
**easily** [1] - 624:16
**EASTERN** [1] - 591:1
**easy** [1] - 598:25
**eat** [1] - 623:2
**effect** [2] - 632:8,
638:21
**either** [7] - 595:2,
599:19, 612:1,
631:21, 632:6,
632:18, 642:9
**election** [1] - 611:12
**elements** [4] - 630:23,
631:25, 636:6, 641:2
**Ellen** [1] - 591:20
**embarrassing** [1] -
618:3
**embarrassment** [3] -
618:8, 618:9
**emergency** [1] -
617:22
**employed** [2] -
595:16, 595:17
**employees** [2] -
635:12, 635:14
**employer** [1] - 595:19
**employers** [1] - 607:3
**end** [1] - 594:10
**endure** [1] - 628:12
**engaged** [2] - 610:6,
620:1

**engagement** [1] -
612:11
**engine** [2] - 611:4,
612:10
**engineer** [3] - 595:6,
610:19, 611:2
**England** [7] - 600:4,
600:13, 600:17,
602:19, 602:21,
603:2, 603:5
**enjoyment** [2] - 640:1,
640:2
**ensued** [4] - 592:1,
592:11, 647:8, 649:8
**entered** [2] - 611:22,
612:4
**entities** [1] - 631:16
**entitled** [10] - 631:18,
631:19, 639:1,
639:6, 639:7, 639:9,
639:11, 640:9,
640:22, 641:23
**epidural** [1] - 607:9
**equal** [4] - 631:13,
631:15, 631:16,
631:18
**equals** [1] - 631:17
**ESQ** [3] - 591:14,
591:16, 591:17
**essence** [1] - 613:23
**essential** [1] - 631:24
**establish** [1] - 632:1
**established** [1] -
621:6
**et** [3] - 605:20, 605:21,
649:12
**evaluate** [1] - 635:3
**evenly** [1] - 632:17
**event** [4] - 602:8,
614:5, 617:16,
634:15
**events** [1] - 633:19
**eventually** [1] - 607:8
**evidence** [73] -
592:17, 592:20,
593:6, 594:18,
594:21, 594:22,
594:25, 598:2,
602:12, 602:13,
603:12, 604:22,
604:24, 604:25,
605:17, 609:17,
611:22, 612:4,
612:21, 612:22,
612:23, 613:1,
615:10, 616:18,
621:7, 622:20,
625:3, 625:16,
625:19, 630:14,
631:2, 631:6, 631:7,

631:8, 631:9,
631:11, 632:1,
632:2, 632:4, 632:7,
632:8, 632:10,
632:12, 632:14,
632:17, 632:20,
632:21, 632:25,
633:4, 633:6, 633:8,
633:12, 633:14,
634:1, 634:22,
634:25, 636:7,
639:4, 640:11,
641:5, 641:17,
641:20, 644:8,
645:9, 645:10,
645:12, 645:13,
645:15, 646:7,
646:15, 646:19,
649:13
**evil** [1] - 628:8
**exacerbate** [2] -
627:4, 627:5
**exacerbated** [1] -
628:19
**exact** [2] - 638:5
**exaggerating** [1] -
615:17
**examination** [2] -
615:17, 633:2,
643:10
**examined** [2] -
607:23, 646:12
**examples** [1] - 603:20
**except** [1] - 642:13
**excessive** [2] - 629:3,
629:17
**exchange** [1] - 641:24
**excluded** [1] - 633:10
**excused** [1] - 649:3
**exercise** [2] - 637:2,
637:9
**Exhibit** [5] - 646:25,
647:2, 647:4, 647:5,
647:13
**exhibits** [2] - 633:3,
645:9
**exist** [4] - 614:24,
615:2, 615:4, 615:9
**expectancy** [7] -
629:8, 640:7,
640:11, 640:12,
640:13
**expected** [1] - 635:1
**experience** [3] -
613:8, 634:23, 641:6
**expert** [14] - 595:24,
606:15, 607:14,
607:19, 608:1,
610:10, 613:4,
619:6, 619:11,

626:13, 628:2,
634:22, 634:25,
635:4
**Expert** [1] - 611:18
**experts** [2] - 598:23,
626:21
**explain** [2] - 636:4,
636:14
**extensively** [1] - 594:6
**extent** [2] - 603:15,
640:8
**extremely** [1] - 612:2
**eye** [1] - 618:4
**eyes** [1] - 603:13

## F

**face** [4] - 621:5,
624:10, 628:15,
628:16
**fact** [7] - 595:5,
602:10, 604:11,
604:12, 604:13,
621:17, 634:13
**factor** [1] - 638:20
**factors** [2] - 633:17,
634:17
**facts** [11] - 604:17,
631:2, 631:3,
631:11, 631:19,
633:1, 633:4, 633:7,
633:13, 641:7,
641:16
**failed** [2] - 614:10,
637:1
**failing** [1] - 636:22
**fails** [1] - 636:12
**failure** [2] - 636:17,
637:9
**fair** [3] - 594:18,
594:24, 603:16
**fairest** [1] - 629:11
**fall** [2] - 598:19,
611:17
**falsehood** [1] - 634:12
**family** [3] - 618:16,
618:18, 622:9
**fault** [1] - 638:17
**favor** [7] - 594:24,
595:21, 631:19,
632:16, 632:19,
644:7, 648:4
**favorable** [2] - 594:21,
594:22
**favorite** [1] - 628:13
**Fax** [1] - 591:22
**fear** [1] - 644:7
**February** [1] - 623:15
**Federal** [1] - 591:21
**feedback** [1] - 594:13

5

**feet** [1] - 624:2
**fell** [7] - 598:24, 600:7, 601:5, 611:15, 617:1, 617:14, 618:14
**fellow** [1] - 641:25
**felt** [2] - 600:10, 621:24
**FERRY** [1] - 591:14
**ferry** [11] - 596:12, 606:7, 610:8, 635:15, 635:17, 635:20, 637:3, 637:13, 637:15, 637:17
**Ferry** [7] - 606:23, 606:25, 615:3, 625:3, 635:9, 635:11, 635:14
**few** [4] - 614:2, 616:12, 617:13
**field** [1] - 634:24
**filed** [5] - 604:11, 610:1, 610:2, 610:6, 611:16
**film** [2] - 612:20, 613:2
**films** [2] - 613:1, 613:7
**finally** [2] - 597:1, 630:24
**fine** [2] - 600:22, 606:20
**fingers** [1] - 614:9
**finished** [1] - 626:15
**first** [12] - 593:7, 593:16, 606:12, 608:25, 609:5, 609:24, 612:18, 618:23, 630:2, 630:19, 635:24, 645:16
**fishing** [3] - 623:1, 627:20
**five** [10] - 592:16, 597:8, 605:3, 605:5, 608:4, 621:22, 623:21, 625:13, 630:7
**Five** [1] - 630:9
**flavor** [2] - 642:21, 643:3
**flip** [2] - 611:12, 611:13
**flip-flopping** [2] - 611:12, 611:13
**flopping** [2] - 611:12, 611:13
**Florida** [1] - 622:23
**fluidly** [1] - 624:18
**flush** [1] - 621:11
**follow** [4] - 613:6,

645:23, 645:25, 646:1
**following** [11] - 592:1, 592:11, 620:14, 630:11, 633:18, 636:6, 644:14, 644:18, 647:7, 647:8, 649:8
**food** [1] - 600:8
**fooled** [2] - 625:6
**FOR** [4] - 593:11, 609:12, 650:3, 650:4
**forelady** [1] - 647:17
**foreperson** [2] - 645:17, 645:24
**FOREPERSON** [2] - 647:19, 647:24
**foresee** [2] - 638:9, 638:11
**foreseeable** [9] - 619:21, 620:2, 620:6, 620:12, 637:6, 637:25, 638:1, 638:5, 638:6
**foreseen** [2] - 638:13, 638:15
**forget** [1] - 634:10
**former** [2] - 610:10, 618:2
**forms** [1] - 633:1
**forward** [3] - 606:21, 610:13, 610:15
**four** [10] - 597:9, 604:14, 607:12, 622:7, 622:8, 622:22, 627:8, 628:25, 643:23
**fractured** [6] - 600:20, 600:22, 612:21, 612:22, 612:25
**frankly** [1] - 622:6
**free** [4] - 626:24, 627:1, 627:7, 649:17
**Friday** [5] - 602:22, 602:23, 603:2, 617:20, 617:23
**front** [1] - 609:15
**functions** [1] - 640:3
**funny** [2] - 618:15, 621:10
**fusion** [2] - 607:19, 608:20
**future** [5] - 629:7, 630:4, 639:14, 640:10, 641:10

### G

**game** [1] - 624:1
**games** [1] - 623:3

**Garden** [1] - 591:13
**gears** [1] - 613:13
**gee** [2] - 599:15, 600:10
**geeze** [1] - 624:23
**general** [2] - 630:20, 630:24
**gentleman** [1] - 599:13
**gentlemen** [9] - 593:15, 596:2, 598:17, 599:24, 608:22, 625:12, 626:15, 629:20, 648:2
**George** [1] - 628:13
**GEORGE** [1] - 591:14
**Gibson** [38] - 593:14, 598:4, 598:6, 598:7, 598:12, 601:19, 602:1, 602:19, 603:24, 604:5, 604:13, 606:4, 606:7, 608:13, 612:13, 616:21, 623:9, 629:15, 629:24, 635:8, 635:18, 635:21, 636:3, 636:5, 638:25, 639:4, 639:9, 639:11, 639:18, 640:12, 640:17, 640:21, 641:4, 641:8
**GIBSON** [2] - 591:3, 591:4
**Gibson's** [6] - 611:11, 621:3, 636:1, 637:1, 640:8, 640:18
**giggling** [1] - 600:7
**given** [5] - 613:7, 620:7, 639:5, 641:18, 644:9
**glasses** [2] - 618:5, 618:7
**goodness** [1] - 604:18
**govern** [1] - 630:20
**governs** [1] - 630:17
**greater** [4] - 632:4, 632:5, 634:19
**greatest** [1] - 628:8
**greet** [1] - 593:20
**GRIDELLI** [17] - 591:14, 592:3, 592:9, 593:10, 593:13, 605:4, 605:6, 609:7, 616:16, 625:12, 629:13, 644:16, 644:24, 646:13,

646:21, 646:24, 649:11
**Gridelli** [3] - 621:8, 621:18, 625:11
**grimacing** [1] - 624:11
**Guard** [3] - 610:11, 612:15, 619:12
**guess** [1] - 595:16
**gun** [2] - 602:12, 602:16, 616:11
**guy** [2] - 600:3, 603:9, 618:4
**GYN** [1] - 604:18

### H

**ha-ha** [1] - 606:17
**half** [13] - 597:9, 601:11, 607:20, 608:14, 613:9, 613:14, 613:16, 615:12, 624:1, 624:3, 624:23, 627:8, 628:25
**hallway** [1] - 593:23
**hand** [5] - 607:14, 608:18, 612:24, 636:22, 638:12
**hands** [2] - 619:16, 624:10
**hardest** [1] - 627:25
**head** [7] - 593:23, 599:8, 600:10, 618:5, 621:24, 622:5, 624:19
**heads** [2] - 619:1, 643:17
**healing** [2] - 612:23, 615:10
**hear** [7] - 611:12, 642:7, 642:20, 642:21, 643:3, 643:18
**heard** [8] - 595:8, 618:3, 619:24, 621:20, 633:11, 643:7, 643:16, 643:19
**HEATHER** [1] - 591:3
**Heather** [30] - 593:14, 598:4, 598:12, 600:9, 602:1, 602:19, 606:4, 608:13, 609:19, 609:20, 611:11, 612:13, 616:21, 618:16, 618:18, 623:9, 635:8, 635:18, 635:25, 636:5, 636:25,

638:25, 639:3, 639:9, 639:11, 639:18, 640:8, 640:12, 640:18, 640:21
**held** [1] - 614:14
**help** [3] - 599:3, 645:24, 646:22
**herniated** [3] - 607:5, 614:23, 627:3
**herniation** [2] - 615:7, 615:11
**heroes** [1] - 628:16
**herself** [1] - 599:5
**hesitate** [1] - 642:1
**hesitated** [1] - 622:17
**high** [3] - 597:20, 597:21, 597:24
**hired** [4] - 613:3, 613:4, 616:11
**hit** [3] - 606:8, 610:8, 643:1
**hitting** [1] - 607:16
**hold** [1] - 619:16
**holding** [2] - 624:8, 627:14
**honeymoon** [1] - 630:1
**Honor** [11] - 592:3, 593:10, 603:22, 616:16, 622:11, 623:22, 644:24, 646:13, 646:21, 647:13, 649:11
**HONORABLE** [1] - 591:10
**hope** [4] - 594:13, 596:15, 598:7, 626:2
**hoped** [1] - 594:2
**hopefully** [1] - 604:25
**hospital** [2] - 600:19, 608:14
**hours** [1] - 622:25
**house** [2] - 626:5
**hulls** [1] - 612:1
**Hum** [1] - 621:23
**hundred** [1] - 623:7
**hundreds** [1] - 608:2
**hunt** [1] - 617:4
**hurt** [12] - 595:11, 599:5, 599:7, 601:6, 601:21, 601:24, 606:1, 616:25, 617:3, 617:4, 617:5, 617:15
**hurting** [1] - 617:21
**husband** [2] - 635:8, 640:18

## I

**identify** [1] - 618:1
**imagination** [1] - 620:12
**immediately** [1] - 610:2
**impending** [1] - 619:9
**implicate** [1] - 618:1
**importance** [1] - 631:4
**important** [9] - 595:18, 600:18, 604:19, 604:21, 605:12, 606:5, 614:22, 625:15, 634:13
**imposed** [1] - 637:10
**impossible** [1] - 611:19
**impress** [1] - 631:4
**impression** [1] - 605:23
**improper** [1] - 620:10
**inability** [1] - 641:10
**inadequate** [2] - 629:6, 629:19
**Inc** [2] - 635:9, 635:14
**incident** [11] - 602:8, 603:11, 603:14, 603:17, 608:12, 610:18, 615:12, 616:9, 618:10, 623:10, 624:23
**include** [1] - 641:19
**includes** [1] - 640:1
**including** [1] - 633:18
**inconsistent** [1] - 597:5
**indicate** [1] - 614:3
**indicated** [6] - 610:11, 612:24, 614:4, 615:2, 621:3, 640:16
**indicia** [1] - 599:24
**individual** [1] - 607:2
**individuals** [1] - 606:24
**industry** [2] - 595:12, 595:13
**inferences** [1] - 631:7
**influence** [1] - 606:16
**inherently** [1] - 611:21
**initial** [1] - 608:23
**injection** [2] - 623:17
**injections** [3] - 607:9, 607:13, 629:1
**injured** [4] - 600:8, 605:12, 612:19, 625:24
**injuries** [14] - 603:16, 606:11, 609:9,

628:1, 628:18, 628:19, 635:19, 637:14, 638:5, 638:25, 640:4, 640:7, 640:9, 641:12
**injury** [27] - 600:24, 601:3, 601:6, 604:16, 607:4, 608:23, 609:4, 609:8, 610:2, 614:1, 614:3, 614:5, 619:21, 627:3, 636:1, 637:7, 638:1, 638:4, 638:6, 638:9, 638:14, 638:18, 638:19, 638:20, 638:21, 638:23, 639:16
**injustice** [1] - 629:23
**innocent** [1] - 634:11
**inspector** [1] - 610:11
**instead** [3] - 592:4, 608:3, 637:9
**instruct** [1] - 630:17, 630:22, 631:20
**instructions** [4] - 630:18, 630:19, 636:15, 642:8
**insurer** [1] - 637:8
**intelligence** [1] - 633:20
**intentional** [1] - 634:12
**interacting** [1] - 594:3
**interest** [1] - 633:22
**interested** [1] - 622:9
**interpretation** [1] - 593:3
**interruption** [3] - 623:4, 623:14, 624:13
**investigator** [1] - 619:12
**involved** [4] - 598:10, 616:10, 625:21, 633:24
**involves** [1] - 640:2
**irrelevant** [1] - 633:10
**Island** [4] - 607:7, 614:2, 616:1, 616:6
**Islip** [2] - 591:6, 591:21
**issue** [4] - 594:20, 595:1, 600:23, 616:2
**issues** [2] - 615:14, 644:8
**itself** [5] - 601:7, 612:20, 613:2, 639:23, 642:19

## J

**Jadamec** [1] - 611:1
**jammed** [1] - 617:15
**January** [1] - 623:13
**Jeremy** [1] - 618:2
**jerks** [1] - 637:16
**Jersey** [1] - 622:24
**Jessica** [2] - 598:5, 601:19
**jet** [2] - 611:9, 612:8
**Jet** [3] - 596:9, 610:6, 635:16
**jobs** [1] - 604:12
**Joe** [2] - 642:10, 642:13
**jolting** [1] - 637:13
**Jonathan** [15] - 593:14, 603:24, 603:25, 604:5, 622:20, 629:14, 629:24, 635:8, 635:21, 636:3, 640:17, 640:22, 641:4, 641:8
**JONATHAN** [1] - 591:4
**judge** [11] - 593:13, 594:17, 597:4, 605:9, 619:19, 629:9, 631:19, 641:16, 646:8, 647:16, 649:2
**JUDGE** [1] - 591:10
**Judge** [1] - 594:1
**judge's** [1] - 627:2
**judges** [1] - 631:3
**judgment** [1] - 641:7
**JUJROR** [1] - 592:24
**Julius** [1] - 628:10
**Juror** [7] - 648:5, 648:7, 648:10, 648:13, 648:16, 648:19, 648:22
**JUROR** [7] - 648:6, 648:9, 648:12, 648:15, 648:18, 648:21, 648:24
**jurors** [7] - 592:21, 593:18, 594:4, 594:11, 594:18, 630:25, 641:25
**jury** [21] - 591:10, 592:1, 592:12, 593:15, 598:7, 606:12, 624:25, 628:1, 628:20, 630:20, 642:15, 643:15, 646:17, 647:9, 647:12,

647:18, 648:1, 649:2, 649:3, 649:9, 649:16
**JURY** [1] - 649:1
**justice** [3] - 594:20, 629:21, 629:23

## K

**Kamewa** [1] - 612:7
**keep** [3] - 605:13, 605:15, 634:9
**keeps** [1] - 610:9
**kid** [1] - 622:7
**kids** [11] - 598:9, 599:2, 600:11, 617:1, 617:14, 621:6, 622:7, 622:8, 622:12, 622:13, 627:19
**kids'** [1] - 623:3
**kind** [1] - 598:11
**King** [1] - 628:6
**knowledge** [1] - 641:6
**known** [1] - 635:15

## L

**lack** [2] - 631:9, 636:16
**ladder** [1] - 607:17
**ladies** [9] - 593:14, 597:5, 598:16, 599:24, 608:22, 625:12, 626:14, 629:20, 648:2
**landed** [1] - 598:19
**lapse** [1] - 634:11
**large** [1] - 611:23
**last** [2] - 613:3, 613:4
**law** [13] - 630:17, 631:17, 631:20, 635:6, 635:7, 639:2, 639:5, 641:18, 645:3, 645:4, 645:21, 646:6, 646:14
**laws** [1] - 610:12
**lawsuit** [3] - 610:1, 610:3, 640:19
**lawyer** [1] - 594:13
**lawyers** [13] - 592:15, 592:17, 592:19, 593:6, 594:11, 616:18, 633:4, 633:8, 642:25, 643:25, 644:11, 644:13, 645:8
**leading** [1] - 621:19
**learn** [1] - 594:12
**learning** [2] - 596:1,

634:24
**least** [1] - 599:16
**leave** [2] - 601:24, 649:17
**leaves** [1] - 600:12
**left** [7] - 592:16, 605:3, 605:5, 618:24, 623:21, 629:12, 646:17
**legal** [2] - 630:22, 635:25
**length** [1] - 632:6
**LEONARD** [1] - 591:10
**less** [2] - 629:18, 629:21
**letter** [2] - 646:25, 647:2
**level** [1] - 639:25
**liability** [1] - 637:10
**liable** [5] - 637:13, 638:24, 644:17, 644:21, 644:23
**lie** [1] - 598:10
**life** [15] - 605:20, 623:3, 627:7, 629:8, 629:14, 630:1, 640:2, 640:4, 640:7, 640:11, 640:12, 640:13
**ligament** [2] - 615:7, 615:8
**light** [4] - 633:25, 638:10, 638:15, 642:24
**likely** [3] - 599:18, 632:3, 632:23
**limited** [1] - 594:5
**limits** [1] - 592:15
**line** [4] - 596:7, 603:10, 613:7, 619:16
**LISA** [1] - 591:17
**list** [5] - 594:15, 598:22, 606:14, 626:17
**listed** [3] - 599:2, 602:10, 609:2
**listen** [1] - 592:19, 627:2, 641:25, 643:9
**listened** [1] - 594:2
**listening** [1] - 609:17
**listing** [1] - 598:3
**litigation** [2] - 597:9, 610:5
**live** [2] - 629:10, 640:15
**lives** [1] - 623:5
**LLP** [1] - 591:15
**Loch** [1] - 606:17

**log** [2] - 611:4, 611:6
**London** [2] - 596:10, 635:17
**look** [9] - 597:8, 598:2, 602:11, 607:14, 613:7, 615:8, 622:8, 624:10, 624:11
**looked** - 612:20, 612:25, 613:1
**looking** [4] - 609:21, 612:13, 615:9, 643:17
**loss** [15] - 622:19, 629:24, 630:4, 635:22, 636:3, 640:1, 640:2, 640:17, 640:19, 640:23, 640:24, 641:1, 641:8
**lost** [1] - 628:21
**love** [2] - 594:11, 641:3
**loving** [1] - 624:7
**lower** [3] - 613:12, 613:13, 616:2
**loyalty** [1] - 595:19
**luck** [1] - 646:16
**lumbar** [1] - 607:5
**lunch** [3] - 646:4, 649:6, 649:17
**lurks** [1] - 637:16

## M

**madam** [1] - 647:17
**magnitude** [1] - 618:11
**main** [4] - 607:21, 607:24, 608:1
**major** [1] - 615:15
**man** [2] - 596:19, 628:10
**manager** [2] - 600:13, 619:24
**maneuvered** [1] - 606:19
**manned** [1] - 612:14
**manner** [1] - 633:21
**manual** [4] - 597:19, 597:23, 612:5, 612:7
**manufacturer** [1] - 612:10
**Marcus** [12] - 612:24, 613:3, 613:24, 614:10, 614:12, 614:17, 614:21, 615:1, 616:12, 616:13, 616:15
**Marine** [1] - 618:2
**marine** [2] - 595:13,

610:10
**marked** [3] - 645:9, 645:15, 647:12
**marks** [1] - 608:18
**married** [3] - 603:23, 604:13, 630:1
**Mary** [3] - 599:23, 600:1
**massive** [2] - 624:5
**material** [1] - 615:8
**matter** [4] - 608:15, 614:6, 616:19, 633:24
**mean** [13] - 603:7, 612:10, 613:11, 618:4, 618:8, 621:5, 623:14, 624:3, 624:5, 624:20, 632:5, 642:18, 645:3
**meaning** [1] - 609:4
**means** [8] - 608:14, 626:23, 628:21, 632:2, 632:4, 632:21, 637:4, 639:24
**measure** [1] - 639:10
**mechanical** [1] - 591:25
**mechanically** [2] - 611:19, 617:17
**medical** [6] - 612:17, 613:25, 615:23, 617:20, 639:19
**medicals** [2] - 615:25, 626:20
**meeting** [1] - 622:1
**member** [3] - 616:22, 617:5, 642:15
**members** [6] - 595:6, 599:17, 610:21, 610:22, 610:24, 624:25
**memory** [2] - 633:21, 634:11
**merciless** [1] - 628:6
**merely** [1] - 638:7
**merits** [1] - 642:16
**message** [1] - 600:12
**might** [1] - 595:20
**migrated** [1] - 613:15
**miles** [1] - 627:17
**million** [4] - 629:3, 629:4, 629:16, 629:18
**mind** [2] - 632:22, 634:10
**minds** [1] - 632:9
**Mineola** [1] - 591:16
**minimum** [1] - 595:18
**minute** [5] - 623:8,

624:1, 624:2, 629:12, 630:7
**minutes** [15] - 592:5, 592:16, 603:22, 605:3, 605:5, 619:3, 619:8, 619:13, 619:17, 620:8, 623:21, 625:13, 630:8, 630:9
**miss** [2] - 644:11, 644:12
**missed** [1] - 645:6
**mistake** [1] - 606:20
**Moderate** [1] - 618:24
**mom** [5] - 598:8, 601:21, 601:22, 601:24, 617:2
**moms** [1] - 598:7
**Monday** [3] - 600:4, 600:5, 602:20
**money** [1] - 645:18
**Monster** [1] - 606:17
**month** [3] - 608:7, 613:3, 613:4
**months** [7] - 604:14, 607:22, 608:3, 608:4, 608:5, 608:7, 623:13
**morning** [2] - 592:3, 609:14
**most** [5] - 604:19, 604:21, 606:5, 626:8, 649:12
**mother** [6] - 598:11, 599:3, 613:22, 621:5, 621:23
**motion** [1] - 615:20
**motions** [1] - 649:10
**motive** [1] - 595:21
**mouth** [1] - 606:9
**move** [3] - 606:21, 624:16, 649:12
**movement** [3] - 619:9, 637:17, 637:20
**moving** [5] - 615:18, 619:10, 619:18, 624:18
**MR** [21] - 592:3, 592:9, 593:10, 593:13, 605:4, 605:6, 609:7, 609:14, 616:16, 616:21, 621:1, 622:11, 623:22, 625:12, 629:13, 644:16, 644:24, 646:13, 646:21, 646:24, 649:11
**MRI** [4] - 600:21, 612:20, 614:25, 615:9

**MRIs** [2] - 613:2, 614:25
**Mulvehill** [1] - 626:8
**must** [16] - 631:19, 632:11, 632:19, 633:13, 633:15, 634:3, 636:6, 637:9, 637:15, 638:7, 638:17, 638:25, 639:2, 639:12, 642:3, 644:5
**miss** [2] - 644:11, 644:12

## N

**name** [2] - 600:1, 604:5
**nearly** [1] - 632:11
**necessary** [2] - 642:11
**neck** [10] - 609:21, 613:14, 613:15, 614:1, 614:3, 614:5, 614:18, 615:18, 624:22
**need** [5] - 592:22, 605:9, 614:5, 624:23, 626:18
**negligence** [18] - 608:25, 609:3, 619:20, 635:20, 635:25, 636:6, 636:8, 636:12, 636:16, 636:19, 637:1, 637:25, 638:8, 638:12, 639:17, 639:20, 640:21
**negligent** [8] - 597:13, 606:13, 628:18, 636:2, 637:19, 637:21, 638:7, 647:22
**nerves** [1] - 608:19
**Ness** [1] - 606:17
**never** [15] - 595:10, 596:23, 597:17, 597:18, 598:9, 603:6, 612:25, 618:4, 619:25, 627:8, 627:21, 627:22
**new** [4] - 615:10, 615:11, 615:13, 622:25
**NEW** [1] - 591:1
**New** [9] - 591:13, 591:16, 591:21, 596:10, 607:7, 625:5, 625:6, 635:16
**next** [3] - 599:23, 629:17, 630:5

**Nicholas** [4] - 598:6, 606:6, 621:17, 621:21
**night** [19] - 595:7, 596:9, 601:7, 601:9, 601:13, 601:14, 602:22, 602:23, 603:3, 611:2, 611:4, 616:23, 616:24, 617:2, 617:7, 617:21, 617:23
**NO** [7] - 648:6, 648:9, 648:12, 648:15, 648:18, 648:21, 648:24
**nobody** [1] - 618:13
**nontreating** [1] - 613:17
**normally** [1] - 594:7
**notation** [1] - 611:5, 611:6
**note** [9] - 642:9, 642:13, 642:14, 642:18, 642:19, 642:23, 642:25, 644:2, 647:12
**notes** [5] - 592:21, 593:1, 593:2, 594:6, 645:2
**nothing** [12] - 595:7, 601:12, 602:25, 611:3, 614:3, 620:3, 623:3, 623:4, 624:21, 626:19, 628:14, 640:14
**notice** [2] - 620:5, 644:10
**notify** [3] - 599:10, 599:11, 599:12
**November** [4] - 599:18, 623:10, 647:1, 647:2
**number** [5] - 592:6, 594:15, 602:24, 632:5, 633:17
**Number** [1] - 646:25
**numbness** [1] - 608:18
**numerically** [1] - 644:3
**NY** [1] - 591:6

## O

**o'clock** [1] - 646:4
**oath** [1] - 644:6
**OB** [1] - 604:18
**OB-GYN** [1] - 604:18
**objected** [2] - 595:23, 604:2

**objection** [1] - 616:16
**objections** [2] - 594:3, 633:9
**objective** [1] - 615:23
**observations** [1] - 641:5
**observe** [1] - 633:19
**observed** [1] - 609:19
**obviously** [4] - 602:7, 602:9, 603:1, 644:23
**occasionally** [1] - 637:12
**occurred** [6] - 596:3, 602:2, 620:12, 630:11, 644:14, 644:18
**occurrence** [2] - 611:9, 638:5
**OF** [2] - 591:1, 591:9
**offer** [1] - 646:20
**offered** [1] - 633:14
**officer** [2] - 595:11, 600:14
**officers** [1] - 595:9
**offices** [3] - 599:13, 599:15, 599:17
**often** [2] - 602:6, 602:7
**old** [2] - 622:24
**Old** [1] - 591:13
**omission** [1] - 638:19
**once** [1] - 641:15
**One** [1] - 604:18
**one** [26] - 592:21, 593:25, 594:15, 594:22, 595:16, 596:4, 599:16, 601:18, 602:12, 603:8, 603:9, 607:25, 608:12, 608:13, 608:16, 611:4, 611:5, 613:19, 618:14, 618:19, 625:23, 625:24, 628:14, 629:12, 643:22, 645:18
**open** [3] - 642:17, 644:9, 644:18
**opening** [5] - 593:5, 594:5, 601:25, 604:4, 617:25
**operates** [1] - 635:15
**operating** [1] - 600:13
**operation** [2] - 612:7, 637:2
**operations** [2] - 612:5, 619:24
**operative** [1] - 615:5
**operator** [3] - 599:14,

637:13, 637:15
**opinion** [9] - 607:24, 608:5, 608:10, 613:17, 616:8, 635:2, 641:24, 642:1, 642:2
**opinions** [2] - 634:21, 634:22
**opportunist** [2] - 603:19, 603:23
**opportunity** [2] - 617:14, 633:19
**opposed** [2] - 632:12, 632:22
**opposite** [1] - 632:14
**orally** [1] - 642:17
**order** [1] - 619:19
**ordinarily** [1] - 634:21
**ordinary** [1] - 636:17
**Orient** [4] - 599:12, 601:22, 617:7, 635:16
**Orthopedist** [1] - 607:7
**Orwell** [1] - 628:13
**osteophyte** [1] - 614:20
**osteophytes** [1] - 614:19
**otherwise** [1] - 601:16
**outcome** [1] - 633:22
**outside** [3] - 592:1, 606:16, 633:12
**overruled** [1] - 616:17
**owed** [1] - 636:24
**owl** [1] - 624:20
**own** [9] - 606:15, 606:20, 611:3, 611:4, 619:6, 622:8, 641:5, 641:24, 642:3
**owner** [5] - 637:5, 637:8, 638:3, 638:9, 638:13
**owns** [1] - 635:15

**P**

**p.m** [1] - 591:7
**pad** [1] - 592:23
**page** [5] - 612:4, 620:14, 637:24, 644:12, 647:7
**paid** [2] - 613:6, 613:16
**pain** [21] - 607:10, 607:12, 624:11, 626:25, 627:23, 628:5, 628:7, 628:9, 628:12, 628:13, 628:15, 628:16,

628:21, 628:25, 629:5, 629:7, 639:14, 639:24, 640:1
**painful** [2] - 623:24, 627:1
**paint** [1] - 604:10
**papers** [1] - 610:6
**paragraph** [1] - 644:12
**paralyzed** [1] - 627:22
**parent** [1] - 599:4
**parking** [1] - 624:20
**part** [8] - 597:3, 608:21, 608:23, 619:20, 632:4, 633:23, 634:8, 640:4
**participate** [1] - 640:3
**particular** [4] - 618:11, 634:24, 643:4, 643:13
**parties** [4] - 630:15, 631:13, 631:15, 631:18
**parts** [1] - 630:18
**party** [1] - 631:18
**pass** [1] - 631:5
**passenger** [4] - 618:13, 635:20, 637:8, 637:14
**passengers** [5] - 596:15, 618:17, 618:25, 619:8, 636:25
**passengers'** [1] - 637:14
**past** [6] - 628:20, 628:25, 629:5, 629:24, 630:3, 639:14
**patience** [1] - 628:12
**pause** [1] - 596:25
**pay** [1] - 592:25
**Peconic** [3] - 600:21, 607:6, 614:1
**pecuniary** [2] - 640:23, 641:8
**penalized** [1] - 643:12
**pencil** [1] - 592:23
**people** [4] - 626:22, 629:10, 634:10, 634:14
**percent** [6] - 623:7, 629:15, 629:21, 629:22, 629:23
**perform** [2] - 640:3, 641:10
**perjury** [1] - 603:10
**permanency** [1] - 640:7
**permanent** [1] - 640:9

**permitted** [1] - 640:5
**person** [10] - 602:20, 606:2, 609:4, 636:18, 636:20, 636:23, 638:22, 640:15, 645:17, 645:19
**personal** [2] - 604:16, 635:19
**persons** [2] - 631:16, 644:7
**persuaded** [2] - 625:1
**phony** [1] - 615:20
**photo** [1] - 624:7
**phrase** [1] - 632:7
**physical** [2] - 628:8, 628:15
**physically** [2] - 611:19, 618:20
**physician** [1] - 613:17
**physics** [1] - 610:12
**pictures** [1] - 611:22
**piece** [2] - 602:12, 602:13
**pills** [1] - 604:17
**pilot** [1] - 606:25
**pin** [1] - 615:3
**piped** [1] - 621:19
**place** [1] - 632:12
**Plaintiff** [1] - 591:12
**plaintiff** [18] - 593:6, 593:7, 593:9, 596:3, 608:4, 609:23, 622:15, 631:24, 632:15, 635:18, 635:21, 635:25, 636:12, 638:24, 640:1, 640:17, 644:16, 644:22
**PLAINTIFF** [3] - 593:11, 650:3, 650:5
**plaintiff's** [1] - 627:25
**PLAINTIFF/Mr** [1] - 625:11
**plaintiffs** [6] - 631:21, 632:10, 632:13, 634:2, 635:8, 648:4
**Plaintiffs** [1] - 591:5
**plaintiffs'** [2] - 635:23, 636:14
**play** [1] - 643:5
**played** [1] - 609:22
**playing** [2] - 627:15, 627:19
**Plaza** [1] - 591:21
**pleasure** [1] - 628:5
**pm** [2] - 647:9, 649:18
**Point** [5] - 599:12, 601:22, 617:8, 635:16, 646:1

**point** [8] - 595:1, 595:3, 600:23, 602:15, 609:24, 617:10, 625:18, 625:19
**points** [1] - 615:6
**police** [2] - 595:9, 595:11
**poll** [1] - 648:1
**polled** [1] - 649:2
**port** [1] - 618:24
**portion** [4] - 635:6, 635:7, 645:4, 645:21
**portions** [2] - 642:6, 642:7
**ports** [1] - 596:5
**position** [2] - 621:4, 634:20
**possible** [1] - 638:7
**precisely** [1] - 635:4
**preexisting** [4] - 639:19, 639:20, 639:22, 639:23
**prejudice** [2] - 631:21, 633:23
**preponderance** [9] - 594:18, 594:24, 632:1, 632:2, 632:3, 632:7, 632:18, 632:20, 636:7
**presence** [2] - 592:11, 647:8
**presented** [2] - 630:15, 639:5
**pretty** [1] - 604:7
**prevail** [1] - 636:5
**previous** [1] - 627:5
**probable** [1] - 638:8
**problem** [6] - 600:20, 614:14, 615:6, 617:5, 620:4, 627:8
**problems** [2] - 614:11, 614:15
**proceed** [3] - 606:2, 611:10, 626:15
**proceeding** [1] - 598:10
**Proceedings** [2] - 591:25, 649:18
**process** [1] - 614:21
**produced** [1] - 591:25
**produces** [3] - 603:12, 626:25, 632:22
**producing** [1] - 638:21
**proof** [8] - 601:3, 605:14, 605:17, 608:22, 612:12, 631:23, 636:11
**properly** [1] - 612:14

**proportion** [2] - 619:22, 638:2
**protect** [1] - 608:10
**prove** [8] - 594:16, 595:2, 602:14, 602:15, 605:15, 628:23, 632:2, 636:6
**proved** [1] - 632:23
**proven** [4] - 595:1, 595:3, 609:24, 623:5
**proves** [1] - 601:7
**provide** [3] - 636:15, 640:14, 641:11
**proving** [1] - 631:24
**proximate** [7] - 609:3, 636:9, 637:24, 638:16, 638:17, 638:18, 638:19
**prudent** [6] - 636:18, 636:20, 636:22, 637:5, 638:8, 638:13
**pull** [1] - 603:13
**pulled** [1] - 624:4
**pulling** [1] - 624:20
**puppy** [1] - 624:9
**put** [10] - 592:15, 592:19, 593:23, 594:21, 596:7, 622:13, 632:13, 643:2

**Q**

**qualified** [1] - 634:23
**quality** [2] - 597:25, 632:8
**questioning** [2] - 622:7, 622:12
**questions** [3] - 595:22, 622:17, 633:9
**quick** [1] - 625:13
**quickly** [5] - 596:23, 597:15, 626:11, 627:11, 645:17
**quite** [4] - 602:5, 602:7, 605:6, 622:6
**quotes** [1] - 628:3

**R**

**range** [1] - 615:20
**rape** [2] - 605:24, 605:25
**rational** [1] - 641:19
**ray** [1] - 612:20
**reach** [2] - 599:4, 644:5
**reached** [2] - 647:13, 647:18

**read** [10] - 597:4, 626:5, 626:7, 642:6, 643:1, 643:10, 644:10, 644:15, 644:19, 645:4
**reading** [4] - 605:22, 643:8, 643:9, 643:12
**real** [1] - 621:2
**realistic** [1] - 613:11
**realize** [1] - 598:8
**realized** [1] - 613:13
**really** [4] - 596:16, 596:18, 597:18, 618:3
**reason** [9] - 592:5, 601:17, 607:21, 607:24, 641:10, 642:12, 645:3
**reasonable** [18] - 594:17, 609:4, 614:7, 619:14, 630:3, 631:8, 636:18, 636:20, 636:22, 636:24, 637:2, 637:4, 637:5, 637:10, 638:1, 638:8, 638:22, 639:12
**reasonableness** [1] - 633:24
**reasonably** [6] - 637:23, 638:4, 638:13, 638:14, 639:13, 641:9
**reasons** [2] - 608:1, 635:1
**rebuttal** [1] - 593:8
**REBUTTAL** [2] - 625:11, 650:5
**recapitulate** [1] - 632:20
**receipt** [2] - 605:14, 605:15
**receipts** [4] - 605:8, 605:9, 605:10, 605:11
**received** [4] - 633:4, 634:22, 634:24, 648:3
**Recess** [1] - 592:10
**recess** [3] - 630:10, 630:11, 647:6
**recollection** [3] - 597:5, 597:10, 631:11
**record** [1] - 645:12
**recorded** [1] - 591:25
**records** [7] - 604:18, 613:8, 613:25, 614:1, 614:12,

614:14, 618:17
**recover** [6] - 639:2, 639:6, 639:8, 639:9, 640:9, 640:23
**recreate** [1] - 596:2
**red** [1] - 643:2
**redirect** [1] - 643:10
**refer** [6] - 603:6, 609:19, 635:10, 635:12, 635:17, 647:20
**referred** [1] - 641:1
**referring** [1] - 635:13
**refers** [1] - 632:7
**refused** [1] - 625:20
**regard** [2] - 638:22, 640:10
**regarding** [1] - 630:19
**regardless** [2] - 594:12, 633:3
**rehearsed** [1] - 621:8
**related** [7] - 607:15, 607:20, 608:6, 615:12, 615:15, 616:5, 616:9
**relations** [1] - 641:4
**relative** [1] - 630:23
**relieve** [1] - 607:10
**rely** [1] - 626:2
**remain** [2] - 618:25, 626:17
**remaining** [1] - 640:13
**remarks** [1] - 594:6
**remember** [34] - 592:17, 596:7, 596:22, 596:25, 597:2, 597:6, 599:12, 599:18, 600:6, 600:11, 600:14, 600:17, 601:10, 601:13, 601:17, 601:23, 602:20, 603:4, 605:8, 605:19, 606:8, 606:22, 607:14, 621:22, 621:23, 625:14, 626:11, 629:14, 629:20, 629:25, 634:14, 634:15, 643:24
**remembered** [2] - 617:11, 621:25
**remembers** [3] - 600:1, 601:9, 617:12
**remind** [1] - 641:15
**repeat** [1] - 644:5
**repeated** [2] - 642:5, 642:8
**report** [4] - 613:1,

615:6, 616:12, 616:22
**reported** [2] - 614:6, 619:25
**reporter** [2] - 593:4, 642:6
**Reporter** [1] - 591:19
**reports** [2] - 614:25, 615:1
**representing** [1] - 632:12
**request** [3] - 592:4, 642:5, 642:8
**requires** [1] - 637:25
**resisting** [1] - 615:18
**resolve** [2] - 614:18, 631:6, 632:19
**resolves** [1] - 613:19
**respect** [2] - 609:25, 631:10
**respectfully** [1] - 649:12
**response** [2] - 612:8, 612:9
**responsibilities** [1] - 593:18
**responsibility** [3] - 630:16, 631:1, 641:16
**responsible** [4] - 607:2, 627:4, 627:7, 638:3
**result** [6] - 635:19, 638:6, 638:9, 638:14, 639:19, 641:11
**results** [1] - 638:3
**return** [4] - 596:9, 616:23, 617:12, 625:7
**reveal** [1] - 593:2
**review** [2] - 615:5, 646:8
**reviewed** [5] - 613:2, 613:24, 614:1, 614:2, 614:25
**ridiculous** [1] - 601:6
**rise** [1] - 647:17
**risk** [2] - 637:6, 638:4
**river** [1] - 596:10
**Road** [1] - 591:13
**rock** [1] - 606:8
**role** [1] - 631:5
**rolled** [1] - 601:5
**room** [1] - 617:22
**round** [1] - 601:11
**round-trip** [1] - 601:11
**Roy** [2] - 610:10, 619:12
**rude** [1] - 593:23

**rule** [1] - 643:21
**rules** [6] - 593:21, 594:1, 594:2, 630:20, 630:24, 639:5
**run** [1] - 606:11
**running** [1] - 624:14
**runs** [1] - 635:16

**S**

**safety** [2] - 636:25, 637:9
**Saint** [3] - 624:5, 624:9, 628:8
**sat** [2] - 622:1, 622:16
**satisfied** [2] - 620:9, 643:7, 643:11
**Saturday** [1] - 617:23
**savvy** [2] - 625:5
**saw** [8] - 593:23, 613:25, 614:15, 617:9, 623:9, 624:18
**scale** [1] - 632:14
**scales** [2] - 594:20, 632:15
**Scognamillo** [1] - 593:14
**SCOGNAMILLO** [1] - 591:17
**Scott** [8] - 595:7, 595:24, 596:13, 596:22, 597:11, 610:10, 611:18, 619:12
**Scott's** [1] - 626:10
**scrutiny** [1] - 622:14
**Sea** [4] - 596:8, 610:6, 618:24, 635:16
**seamen** [1] - 595:12
**seat** [4] - 599:2, 610:4, 611:17, 626:4
**seated** [4] - 592:13, 618:25, 626:17, 647:25
**seats** [1] - 611:16
**second** [5] - 593:7, 604:21, 618:16, 622:19, 630:22
**secondly** [1] - 620:6
**section** [1] - 609:6
**secure** [2] - 626:17, 628:5
**see** [13] - 592:22, 597:19, 601:24, 611:13, 611:22, 621:13, 623:23, 623:25, 643:17, 644:11, 645:6, 645:12, 645:25

**seeing** [1] - 621:3
**seek** [1] - 617:20
**seeks** [1] - 635:21
**selective** [1] - 613:8
**sell** [1] - 626:5
**selling** [1] - 623:15
**send** [11] - 642:12, 642:18, 642:25, 643:2, 643:20, 643:24, 644:2, 645:20, 645:22, 646:4
**sending** [1] - 645:4
**sense** [2] - 596:5, 606:18
**separate** [1] - 640:18
**Service** [1] - 635:9
**SERVICES** [1] - 591:7
**services** [11] - 622:20, 629:25, 630:4, 635:22, 636:3, 640:17, 640:19, 640:25, 641:2, 641:11
**Services** [2] - 635:11, 635:14
**setting** [1] - 608:9
**several** [1] - 633:1
**sexual** [2] - 605:20, 641:3
**shall** [3] - 631:20, 635:10, 639:21
**sharply** [1] - 597:17
**shaved** [1] - 618:5
**sheet** [10] - 606:13, 628:20, 645:23, 645:25, 646:9, 646:11, 646:14, 647:4, 647:21
**shell** [1] - 627:19
**ship** [16] - 598:18, 599:7, 599:10, 599:11, 601:9, 601:10, 601:14, 605:10, 619:15, 619:18, 625:23, 637:5, 637:8, 638:3, 638:9, 638:13
**ships** [1] - 596:11
**shopping** [2] - 623:1, 623:11
**shore** [1] - 622:24
**short** [2] - 592:6, 593:7
**shortly** [4] - 619:5, 619:10, 624:22
**shoulder** [3] - 614:10, 614:15, 615:15
**show** [3] - 598:2, 604:1, 618:18

**showed** [2] - 597:19, 608:17
**showing** [1] - 611:23
**shown** [1] - 622:21
**shows** [2] - 604:25, 621:7
**sic** [1] - 612:1
**side** [9] - 594:22, 594:23, 595:21, 605:1, 612:1, 614:16, 616:16, 632:6, 632:18
**sidebar** [3] - 644:11, 644:13, 644:14
**sides** [1] - 632:14
**Siena** [1] - 607:8
**sign** [1] - 626:6
**significant** [1] - 612:8
**Silence** [1] - 595:9
**silence** [2] - 610:21, 621:2
**simple** [2] - 598:23, 621:22
**simply** [1] - 632:2
**Sise** [3] - 600:16, 603:8, 619:25
**sit** [1] - 625:18
**sits** [1] - 623:6
**sitting** [3] - 609:20, 616:4, 616:7
**situation** [1] - 594:19
**six** [2] - 603:21, 643:22
**skip** [1] - 605:6
**skipped** [1] - 622:17
**skipping** [1] - 637:24
**slam** [3] - 621:16, 621:19, 622:2
**slammed** [3] - 618:12, 620:2, 621:9
**slamming** [1] - 599:5
**slightly** [1] - 632:15
**slip** [1] - 598:19
**slipped** [1] - 598:23
**slow** [1] - 596:12
**slowing** [2] - 619:4, 637:11
**slowly** [1] - 619:18
**small** [1] - 634:14
**smile** [1] - 624:10
**smoking** [2] - 602:12, 602:16
**smoothly** [1] - 637:12
**snob** [1] - 593:22
**so-called** [1] - 616:22
**soccer** [1] - 627:15
**society** [4] - 640:25, 641:2, 641:3, 641:11
**soda** [1] - 598:19

**sole** [1] - 631:3
**solely** [2] - 613:18, 634:19
**someone** [1] - 618:2
**sometimes** [8] - 597:6, 634:10, 641:1, 642:18, 642:20, 642:21, 643:3
**son** [1] - 598:6
**sooner** [1] - 640:15
**sorry** [2] - 605:4, 605:6
**sought** [1] - 632:23
**SOUND** [1] - 591:7
**Sound** [8] - 606:23, 606:25, 615:3, 620:10, 625:3, 635:9, 635:11, 635:13
**space** [1] - 619:3
**speaking** [4] - 594:2, 615:25, 617:11
**speaks** [1] - 599:23
**specialized** [1] - 634:24
**specifically** [4] - 601:8, 601:13, 601:17, 614:18
**speculative** [1] - 640:5
**speed** [5] - 597:20, 597:22, 597:24, 619:5, 619:10
**spilled** [2] - 618:13, 625:23
**spinal** [1] - 607:19
**spine** [7] - 599:8, 600:10, 607:5, 608:24, 617:15, 621:24, 622:3
**Spine** [4] - 607:7, 614:3, 616:1, 616:6
**spot** [1] - 624:21
**squat** [1] - 627:23
**squatting** [4] - 624:1, 624:2, 624:14, 627:13
**squirming** [1] - 624:9
**St** [1] - 607:8
**stable** [4] - 611:21, 611:23, 612:2, 612:14
**stand** [4] - 609:21, 631:16, 643:22, 644:3
**standards** [1] - 634:3
**standing** [1] - 631:15
**start** [2] - 593:5, 646:5
**started** [1] - 643:4
**starting** [3] - 628:22,

629:25, 637:11
**starts** [1] - 607:5
**statement** [4] - 601:25, 606:5, 645:13, 645:14
**statements** [2] - 593:5, 633:8
**states** [1] - 612:7
**STATES** [2] - 591:1, 591:10
**States** [1] - 612:14
**statistical** [1] - 640:14
**stay** [1] - 604:16
**steer** [1] - 596:2
**stenography** [1] - 591:25
**Stephen** [2] - 598:6, 628:6
**stepped** [1] - 598:18
**stiff** [1] - 624:17
**still** [7] - 595:16, 600:15, 600:17, 603:5, 603:8, 622:21
**stipulated** [1] - 633:5
**stop** [5] - 611:9, 628:14, 637:20, 643:8, 643:11
**stopping** [1] - 637:16
**stops** [1] - 637:16
**store** [1] - 623:11
**stories** [1] - 611:13
**story** [9] - 598:17, 599:21, 601:19, 610:9, 610:11, 612:18, 613:6, 613:12, 629:1
**Street** [1] - 591:15
**stretch** [1] - 620:11
**stricken** [1] - 633:10
**strong** [1] - 602:13
**stuff** [1] - 602:24
**subject** [2] - 622:14, 642:15
**submit** [6] - 598:2, 604:20, 629:2, 629:5, 629:16, 630:3
**submitted** [1] - 641:17
**substance** [1] - 602:1
**substantial** [1] - 638:20
**sudden** [7] - 611:19, 612:6, 612:11, 618:21, 637:15, 637:18, 637:20
**suddenly** [1] - 620:1
**suffered** [2] - 635:19, 638:25
**suffering** [8] - 628:21, 628:25, 629:5, 629:7, 639:15,

629:25, 637:11
**suggestion** [1] - 639:3
**Suite** [1] - 591:13
**Sultan** [7] - 612:21, 613:2, 614:4, 614:17, 614:21, 614:25, 615:16
**Sultan's** [1] - 615:5
**sum** [2] - 602:1, 604:24
**SUMMATION** [6] - 593:11, 609:12, 625:11, 650:3, 650:4, 650:5
**summation** [1] - 645:2
**summations** [1] - 592:15
**sums** [1] - 644:6
**Sunday** [4] - 600:2, 616:24, 617:24
**support** [1] - 613:25
**supported** [1] - 610:17
**supports** [1] - 632:11
**supposed** [4] - 619:15, 643:21, 643:24, 643:25
**surgery** [9] - 613:16, 614:4, 614:18, 614:23, 615:15, 616:9, 624:24, 627:10, 629:1
**surveillance** [1] - 627:12
**sustain** [2] - 636:12, 641:9
**sustained** [2] - 640:24, 641:9
**switched** [2] - 613:13, 616:3
**sworn** [1] - 633:1
**sympathy** [2] - 631:19, 631:21
**symptom** [2] - 626:24, 627:1
**symptom-free** [1] - 627:1
**symptoms** [4] - 608:11, 615:17, 615:21, 626:23
**sympton** [1] - 627:7
**system** [3] - 599:14, 602:4, 612:7

**T**

**table** [3] - 600:8, 610:17, 629:9
**tables** [3] - 640:12,

640:14, 640:16
**talks** [2] - 602:21, 621:2
**tear** [1] - 615:6
**ten** [9] - 596:20, 607:22, 608:3, 608:17, 619:8, 619:17, 620:8, 622:23, 629:23
**term** [1] - 595:8
**terminated** [1] - 604:12
**test** [1] - 596:6
**testified** [14] - 595:25, 596:21, 598:4, 608:1, 611:18, 613:21, 614:17, 614:20, 614:22, 615:16, 616:8, 619:6, 621:4, 621:17
**testify** [9] - 595:10, 616:5, 616:14, 616:15, 625:17, 625:18, 625:20, 634:15
**testifying** [1] - 633:21
**testimony** [25] - 597:3, 597:25, 598:1, 611:11, 611:15, 620:7, 625:24, 625:25, 626:11, 633:1, 633:9, 633:15, 633:16, 633:25, 634:2, 634:5, 634:7, 634:8, 634:18, 635:3, 635:4, 642:4, 642:21, 642:22, 643:6
**tests** [1] - 615:19
**THE** [43] - 591:10, 592:8, 592:13, 592:25, 605:3, 605:5, 609:5, 616:17, 622:9, 623:21, 629:12, 630:7, 630:13, 630:14, 644:15, 644:19, 644:25, 646:8, 646:10, 646:14, 646:19, 646:22, 646:25, 647:12, 647:16, 647:19, 647:20, 647:24, 647:25, 648:1, 648:2, 648:7, 648:10, 648:13, 648:16, 648:19, 648:22, 648:25, 649:1, 649:2, 649:3,

649:10, 649:15
**theory** [2] - 595:9, 598:15
**therefore** [3] - 616:18, 634:12, 634:15
**thinking** [2] - 596:25, 597:12
**Third** [1] - 591:15
**third** [2] - 602:20, 630:24
**Thomas** [6] - 601:8, 601:13, 617:8, 617:11, 619:2
**three** [22] - 595:6, 607:12, 607:13, 607:20, 608:7, 608:14, 613:9, 613:14, 613:16, 615:12, 616:2, 619:2, 619:3, 619:7, 619:13, 619:16, 620:8, 624:23, 627:17, 630:18, 636:6, 643:23
**three-and-a-half** [4] - 607:20, 608:14, 613:14, 613:16
**threw** [1] - 599:2
**throughout** [1] - 609:20
**thrown** [6] - 610:3, 610:14, 611:14, 626:3
**tie** [1] - 622:4
**tie-in** [1] - 622:4
**tilt** [2] - 594:15, 626:17
**tilted** [1] - 601:20
**tilting** [1] - 598:3
**tingling** [1] - 607:13, 608:19, 614:8, 614:11, 614:16, 615:14
**tinglings** [1] - 614:9
**tip** [3] - 595:5, 597:17, 632:15
**tipped** [1] - 596:17
**tips** [3] - 594:23, 594:25, 595:2
**title** [2] - 600:14, 634:20
**today** [2] - 603:6, 616:4
**together** [7] - 592:20, 622:22, 623:1, 645:9, 646:6, 646:21, 646:23
**took** [1] - 632:12
**tos** [1] - 649:12
**totality** [1] - 637:23
**touching** [1] - 642:16

**training** [1] - 634:23
**TRANSCRIPT** [1] - 591:9
**transcript** [1] - 591:25
**trap** [1] - 608:9
**trauma** [2] - 600:25, 626:25
**traumatic** [1] - 614:5
**treated** [3] - 616:1, 625:17, 629:1
**treating** [2] - 607:6, 627:9
**treats** [5] - 607:6, 607:7, 607:8, 607:9
**TRIAL** [1] - 591:9
**trial** [9] - 593:19, 602:11, 604:19, 609:16, 609:20, 610:1, 621:4, 627:25, 641:17
**tried** [5] - 596:1, 596:14, 596:16, 599:12, 599:22
**tries** [1] - 602:11
**trip** [7] - 596:9, 601:11, 616:22, 616:23, 617:2, 617:4, 617:13
**trips** [2] - 601:12, 601:18
**true** [2] - 595:12, 605:11
**truly** [1] - 644:8
**trust** [2] - 605:1, 605:2
**truthfulness** [1] - 599:25
**try** [5] - 599:3, 606:1, 606:2, 644:8
**trying** [8] - 602:1, 602:9, 603:13, 604:10, 615:2, 615:13, 615:20, 628:23
**turn** [2] - 610:7, 621:18
**turning** [1] - 624:19
**Tursi** [1] - 591:19
**twelve** [1] - 646:4
**two** [14] - 600:6, 601:4, 603:4, 604:12, 605:20, 606:3, 606:6, 608:12, 608:13, 608:16, 609:3, 614:25, 619:22, 645:18
**type** [7] - 594:8, 594:19, 596:6, 597:25, 620:5, 627:17, 627:20

**types** [1] - 615:19
**tyrant** [1] - 628:6

**U**

**ultimately** [1] - 637:22
**unable** [1] - 632:18
**unanimous** [3] - 643:14, 643:15, 644:6
**unanimously** [1] - 644:3
**unbelievable** [1] - 599:20
**uncomfortable** [2] - 622:7, 622:12
**under** [5] - 636:19, 636:21, 636:23, 637:5, 637:23
**United** [1] - 612:14
**UNITED** [2] - 591:1, 591:10
**Universal** [1] - 622:24
**unless** [3] - 613:20, 622:15, 644:3
**unlimited** [1] - 624:8
**unreasonable** [2] - 619:22, 638:2
**unreasonably** [1] - 638:10
**unsafe** [1] - 598:24
**unusual** [5] - 611:5, 611:6, 637:16, 637:18, 637:20
**unwitnessed** [1] - 622:15
**up** [20] - 598:16, 598:17, 604:24, 606:20, 607:17, 609:5, 610:13, 611:24, 613:15, 615:20, 618:12, 619:5, 619:10, 620:1, 621:18, 622:4, 622:13, 627:24, 644:6
**US** [3] - 591:5, 591:20, 618:2
**usual** [2] - 623:4, 623:15

**V**

**vacations** [1] - 622:22
**veer** [1] - 597:17
**VERDICT** [2] - 647:11, 650:7
**verdict** [28] - 598:1, 625:7, 628:20, 629:3, 629:4, 639:12, 644:4,

644:5, 645:23, 645:25, 646:9, 646:11, 646:14, 647:4, 647:14, 647:15, 647:18, 647:21, 648:3, 648:5, 648:8, 648:11, 648:14, 648:17, 648:20, 648:23, 649:13
**verdicts** [1] - 594:12
**vessel** [18] - 594:15, 595:5, 595:25, 596:16, 596:17, 597:16, 605:17, 610:13, 611:20, 611:24, 612:9, 612:15, 618:12, 618:20, 618:24, 619:4, 619:9, 620:1
**vessel's** [1] - 611:6
**victim** [3] - 605:24, 606:2, 606:4
**video** [8] - 624:4, 627:11, 627:12, 627:15, 627:16, 627:17, 627:18, 627:19
**videos** [11] - 609:18, 609:22, 623:5, 623:8, 623:9, 623:18, 623:23, 624:15, 624:18, 625:1, 625:2
**videotapes** [1] - 623:12
**views** [1] - 641:24
**violent** [3] - 637:16, 637:18, 637:20
**visit** [1] - 601:21
**voir** [1] - 606:12
**volunteer** [1] - 628:11
**vote** [2] - 645:19
**votes** [1] - 645:18
**voyage** [1] - 602:2

**W**

**wage** [1] - 595:18
**wages** [1] - 628:21
**waited** [3] - 597:1
**walk** [1] - 619:15
**walked** [1] - 593:24
**walking** [7] - 617:9, 622:23, 623:14, 623:16, 627:13, 627:16, 627:21
**Wall** [1] - 595:9
**warranted** [1] - 631:8
**watching** [1] - 609:18

**watchman** [1] - 617:7
**water** [5] - 598:19, 606:14, 611:25, 619:1, 620:1
**wave** [1] - 610:8
**weakness** [1] - 614:16
**weather** [1] - 606:15
**weekend** [1] - 601:11
**weeks** [3] - 607:12, 616:12
**weigh** [2] - 635:3, 635:4
**weighs** [1] - 632:17
**weight** [5] - 631:5, 632:8, 634:18, 634:19, 649:13
**Wexler** [2] - 593:13, 594:1
**WEXLER** [1] - 591:10
**whole** [5] - 598:15, 599:14, 617:16, 627:7, 629:1
**wife** [1] - 640:20
**wife's** [4] - 635:22, 636:3, 640:24, 641:10
**WILL** [7] - 591:15, 591:16, 609:14, 616:21, 621:1, 622:11, 623:22
**William** [2] - 600:2, 600:3
**willing** [1] - 628:11
**win** [3] - 602:14, 625:19, 632:10
**winter** [1] - 599:18
**wise** [1] - 628:4
**wish** [3] - 628:14, 642:4, 642:7
**witness** [15] - 603:4, 608:1, 609:21, 633:22, 633:23, 634:4, 634:6, 634:9, 634:19, 634:25, 635:4, 635:5, 642:23, 643:4, 643:5
**witness'** [2] - 633:25, 634:8
**witness's** [4] - 633:19, 633:20, 633:21, 634:5
**witnesses** [13] - 592:7, 592:18, 602:5, 603:8, 604:20, 606:6, 613:20, 615:25, 632:5, 633:2, 634:7, 634:21, 634:23
**woman** [2] - 600:1, 624:6

**wool** [1] - 603:13
**word** [5] - 597:12, 597:13, 621:9, 621:12, 621:14
**words** [6] - 613:19, 619:11, 621:9, 621:16, 622:18, 641:21
**works** [3] - 600:15, 603:5, 603:9
**world** [1] - 628:15
**World** [1] - 622:23
**worn** [1] - 618:4
**wow** [3] - 601:9, 621:24, 623:10
**writing** [3] - 642:14, 642:16, 642:19
**wrote** [1] - 642:23

## X

**x-ray** [1] - 612:20

## Y

**year** [3] - 601:11, 611:12, 616:3
**year-and-a-half** [1] - 601:11
**years** [21] - 596:20, 597:8, 597:9, 605:15, 607:20, 613:9, 613:14, 613:16, 614:20, 615:12, 616:2, 622:22, 624:23, 627:9, 628:25, 629:8, 629:14, 629:17, 630:2, 630:5, 640:13
**yesterday** [1] - 592:14
**YORK** [1] - 591:1
**York** [5] - 591:13, 591:16, 591:21, 607:7, 635:16
**Yorkers** [2] - 625:5, 625:6
**yourself** [1] - 626:18
**yourselves** [1] - 641:22